# EXHIBIT A

**AGREEMENT BETWEEN**

**VERIZON PENNSYLVANIA INC.**
**VERIZON SERVICES CORP.**

**AND**

**COMMUNICATIONS WORKERS OF AMERICA**
**AFL-CIO**

**CWA - LOCAL 13000**
**Plant/Services/Financial**

**May 17, 1943**

**As Amended**

**AUGUST 3, 2003**

This amended agreement includes the provisions of the following amending agreements:

**Date Effective**

| Date of Execution | Other | Wages | Date of Termination |
|---|---|---|---|
| 7/28/71 | 7/28/71 | 7/25/71 | |
| | | 7/23/72 | |
| | | 7/22/73 | 7/28/74 |
| 8/11/74 | 7/28/74 | 7/28/74 | |
| | | 8/ 3/75 | |
| | | 8/ 1/76 | 8/ 6/77 |
| 8/13/77 | 8/ 7/77 | 8/ 7/77 | |
| | | 8/ 6/78 | |
| | | 8/ 5/79 | 8/ 9/80 |
| 8/16/80(1) | 8/10/80 | 8/10/80 | |
| | | 8/ 9/81 | |
| | | 8/ 8/82 | 8/ 6/83 |
| 8/27/83(2) | 8/ 7/83 | 8/28/83 | |
| | | 8/12/84 | |
| | | 8/11/85 | 8/ 9/86 |
| 8/14/86 | 8/10/86 | 8/10/86 | |
| | | 8/ 9/87 | |
| | | 8/ 7/88 | 8/ 5/89 |
| 8/28/89(3) | | 8/27/89 | |
| | | 8/ 5/90 | |
| | | 8/ 4/91 | 8/ 8/92 |
| 8/28/92 | | 8/ 9/92 | |
| | | 8/ 8/93 | |
| | | 8/ 7/94 | 8/ 5/95 |
| 1/25/96 | | 12/31/95 | |
| | | 12/29/96 | |
| | | 12/28/97 | 8/ 8/98 |
| 8/11/98 | | 8/ 9/98 | |
| | | 8/ 8/99 | 8/ 5/00 |
| 8/23/00 | | 8/ 6/00 | |
| | | 8/ 5/01 | |
| | | 8/ 4/02 | 8/ 2/03 |
| 9/5/03 | | 8/ 3/03 | |
| | | 8/ 1/04 | |
| | | 8/ 7/05 | |
| | | 8/ 6/06 | |
| | | 8/ 5/07 | 8/2/08 |

(1) Area Headquarters Services combined with "Plant" bargaining unit.
(2) Comptrollers Dept. & Treasurer's Organ. combined with "Plant" bargaining unit.
(3) Comptrollers Dept. & Treasurer's Organ. were redesignated "Financial Organization"

See inside back cover for earlier history.

**CONTENTS**
**PLANT/SERVICES, ETC.**

| **ARTICLES OF AGREEMENT** | **Page** |
|---|---|
| 1. Definitions | 5 |
| 2. Recognition | 8 |
| 3. Deduction of Union Dues Payments | 9 |
| 4. Absence for Union Business | 11 |
| 5. Transfer and Promotion of Union Representatives | 14 |
| 6. Union Bulletin Boards | 15 |
| 7. Wages. | 15 |
| 8. Working Conditions | 16 |
| 9. Seniority—Lay Offs—Part-Timing | 16 |
| 10. Grievances | 25 |
| 11. Demotions for Misconduct, Discharges and Suspensions | 31 |
| 12. Discrimination | 32 |
| 13. Arbitration | 33 |
| 14. Amendment | 33 |
| 15. Federal or State Laws | 33 |
| 16. Pensions and Benefits | 34 |
| 17. Contract Labor | 35 |
| 18. Permanent Transfer of Employees | 36 |
| 19. Safety | 40 |
| 20. Retroactivity | 42 |
| 21. Job Stewards | 43 |
| 22. Promotions | 44 |
| 23. Non-Discrimination. | 45 |
| 24. Agency Shop | 45 |
| 25. Inclement Weather | 46 |

26. Personnel Records . . . . . . . . . . . . . . . . . . . . . . . . 47
27. Union Representation . . . . . . . . . . . . . . . . . . . . . 47
28. Income Security Plan/Enhanced ISP . . . . . . . . . 48
29. Temporary Promotions . . . . . . . . . . . . . . . . . . . . 52
30. Transfers Due to Job-Related Disability . . . . . . . 53
31. New Job Titles and Job Classifications . . . . . . . 54
32. Reassignment Pay Protection Plan . . . . . . . . . . . 56
33. Technology Change Committee . . . . . . . . . . . . . . 58
34. Technological Displacement . . . . . . . . . . . . . . . . 60
35. Employment Security Training . . . . . . . . . . . . . . 61
36. Service Quality and Supervisory Observing . . . . 67
37. Motor Vehicle Usage Program . . . . . . . . . . . . . . 68
38. Loans to Another Company . . . . . . . . . . . . . . . . 70
39. Administrative Groups . . . . . . . . . . . . . . . . . . . . 71
40. Assignment of Employees . . . . . . . . . . . . . . . . . 73
41. Duration of Agreement . . . . . . . . . . . . . . . . . . . . 74

EXHIBIT A—WORKING CONDITIONS
*Regular Full-Time Employees—Group 1*

Section A1. Definitions . . . . . . . . . . . . . . . . . . . . . . 77
Section A2. Work Time Schedules . . . . . . . . . . . . . 79
Section A3. Basis of Compensation . . . . . . . . . . . . 84
Section A4. Pay Allowances for Absent Time . . . . 98
Section A5. Travel Time . . . . . . . . . . . . . . . . . . . . 107
Section A6. Reimbursement of Incidental
            Expenses . . . . . . . . . . . . . . . . . . . . . . 115
Section A7. Vacations . . . . . . . . . . . . . . . . . . . . . . 126
Section A8. Holidays . . . . . . . . . . . . . . . . . . . . . . . 134
Section A9. Excused Work Days . . . . . . . . . . . . . . 135
Section A10. Scheduling of Time Off . . . . . . . . . . 137
Section A11. Titles of Group 1 Employees . . . . . . 139

*Regular Full-Time Employees—Group 2*

Section A14. Definitions . . . . . . . . . . . . . . . . . . . . 141
Section A15. Work Time Schedules . . . . . . . . . . . 143
Section A16. Basis of Compensation . . . . . . . . . . 144
Section A17. Pay Allowances for Absent Time . . . 146
Section A18. Travel Time . . . . . . . . . . . . . . . . . . . 146
Section A19. Reimbursement of Incidental
　　　　　　　Expenses . . . . . . . . . . . . . . . . . . . . 147
Section A20. Vacations . . . . . . . . . . . . . . . . . . . . . 147
Section A21. Holidays . . . . . . . . . . . . . . . . . . . . . 147
Section A22. Excused Work Days . . . . . . . . . . . . . 147
Section A23. Scheduling of Time Off . . . . . . . . . . 147
Section A24. Titles of Group 2 Employees . . . . . . 147

*Regular Part-Time Employees—Group 1*

Section A27. Regular Part-Time Employees
　　　　　　　(Engaged or Re-engaged prior to
　　　　　　　January 1, 1981) . . . . . . . . . . . . . . 148
Section A28. Part-Time Employees (Engaged or
　　　　　　　Re-engaged after January 1, 1981) . 151

*Regular Part-Time Employees—Group 2*

Section A31. Regular Part-Time Employees
　　　　　　　(Engaged or Re-engaged prior to
　　　　　　　January 1, 1981) . . . . . . . . . . . . . . 155
Section A41. Temporary Employees . . . . . . . . . . . 158
Section A51. Occasional Employees . . . . . . . . . . . 159
Section A61. Term Employees . . . . . . . . . . . . . . . 160

EXHIBIT B

Section B1. Procedure for Arbitration . . . . . . . . . 160
Section B2. Expedited Arbitration . . . . . . . . . . . . . 163

EXHIBIT C

Notes on Wage Increase Schedule Administration . 167
Wage Increase Schedule Assignment List . . . . . . . . 177

WAGE INCREASE SCHEDULE

*Occupation*

Assignment Administrator . . . . . . 184,192,200,208,216
Assignment Technician . . . . . . . . 181,189,197,205,213
Assistant Technician . . . . . . . . . . 188,196,204,212,220
Automotive Mechanic . . . . . . . . . 181,189,197,205,213
Bill Production Technician . . . . . . 186,194,202,210,218
Building Custodian  . . . . . . . . . . . 187,195,203,211,219
Building Custodian Associate . . . 187,195,203,211,219
Building Equipment Mechanic . . 181,189,197,205,213
Combination Technician  . . . . . . . 181,189,197,205,213
Communications Assistant . . . . . . 183,191,199,207,215
Customer Service Agent  . . . . . . . 181,189,197,205,213
Customer Billing Analyst . . . . . . . 184,192,200,208,216
Drafter  . . . . . . . . . . . . . . . . . . . . 184,192,200,208,216
Driver - Heavy Truck . . . . . . . . . . 182,190,198,206,214
Driver - Medium Truck  . . . . . . . . 182,190,198,206,214
Driver - Light Truck . . . . . . . . . . . 185,193,201,209,217
Driver - Tractor Trailer . . . . . . . . . 182,190,198,206,214
Facilities Assigner  . . . . . . . . . . . . 181,189,197,205,213
Field Clerk . . . . . . . . . . . . . . . . . . 187,195,203,211,219
Frame Attendant . . . . . . . . . . . . . . 183,191,199,207,215
Frame Attendant—A  . . . . . . . . . . 183,191,199,207,215
General Clerk . . . . . . . . . . . . . . . . 187,195,203,211,219
General Field Clerk  . . . . . . . . . . . 186,194,202,210,218
Graphics Designer . . . . . . . . . . . . 188,196,204,212,220

| | |
|---|---|
| Maintenance Administrator | 184,192,200,208,216 |
| Materials Handler | 183,191,199,207,215 |
| Material Service Coordinator | 181,189,197,205,213 |
| Office Clerical Assistant | 187,195,203,211,219 |
| Outside Plant Technician | 181,189,197,205,213 |
| Payroll Analyst | 184,192,200,208,216 |
| Senior Attendant | 186,194,202,210,218 |
| Senior Clerk | 186,194,202,210,218 |
| Senior Field Clerk | 185,193,201,209,217 |
| Service Evaluator | 185,193,201,209,217 |
| Services Technician | 181,189,197,205,213 |
| Splicing Technician | 181,189,197,205,213 |
| Splicing Technician's Helper | 184,192,200,208,216 |
| Staff Clerk | 185,193,201,209,217 |
| Stenographer—Clerk | 186,194,202,210,218 |
| Storekeeper | 182,190,198,206,214 |
| Supplies Attendant | 186,194,202,210,218 |
| Support Systems Attendant | 184,192,200,208,216 |
| Switching Equipment Technician | 181,189,197,205,213 |
| Systems Technician | 181,189,197,205,213 |
| Systems Technician—Radio | 181,189,197,205,213 |
| Test Desk Technician | 181,189,197,205,213 |
| Translations Administrator | 184,192,200,208,216 |
| Treasury Clerk | 185,193,201,209,217 |

### Exhibit D

| | |
|---|---|
| Pension Bands and Monthly Benefits | 221 |
| **LETTER AGREEMENTS** | 224 |
| **GENERAL INDEX** | **I** |
| **OLD TITLES** | **X** |

## ARTICLES OF AGREEMENT

THIS AGREEMENT, entered into at Washington, D.C., on September 5, 2003, between VERIZON PENN-SYLVANIA INC. (formerly Bell Atlantic-Pennsylvania, Inc. and The Bell Telephone Company of Pennsylvania), a corporation organized under the laws of the Common-wealth of Pennsylvania, VERIZON SERVICES CORP., (herein collectively called the "Company") and the COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, on behalf of its affiliated Local 13000 (herein called the "Union");

WHEREAS, on May 19, 1943, the Company and the Union entered into an Agreement with respect to terms and conditions of employment applicable to employees represented by the Union in Plant and Services; which Agreement, as amended, was subject to termination on August 2, 2003, as provided in Article 41 thereof; and

WHEREAS, on August 27, 1975, the Company and the Union entered into Agreement that certain employees in the Outside Plant Engineering organization shall be represented by the Union and included under the terms of the Agreement covering the employees in Plant and Ser-vices; and

WHEREAS, on October 17, 1975, the Company and the Union entered into Agreement that certain employees in the Plug-In Inventory Control System shall be repre-sented by the Union and included under the terms of the Agreement covering the employees in Plant and Ser-vices; and

WHEREAS, on August 10, 1980, the Company and the Union agreed to combine into a single bargaining unit

[1]

employees in the "Area Headquarters Services" bargaining unit and employees in the "Plant" bargaining unit and that such employees will continue to be represented by the Union under the terms of this Agreement; and

WHEREAS, on December 1, 1982, the Company and the Union entered into Agreement that certain employees in the Philadelphia Central Order Bureau shall be represented by the Union and included under the terms of the Agreement covering the employees in Plant and Services; and

WHEREAS, on August 27, 1983, the Company and the Union agreed to combine into a single bargaining unit employees in the "Comptrollers Department and the Treasurer's Organization" bargaining unit and employees in the "Plant" bargaining unit and that such employees will continue to be represented by the Union under the terms of this Agreement; and

WHEREAS, on January 13, 1986, the Company and the Union entered into Agreement that certain employees in the Customer Contact Simulation Unit shall be represented by the Union and included under the terms of the Agreement covering the employees in Plant and Services;

WHEREAS, on August 27, 1989 the Comptrollers Department and Treasurer's Organization were combined and redesignated "Financial Organization;"

WHEREAS, on August 28, 1992, the Company and Union agreed that the provisions of the Agreement of August 27, 1989 between the Company and the Union with respect to terms and conditions of employment applicable to employees represented by the Union in the

[2]

Financial Organization will be merged into the Agreement covering the employees in Plant and Services;

WHEREAS, the Company and the Union recognize the importance of maintaining and promoting equitable and harmonious industrial relations and achieving a high level of productivity and efficiency;

NOW, THEREFORE, the parties agree that the Agreement of May 19, 1943, as amended, shall be further amended in accordance with the following:

[4]

# ARTICLE 1

### DEFINITIONS

1.01  *"Employee"*

    (a) An employee below the grade of first line supervisor in any occupations listed in Sections A11 and A24 of Exhibit A of this Agreement who is employed in any of the following organizations:

        (1) Customer Services

        (2) Network Services

        (3) Outside Facilities Engineering

        (4) Public Telephone Services Installation and Maintenance

        (5) Support Services

            (a) Administrative Services

            (b) Automotive Operations

            (c) Real Estate

            (d) Materials Management

            (e) Plug-In Materials Management

            (f) Transportation

        (6) Central Order Bureau (Philadelphia only)

        (7) Customer Contact Simulation Unit (Philadelphia only)

    (b) A non-management employee of the Company's Area Services Organization and its Financial Organization (previously referred to as the Comptrollers Department or Treasurer's Organization) below the grade of first line

[5]

supervisor, in any of the occupations listed in Section A24 of Exhibit A of the Agreement, except those employed in any of the following organizations:

(1) Real Estate

(2) Materials Management

(3) Automotive Operations

(4) Public Communications Collection

(5) Credit Manager

(6) Special Services Management Bureau

(7) Network Service Center

(It is understood the foregoing is not intended to omit any work groups of employees represented by the Communications Workers of America, AFL-CIO, Local 13000 as encompassed by the list of organizations set forth in Section 1.01 of the 1980 Agreement, nor to include any work groups of employees not represented by the Communications Workers of America, AFL-CIO, Local 13000 prior to the effective date of the 1983 Agreement.)

(c) The term "Plant" shall refer to employees covered by 1.01 (a). The term "Services" and the term "Financial" shall refer to employees covered by 1.01 (b).

1.02 *"Basic Weekly Wage Rate"*

The amount at which an employee is carried on the payroll.

[6]

1.03 *"Basic Hourly Wage Rate"*

> The rate from which all wage payments are computed and is determined by dividing the basic weekly wage rate by 40 in the case of Group 1 Plant Employees and by 37½ in the case of Group 2 Plant Employees and Services and Financial Employees.

1.04 *"Payroll Location"*

> One of the communities listed in the Wage Increase Schedule Assignment List in the Wage Increase Schedules.

1.05 *"Representative of the Union"*

> One of the Representatives of the Union or any higher ranking Union official elected pursuant to the Union's constitution.

1.06 *"Organizational Unit of the Company"*

> Any provision of this Agreement which refers to an organizational or operating unit of the Company shall apply to such unit as may be established by the Company from time to time during the term of this Agreement.

1.07 *"Titles of Company Supervisors"*

> Any provision of this Agreement which refers to a Company Supervisor by title shall be deemed to include any comparable or acting Company Supervisor having authority over the matter involved.

1.08 *"Time Required for Notice"*

> Whenever this Agreement requires any written

notice, reply, etc., to be submitted within a speci-
fied time, such time requirement shall be deemed
met if the instrument is addressed to the person
specified in the Agreement and mailed within the
time set forth.

1.09   *"Generic Terms"*

The use of the masculine or feminine gender in
this contract shall be construed as including both
genders and not as sex limitations unless the con-
tract clearly requires a different construction.

# ARTICLE 2
## RECOGNITION

2.01   The Company recognizes the Union as the exclu-
sive representative of the employees for the pur-
pose of collective bargaining with respect to rates
of pay, wages, hours of employment and other
conditions of employment, and for the purpose of
entering into agreements with respect thereto.

2.02   Group 2 employees assigned "confidential" titles
shall not hold membership in or be represented by
the Union. These titles shall not be assigned to
more than fifteen Group 2 employees in the bar-
gaining unit at one time.

2.03   Confidential employees must be assigned to man-
agement employees, at third-tier or higher, who
are directly involved in determining and effectuat-
ing labor relations policies. In addition, the
assignment of confidential titles shall be held to a
maximum of one title for those third-tier supervi-

[8]

sors who have bargaining unit employees in their group. Where two or more such third-tier supervisors are located in the same building or within reasonably close proximity, and where feasible, one confidential title shall be utilized for all of the third-tier supervisors concerned.

2.04 Employees whom the Company wishes to classify as "confidential" employees will be given the opportunity of deciding whether or not they wish to be so classified. The Company will not discriminate against any employee because of any choice made by the employee under this Section. Any charge that the Company has discriminated because of a choice made under this Section shall be reviewed in accordance with Article 12.

# ARTICLE 3

## DEDUCTIONS OF UNION DUES PAYMENTS

3.01 The Company will deduct Union membership dues or an amount equal to the periodic dues applicable to members, from the weekly wages or sickness or accident benefits of any employee, upon written authorization signed by the employee, until such authorization is revoked by the employee in writing, or until the employee is formally separated from the bargaining unit. Formal separation includes transfers out of the bargaining unit and removal from the payroll of the Company. Deductions shall be reinstated within 30 days following the employee's return to the bar-

gaining unit, provided a new authorization is submitted or a valid non-revoked authorization is on file with the Company. No deductions will be made in any week in which the wages or sickness or accident benefits of an employee amount to less than the total of all deductions authorized for the employee.

For purposes of this Section, leaves of absence not exceeding one year will not be considered as formal separations from the bargaining unit.

3.011  In the event an employee is suspended or discharged and subsequently receives back pay either in a settlement of the grievance by the Company and the Union or an arbitration or mediation between the Company and the Union over the suspension or discharge, the Company agrees that, to the extent permitted by law, it will deduct from the grievant's back pay, Union dues or an amount equal to periodic dues and forward this amount to the Union. In order for this deduction to be made, in suspension cases the grievant must have on file a signed, written authorization consenting to the deduction of Union dues or an amount equal to periodic dues and in discharge cases the grievant must sign a new written authorization consenting to the deduction of Union dues or an amount equal to periodic dues.

3.02   The Company will forward to the Union the weekly amount deducted, together with supporting information as agreed to by Company and Union.

[10]

# ARTICLE 4

### ABSENCE FOR UNION BUSINESS

4.01  Representatives of the Union, or members acting in place of Representatives will be excused without pay or given leave of absence, to the extent that service requirements permit, as determined by the Company, to attend solely to the business of the Union, in accordance with the following provisions:

4.02  Union officials other than full-time Union officials will be excused during each year the Agreement is in effect as follows:

   4.021

| Title | Cumulative Total of Excused Scheduled Time |
|---|---|
| Local President, Vice President and Secretary Treasurer collectively . . . . . . . . . . . . . . . . . | 200 Days <u>Each</u> |
| Vice Presidents - East and West . . . . . . . . . . . . . . . . . | 150 Days <u>Each</u> |
| Unit Presidents collectively. . . . . . . . . . . . . . . . . . . . . | 2000 Days |
| Other Elected Representatives. . . . . . . . . . . . . . . . . . . | 30 Days |
| The Secretary of the Union's General Convention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 Days |
| Members appointed by Union to assist in such matters as Union conventions, elections and audits . . . . . . . . . | 5 Days |
| Editor of Union Periodical . . . . . . . . . . . . . . . . . . . . . . | 5 Days in each calendar month |

   4.022  If a Representative replaces another Representative, the allowable excused time will be

[11]

increased to the total time the replaced Representative could have been excused.

4.023 Unless it is not possible to do so, requests for excused absence shall be made to the employee's immediate supervisor five full days exclusive of Sunday prior to the beginning of the absence.

4.024 A single period of excused absence shall not exceed thirty consecutive calendar days.

4.025 No change in an employee's basic wage rate shall be made during a period of excused time.

4.03 A leave of absence will be required:

(a) If excused time exceeds or is expected to exceed thirty consecutive calendar days.

(b) If, during any Agreement period, the total excused time exceeds the time specified in Section 4.02.

4.031 Leave of absence shall include any period of Excused Scheduled Time taken under 4.021 in the agreement year in which the leave of absence is granted.

4.032 When possible, requests for leaves of absence shall be made to the employee's immediate supervisor at least eight days prior to the beginning of the leave.

4.033 The total number of Plant employees on leave of absence for Union business shall not exceed fifteen at any one time. The total number of Services employees on leave of absence for Union business shall not exceed four at any one

time. The total number of Financial employees on leave of absence for Union business shall not exceed seven at any one time.

4.034 Leaves of absence will be granted during the life of the Agreement. During any such leaves of absence employees shall be entitled to Death Benefits.

During any period of leave of absence as required by Section 4.03, the employee shall pay the premiums for the Dental Expense Plan, Vision Care Plan, Supplementary Group Life Insurance Program and Dependent Group Insurance Plan. The Company shall pay the premiums for the Basic Group Life Insurance Plan, and will pay the same amount towards the employee's (single or family) coverage under the Medical Expense Plan as the Company would have paid if the employee had remained on the active payroll.

4.035 Employees, upon returning from a leave of absence, shall be reinstated to their former occupation unless conditions have changed so that it is impractical to do so, in which case they will be assigned to work generally similar to that in which they were engaged last prior to their absence, subject, however, to the provisions of this Agreement relating to layoffs. They will be placed on the payroll at the rate received when such absence began, adjusted for any general increase in wages made during the period of absence.

[13]

4.036   The leave of absence shall cease if the Union notifies the Company that the employee on leave is no longer authorized to transact business for the Union.

4.037   There shall be no limitation on the total cumulative period of leave of absence for Union business for an employee. Service credit will not be given for leave of absence for Union business prior to August 7, 1977; however, service credit will be given for leave of absence for Union business subsequent to August 7, 1977.

## ARTICLE 5

TRANSFER AND PROMOTION OF UNION REPRESENTATIVES

5.01   In the event that the Company desires to promote or transfer within the Company a duly elected Representative of the Union, the Company will give written notice of such desire to the President of the Union and the Representative involved. If, within two weeks after such notification, the Union objects in writing to the promotion or transfer, the Company will not make the proposed promotion or transfer.

5.011   The above will not apply to promotions or transfers which do not affect the status of an employee as a Representative, or which are for a period of six months or less, except that if the transfer requires the Representative to work in a Company building other than the one in

[14]

which they normally work, the transfer will be limited to a period of six weeks or less.

5.02 The Union will keep the Company advised of the names of its Representatives.

# ARTICLE 6
## UNION BULLETIN BOARDS

6.01 The Union may erect bulletin boards at its own expense on premises occupied by the Company. The location, number and construction of such bulletin boards will be subject to the approval of the third tier supervisor for the district involved. The Union will not post on the bulletin boards any matter deemed objectionable by the Company. In the event a second tier supervisor responsible for the location at which the matter is posted, or any higher ranking supervisor of the Company, complains to the Unit President of the Union or to any other Representatives of the Union that the matter posted is objectionable, the Union will immediately remove such material.

# ARTICLE 7
## WAGES

7.01 The basic weekly wage rates to be paid to Regular, Term, and Temporary Employees, the additional wage increases to be granted during the life of this Agreement, and the times when such additional wage increases will be granted, are set forth

[15]

in Exhibit C attached to and made part of this Agreement.

7.02 The Company will not, except as the result of the application of the Notes on Wage Increase Schedule Administration included in Exhibit C (Plant/Services) and Exhibit CC (Financial), reduce the basic weekly wage rate of any Regular, Term, or Temporary Employee.

7.03 If the Company establishes a new location for an existing occupation, it will notify the Union of the action taken. The notice will be given in advance wherever reasonably possible. If the basic weekly wage rate established by the Company is unsatisfactory to the Union, the Company within thirty days after notice by the Union will meet and negotiate the basic weekly wage rate.

### ARTICLE 8
#### WORKING CONDITIONS

8.01 The "Working Conditions" marked Exhibit A, attached hereto, are incorporated herein as part of the Agreement, and shall continue in effect during the period covered by the Agreement.

### ARTICLE 9
#### SENIORITY—LAYOFFS—PART-TIMING

9.01 Reduction in work time may be accomplished by part-timing, layoffs, or a combination of the two.

[16]

The Company will determine the necessity for reductions in work time, the extent of the reductions required and the occupations and the payroll locations affected.

9.02　As used in this Article, "service" means the period of time since the "Verizon Service Date" which date appears on the Company's records for each employee. In addition, in the case of an employee taken over from another telephone company at the time of either the purchase of the physical property of such other company by the Company or the consolidation or merger of such other company with the Company, it includes continuous service with such other company immediately prior to service with the Company which has not already been included in determining the employee's "Verizon Service Date."

9.03　As used in this Article, a "Service Group" consists of all employees in any one occupation in an Operating Area whose service, as defined in Section 9.02, began in a particular calendar year. Service Groups are designated by numbers, No. 1 consisting of employees whose service began in the current year, No. 2 consisting of those whose service began in the preceding calendar year, etc.

9.04　The Company, without giving notice to the Union, may:

9.041　Layoff Occasional, Temporary, and Term Employees, without regard to their service.

9.05　Before instituting any program for the reduction of work time, other than any reduction covered by

[17]

9.04, the Company will give the Union thirty days' notice of such intention. During this period, the Company will consult with the Union regarding the method of effecting the reduction in work time, and will give consideration to the recommendations of the Union before arriving at a final decision as to the method to be pursued.

9.06 Except as provided in Sections 9.07 and 9.08, no employee, other than those covered by Section 9.04, will be laid off in any occupation while there is an employee in that occupation with less service anywhere in that Operating Area, as listed in Exhibit C4.00.

9.07 When employees are to be laid off in any occupation in an Operating Area, they will be laid off to the extent necessary in the following order:

   (a) Occasional and Temporary Employees.

   (b) Term Employees, without regard to their service.

   (c) Service Groups 1 and 2 in numerical order, all employees in each Service Group being considered as having the same service.

   (d) Remaining employees in the affected occupation in the Operating Area in inverse order of seniority. The Company may retain, without regard to seniority, up to 4% of the number of employees in each of the Service Groups 3 through 15.

   The Vice President - BOC affected will be notified, in writing, of the names of the

[18]

> employees retained under the retention provision of this Section.
>
> Employees retained under the retention provision of this Section will not be transferred or laid off under Section 9.08 in order to avoid transferring or laying off employees of greater service.

9.08   If as a result of the order of layoff specified in Section 9.07, it is necessary to transfer the employee in a given payroll location with the least service to another payroll location anywhere in the Operating Area to replace an employee in that payroll location with less service who is to be laid off, or if an employee who is about to be laid off request to be transferred to a job in another occupation anywhere in the Operating Area which is either unfilled or held by an employee with less service, the employee will be transferred to the unfilled job or to the job of the employee with the least service provided the employee has had prior experience in the job to be filled and is qualified, in the judgment of the Company, to take the job without additional training.

9.081   If the employee does not meet the above qualifications or does not accept the transfer within seven days the employee may be laid off and the employee with less service retained.

9.082   In any case where a transfer results from a layoff under this Section, the employee transferred will not be paid for any travel time or

[19]

reimbursed for any expenses resulting from the transfer.

9.083 In Philadelphia and Pittsburgh, the provisions of this Section 9.08 shall be applied on the basis of a Geographical Area as defined in Subsection 18.033 rather than a "payroll location". If Philadelphia or Pittsburgh Geographical Areas include one or more payroll locations beyond the geographical boundary of the city, all the employees shall be treated as being within the city Geographical Area. If a suburban District includes portions of Philadelphia or Pittsburgh, then such portions of the city will be treated as individual payroll locations.

9.09 *Layoff Allowances*

9.091 Each employee laid off will be paid a layoff allowance in accordance with the provisions of this section except for "Temporary," "Term," or "Occasional" employees.

   (a) An employee with five years of service or less will be paid one week's pay for each year of service.

   (b) An employee with more than five, but not more than ten years' service will be paid one week's pay for each of the first five years and two week's pay for each year thereafter.

   (c) An employee with more than ten, but not more than fifteen years' service will be paid one week's pay for each of the first five years, two week's pay for each of the

[20]

next five years, and three weeks' pay for each year thereafter.

(d) An employee with more than fifteen years of service will be paid one week's pay for each of the first five years, two weeks' pay for each of the next five years, three weeks' pay for each of the next five years and four weeks' pay for each year thereafter.

(e) In computing years of service, a fraction amounting to less than six months will be disregarded, and a fraction amounting to six months or more will be considered as a full year.

(f) In addition to the above, the employee will be paid for any vacation to which the employee may be entitled.

9.092  A week's pay for a Regular Full-Time Employee will be at the employee's basic weekly wage rate even though part-timing is currently in effect.

9.093  A week's pay for a Regular Part-Time Employee engaged or re-engaged prior to January 1, 1981 will be the employee's average weekly earnings, exclusive of any premiums paid or any payments for worktime in excess of eight hours per day or forty hours per week for a Group 1 employee and seven and one-half hours per day or thirty-seven and one-half hours per week for a Group 2 employee, during the last three months prior to layoff. A week's pay for a Regular Part-Time Employee

[21]

engaged or re-engaged after January 1, 1981 will be based on the employee's "part-time equivalent work week", in accordance with the provisions of Subsection A28.05.

9.094 If an employee who has received a layoff allowance is rehired and the number of weeks since the date of the layoff is less than the number of weeks upon which the allowance is based, less vacation, if any, the amount paid to the employee for the excess number of weeks shall be refunded to the Company. If an employee who has been laid off and given a layoff allowance is subsequently reemployed and again laid off, the layoff allowance in the case of the second layoff will be based upon the length of service since the date of last reemployment plus any portion of the prior layoff allowance which has been refunded to the Company.

9.10 Before offering employment to new employees in an occupation in the Operating Area, the Company will offer employment in seniority order to former employees who were laid off in such occupations in such Operating Area, provided those employees have not been laid off more than three years. The offer shall be made in writing and mailed to the last known address of the employee. A copy of the letter will be furnished to the Union.

9.101 Such a former employee will be employed if the former employee can meet the requirements of the available job, and if the former employee responds in ten days and is available

[22]

for duty within twenty days from the date employment is offered. However, in the case of an emergency, employment may be given for the duration of the emergency to any applicant who can meet the requirements of the available job.

9.102 This Section shall not restrict the Company from placing on the Company payroll employees taken over from other telephone companies at the time of either the purchase of the physical properties of such other companies or of the consolidation or merger of such other companies with the Company.

9.11 After laying off all employees covered by Paragraphs (a), (b) and (c) of Section 9.07 in an occupation in an Operating Area, the Company may part-time employees in such occupations in one or more payroll locations in such Area providing the notice required by Section 9.05 has been given.

9.12 For employees being part-timed, the working conditions set forth in Exhibit A will be modified as follows:

9.121 The work time schedule, as originally posted for each week, will provide for a normal work week.

Not later than Thursday of each week, the Company will indicate on the schedule for the following week the time which the employees will not work. This time, referred to hereafter as "rotation time", will consist of one full tour or one or two part tours.

[23]

9.122 Employees may be assigned to work during the rotation time. No time off will be required to compensate for such time worked, and they will be paid for it as follows:

   (a) If they are notified up to the end of the last previous tour scheduled before the day affected that they are to work a full or part tour of the rotation time, they will be paid for that tour at their basic hourly wage rate (one and one-half times the rate if on Sunday).

   (b) If the notice specified in (a) above is not given, the time worked will be considered as time worked during non-scheduled hours.

9.123 If any employee works time in excess of a full tour on a day, or works other time not covered by the definition of a full or part tour, no time off will be required to compensate for such time worked and the employee will be paid for it at one and one-half times the employee's basic hourly wage rate, except as provided in Subsection A3.021(b).

9.124 An employee may be assigned to work a full or part tour on a day on which the employee was previously not scheduled to work or to work an additional part tour on a day which the employee was previously scheduled to work only a part tour. If the total such time worked plus the scheduled hours worked in the week exceeds 40 hours for a Group 1 employee or 37½ hours

[24]

for a Group 2 employee, the employee may be required to take time off in the same or the next following week. The time to be taken off will be the amount by which the above total exceeds 40 hours in the case of a Group 1 employee or 37½ hours in the case of a Group 2 employee.

9.125 The weekly and daily payments specified in Exhibit A will be reduced to payments at the basic hourly wage rates for the time scheduled, excluding rotation time not worked.

If no time has been scheduled for any week as in the case of vacations, the weekly and daily payments specified in Exhibit A will be reduced to payments at the basic hourly wage rates for the amount of time scheduled in that week, excluding rotation time, for other employees in the same occupation and payroll location. If there are no other employees in the same occupation and payroll location, the payments for such a week will be based on the employee's then current degree of part-timing.

# ARTICLE 10
### GRIEVANCES

10.01 Except as provided in the next paragraph of this Section 10.01, any complaint or dispute arising between any employee and the Company shall be presented by the employee or by a representative of the Union to the immediate supervisor of the

[25]

employee in an effort to reach a mutually accept-able adjustment.

Complaints or disputes involving a Human Resources issue (such as promotion bypasses, wage credit issues, Worker's Compensation matters or benefits-related matters) shall be presented directly to the Director – Labor Relations for Pennsylvania, or his or her designated representative. The written statement required by Subsection 10.021 will accompany any Human Resources grievance. Labor Relations shall be the final step prior to arbitration for all grievances involving a Human Resources issue.

(a) Grievances must be presented within 30 days from the time the employee has knowledge of the act which is the basis of the disagreement. The immediate supervisor shall answer the grievance within ten (10) calendar days after it is presented.

(b) Any settlement or adjustment of a non-disciplinary grievance by the immediate supervisor shall be binding only for the particular grievance and shall not constitute precedent. Such settlements shall not be used in any legal or arbitration proceeding except in connection with a claim that the settlement has been violated.

10.02 *Processing of Grievances Beyond the First Step of the Grievance Procedure*

10.021 A written statement will accompany any grievance which is presented at the second step of

[26]

the grievance procedure. This statement, signed by either the grievant or the Union, shall contain all pertinent information including what is being grieved, the circumstances giving rise to the grievance, the places, times, dates, and names of the employees involved, the sections of the Agreement alleged to be violated, and the remedy requested.

10.022   *Grievances Involving Discipline Only -*

If the grievance has not been satisfactorily resolved at the first step, the Union shall present the grievance to the employee's third-tier supervisor or his/her designated representative within fourteen (14) calendar days from the date it receives the Company's answer at the first step. The grievance shall be heard at the mutual convenience of the parties, but in any event within three (3) weeks from the date the grievance is placed on the agenda. After the grievance is heard, the Company's answer must be given within twenty (20) calendar days. This step shall be the final step prior to arbitration for all disciplinary grievances, except for grievances involving a discharge.

10.023   *Grievances Involving Matters Other Than Discipline –*

If the grievance has not been satisfactorily resolved at the first step, the Union shall present the grievance directly to the Director – Labor Relations for Pennsylvania, or his or her designated representative within fourteen (14)

calendar days of the answer provided at the first step. The grievance shall be heard at the mutual convenience of the parties, but in any event within four (4) weeks from the date it was presented to Labor Relations. After the grievance is heard, the Company's answer must be given within twenty (20) calendar days. The Company's answer to the grievance will be in writing. Labor Relations shall be the final step prior to arbitration for all grievances involving matters other than discipline.

10.024  *Grievances Involving a Discharge*

If a grievance involving a discharge has not been satisfactorily resolved at the second step, the Union shall present the grievance to the Director – Labor Relations for Pennsylvania, or his or her designated representative within fourteen (14) calendar days of the answer provided at the second step. The grievance shall be heard at the mutual convenience of the parties, but in any event within four (4) weeks from the date it was presented to Labor Relations. The Company's answer to the grievance will be in writing. After the grievance is heard, the Company's answer must be given within twenty (20) calendar days. Labor Relations shall be the final step prior to arbitration for all grievances involving a discharge.

10.03  Grievances held pending by the Company or Union for further review shall be answered within ten (10) calendar days after presentation at the first step and twenty (20) calendar days at the sec-

ond step and the Labor Relations step. Nothing herein shall preclude the parties from arranging for different time periods whenever deemed appropriate by them or waiving the first step of the grievance process.

10.04 Controversies of a general nature involving solely matters of contract or policy interpretation obviously not under the jurisdiction of a particular management level may be initiated by the Union with the Director – Labor Relations for Pennsylvania in accordance with Subsections 10.021 and 10.023. Such grievances must be initiated by the Union within 30 days of the events giving rise to the controversy.

10.05 The Company may initiate grievances with the appropriate Unit President or higher Union official. When the Company initiates a grievance, the same time limits will apply.

10.06 If, at any time, a controversy should arise between the Union and the Company regarding the true intent and meaning of any provision of this Agreement or regarding any claim that either party has not performed a commitment of this Agreement, the controversy may be presented for review in accordance with the preceding Sections of this Article. If the controversy is processed under these Sections and is not satisfactorily settled, the Union or the Company, by written notice specifying the Section of the Agreement alleged to be violated, may submit the question under dispute to arbitration in accordance with the provisions of Article 13 of this Agreement. Such written notice

[29]

of arbitration must be given no later than 30 cal-
endar days from the Company's or the Union's
final answer.

10.07 Grievances and controversies shall be settled only
in accordance with the procedures set forth here-
in. In a particular case, the parties may agree to
eliminate any steps in the procedure or change any
time limits in this Article. If any step under this
Article is not taken within the time limits speci-
fied, unless such an agreement has been made or
the delay is caused by the Company, the grievance
or controversy shall be considered settled. Upon
request of either party, agreed settlements of
grievances at the third-tier supervisor level or
higher shall be reduced to writing. The parties
agree to inform their respective Representatives
and supervisors involved in the administration of
the agreement of grievance settlements. It is fur-
ther agreed that joint statements shall be distrib-
uted by the Company to its supervisors and by the
Union to its Representatives.

10.08 The number of employees (i.e., the aggrieved
employee or employees and Representative or
Representatives of the Union) who shall be paid
for Joint Conference time as provided under Sec-
tion A4.13 or A17.01 of this Agreement, shall not
be more than three when attending grievance
meetings at the first level. When multiple griev-
ances involving more than one Representative or
grievant are to be discussed at a single joint con-
ference at District level or above, the maximum

[30]

number of employees who shall be paid for joint conference time shall be increased to five.

10.09 Nothing in this Agreement shall, in any manner, affect the right of an individual employee or group of employees to present grievances to the Company under Section 10.01 nor affect the rights of the Union under the National Labor Relations Act as amended. The Company agrees, however, that after a grievance arising under any provision of this Agreement has been referred to a Union Representative and such Representative has dealt with a Company Representative with respect thereto, no Company Representative will adjust or attempt to adjust the grievance with the employee or employees involved unless a Union Representative is first given an opportunity to be present at the adjustment.

# ARTICLE 11
### DEMOTIONS FOR MISCONDUCT,
### DISCHARGES AND SUSPENSIONS

11.01 The Company will not demote for misconduct, discharge or suspend an employee without proper cause. Any question as to whether an employee has been demoted for misconduct, discharged or suspended without proper cause shall be reviewed in accordance with Section 11.02 or 11.03 of this Article, whichever is applicable.

11.02 In the event the Union, within thirty days from the date of a demotion for misconduct, a dis-

[31]

charge or a suspension of an employee with less than six months of continuous service, charges that such employee has been demoted for misconduct, discharged or suspended without proper cause, the complaint shall be reviewed in accordance with the provisions of Article 10, but is not arbitrable.

11.03   In the event the Union, within thirty days from the date of a demotion for misconduct, a discharge or a suspension of an employee with six months of continuous service or more, charges that such employee has been demoted for misconduct, discharged or suspended without proper cause, the complaint shall be reviewed in accordance with the provisions of Article 10.

## ARTICLE 12
### DISCRIMINATION

12.01   The Company will not discriminate against any employee because of membership in or activity on behalf of the Union.

12.02   In the event the Union, within thirty days from the date of any alleged violation of Section 12.01, charges that an employee has been discriminated against because of membership in or activity on behalf of the Union, the claim shall be reviewed in accordance with Article 10.

# ARTICLE 13
### ARBITRATION

13.01 There shall be arbitrated only the matters specifically made subject to arbitration by the provisions of this Agreement.

13.02 The procedure for arbitration is set forth in Exhibit B attached to and made a part of this Agreement. In making an award the Arbitration Board may not add to, subtract from, modify or disregard any contract provision. In no way shall this detract from the right of the Arbitration Board to interpret the meaning and application of any contract term in which the parties hereto are in dispute as to such meaning and application.

# ARTICLE 14
### AMENDMENTS

14.01 The entire understanding between the parties is set forth completely in this Agreement and the Exhibits attached hereto. Any amendment to this Agreement or any interpretation of the true intent and meaning of the provisions of this Agreement will be committed to writing and signed by the duly authorized representatives of the parties.

# ARTICLE 15
### FEDERAL OR STATE LAWS

15.01 Should any valid Federal or State Law, or the final

[33]

decision or order of any Court or national or state regulatory body of competent jurisdiction specifically affect any provisions of this Agreement, the provision or provisions so affected will be construed as having been changed to conform to the law or decision, and the other provisions of this Agreement will continue in full force.

### ARTICLE 16
#### PENSIONS AND BENEFITS

16.01 During the life of this Agreement the Company will not:

16.011 Make any change in the "Verizon Pension Plan" or the "Verizon Sickness and Accident Disability Benefit Plan" which would reduce or diminish the benefits or privileges provided by the Plans for employees within the bargaining unit without the agreement of the Union.

16.012 Make any change in the Plans which would increase or enlarge the benefits or privileges provided by the Plans for employees within the bargaining unit without notice to the Union and an offer to bargain during the thirty days following such notice.

16.02 A claim that this Article has been violated may be submitted to arbitration under Article 10. A claim of an employee within the bargaining unit that they have been deprived of any benefits or privileges to which they are entitled under the Plans may be processed as a grievance under the provi-

[34]

sions of Article 10, but shall not be subject to arbitration. However, nothing in this Agreement shall be construed to subject the provisions of the Plans or their administration or the terms of a proposed change to arbitration.


## ARTICLE 17
### (PLANT ONLY)
#### CONTRACT LABOR

17.01 The Company will maintain its established policies as to the assignment of work in connection with the installation and maintenance of communications facilities owned, maintained and operated by the Company.

17.02 The Company, except in emergencies, will not enter into contracts with any company or agency, to do work which is similar in nature to that normally done by the Company's employees, if:

  17.021 Such action, in the judgment of the Company, would currently result in the layoff or part-timing of employees in the same occupation and Operating Area as those who would normally perform the work to be done under the contract.

  17.022 Part-timing is in effect in the said occupation and Operating Area.

17.03 It is an established policy of the Company to have affiliated companies, connecting companies of the Company or of an affiliated company, other wire using companies, municipalities and governmen-

[35]

tal agencies, do work some of which is similar in nature to that normally done by the Company's employees. The kind and relative amount of such work which the Company's employees do and which the above mentioned companies, municipalities or agencies do varies from time to time. Nothing in Section 17.01 will prevent the Company from continuing this policy.

17.04 The Company except in emergencies will give the Union notice before it enters into any contract with any company or agency to do outside plant construction or reconstruction work normally done by the Company's employees.

NOTE: For Services/Financial only, see Letter Agreement of August 9, 1980 regarding contracting, in Letter Agreements section.

# ARTICLE 18
PERMANENT TRANSFER OF EMPLOYEES

18.01 The Company has the right to transfer employees from one payroll location to another and to determine the number of employees to be transferred, the occupations and payroll locations involved, the qualifications required and which employees have such qualifications.

18.02 Before transferring any employee from one payroll location to another, or from one occupation to another, where the transfer would necessitate a move of the employee's residence, the Company will give the employee thirty days' prior notice. If

[36]

the transfer would not require a move of the employee's residence the Company will give the employee at least seven days' prior notice.

18.03 When an employee is to be transferred (either from an occupation in one payroll location to the same occupation in another payroll location, or from one occupation to another occupation with the same or lower maximum wage rate, and the same or longer wage progression schedule in the same or another payroll location), the Company will transfer from the occupation and payroll location from which the transfer is to be made the employee with the least service who, in the judgment of the Company, is qualified to fill the job and can be transferred without injuring the Company's ability to render telephone service.

18.031 At the option of the Company, the employee with the least service need not be transferred if another qualified employee requests to be transferred, or if the Company offers the job to an employee other than the one with the least service and such employee accepts the offer. Where more than one qualified employee requests to be transferred, the Company will select the employee to be transferred.

18.032 "Service" as used herein means service as defined in Section 9.02.

18.033 For Philadelphia and Pittsburgh, the provisions of this Section 18.03 shall be applied on the basis of geographical areas rather than a "pay-

[37]

roll location." These geographical areas shall
be designated as follows:

## PHILADELPHIA

| Designation | Geographical Area |
|---|---|
| Central | Locust Central Office area |
| East | Market and Pennypacker Central Office areas |
| South | Dewey, Eastwick and Saratoga Central Office areas |
| West | Sherwood, Trinity and Evergreen Central Office areas |
| Frankford | Poplar, Regent, Jefferson and Mayfair Central Office areas |
| Northern | Waverly, Davenport, Pilgrim, Orchard and Neptune Central Office areas |
| Germantown | Germantown, Baldwin, Ivyridge and Chestnut Hill Central Office areas |

## PITTSBURGH

| Designation | Geographical Area |
|---|---|
| Downtown | Downtown Central Office area |
| Eastern | Oakland, Squirrel Hill, East Liberty, Wilkinsburg, Braddock and Homestead Central Office areas |
| Northern | Crafton, Northside, McKees Rocks, Bellevue, West View, Millvale, Sharpsburg, Fox Chapel, Glenshaw, and Perrysville Central Office areas |
| Southern | Allentown, Dormont, Carrick, Pleasant Hills, Bethel Park, Bridgeville and Carnegie Central Office areas |

Where a force rearrangement, subject to the
provisions of Section 18.03, occurs within a
single third-tier supervisor's organization, the
provisions of this Article will apply only
among those employees assigned to that third-
tier supervisor's organization.

[38]

18.034   Where the employee selected on a seniority basis is a Union Representative, such employee will not be transferred, if the Union objects in writing within two weeks of notification; in such case, the qualified employee with the next least service will be transferred.

18.035   For a period of one year after reinstatement in the Company, an employee who has been on military leave of absence may be exempted from the seniority provisions of Section 18.03 at the discretion of the Company.

18.036   An employee taken over from another telephone company by reason of the purchase of the physical properties of such other company or the consolidation or merger of such other company with the Company shall not be subject to seniority provisions of Section 18.03 until such time as the employee shall have received a regular assignment with the Company.

18.037   When, under the provisions of this Article, an employee is forced to transfer in title or to a different title with the same or lower maximum wage rate for force adjustment reasons, and a move of residence is not necessary, the Company, before filling any available opening in the employee's title or former title at the old or new location, will, for a period of one year from date of transfer, offer the transferred employee the opportunity to return to the former title and/or location.

[39]

When an employee is forced to transfer to a different title with the same or lower maximum wage rate for force adjustment reasons and a move of residence is involved, before filling any available job in the former title at the new location, the will, for a period of three years, offer the transferred employee, the opportunity to return to the former title.

Opportunities under the provisions of this sub-section will not be offered to an employee who voluntarily transfers, or to an employee trans-ferred because of inability to adequately per-form in a particular job.

An employee rejecting an initial opportunity to return to the former title and/or location will forfeit all return rights under this subsection.

18.04 Nothing in this Article shall be construed to affect or limit the right of the Company to make tempo-rary transfers, except as follows: An employee will not be temporarily transferred for longer than 6 months at a time, unless the Company and Union locally agree to a longer transfer, or a longer transfer is necessitated by an emergency as defined in Subsection A3.0222.

## ARTICLE 19

### SAFETY

19.01 Safety is of primary concern to the Company and the Union as well as to each individual employee.

[40]

19.02   The Company provides various safety equipment and devices for the use of employees.

19.03   The Company further undertakes to give training in safe methods of working, safe driving and in safety precautions which are useful to employees in connection with their work. Safety rules and practices, which employees are expected to follow, will be made known to them.

19.04   The Company and the Union agree to promote safety, and to attempt to develop a completely accident-free operation. To this end, the Company and Union agree to establish for the duration of the Collective Bargaining Agreement a committee composed of not more than three (3) Company Safety officials and three (3) CWA Local 13000 representatives. This committee shall be advisory in nature and meet quarterly. Any recommendations will be given serious consideration by field management.

19.05   Employees are responsible for reporting promptly and accurately all accidents, even though they may appear to be minor.

19.06   In the case of an accident involving an employee, the employee members of the Accident Investigating Committee appointed according to the existing Company practice shall be (1) the Unit President, or a branch Representative of such Unit, or an alternate, designated by the Union, and (2) an employee appointed by the Union having experience within the craft to which the injured employee was assigned at the time of the accident. In the

[41]

event a third-tier supervisor is a management member of the Committee, the Regional Vice President may also be a member. The employee members shall be compensated only for such of their scheduled hours as are spent with the Committee. The purpose of the Committee is to attempt to determine the facts, the cause of the accident, and what might be done to prevent future accidents. The Committee shall investigate the accident as soon as practical, but the final report of the Committee may be delayed a reasonable period upon the request of either the Union or the Company.

## ARTICLE 20
### RETROACTIVITY

20.01   Any determination as to the interpretation of this Agreement or as to the fulfillment of any obligations thereunder shall be limited in its retroactive effect as follows:

20.011   If it is found that a discharge based in whole or in part on grounds of misappropriation of Company funds or information or records necessary for billing purposes, or violation of the Company policy regarding the secrecy of communications, was made without proper cause, the Company will reinstate the employee and will reimburse the discharged employee the amount of pay the employee would have received had the employee not been dis-

charged, less any amount received by the employee as wages in other employment or as unemployment benefits for the period since the time of such discharge, or both.

20.012 In discharge cases other than those covered by Section 20.011 and in suspension cases the Arbitration Board shall have authority to modify as well as to sustain or set aside the disciplinary action.

20.013 Other Cases—The determination may or may not be retroactive as the equities of the particular case shall demand, but in any case where the determination is retroactive the effect shall be limited to thirty days prior to the date the current dispute is initially submitted to the Company.

## ARTICLE 21
### Job Stewards

21.01 Job Stewards will not be excused from work in order to perform their duties as Stewards except when in the opinion of the immediate Supervisor the particular circumstances justify such excused time. Job Stewards are not authorized to present grievances on behalf of employees. Job Stewards will not be paid for any time spent in joint conferences with the Company unless they are personally involved in the matter under consideration in the joint conference. The Union will keep the Regional Labor Relations Staff concerned advised

[43]

of the names of its Job Stewards. The number of
Job Stewards shall not generally exceed one for
each Supervisor's group.

## ARTICLE 22
### PROMOTIONS

22.01 The Company will consider many factors includ-
ing seniority, job performance, health, attendance
record and experience in determining employees'
qualifications for temporary or permanent promo-
tion within the bargaining unit. Seniority will pre-
vail when other qualifications are substantially
equal.

22.02 The Union may call to the Company's attention
particular employees whose seniority it believes
warrants recognition. The Company will give con-
sideration to such employees, along with others,
provided the individual employee so wishes.

22.03 The employee's Supervisor, if requested by an
unsuccessful aspirant to a job, will inform such
employee of the reasons for the selection and
review with the employee the employee's own sta-
tus.

22.04 If the Union claims that a promotion violates this
Article because it was not given to the applicant
with the most seniority, such claim may be
grieved and then submitted to arbitration pursuant
to Section B1. A Union claim regarding any single
promotion must be confined to a single grievant.
In such event, the Company must be shown to

[44]

have acted arbitrarily or in bad faith. The Union will limit the scope of arbitrability under this Article to seniority and the issue of qualifications being substantially equal. Any Union representing a Company employee may be a party to the arbitration.

# ARTICLE 23
## NON-DISCRIMINATION

23.01 Neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, sexual orientation, age or national origin, because the employee is disabled or a disabled veteran, or because of current or past uniformed military service.

# ARTICLE 24
## AGENCY SHOP

24.01 All employees, except Occasional employees, who are members of the Union or who are obligated to tender to the Union amounts equal to periodic dues on the effective date of this Agreement, or who later become members, and all employees, except Occasional employees, entering into the bargaining unit on or after the effective date of this Agreement, shall as a condition of employment pay or tender to the Union amounts equal to the periodic dues applicable to members from such

[45]

       effective date or, in the case of such employees entering into the bargaining unit after the effective date, on the thirtieth day after such entrance, until the termination of this contract.

24.02   The condition of employment specified above shall not apply during periods of formal separation(*) from the bargaining unit by any such employee but shall reapply to such employee on the thirtieth day following his return to the bargaining unit.

# ARTICLE 25
### INCLEMENT WEATHER

25.01   Supervisors will take weather into consideration when assigning work. On scheduled tours, when employees report for duty and because of inclement weather are, in the opinion of the supervisor, unable to perform their regular duties, they shall be assigned such other work as is available.

25.02   A supervisory order requiring employees to work in inclement weather may be grieved and is subject to arbitration. The Arbitration Board may not substitute its judgment for that of the supervisor unless it finds that the work assignment resulted in a clear and substantial danger to the employee's health or safety over and above any danger inherent in the responsibilities and duties of the employee's job classification.

---

(*) The term "formal separation" includes transfers out of the bargaining unit, removal from the payroll of the Company, and leaves of absence of more than one month duration.

[46]

## ARTICLE 26

### PERSONNEL RECORDS

26.01 Entries which are intended to be used against an employee for the purpose of justifying discipline shall not be made a part of an employee's personnel record unless a copy has been provided to the employee.

26.02 After one year from the date of an entry into an employee's record, the employee involved or the Union may request a review of the entry by the first or second tier supervisor then having authority over the employee. Within two weeks of the request, the employee or the Union shall be advised whether the write-up will be removed.

26.03 The provisions of Section 26.01 do not apply to routine recording of statistics on such matters as absence, tardiness, productivity, quality, etc. However, any adverse entry based on such statistics shall be subject to Section 26.01.

## ARTICLE 27

### UNION REPRESENTATION

27.01 At any meeting between a representative of the Company and an employee in which discipline (including warnings which are to be recorded in the personnel file, suspension, demotion or discharge for cause) is to be announced, or at any meeting with an employee for the purpose of conducting an investigatory interview which may lead

to discipline of such employee, a Union Represen-
tative may be present if the employee so requests.

## ARTICLE 28

### INCOME SECURITY PLAN
### ENHANCED INCOME SECURITY PLAN

28.01 If during the term of this Agreement, the Com-
pany notifies the Union in writing that technolog-
ical change (defined as changes in equipment or
methods of operation) has or will create a surplus
in any job title in a work location which will
necessitate lay-offs or involuntary permanent
reassignments of regular employees to different
job titles involving a reduction in pay or to work
locations requiring a change of residence, or if a
force surplus necessitating any of the above
actions exists for reasons other than technological
change and the Company deems it appropriate,
regular employees who have at least one (1) year
of net credited service may elect, in the order of
seniority, and to the extent necessary to relieve the
surplus, to leave the service of the Company and
receive Income Security Plan (ISP) and if applica-
ble, during the term of this agreement, Enhanced
Income Security Plan (Enhanced ISP) benefits
described in this Section, subject to the following
conditions:

(a) The Company shall determine the job titles
and work locations in which a surplus exists,
the number of employees in such titles and

[48]

locations who are considered to be surplus, and the period during which the employee may, if he or she so elects, leave the service of the Company pursuant to this Section. Effective until August 8, 1998, the Company will offer Enhanced ISP in the circumstances described in Subsection 28.02 (a) of this Section and may also offer Enhanced ISP in other circumstances if the Company chooses to do so. The Company may limit acceptances to the number of surplus and this Enhanced ISP offer would be in lieu of obligations, if any, the Company may have to offer regular ISP. Neither such determinations by the Company nor any other part of this Article shall be subject to arbitration.

(b) The number of employees who may make such election shall not exceed the number of employees determined by the Company to be surplus.

(c) An employee's election to leave the service of the Company and receive ISP or Enhanced ISP payments must be in writing and transmitted to the Company within thirty (30) calendar days from the date of the Company's offer in order to be effective and it may not be revoked after such thirty (30) calendar day period.

28.02   *ISP Termination Allowance*

(a) For an employee who so elects in accordance with this Section, the Company will pay an ISP Termination Allowance of One Thousand

[49]

and One Hundred Dollars ($1,100.00), less withholding taxes, for each completed year of net credited service up to and including thirty (30) years, for a maximum of Thirty Three Thousand Dollars ($33,000.00) prior to withholding taxes. Furthermore, prior to proceeding to a layoff resulting from a surplus in any particular title, location, and work group, the Company will offer an Enhanced ISP Termination Allowance equal to two (2) times the normal ISP Termination Allowance (e.g., up to a maximum of $66,000) in the surplus title and location.

(b) If the total amount of the ISP or Enhanced ISP Termination Allowance prior to deductions for taxes does not exceed Ten Thousand Dollars ($10,000.00), that allowance shall be paid in a single lump sum within thirty (30) calendar days after the employee has left the service of the Company.

(c) Except when (b) above applies, an employee may select one of the following irrevocable payment options:

(i) Forty-eight (48) monthly payments beginning the month following the month in which the employee leaves the service of the Company. Employees who elect this option and are within forty-eight (48) months of their sixty-seventh (67th) birthday will be paid their monthly payments over the months remaining up to their sixty-seventh (67th) birthday.

[50]

(ii) Half of the ISP or Enhanced ISP Termination Allowance prior to deductions for taxes, in a lump sum, with the remaining half paid in forty-eight (48) monthly payments as described in (i) above. Such lump sum payments shall be paid within thirty (30) calendar days after the employee has left the service of the Company.

28.03 In addition to the ISP or Enhanced ISP Termination Allowance, for an employee who so elects to leave the service of the Company in accordance with Subsection 28.01 above, the Company, as an ISP or Enhanced ISP Expense Allowance, will reimburse the employee for actual expenses incurred for relocation costs, tuition or training costs, or job placement expenses related to seeking other employment, or any combination thereof, up to an amount not to exceed Seven Hundred Fifty Dollars ($750.00) for each year of net credited service (prorated for any partial year of service) to a maximum of Three Thousand Seven Hundred Fifty Dollars ($3,750.00). Any such expenses for which reimbursement will be made must be approved by the Company prior to being incurred and must be incurred within one (1) year from the date of termination of employment except that reimbursement for tuition or training costs will be made for such expenses incurred within two (2) years from the date of termination of employment.

28.04 The years of net credited service in determining the ISP or Enhanced ISP Termination Allowance

[51]

and the ISP or Enhanced ISP Expense Allowance shall be prorated for any period of time during which an employee is (was) employed on a part-time basis in the same manner as net credited service is prorated based on part-time hours pursuant to the Verizon Pension Plan.

28.05 *Repayment of ISP or Enhanced ISP Termination Allowance*

If the recipient of an ISP or Enhanced ISP Termination Allowance is reemployed within forty-eight (48) months by the Company or by an affiliate or subsidiary company within the Verizon Services Group, ISP or Enhanced ISP termination allowance payments will cease. If the termination allowance was being paid in forty-eight (48) monthly payments (with no lump sum), no repayment is required. If the employee received a lump sum, or a partial lump sum and monthly payments, the employee will repay the excess over what he or she would have received if payments had been made under the forty-eight (48) monthly payment schedule. Such repayment will be made through payroll deduction in each payroll period at the rate of ten percent (10%) of the employee's basic weekly wage.

# ARTICLE 29

## TEMPORARY PROMOTIONS

29.01 The Company has the right to make temporary

promotions. Such promotions shall last for a max-
imum of six months.

29.02 Temporary promotions would be used to backfill
vacancies such as pregnancies, illness, temporary
promotions to management, training and vaca-
tions.

### ARTICLE 30
TRANSFERS DUE TO JOB-RELATED DISABILITY

30.01 Where an employee has been assigned to work in
a lower rated job classification because of restric-
tions due to a job-related disability and, at a later
date, the restriction is lifted, the Company will
reinstate the employee in the employee's previ-
ously held job classification effective on the Sun-
day following the lifting of the restriction.

30.02 When it is necessary to transfer an employee to
another occupation, the Company will endeavor to
make the transfer to an available job within the
restrictions imposed upon the employee which
will result in as little loss of wages as possible
under the circumstances. When a job within the
restrictions subsequently becomes available in a
job classification whose maximum rate is no high-
er than the employee's old job classification, the
Company will consider the employee for such job
ahead of regular Regional Associate Mobility Plan
candidates. However, any promotion to an avail-
able job which is in a job classification that is
higher than the employee's job classification prior

[53]

to the imposition of restrictions must be processed through the procedures of RAMP.

30.03 When an employee is placed in a lower paying job, the Company will review the circumstances of the individual case. Depending upon the results of this review, the Company may reduce the employee's basic wage over a period of time to avoid undue hardship.

### ARTICLE 31
#### NEW JOB TITLES AND JOB CLASSIFICATIONS

Whenever the Company determines it appropriate to create a new job title or job classification in the bargaining unit, or to re-structure or redefine an existing one, it shall proceed as follows:

31.01 The Company shall notify the Union in writing of such job title or classification and shall furnish a job description of the duties and the wage rates and schedules initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. Following such notice to the Union, the Company may proceed to staff such job titles or classifications.

31.02 The Union shall have the right, within thirty (30) days from the receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established by the Company.

31.03 If negotiations are not so initiated, the initial wage

rates and schedules set by the Company shall remain in effect and the temporary designation removed.

31.04 If agreement is reached between the parties within the sixty (60) days following the Union's receipt of notice from the Company concerning the initial wage rates and schedules, the agreed upon wage rates and schedules shall be retroactive to the date the change or new job was implemented.

31.05 If negotiations are initiated pursuant to paragraph (2), above, and if the parties are unable to reach agreement within sixty (60) days following receipt of notice from the Company, the Union may, within thirty (30) days of the expiration of the sixty (60) day period for negotiations, demand that the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party. Within seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed.

31.06 The neutral third party shall be selected by mutual agreement from among those who possess acknowledged expertise in the area of employee compensation. The parties may submit all evidence deemed relevant to the issue to the neutral third party. At the request of either party, a hearing shall be held to receive such evidence. Any such hearing shall be held within thirty (30) days after the matter is referred to the neutral third party. While it is not intended that such third party

undertake a full and complete job evaluation study, he or she shall review other job titles or classifications and their wage schedules for comparison purposes and may make an on-site inspection of the workplace and conduct a reasonable number of interviews of incumbents. A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party within sixty (60) days of the date that the matter is referred for resolution. In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new job was implemented, except that in no event shall the retroactive effect exceed 150 days.

31.07 The procedures set forth in this Section shall be the exclusive means by which the Union may contest the schedule of wage rates which the Company sets for any new, restructured, or redefined job title or classification.

31.08 The cost of the neutral third party shall be borne one-half by the Company and one-half by the Union.

## ARTICLE 32

### REASSIGNMENT PAY PROTECTION PLAN

32.01 If the Company notifies the Union that a need exists to adjust force and employees are reassigned or voluntarily transferred in lieu of others being reassigned, to vacancies where the rate of pay for the new job is less than the current rate for

[56]

the employee's former job, the rate of pay will be reduced over a period of time based on the employee's length of service. The reductions in pay are effective at periods following reassignment as shown below and are based on the difference in rates for the old and new jobs:

### 0-5 Years

| | |
|---|---|
| Weeks 1 through 4 | —No reduction |
| Weeks 5 through 8 | —⅓ reduction |
| Weeks 9 through 12 | —⅔ reduction |
| Weeks 13 and thereafter | —Full reduction |

### 5+ Years

| | |
|---|---|
| Weeks 1 through 56 | —No reduction |
| Weeks 57 through 60 | —⅓ reduction |
| Weeks 61 through 64 | —⅔ reduction |
| Weeks 65 and thereafter | —Full reduction |

32.02   However, notwithstanding the foregoing schedule, an employee with fifteen (15) years or more of net credited service who, due to technological change, is assigned to a vacancy with a lower rate of pay than the then current rate of the employee's regular job shall continue to be paid in the lower paid job an amount equivalent to the rate of pay of the higher paid job in effect at the time of the downgrade for a period of thirty-six (36) months following the effective date of such downgrade. Thereafter, the following schedule in reduction shall apply:

| | |
|---|---|
| Weeks 1 through 4 | —No reduction |
| Weeks 5 through 8 | —⅓ reduction |
| Weeks 9 through 12 | —⅔ reduction |
| Weeks 13 and thereafter | —Full reduction |

[57]

32.03 The employee, however, shall receive any increases in pay in amounts which are applicable for a comparable employee in the lower rated job to which downgraded.

# ARTICLE 33
### TECHNOLOGY CHANGE COMMITTEE

33.01 The Company and the Union recognize that technological changes in equipment, organization, or methods of operation have a tendency to affect job security and the nature of the work to be performed. The parties, therefore, will attempt to diminish or abolish the detrimental effects of any such technological change by creating a joint committee to be known as the Technology Change Committee to oversee problems and recommend solutions of problems in this area as set forth below.

33.02 It is agreed that a Technology Change Committee be constituted in each Company. Such committee will consist of not more than three representatives of the Company and not more than three representatives of the Union. Such Committee may be convened at the option of either party at mutually agreeable places and times, at least two (2) times each year.

33.03 The purpose of the Committee is to provide for discussion of major technological changes (including changes in equipment, organization, or methods of operation) which may affect employees

represented by the Union. The Company will notify the Union at least four (4) months in advance of planned major technological changes. Meetings of the Committee will be held as soon thereafter as can be mutually arranged. At such meetings, the Company will advise the Union of its plans with respect to the introduction of such changes and will familiarize the Union with the progress being made.

33.04   The impact and effect of such changes on the employees shall be appropriate matters for discussion. The Company will discuss with the Union:

(a) What steps might be taken to offer employment to employees affected:

(1) In the same locality or other localities in jobs which may be available in occupations covered by the Collective Bargaining Agreements between the parties;

(2) In other occupations in the Company not covered by the Collective Bargaining Agreement;

(3) In other Verizon Services Group companies.

(b) The applicability of various Company programs and contract provisions relating to force adjustment plans and procedures, including Income Security Plan, Reassignment Pay Protection Plan, termination allowances, retirement, transfer procedures and the like.

(c) The feasibility of the Company providing

[59]

training for other assignments for the employ-
ees affected. (Example: sponsorship of typing
training on Company time)

33.05 The Committees shall not formulate policy or
arrive at binding decisions or agreements, but
rather shall be charged with the responsibility to
develop facts and recommendations so that the
Company can make well-informed decisions
regarding the matters covered by this provision.

## ARTICLE 34

### TECHNOLOGICAL DISPLACEMENT

34.01 If during the term of this Agreement, the Com-
pany notifies the Union in writing that technolog-
ical change (defined as changes in equipment or
methods of operation) has or will create a surplus
in any job title in a work location which will
necessitate reassignments of Regular employees
to different job titles involving a reduction in pay
or to locations requiring a change in residence, or
if a force surplus necessitating any of the above
actions exists for reasons other than technological
change and the Company deems it appropriate,
any Regular employee—who is in the affected job
titles and work locations; may elect not to accept
such reassignment to a job title involving a reduc-
tion in pay or to a location requiring a change in
residence and shall be paid a termination
allowance. Any such Regular employee who
refuses to accept a transfer to a job title having the

[60]

same or greater rate of pay and which does not require a change in residence shall not be paid a termination allowance.

34.02 Employees eligible for a termination allowance under the terms of this provision alternatively may elect to participate in the Income Security Plan (ISP) providing they meet the eligibility requirements of that program.

### ARTICLE 35
#### EMPLOYMENT SECURITY TRAINING

35.01 *Personal or Career Development Training*

Personal or career development training programs will be designed as an educational self-development aid to assist employees in their personal development or preparing them for career progression opportunities or job changes within the Company.

35.011 Training under such program will be generic in nature as opposed to job specific and will cover technical, sales, clerical and other fundamental skills.

35.012 Any regular employee with at least one year of net credited service will be eligible to participate in such training program under the terms of such program.

35.013 Participation by employees in the personal or career development training program will be voluntary, and time spent by employees in such

[61]

training will be outside scheduled working hours and not paid or considered as time worked for any purpose.

35.014 Successful completion by an employee of any training or courses offered pursuant to such program will be taken into account by the Company when considering the employee for an upgrade or transfer.

35.02 *Job Displacement Training*

Job displacement training opportunities will be offered to prepare employees whose jobs are being displaced, or whose jobs are being restructured or redefined to a wage schedule with a lower maximum wage rate, to enhance their ability to qualify for anticipated job vacancies within the Company or for job opportunities external to the Company.

35.021 *Internal Job Vacancies*

Employees will be informed of potential displacements as soon as possible and, depending on the number of any anticipated job openings, will be offered training, if necessary, which is intended to enable them to qualify for such job openings in the Company.

35.022 *External Job Opportunities*

For any such employees (those being displaced) interested in seeking employment external to the Company, the Company will reimburse the employee for actual expenses incurred for job specific tuition, training, or

counseling, not covered by the Tuition Aid Plan, related to seeking such other employment. Reimbursement for such expenses shall be made up to an amount not to exceed $500 for each year of net credited service (prorated for any partial year of service) to a maximum of $2,500.

Any such expenses for which reimbursement will be made must be approved by the Company prior to being incurred and while the employee is still on the active payroll of the Company.

35.023 Only regular employees who are notified of potential displacement from their current job or restructuring of that job to a lower maximum wage rate will be eligible to participate in such training as covered in Sections 35.021 and 35.022.

35.024 Participation by employees in job displacement training programs will be voluntary, and time spent by employees in such training will be outside scheduled working hours and not paid or considered as time worked for any purpose unless the Company determines it appropriate in specific instances to permit employees to receive such training during working hours.

35.03 *Training Advisory Board*

There will be a Training Advisory Board consisting of three Union representatives, three Management representatives and a professional educational counselor selected by the Training Advisory

[63]

Board from the academic community. The Board will meet periodically and have responsibility for:

35.031 furnishing advice to the Company on personal or career development and job displacement training courses and curricula;

35.032 reviewing and making recommendations regarding training delivery systems (e.g., technical schools, community colleges, home study programs, etc.) available to be used by the Company;

35.033 evaluating the effectiveness of such training programs and courses and the delivery systems utilized;

35.034 encouraging employees to participate in and successfully complete the available training courses; and

35.035 researching and recommending through the educational counselor, appropriate educational counseling programs to be made available to those employees interested in seeking employment outside the Company.

35.04 The Union and the Company will each be responsible for the respective costs and expenses of their representatives' participation on the Training Advisory Board and will share equally in the joint costs and expenses incurred by the Board. The Company will be responsible for the costs and expenses of the professional educational counselor.

[64]

35.05 *Employee Career Resource Center*

> The Company agrees to continue to offer the Employee Career Resource Center over the life of this Agreement.

35.051 Functions: Each Center will perform the following functions:

a. One-on-one and group counseling of employees regarding:

—career goals and objectives;

—job skills and knowledge requirements;

—training for specific jobs;

b. Provide information on available job opportunities and trends inside and outside of the Network Services Group;

c. Provide information on available Company programs and procedures (e.g., Mobility Application Plan/Upgrade and Transfer Plan, Intercompany Job Bank, Tuition Assistance, ATLAS/P.M. Education);

d. Aptitude and interest testing;

e. Liaison with Company departments (e.g., Operations, Labor Relations, MAP/Upgrade and Transfer Bureaus) to develop recommendations for:

—placement of employees whose jobs are being displaced, including job specific test training;

—placement of employees whose jobs are being restructured or redefined to a wage

[65]

> schedule with a lower maximum wage
> rate;

> —out-placement services for employees
> when necessary.

35.052 Participation: Employee participation in the
services of the Center will be voluntary, and
time spent by employees in the Center will be
outside scheduled working hours and not paid
or considered as time worked for any purpose.
However, employees who have been declared
surplus or in a group that has been declared
surplus may be allowed to participate on Com-
pany-paid time when specifically authorized
and approved by Management. Employees
who are voluntarily separated under an ISP
offer or laid-off during the life of the Agree-
ment may utilize the services of the Center for
a period not to exceed six (6) months from the
date of separation.

35.053 Administration: Subject to the oversight and
potential enhancement responsibility of the
Training Advisory Board Executive Council,
the Company will continue to have on-going
responsibility for the administration of the
Center(s), as well as the other employment
security programs currently offered, including
but not limited to their number, location and
budget.

35.054 Effect on Other Contract Provisions: Nothing
in this program will supersede the applicable

[66]

promotion, transfer or other provisions of the Agreement.

35.055 Nothing in this Article 35 shall be subject to arbitration.

## ARTICLE 36

### SERVICE QUALITY AND SUPERVISORY OBSERVING

36.01 It is the policy of the Company to conduct Service Quality Observations in full compliance with Federal and State laws. Service Quality Observing includes Service Observing and Supervisory Observing.

36.02 Service Observing measures the overall speed, accuracy and efficiency of our telecommunications network and work forces. It is not used for evaluating individual employee performance.

36.03 Supervisory Observing involves observations of employee contacts with customers or service-related contacts with other employees. It is used in determining the quality of individual employee performance and as an aid to training and development.

36.04 Supervisory observations are limited to the handling of customer contacts and contacts between employees involved in the provision of customer service. Employees who may be observed will be made aware of such fact on a quarterly basis and of the general frequency of such observations.

[67]

Employees' conversations will not be electronically recorded.

36.05 Records of supervisory observations will be limited to Company-related matters. They will not be disclosed except to authorized personnel for Company-related reasons. Results of observations will be periodically reviewed with employees and adverse notations, which are intended to be used against an employee for the purpose of justifying discipline, will be reviewed promptly with such employee.

36.06 Telephones which are not subject to Supervisory Observing will be provided by the Company for employees' personal calls. In addition, Supervisors will not listen in on personal conversations of employees on any telephone.

ARTICLE 37

MOTOR VEHICLE USAGE PROGRAM

37.01 There will be established in Verizon Pennsylvania Inc. or Verizon Services Corp. a Motor Vehicle Usage Program to provide, in those administrative work units where implemented, that employees who participate will be assigned a motor vehicle for use in their work and for traveling between their work locations and places of residence or other designated places for the vehicle storage.

37.02 The Motor Vehicle Usage Program will be implemented only within administrative work units where some or all of the employees normally use

[68]

a Company-provided motor vehicle in order to perform their work. The decision to implement and to continue the program within any such administrative work unit will be within management's discretion.

37.03   When the Motor Vehicle Usage Program is introduced within an administrative work unit, all employees within that unit who normally use a Company-provided motor vehicle in the performance of their work assignment will be eligible to participate. Participation by any such employees will be on a voluntary basis. If an employee elects not to participate, management will determine where the motor vehicle assigned to that employee is to be stored and that location will become the employee's work reporting location.

37.04   Employees who participate in the program will be expected to provide normally secure and legal storage for the vehicle at their places of residence. If the vehicle cannot be properly stored at an employee's place of residence, the Company may arrange for appropriate storage at its expense.

37.05   Operating and maintenance costs will be at the Company's expense. The Company will make arrangements for maintenance of the vehicle; however, it will be the responsibility of the employee to whom the vehicle is assigned to assure that the vehicle is properly maintained.

37.06   For employees who participate in the Motor Vehicle Usage Program, a work reporting area will be established on a local basis before implementa-

[69]

tion. Such work reporting area will be designed so as to serve the interests of the customer, reasonably accommodate the employee, and be satisfactory to management and the Union. The work reporting area normally will be a circular geographic area. In large congested metropolitan locations or where natural barriers render a circular work reporting area impractical, other suitable parameters will be established.

37.07   Each participating employee will be expected to begin and end the work tour at any assigned location within the established work reporting area. Prior to implementation of the program, the Company and Union will determine a method of compensation for employees who begin or end a work tour outside an established work reporting area.

## ARTICLE 38
### LOANS TO ANOTHER COMPANY

38.01   When an employee is loaned to another Company, the provisions of this Agreement shall continue to apply except that the wage and Reimbursement Of Incidental Expenses (A6) provisions of this Agreement will not apply if the receiving Company's contract provides for more liberal treatment of comparable provisions.

# ARTICLE 39
## (PLANT/SERVICES ONLY)
### ADMINISTRATIVE GROUPS

39.01 For purposes of overtime administration, vacation and tour selection, employees will be placed in administrative groups.

39.02 When assignments of employees to new or different administrative groups result from a Company reorganization during the term of this Agreement, for the purposes of Article 9, Seniority-layoffs — Part-timing, and Article 18, Permanent Transfer of Employees, employees involved in such reorganization will, for the remaining term of this Agreement, retain their identification with the geographic and organizational units mentioned in Article 9 and 18 to which they were assigned immediately prior to the reorganization. The units include: Operating Area, Operating District, Payroll Location, and Geographic Area.

39.03 For all other purposes, when assignments of employees to new or different administrative groups result from a Company reorganization during the term of this Agreement, employee contract rights shall be applicable within the context of their new administrative groups. For example, rights granted employees based on years of service (i.e., seniority) will apply in the new administrative group, but an employee's seniority relative to other employees may be different in the new administrative group, and this may affect adversely or advantageously an employee's ability to select tours, etc.

[71]

39.04  When a company reorganization results in a new or different administrative group, the third tier supervisor or equivalent manager shall meet with the appropriate officer of the union to bargain about the composition of the group, the scheduling of tours, overtime procedures, and vacation selection procedures.

39.05  Any agreement reached must be consistent with the applicable sections of this Agreement and with economy of operation, good customer service, fairness to all employees in the group and consideration to the employees' wishes. Any agreement on overtime procedures must have a goal of accomplishing a reasonably equal distribution of overtime opportunities among all of the qualified employees in the group consistent with the letter of August 3, 1971.

39.06  If no agreement is reached within 30 days, the manager shall implement administrative procedures concerning the items listed in 39.04. Such procedures must be consistent with the standards and requirements listed in 39.05.

39.07  If management implements procedures without the agreement of the Union, the Union may submit to expedited arbitration the question whether the procedures implemented are in compliance with the standards and requirements listed in 39.05.

NOTE: This Article does not apply to employees in the Financial Organization.

[72]

## ARTICLE 40
### (PLANT/SERVICES ONLY)
ASSIGNMENT OF EMPLOYEES

40.01 The Company may assign scheduled employees of one work group to perform work normally performed by employees in the same title in another work group during the scheduled hours of the receiving group whether such employees are scheduled or not. In those situations where there is a service affecting trouble or a central office maintenance alarm, and a scheduled employee is available in close proximity to the trouble location, the scheduled employee may be assigned to clear the trouble even if during non-scheduled hours of the receiving group. Where a scheduled employee is assigned to clear a central office maintenance alarm under this Section 40.01, the non-scheduled employee in the receiving group who would have been called-out to clear the alarm will receive the sum of $35. (This special payment will not enter into the computation of overtime pay and will not be part of the basic rate or basic weekly wages for any other purpose nor enter into the computation of any payments under the "Verizon Pension Plan" or the "Verizon Sickness and Accident Disability Benefit Plan".)

40.02 Before assigning an employee from another work group on an overtime basis (except where overtime results from the need for continuity on the first day) the Company will make a reasonable effort to give the work opportunity to a qualified employee in the work group normally assigned to

[73]

the work. The Company may not loan in different employees on successive days to avoid this continuity limitation.

40.03 If an employee is assigned work normally assigned to employees in another work group, such employee will be subject to the administrative procedures of the group normally assigned the work. In absence of overtime agreements the loaned in employee will be given overtime opportunities according to the kinds of groundrules presently established in that work group.

40.04 Employees will not be loaned to work into other groups if there is planned overtime in their group unless an equal amount or more overtime is planned in the group they are being loaned into.

# ARTICLE 41

## DURATION OF AGREEMENT

41.01 This Agreement shall continue in effect, subject to the other provisions of this Article, until terminated in accordance with Section 41.02.

41.02 Either party may terminate this Agreement at 11:59 PM, August 2, 2008 by notifying the other party in writing at least 60 calendar days prior to such date. If no such notice of termination is given, this Agreement shall automatically continue in full force and effect for successive renewal periods of one year each, subject to the right of either party to terminate this Agreement at the end

[74]

of any renewal period, of its intention to terminate this Agreement.

41.03 At the time that the notice of the desire to terminate this Agreement is served pursuant to Section 41.02 or at least 30 calendar days prior to the date for negotiations agreed to by the parties, the party serving the notice shall submit a written list of the changes desired in the Agreement. Submission of such a list shall not prejudice the right of either party to submit additional changes during the period of negotiations.

41.04 This Agreement has been made in final settlement for its duration of all demands and proposals made by either party during negotiations preceding its execution. It is agreed that during the term of this Agreement the Company shall not be obligated to discuss or agree to any improvement or liberalization either of the provisions of this Agreement or with respect to rates of pay, wages, hours of employment or other conditions of employment not specifically set forth herein, if such improvement or liberalization is proposed to be made effective during the period covered by this Agreement; and the Union shall not be obligated to discuss or agree to any impairment or deliberalization either of the provisions of this Agreement or with respect to rates of pay, wages, hours of employment or other conditions of employment not specifically set forth herein, if such impairment or deliberalization is proposed to be made effective during the period of this Agreement.

[75]

The Company and the Union agree that unless a different effective date is specified in this Agreement its terms shall be effective August 3, 2003.

The Company and the Union further agree that this Agreement shall become effective if and only if it is ratified by the membership of the Union on or before the 28th day following the date of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives on the day and year first above written.

**COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO**

**VERIZON PENNSYLVANIA INC. VERIZON SERVICES CORP.**

By  (s) James J. Short
    Assistant to Vice President
    District 13, CWA, AFL-CIO

By  (s) Ronald H. Williams
    Executive Director-Labor Relations

By  (s)Edward T. Carr
    President
    Local 13000, CWA, AFL-CIO

APPROVED:
(s) M. Bahr
President
Communications Workers of America

[76]

EXHIBIT A

REGULAR FULL TIME EMPLOYEES

GROUP 1

SECTION A1—DEFINITIONS

A1.01 *Full Day Tours*

   A1.011 Eight hours, starting at or after 6 A.M. but not after 10 A.M., and divided into two sessions, not necessarily of the same length, by a meal period of not more than one hour. During a calendar week, no more than twenty percent (20%) of the employees in each job title in an administrative group may be scheduled on a full day tour which starts after 9 A.M.

   A1.012 On Saturdays, Sundays and Holidays, at locations with one employee scheduled on duty when continuous coverage for the tour is necessary, these tours may be assigned as eight consecutive hours including a paid meal period of one-half hour during which the Company may require employees to remain at the job location.

A1.02 *Part Day Tours*

   A1.021 Four hours, starting at or after 6 A.M. but not after 9 A.M.

A1.03 *Full Evening Tours*

   A1.031 Eight hours, starting at or after 1 P.M. but not after 5 P.M. and including a meal period of one-half hour, during which the Company may require employees to remain at the job location.

[77]

A1.032 For employees assigned to work on the direct distribution of supplies, these tours start at or after 1 P.M. but not after 6 P.M.

A1.033 Where, during any calendar week, one or more of the employees in an administrative group has been scheduled on a full day tour which starts after 9 A.M., no other employee in the same title in that administrative group will be scheduled for a full evening tour during the same calendar week.

A1.04 *Part Evening Tours*

A1.041 Four hours, starting at or after 1 P.M. but not after 5 P.M.

A1.042 Part evening tours will not normally be scheduled.

A1.05 *Night Tours*

A1.051 Eight hours starting at or after 10 P.M. but not after midnight and including a meal period of one-half hour, during which the Company may require the employee to remain at the job location. (Part night tours will not be scheduled.)

A1.06 *Normal Work Week*

A1.061 A normal work week consists of five full tours which may be scheduled on any of the seven days of a calendar week.

A1.07 *Group 1 Employees*

A1.071 Employees assigned one of the occupational titles listed in Section A11.

[78]

A1.08 *Regular Full-Time Employees*

   A1.081 Employees whose regular assignments of work cover normal work weeks.

SECTION A2—WORK TIME SCHEDULES

A2.01 *Posting Work Time Schedules*

   A2.011 Work time schedules for a three-week cycle will be posted on or before Tuesday of the last week of the preceding cycle. However, where assignments for any group generally do not change from week to week the schedule need not be posted in three-week cycles and in such cases revisions in schedules will be made on or before Tuesday of the week prior to the week in which the new schedules are to be effective.

   A2.012 These schedules will show the time each tour starts and ends on each day. Each employee will be scheduled for a normal work week.

   A2.013 Work time so scheduled is referred to hereafter as "scheduled hours," "scheduled time," or "scheduled tours." Any time not so scheduled is referred to hereafter as "non-scheduled hours," "non-scheduled time," or "non-scheduled tours."

   A2.014 (Financial Organization Only) Work time schedules will be posted in each office. Revisions in schedules will be posted during the second week preceding the week for which they apply. These schedules will show the

[79]

starting and quitting time of each daily
assignment of a full or part tour in the week.
Each employee ordinarily will be scheduled
for a normal work week. Where necessary,
due to service requirements as determined by
the Company, an employee may be assigned
to work additional time on any day of the
week within the limits prescribed by law.

A2.02  *Work Time Schedules*

A2.021  In each Service Center, not oftener than once
every three months, Field Clerks, General
Field Clerks and Senior Field Clerks with
twenty or more years of service and in each
Supervisor's group, not oftener than once
every three months, all other employees with
titles listed in A11.01, and Materials Service
Coordinator and Financial Organization
employees listed in A24.01 who have twenty
or more years of service will notify their
immediate supervisor as to the normally
scheduled tours they desire to work. This
notification will be made in order of length of
service. The requested assignments will be
granted to the extent and in such combina-
tions that it is practicable to do so in accor-
dance with service and training requirements,
proper coverage and normal scheduling pro-
cedures, as determined by the Company, pro-
vided no other employee in the group would
thereby be required to work either evening or
night tours, or a combination thereof, for
more than 26 weeks in a calendar year, and

[80]

providing no other employee in the group would be required to work weekends, as defined below, more than 26 times in a calendar year. ("Weekends" is defined as a single Saturday tour or a single Sunday tour, or a Saturday tour and a Sunday tour worked back-to-back.)

A2.022 In a Supervisor's group or Service Center where, as a result of selections made under the provisions of A2.021, other less senior employees would be required to work more than 26 weeks of evening and night tours or more than 26 weekends during the course of a calendar year, the following procedure shall be implemented:

The provisions of A2.021 shall be applied to employees with twenty-one or more years of service. If other less senior employees would still be required to work in excess of 26 weekends or weeks of evening and night tours, the provisions of A2.021 shall be applied to employees with twenty-two or more years of service, then to employees with twenty-three or more years of service, and, finally, to those with twenty-four or more years of service, but less than twenty-five, until the less senior employees are not required to work more than 26 weekends or weeks of evening and night tours.

A2.023 If the Company determines that all of the tour assignments requested under the provisions of A2.021 and A2.022 cannot be granted

[81]

because of service requirements, because of the number of employees in the group having more than twenty-five years of services, or because of other reasons, preference shall be given to the requests of those employees with thirty or more years of service.

A2.024  Where there is a small number of employees in the group in the occupations normally scheduled for evening and night tours or weekends or where the number of such employees with sufficient service to exercise a choice is disproportionately large, the provisions of this subsection will apply only as long as the appropriate District representatives of the Company and the Local officials of the Union agree that such provisions will operate equitably with respect to all of the employees concerned. Where no such local agreement is reached, the Company, as far as reasonably possible, will endeavor to schedule the employees involved so as to carry out the above principles.

A2.025  "Service" as used in this Subsection A2.02 shall have the same meaning as in Article 9, Section 9.02.

A2.026  "Evening" tour, for purposes of Subsection A2.02 only, shall include day tours which begin after 9 A.M.

A2.03  *Changes in Work Time Schedules*

A2.031  The schedules may be changed at any time after posting. Changes may be originated by

[82]

the Company or by employees, if approved
by the Company. Changes originated by the
Company will be avoided in so far as service
requirements permit.

A2.04  *Changes In the Amount of Time on a Day*

A2.041  The assignment of an employee to work in
excess of a full tour on a day is not consid-
ered a change in schedule and the employee
will not be required to take time off to com-
pensate for such non-scheduled time.

A2.042  When the Company assigns an employee to
work on a day on which no tour has previous-
ly been scheduled or to work additional time
on a day on which a part tour has previously
been scheduled, his scheduled work time on
another day of the same week may be
reduced by a corresponding amount provid-
ing he is notified at least two full days, exclu-
sive of Sunday, before the day of the added
assignment or that of the decreased assign-
ment, whichever is earlier. In this event, the
work time of the added assignment is within
the normal work week and is therefore sched-
uled hours.

A2.043  If on the other hand the employee is not given
at least two full days notice, exclusive of
Sunday, of the change, no corresponding
reduction in work time will be made in the
work time of another day, and the added time,
being outside the normal work week is non-
scheduled hours.

[83]

A2.05 *Changes in Tours With No Change in Amount of Time*

A2.051 When the Company changes the starting or quitting time of a scheduled tour or changes the type of tour scheduled, and notifies the employee at least twenty-four hours before the previous or new starting time, whichever is earlier, all work time of the new tour is scheduled hours.

A2.052 If on the other hand the employee is not given at least twenty-four hours' notice of the change, all work time before the starting time previously scheduled or after the quitting time previously scheduled will be considered and paid for as non-scheduled hours.

A2.06 *Changes Originated By Employees*

A2.061 Any time worked not in excess of a full tour is scheduled hours.

SECTION A3—BASIS OF COMPENSATION

A3.01 *General*

A3.011 Employees are carried on the payrolls at a weekly basic wage rate which is the amount paid for forty hours work, exclusive of evening and night differential payments and extra time payments for overtime and for work on Sundays or Holidays or outside the scheduled work time.

A3.012 Hourly rates are determined by dividing the weekly basic rate by forty.

[84]

A3.013  In computing payments required by Section 7 of the Federal Fair Labor Standards Act, wage differentials for evening and night work will be included to the extent required by that Act.

A3.02  *Week Days*

A3.021  Employees working outside their scheduled hours will be paid for each full or part hour so worked at one and one-half times their hourly wage rate, except as provided in the following:

(a) An employee working on a non-scheduled day in a week in which the scheduled time has not been worked in full will be paid for such non-scheduled work time at the hourly wage rate to the extent of the absent time in that week but not in excess of the hours in a full tour. For this purpose, time not worked during the normal work week due to the following reasons shall be counted as if worked:

(1) An excused Holiday.

(2) Jury Duty or Grand Jury Duty.

(3) Absence when required to appear as a witness before a court or Grand Jury.

(4) Joint Conference of Representatives of the Union with Representatives of the Company.

(5) Accident occurring while on duty.

[85]

(6) Vacation.

(7) Visits to Medical Department or Local Consultant at Company request.

(8) Scheduled hours excused and paid under Subsection A3.09, Fatigue time.

(9) Judge, Inspector or Clerk of Election or, in primary and general elections only, Constable.

(10) Excused Work Day for which the employee is paid.

(11) Attendance at joint meetings on Quality of Work Life.

(12) Attendance at Union Orientation Meeting.

(13) Excused Time for Union Business

(b) Employees working overtime normally paid at one and one-half times their basic hourly wage rate will, to the extent that the hours in the week exceed 49, be paid at twice their basic hourly wage rate.

A3.022 *Overtime Administration*

A3.0221 Commencing September 1, 2000, the limitation on forced overtime ("cap") for the remainder of 2000 shall be 10 hours per employee per payroll week. Commencing January 1, 2001, this cap on forced overtime shall be 8 hours per employee per payroll week. Voluntary overtime worked

[86]

will be counted toward the overtime cap, except for the period from January 1, 2001 to September 1, 2001. Upon request, the Union will assist in securing volunteers. These overtime caps will not apply in the case of emergency, long term service difficulties or if an employee consents to additional overtime.

A3.0222   An "emergency" is an event of national importance, fire, explosion, or other catastrophe, severe weather conditions, major cable and equipment failures, or an act of God. In the event an "emergency" occurs warranting suspension of the 8 or 10 hour overtime limitations contained in A3.0221, a third-tier supervisor will notify the appropriate Regional Vice President of the Union.

A3.0223   The parties recognize that service difficulties for an extended period may develop from time to time during which suspension of the above overtime limitations would be appropriate. In the event such service difficulties develop, the third-tier supervisor will meet with the appropriate Regional Vice President of the Union to discuss the problem and determine how to best deal with the situation.

A3.0224   It is not the intention of the Company to make changes in our methods of selecting employees to work overtime on non-scheduled days or when the time is contin-

[87]

uous with a scheduled tour as long as qualified volunteers are available in the overtime administrative group, provided volunteers would not work excessive hours and sufficient volunteer work hours are available to perform the necessary work within a reasonable period.

A3.0225 It is expected that employees called out to work would do so unless some compelling personal reasons would prevent compliance.

A3.03 *Sundays*

A3.031 Sunday hours are defined as all hours between midnight Saturday night and midnight Sunday night.

A3.032 Employees working within their scheduled hours will be paid for each full or part hour worked at one and one-half times their hourly wage rate.

A3.033 Employees working outside their scheduled hours will be paid for each full or part hour so worked at one and one-half times their hourly wage rate, except as provided in Subsection A3.021(b).

A3.04 *Holidays*

A3.041 All time included in the tour starting on a Holiday is Holiday time. No time included in tours starting on the preceding day is Holiday time even though the tour ends after midnight.

A3.042 All employees working on a scheduled Holi-

[88]

day tour will be paid for a full tour and in addition:

(a) Employees working within their scheduled hours will be paid at one and one-half times their basic hourly wage rate for each full or part hour worked, except that the minimum call out provisions of A3.07 shall apply to employees called out within scheduled hours.

(b) Employees working outside their scheduled hours will be paid at two and one-half times their basic hourly wage rate for each full or part hour worked, except that on a call out during non-scheduled hours the minimum call out provisions of A3.07 shall apply for one hour's work. If the employee is called out a second time within the hour covered by the first minimum payment, the one hour shall be considered as fully paid for and no additional payment will be made for that period. The provisions of Subsection A3.021(b) shall not apply.

A3.05  *Part Hour Worked*

A3.051  When an employee works less than his full scheduled hours any part hours worked will be paid for according to the following schedule:

| Minutes Worked | Hours Paid |
|---|---|
| 1 to 30, inclusive | ½ |
| 31 to 60,    " | 1 |

A3.052 When employees work outside of their scheduled hours they will be paid for the non-scheduled hours as follows:

| Minutes Worked | Hours Paid (*) |
|---|---|
| 1 to 5 inclusive | None |
| 6 to 15 " | ⅜ |
| 16 to 30 " | ¾ |
| 31 to 45 " | 1⅛ |
| 46 to 60 " | 1½ |
| 61 to 90 " | 2¼ |
| 91 to 120 " | 3 |
| etc. | etc. |

(*) Appropriate adjustments will be made as required by Subsection A3.021(b).

NOTE: The "Hours Paid" shown above represent payment at the employee's basic wage rate.

A3.06 *Evening, Night and Certain Full Day Tours*

A3.061 Any employee assigned one of the occupational titles listed in Section A11 will be paid a wage differential in an amount equivalent to 12% of the employee's basic hourly wage rate for each hour worked between 5 P.M. and 8 A.M. during scheduled evening or night tours, or scheduled full day tours which start after 9 A.M. A wage differential of 15% of the employee's basic hourly wage rate will be paid for each hour worked on a Saturday between 12:01 A.M. and 11:59 P.M. during scheduled Saturday tours. The 12% evening or night tour differential does not apply to Saturday tours.

[90]

A3.062  This wage differential payment where applicable will be in addition to amounts paid for work time during scheduled hours on weekdays, Saturdays, Sundays and Holidays and during non-scheduled hours when tours are changed with insufficient notice.

A3.063  Since the wage differentials are designed to compensate employees for the inconvenience of working after 5 p.m. during evening or night tours, scheduled full day tours which start after 9 a.m., or Saturday tours, wage differential payments will not be made unless the employee actually works between 5 p.m. and 8 a.m. during such scheduled evening, night, or full day tours or works a Saturday tour except as follows:

(a) During full evening and night tours the differential will be paid for the one half hour meal period during which the Company may require the employee to remain on the job.

(b) Absence due to accidents occurring while on duty — if on the day the accident occurs, the employee was scheduled to work a tour carrying a differential payment, this payment will be continued during the period of absence. Otherwise, no differential payment will be made for absent time, Holidays or vacations.

(c) Absence due to Excused Work Day for which the employee is paid.

[91]

A3.07 *Employees Called Out to Work Non-Scheduled Time*

A3.071 Employees who are called out to work non-scheduled time which is not consecutive with a scheduled tour will receive a minimum of three hours' pay (two hours paid for at one and one-half times their basic hourly wage rate), subject to the provisions of Subsection A3.021(b), including any travel time authorized under Section A5. If employees are called out a second time within the two hours covered by the first minimum payment, those two hours will be considered as fully paid for and no additional payments will be made for that period, except as required by Subsection A3.021(b).

A3.08 *In-Charge Payment*

A3.081 In those cases where a management employee is to be absent for a full tour, or more, and, in the opinion of the Company, it is necessary to temporarily appoint an employee in charge, each employee so appointed shall be paid a special payment for each full tour worked during the employee's actual performance of the assignment, in accordance with the following table:

| | **Amount of In-Charge Payment** |
|---|---|
| Customer Service Agent ) | $12.50 |
| Assignment Technician ) | |
| Building Equipment Mechanic ) | |
| Combination Technician ) | |

[92]

| | |
|---|---|
| Test Desk Technician | ) |
| Splicing Technician | ) |
| Switching Equipment Technician | ) |
| Systems Technician | ) |
| Systems Technician - Radio | ) |
| Automotive Mechanic | ) |
| Outside Plant Technician | ) |
| Services Technician | ) $12.50 |
| Facilities Assigner | ) |
| Materials Service Coordinator | ) |
| Driver - Tractor Trailer | ) $11.00 |
| Driver - Heavy Truck | ) |
| Assignment Administrator | ) $10.50 |
| Storekeeper | ) |
| Frame Attendant - A | ) |
| Communications Assistant | ) |
| Materials Handler | ) |
| Frame Attendant | ) |
| Translations Administrator | ) |
| Maintenance Administrator | ) |
| Driver - Medium Truck | ) |
| Customer Billing Analyst | ) |
| Payroll Analyst | ) |
| Graphics Designer | ) |
| Splicing Technician's Helper | ) $10.00 |
| Support Systems Attendant | ) |
| Service Evaluator | ) |
| Drafter | ) |
| Driver - Light Truck | ) $9.00 |
| Senior Field Clerk | ) |
| Staff Clerk | ) |
| Supplies Attendant | ) |
| Stenographer-Clerk | ) |
| General Field Clerk | ) |
| Senior Clerk | ) |
| Senior Attendant | ) |
| Field Clerk | ) |
| General Clerk | ) |

[93]

| | | |
|---|---|---|
| Building Custodian | ) | |
| Bill Production Technician | ) | |
| Treasury Clerk | ) | |
| Building Custodian Associate | ) | $8.00 |
| Office Clerical Assistant | ) | |
| Assistant Technician | ) | |

A3.082   The above amounts shall be included with the basic rate in computing all compensation for that day to which the employee is entitled under this Agreement.

A3.083   The Company will first seek qualified volunteers for in-charge assignments. If there are no qualified volunteers, the Company will administer in-charge assignments so that one or more employees will not be assigned to in-charge work for more than a reasonable continuous period under the circumstances of the particular case. These assignments will be rotated among all employees in a supervisor's group who are qualified for the assignment.

The word qualified means capable of performing the in-charge assignment. In general, an employee who is qualified to perform the duties of his vocational job will qualify to be in charge. There will be instances, such as mixed station and PBX group, a group of all new employees on a special project, etc., where this will not apply.

A3.09   *Working 15 or 16 Hours or More Within a 24 Hour Period — Fatigue Time*

A3.091   When an employee works 16 hours or more in a 24-hour period, or 15 hours or more in a

[94]

24-hour period in the case of Financial Organization employees, except in emergencies, he shall be excused for a minimum of eight hours following completion of the work. Such regularly scheduled hours as fall within the eight hour excused period shall be paid for at the employee's basic hourly wage rate.

A3.092 In emergencies, when an employee is required to continue work beyond 16 hours, or 15 hours in the case of Financial Organization employees, the employee will be paid at one and one-half times the basic hourly wage rate (except as required by Subsection A3.021(b)) until the employee stops such emergency work even though such time worked beyond 16 hours, or 15 hours in the case of Financial Organization employees, is in the next regularly scheduled tour.

A3.093 Employees who have worked lesser amounts of overtime may be excused without pay if excused time is requested by the employee; but at the discretion of the Company, payment may be authorized.

A3.10 *Special City Allowance*

A3.101 An employee whose assigned reporting location on a particular day is within the areas of Philadelphia and Pittsburgh, as described below, will be paid a Special City Allowance of $2.00 for each day he works after reporting at such assigned reporting location. An employee who is scheduled to work 50% or

[95]

less of a regular full tour, or is called in and works 50% or less of a full tour, will be paid one-half of a full daily allowance.

A3.102 Not more than one full daily allowance will be paid to an employee on any one day regardless of the number of times the employee reports to a qualified location during that day.

A3.103 The Special City Allowance will enter into computations of overtime pay required by law but will not be part of the basic rate or basic weekly wages for any other purpose nor enter into the computation of any payments under the Verizon Pension Plan or the Verizon Sickness and Accident Disability Benefit Plan or any other fringe benefits or differentials.

A3.104 Assigned reporting locations within the following designated boundaries qualify, subject to the above provisions, for the Special City Allowance:

For the purpose of this provision, Philadelphia shall include the territories within the present boundaries of the City of Philadelphia and the territories served by the Melrose exchange. Pittsburgh shall include the territories within the present boundaries of the City of Pittsburgh and the territories served by the 241, 242, 243, 244, 247, 256, 371, 731 exchanges (Wilkinsburg); 271, 273, 351, 636 exchanges (Braddock); 461, 462, 464, 476

[96]

exchanges (Homestead); 331, 771, 777, 778
exchanges (McKees Rocks); 921, 922, 928,
937 exchanges (Crafton), and 341, 343, 344,
531, 561, 563, 571 exchanges (Dormont);
and 821, 822 exchanges (Millvale).

A3.11 *Associates Training Other Associates*

A qualified employee may volunteer to be
assigned the responsibility to train another
employee in the same or another occupation. No
employee will be involuntarily assigned this
training responsibility. When this occurs, the
employee performing the training will be given
a special payment of fifteen dollars ($15.00) for
each tour in which training is performed.

Where an employee is involved in merely
explaining and demonstrating the job, in detail,
for the benefit of another employee, or explain-
ing its relationship to associated jobs, or answer-
ing job related questions, the procedure shall not
be considered as job training and the training
payment will not be applicable.

The training responsibility is not merely
explaining the job; it includes directing the
employee in the proper procedures, observing
the performance and reviewing the results of the
work with the other employee.

A3.12 *Differential for Use of Bilingual Skills*

An employee will be paid an hourly differential
in the amount of 3.5% of the employee's basic
hourly wage rate for all scheduled or nonsched-
uled hours or partial hours (including overtime)

[97]

during which the employee is assigned to provide bi-lingual services to customers or to provide translation services for the Company. Only employees who qualify as proficient on the appropriate test for the language being used will be eligible to be assigned such work, and to receive this differential. Employees who were assigned such duties during the term of the 1998 contracts, but who have not qualified as proficient on the appropriate test, will be grandfathered until September 1, 2003, to become test-qualified, during which time they may continue to be assigned such duties.

The bi-lingual differential will enter into computations of overtime pay in accordance with applicable law on overtime on differentials.

It is also agreed that this provision replaces the Bi-lingual Letters of Understanding in the applicable collective bargaining agreements.

SECTION A4 — PAY ALLOWANCES FOR ABSENT TIME

A4.01 Employees will be paid at basic wage rates for absent time within the normal work week under the following conditions. Payments for absent time, unless otherwise specifically provided herein, will not include evening and night wage differentials.

A4.02 *Holidays*

A4.021 If a Holiday occurs during an absence of seven consecutive calendar days or less, employees will be paid for the Holiday even

though no payment is made for the balance of the absence. The third tier supervisor is authorized to withhold these payments in individual cases, where unusual conditions warrant such action.

A4.022 If an absence, for reasons other than those provided for in this Section A4, extends beyond seven consecutive calendar days, no payment will be made for any part of the entire absence unless approved by the third tier supervisor.

A4.03 *Absence Due To Sickness*

A4.031 Employees will be paid for absent time due to sickness during "scheduled hours" in the first seven consecutive calendar days of absence under the conditions and to the extent specified in the following except as otherwise provided in "Holidays" above. The second-tier supervisor, however, may withhold any authorized payment where in his/her opinion no payment is warranted.

(a) Employees with Less than One Year's Service — No payments will be made regardless of the length of the absence, except when specifically authorized by the third tier supervisor.

(b) Employees with One but Less than Two Years' Service — Payments will be made for the first two consecutive days of absence, only when specifically approved by the third tier supervisor. Employees

[99]

absent more than two consecutive days on which they were scheduled to work will be paid for such of their scheduled hours as occur during the remainder of the first seven consecutive calendar days of absence.

(c) Employees with Two but Less than Five Years' Service — Payments will be made for the first day of absence only when specifically approved by the third tier supervisor. Employees absent more than one day on which they were scheduled to work will be paid for such of their scheduled hours as occur during the remainder of the first seven consecutive calendar days of absence.

(d) Employees with Five or More Years' Service — Employees will be paid for such of their scheduled hours as occur during the first seven consecutive calendar days of absence.

A4.04  *Absence Due to an Accident Occurring While on Duty — Regardless of Length of Service*

A4.041  Employees will be paid for the day on which an accident occurs as if they had worked their scheduled hours including evening or night differential payments.

A4.05  *Less Than Regular Full Tour Worked on Recommendation of the Medical Department*

A4.051  Employees working less than a full tour on

recommendation of the Medical Department will be paid:

A4.052 During the "Full Pay" period — For a full tour.

A4.053 During the "Half Pay" period — For the hours on duty at their hourly wage rates, but in no case less than four hours.

A4.054 Outside the "Full Pay" and "Half Pay" periods — For the hours on duty at their hourly wage rates.

NOTE: Employees in the Services Organization (outlined in Section 1.01(b)) as of August 27, 1983 and who remain in that Organization, and employees in the Financial Organization, will be treated under this Section as follows:

During the "Full Pay" and "Half Pay" periods, employees will be paid for a full tour provided it falls within the normal work week. No payments will be made for absent time outside the "Full Pay" and "Half Pay" periods.

A4.06 *Absence Due To Reasons Other Than Sickness or Accident — Regardless of Length of Service*

A4.061 Except as provided for below, no payments will be made for any absence.

NOTE: Employees in the Services Organization (outlined in Section 1.01(b)) as of August 27, 1983 and who remain in that Organization, and all Financial Organization employees, will be treated under this Section as follows:

If the absence does not exceed seven consecu-

[101]

tive calendar days, payment will be made in full unless withheld by the third-tier supervisor. If the absence exceeds seven consecutive calendar days, no payment will be made for any part of the entire absence, unless approved by the third-tier supervisor.

A4.07  *Excused to Visit Medical Department or Local Consultant*

  A4.071  Employees will be paid for such excused time as comes within their scheduled hours.

A4.08  *While Serving as Jurors*

  A4.081  Employees absent due to jury duty will be paid their basic pay. Employees scheduled for evening or night tours will be rescheduled for day tours while serving as jurors.

A4.09  *When Required To Appear In Court Or Before A Grand Jury As Witnesses*

  A4.091  Employees absent due to appearing in court or before a grand jury as witnesses will be paid their basic pay. Payments provided in this Subsection A4.09 will not apply when employees appear in court or before a grand jury in any capacity other than witness.

A4.10  *Authorized Quarantine*

  A4.101  In case of unavoidable quarantine which the Medical Department has approved, employees will be paid as if the absence were due to the employee's own illness.

A4.11  *Death in Family*

  A4.111  When a death occurs in an employee's fami-

[102]

ly, employees may elect to take up to, and be paid for, the maximum number of consecutive scheduled work days coincident with the funeral and delineated below by employee relationship. Employees on evening or night tours shall be excused from evening or night work on the day or days for which they are excused and paid basic rates. Employee's family for purposes of this Subsection is limited to the employee's relatives listed below.

| | |
|---|---|
| Spouse (or live-in equivalent) | 4 days |
| Child (or Step) | |
| Parent (or Step) | |
| | |
| Brother (or Step) | 3 days |
| Sister (or Step) | |
| Father-in-law | 2 days |
| Mother-in-law | |
| Grandfather | |
| Grandmother | |
| Grandchild | |
| | |
| Aunt | 1 day |
| Uncle | |
| Niece | |
| Nephew | |
| Brother-in-law | |
| Sister-in-law | |
| Son-in-law | |
| Daughter-in-law | |
| Person residing in the same household as employee | |
| Cousin (1st) | |

[103]

A4.112 Employees may request additional time over and above that specified in A4.111 and may request time for relationships not specified in A4.111. If circumstances warrant, the Company will grant the time, to be taken as a single vacation day(s), floating holiday(s), excused work day(s), or time off without pay.

A4.12 *Time Off to Vote*

A4.121 Employees who are unable to vote outside their scheduled hours may be allowed time off with pay for the purpose of voting, and in such cases they will be paid for such absent time as comes within their scheduled hours. Employees will not be reimbursed for traveling or other expenses incurred in voting.

A4.13 *Attendance at Joint Conferences of Representatives of the Union with Representatives of the Company*

A4.131 Representatives of the Union will be paid by the Company only for such of their scheduled hours as are actually spent in Joint Conferences.

A4.132 Representatives of the Union scheduled for evening or night tours will be rescheduled for day tours in order to permit them to attend Joint Conferences with Representatives of the Company, but in such cases the time spent in Joint Conferences will be paid for as "scheduled" hours.

A4.133 An individual member of the Union, other than a Representative, who attends a Joint

[104]

Conference at the request of a Representative because he personally is involved in a matter under consideration in the Joint Conference, will be paid only for such of his scheduled hours as are actually spent in the Joint Conference. If he is scheduled for an evening or night tour during his attendance at the Joint Conference, such tour will be rescheduled as provided above for Representatives of the Union.

A4.134   Short interruptions during a Joint Conference for recesses or to permit either group or representatives to confer by themselves will be considered as part of the Joint Conference.

A4.135   A Representative of the Union attending disciplinary meetings or investigatory interviews as outlined in Article 27 will be paid by the Company only for such of the Representative's scheduled hours as are actually spent in those meetings.

A4.14   *When Serving As Judge, Inspector or Clerk of Election or, In Primary and General Elections only, Constable*

Upon reasonable notice, employees will be excused during scheduled hours on election days and, when excused, will be paid their basic pay for those days. Employees normally scheduled for evening or night tours will be rescheduled to day tours if they request.

A4.15 *Attendance at Joint Meetings on Quality of Work Life*

Employees excused to attend joint meetings with representatives of the Company on Quality of Work Life shall be paid for such absent time as comes within their scheduled hours.

A4.16 *PreAdmission Medical Tests*

Employees directed by their physicians to visit a hospital or other medical facility on an out-patient basis, in order to have a pre-admission medical test(s) (in connection with either in-patient or out-patient surgery) administered in lieu of similar services rendered on an in-patient basis, will be excused and will be paid for the necessary absent time on the same basis as for Absence Due to Sickness as set forth in Subsection A4.031. A copy of the physician's written directive for such tests must be presented to the employee's supervisor prior to the day of the tests. Such time off will not be counted under the absence or attendance control program.

A4.17 *Attendance at Union Orientation Meeting*

A4.171 One representative of the Union may meet once with one or more employees who is newly hired into, or transferred into, the bargaining unit for purposes of furnishing the employee(s) with information about the Union. The date, time, and place of the meeting must be approved in advance by the employee's immediate supervisor. The meeting shall last no longer than thirty minutes.

[106]

A4.172 Within a second tier supervisor's organization, no more than two Union orientation meetings shall be held monthly. Whenever more than one employee is transferred into a second tier supervisor's organization within the same two week period, every effort will be made by the Union to hold a single group orientation meeting.

A4.173 At his or her request, an employee newly hired into, or transferred into, the bargaining unit will be excused during his or her scheduled hours and paid for up to 30 minutes (including travel time, if any) to attend a Union Orientation Meeting described in this Section A4.17.

A4.174 The representative of the Union who conducts a Union Orientation Meeting described in this Section A4.17 will be paid for no more than thirty minutes of his or her time (including any travel time) to conduct such a meeting, provided such time comes within the representative's scheduled hours.

SECTION A5 — TRAVEL TIME

A5.01 Certain points are specified below at which work time for the various forces starts and stops. Employees will report for duty at the specified point at the time shown on the work time schedule.

A5.011 Individual employees of all forces shall be assigned to normal reporting locations (such

[107]

as a garage, carport, storeroom, central office, locker, such subscriber premises as are normally considered a normal place to report for starting the day's work, or the like) which shall provide the basis for determining normal travel time.

The time normally required to travel from home to the normal reporting location will be considered normal travel time. Employees may be assigned to report to a location other than their normal reporting location or may be loaned or temporarily transferred from one reporting location to another. The place of reporting for the day's work will be designated by the Supervisor.

The temporary reporting location may be one of the locations mentioned above or a motel, work site (the location where the work is to be performed), temporary garaging or storage location, training center or other similar location. Employees working from cable carts, tool carts and located trucks (trucks being used as a tool cart, cable cart or supply point) will ordinarily report to such locations even though a different location is designated as normal reporting location for determining normal travel time.

If employees report first to their normal reporting location and then leave to report to a temporary reporting location for a work assignment which is completed during the same day, and then return to their normal

[108]

reporting location, the assignment will be treated as the employees' normal work assignment and the following sections pertaining to "Commuting Assignment" and "Non-Commuting Assignment" will not apply.

A5.012 The Company shall determine if a specific temporary assignment at a location other than the employee's normal reporting location is a commuting or non-commuting assignment, as follows:

(a) On temporary assignments, where the employee is required to report to a location other than the employee's normal reporting location and the travel time in excess of the employee's normal travel time is less than one-half hour, the assignment will be designated a commuting assignment.

(b) On temporary assignments, where the employee is required to report to a location other than the employee's normal reporting location and the travel time, in excess of the employee's normal travel time is more than one and one-half hours, the assignment will be designated as a non-commuting assignment.

(c) On temporary assignments, when the employee is required to report to a location other than the employee's normal reporting location and the travel time in

[109]

excess of the employee's normal travel time is at least one-half hour but not more than one and one-half hours, the Company will determine if the temporary assignment should be classed as commuting or non-commuting. The decision shall be based upon the circumstances of each case and shall consider such items as the personal considerations of the employee, hours of work required, weather, etc.

The decision will be subject to the grievance procedure and, at the request of the Union, it may be processed under Section B2 — Expedited Arbitration.

(d) The Company will notify employees at least two working days in advance of any assignment to a temporary reporting location on a non-commuting basis whenever possible. Emergency situations are understood to be excluded from this agreement.

A5.02 Time consumed in loading and unloading material will be considered as work time.

A5.03 Time consumed in traveling from job to job during the day's work will be considered as work time.

A5.04 Travel time as referred to in Section A3.071 shall be determined and applied on the following basis:

A5.041 Travel time to the job shall be the period that

is reasonably required after the time of the call for the employee to arrive on the job in cases where he is requested to report for duty as soon as possible.

A5.042 Travel time from the job shall be the period between the ending of the actual work period and the time reasonably required to reach his residence.

A5.043 "Normally assigned starting and quitting times," as used herein, shall be determined on the basis of the majority of tours assigned for the employee in the particular week.

A5.044 Travel time to or from the job, as defined in A5.041 or A5.042, will be paid for all call outs except under the following conditions in which case no travel time will be paid:

(a) Where the work period of any duration as the result of the call out is continuous with a scheduled tour on a day other than a Holiday or a worked scheduled tour on a Holiday.

(b) Where the call out occurs on a non-scheduled day or on a Holiday and four or more hours are worked between the normally assigned starting and quitting times.

A5.05 (a) On designated commuting assignments, the day's work time may be shortened by the amount of excess travel time or the excess travel time may be paid for as work time during non-scheduled hours. If the work

[111]

time is shortened, it may not be shortened by less than one-half hour.

(b) On designated non-commuting assignments, travel time in excess of normal when first reporting to and finally returning from the temporary location will be considered as work time.

When additional temporary assignments at other locations are continuous with the initial assignment, the above provisions shall apply only when first reporting to the initial assignment and when finally returning from the last assignment. Travel time between the locations of such continuous assignments shall be paid except as provided in the following:

If the employee has returned to the employee's normal reporting location on the individual's own initiative and:

A5.051 If he is to report to another temporary location, travel time shall be paid to the extent that such time exceeds the travel time between the former temporary assignment and his normal reporting location.

A5.052 If he is required by the Company to report to his normal reporting location to work one or more scheduled tours but is then directed by the Company to return to the former temporary reporting location or to another temporary reporting location at any time after the start of his first scheduled tour at the normal

[112]

reporting location, the travel time in excess of normal when traveling to such temporary reporting location will be considered as work time. If he is not directed by the Company to go to such temporary reporting location before the end of the last scheduled tour in the first calendar week following his return to his normal reporting location, he will be considered to have finally returned to his normal reporting location. If the work at the normal reporting location has been at his own request, the above travel time will not be considered as work time.

A5.053 If he is required by the Company to work non-scheduled time at his normal location until such a late hour that it is unreasonable for him to return to the former temporary reporting location or go to another temporary reporting location in time to start his first scheduled tour at that location, the travel time included in the scheduled tour will be considered as work time.

A5.054 If an employee, on a non-commuting assignment, must travel between a motel (or other lodging accommodations) and his work location, any travel time in either direction in excess of his normal travel time will be treated as excess travel time. In such cases, the day's work time may be shortened by the amount of excess travel time or the excess travel time may be paid for as work time during non-scheduled hours. This subsection

[113]

shall not change any special arrangements presently in effect regarding attendance at a Plant Training Center.

A5.055 Employees who are scheduled for a full week, or weeks, of vacation during the time they are on a non-commuting assignment will be permitted to return to their normal location prior to the end of their last work day preceding the start of the vacation week, or weeks. Travel time will be considered to be work time. Employees will be reimbursed for transportation expenses as covered in Subsection A6.054(a). If an employee is assigned to continue on a non-commuting assignment on the first tour following return from vacation, excess travel time when first reporting to the temporary location will be considered as work time and transportation expenses will be reimbursed as covered in Subsection A6.054(a). This Subsection will not change any special arrangements presently in effect regarding attendance at a Plant Training Center.

A5.056 Employees on non-commuting assignments who elect to return to their homes on a weekend, and who are then called out to work at their normal reporting location during the weekend, shall be reimbursed for their travel time from their temporary work location to their home and their return from their home to the temporary reporting location.

A5.06 If an employee requests, and is granted, permis-

[114]

sion to commute on a designated non-commuting assignment, the employee's travel time when first reporting to and finally returning from the temporary reporting location will be considered as work time. In addition, the Company will pay the employee's commutation expenses and noon meal in accordance with A6.02.

A5.07 If an employee is permanently transferred from one normal reporting location to another, the travel time in excess of normal when first reporting to the new reporting location will be considered work time.

### SECTION A6 — REIMBURSEMENT OF INCIDENTAL EXPENSES

A6.01 Except as provided for below, employees will not be reimbursed for any expenses:

A6.02 *Meal Expenses*

If the Company decides that employees working away from their normal payroll locations should not commute between tours, the Company will provide daily meal allowances as follows:

| Breakfast | $ 6.00 |
|---|---|
| Noon Meal | 8.00 |
| Evening Meal | 20.00 |
| | $34.00 |

A6.03 *Lodging Expenses*

When an employee is assigned to a temporary location and the assignment is designated non-commuting under Subsection A5.05, the

[115]

employee will be reimbursed for all reasonable lodging expenses actually incurred by that employee.

A6.04 *Laundry Expenses*

Reasonable laundry expenses will be reimbursed when remaining at the temporary location for more than seven days without returning home. If the employee returns home each weekend, the employee will not be reimbursed for laundry expense.

A6.05 *Transportation Expenses*

A6.051 Employees will be reimbursed for payments made by them for all reasonable transportation expenses actually incurred in the performance of their work during scheduled or non-scheduled hours, except that an employee will not be reimbursed for the normal expense involved in traveling in either direction between his residence and the job location either when called out to work any non-scheduled time or when called out to work scheduled time on a Holiday.

A6.052 Employees assigned to report to a location other than their normal reporting location will be reimbursed for the difference between their normal transportation expenses and the reasonable transportation expenses actually incurred in traveling in either direction between their residence and the temporary reporting location except as follows:

On a designated non-commuting assignment,

[116]

where employees have requested and are granted permission to commute, they will be reimbursed for their actual transportation expenses (for approved method of transportation) between their home and temporary reporting location.

A6.053 An employee lodging away from home at a lodging place designated by the Company on a non-commuting assignment on which the Company is paying living expenses as covered in this Section A6 will be reimbursed for necessary carfare or approved use of his personal car from the lodging place to the designated reporting location. Usage of personal vehicles as a convenience rather than as a necessity will not be cause for reimbursement.

A6.054 On a non-commuting assignment lasting more than five consecutive days, employees lodging away from home will be treated as follows:

(a) They will be permitted to return to their residence once in each calendar week and will be reimbursed for transportation expenses to and from their residence or normal reporting location, whichever is nearer, not in excess of 700 miles round trip. If, in the judgment of the third-tier supervisor, circumstances warrant it, employees may be reimbursed for transportation expenses in excess of 700 miles round trip.

[117]

(b) In addition, they will be permitted to return to their residence on a Holiday if one or more scheduled tours intervene between the Holiday and the trip referred to in Paragraph (a) above, and will be reimbursed for transportation expenses to and from their residence or normal reporting location, whichever is nearer, not in excess of 350 miles round trip.

A6.06  *Employees Permanently Transferred*

A6.061  If it is necessary for employees permanently transferred from one payroll location or designated geographical area, as defined in Article 18, Subsection 18.033, to another (other than at their own request but including volunteers in situations where otherwise some other employee would be required to transfer) to move their residence, they will be reimbursed for the following expenses to the extent they were reasonably incurred, except that meal expenses will be reimbursed in accordance with the provisions of A6.02. It is understood that the Company will make tax deductions from such payments to the extent that such deductions are required by law.

For purposes of this subsection, a move of residence will be deemed necessary where the employee relocates his or her home as a result of the permanent transfer within 6 months of the date of transfer and the distance between the new location and the former home of such transferred employee

[118]

exceeds the distance between the former location and the former home by 35 road miles or more. Road miles are determined by the shortest of the more commonly traveled routes between the locations involved.

(a) Meal expenses, as covered in A6.02, and lodging and transportation expenses actually incurred by employees, until their new residence is established, for a period not in excess of six weeks from the date of transfer. If warranted by unusual circumstances, the third-tier supervisor may authorize the reimbursement of such expenses for a period in excess of six weeks.

(b) The actual expense of packing, moving, and unpacking the customary household belongings of employees and their immediate family including transportation insurance of household furniture.

(c) The actual transportation expenses for employees and their immediate family including lodging en route and meal expenses as covered in A6.02.

(d) Meal expenses, as covered in A6.02, and lodging and transportation expenses actually incurred for one other member of employee's immediate family while looking for a residence in the new community up to a maximum of three trips or six days.

[119]

    (e)  Meal expenses, as covered in A6.02, and lodging expenses actually incurred by employees and their immediate family from the date of moving until delivery of household goods and connection of utilities, not to exceed three days.

    (f)  The actual cost of connecting basic utilities (telephone, electricity, gas and water) at the new location and, when authorized by the Company, the cost of disconnecting normal household appliances (such as gas refrigerators, automatic washers, etc.) at the old location and of reconnection at the new location.

    (g)  Duplicate rent at either the new or old location (whichever is less) that employees are unable to avoid up to a maximum of six weeks.

    (h)  The actual realtor's commission paid for the sale of the employee's former residence up to seven percent of the purchase price.

A6.062  If it is not necessary for permanently transferred employees to move their residences and their new normal reporting locations are five or more miles further from their homes than their prior normal reporting locations, they will be reimbursed for a period not in excess of one month from the date of transfer for all expenditures in excess of normal for their lodging and transportation and, meal

[120]

expenses will be reimbursed in accordance with Section A6.02. If warranted by unusual circumstances, the third-tier supervisor may authorize the reimbursement of such expenses for a period in excess of one month.

A6.07 *Method of Reimbursement of Transportation Expense*

A6.071 Transportation incidental to travel as required by Subsections A6.05 and A6.06 will be furnished by the Company or will be by means of transportation approved by the Company.

(a) If public transportation is used, the employee will be reimbursed for fare actually expended.

(b) Use of personal automobiles for individual assignments, trips or projects may be approved by the immediate supervisor, based, among other things, on the transportation available, the employee's qualification as a driver of a Company automobile, evidence of ownership of the personal automobile liability and property damage insurance carried on the automobile and the extent of the benefit to be derived by the Company from the automobile's use.

(c) When a personal automobile is to be used on Company business as the authorized means of transportation, approval of the employee's immediate supervisor must be first obtained. If it is expected that a

[121]

personal automobile will be used on more than half the days on which an employee is scheduled to work over an extended period of time, it shall be considered as a regular recurring usage and written approval must be obtained from the fourth-tier supervisor and renewed each year.

(d) If an employee, with advance approval, is authorized by Subsection (c) to use a personal automobile, the employee will be reimbursed for any compensable mileage at the rate of twenty-eight cents ($.28) per mile. On trips of three miles or less, employees shall be reimbursed an amount equal to the rate for one mile multiplied by three.

In the event the Internal Revenue Service (IRS) increases the standard mileage rate allowable as a business use deduction from gross income during the term of this Agreement, the Company will change the amount of reimbursement, accordingly, effective on the first of the second month following the publication of the change by the IRS, but in no event prior to the effective date of the IRS increase.

This shall apply to reimbursement for authorized incidental use and not use of personal automobiles, which are required as a condition of employment.

[122]

Compensable mileage will be the distance from the point of departure to destination, reduced, where applicable, by the mileage from the employee's home to the employee's normal work location. Mileage will be determined from road maps or odometer readings or a combination of the two. No additional compensation will be paid to or for employee passengers.

(e) Where travel requires the use of a toll road, highway tolls actually expended will be reimbursed.

(f) Should an employee use his personal automobile in the course of Company business without prior approval, the mileage payment is not authorized, and the transportation shall be paid for at public transportation rates.

(g) For approval of the use of a personal automobile, an employee's assurance must be obtained that liability and property damage insurance is in force covering the automobile to be used.

(h) Both the Company and the Union agree that it is highly desirable that employees carry public liability and property damage insurance in adequate amounts.

(i) An employee will not be required to use his personal automobile.

(j) The Company assumes no obligation for payment of repairs, maintenance and

[123]

upkeep of personal automobiles except for the following situations when employees are operating personal cars:

1. On Call outs, both coming to and returning from work;

2. On-the-job authorized use of a personal car for Company business where the accident occurs during paid work time;

3. Special assignment and temporary transfers where use of a personal car is authorized and travel time is paid as work time under the contract.

In these cases the Company will pay a maximum of $250.00 for damage incurred, provided:

1. (a) The employee has actually had the car damage repaired and produces a receipted bill for or in excess of the amount claimed; or (b) the damage is so extensive that it is unreasonable to have the car repaired and it is junked or sold for salvage in which case the Company will pay the reasonable value of the car prior to the accident, less any salvage, up to the maximum of $250; and

2. Collision insurance does not cover the amount claimed; and

3. The employee takes reasonable steps

[124]

to obtain reimbursement but there is no prospect of recovery from a third party or an insurance company within a reasonable period. (It is understood that the employee will reimburse the Company out of any subsequent recovery as a result of a claim arising from the accident); and

4. The accident was not clearly the fault of the employee or was not caused by the defective condition of the employee's car.

(k) Employees are not authorized to permit relatives or friends to ride with them when using a personal automobile on Company business as the authorized means of transportation.

The Company assumes no liability for accident or damage claims made by any such persons or on their behalf and the employee permitting any such person to ride in his personal automobile while on Company business is required to notify him or her to that effect.

(l) Parking fees reasonably incurred will be reimbursed when required by the assignment and approved by the supervisor.

(m) Motor scooters and motorcycles are not covered.

[125]

SECTION A7 — VACATIONS

A7.01 *Vacation Allowances*

A7.011 Vacations with pay at basic wage rates will be granted during each calendar year according to the following schedule:

*No Vacation*—If engaged or re-engaged on or after July 1st of the current year.

*One Week Vacation*—Upon completion of six months' service.

*Two Weeks Vacation*—Upon completion of twelve months' service, provided that if terms of employment of 6 months and 12 months are both completed in the same calendar year, only two weeks will be granted, with the second week to be taken after completion of 12 months of net credited service. The first week may be taken any time after completion of 6 months of net credited service. If an employee becomes eligible for one or two weeks of vacation on or after December 1, it may be taken in the following calendar year, providing it is completed prior to April 30, and prior to the taking of any of that year's vacation.

*Three Weeks Vacation*—Beginning with and at any time within the year in which the employee completes 7 years' service.

*Four Weeks Vacation*—Beginning with and at any time within the year in which the employee completes 15 years' service.

*Five Weeks Vacation*—Beginning with the

[126]

year in which the employee completes 25 years' service but only if at least one week is taken during the month of January, February, March, April, May, October, November or December.

A7.012 Employees transferred to this Company from an affiliated company and employees taken over from other telephone companies at the time of either the purchase of the physical property of such other company by the Company or the consolidation or merger of such other company with the Company will, for vacation purposes, be given credit for any continuous service with such other Company immediately prior to the purchase, consolidation or merger, and a vacation given provided the combined length of service in the other company and this Company entitles him to a vacation, and provided one has not already been given during the calendar year of the transfer.

A7.013 If a Holiday occurs during an employee's vacation, the employee will be excused with pay on a scheduled day of another week. This day may be taken at any time prior to April 30 of the succeeding calendar year, in accordance with the provisions outlined in Subsection A10.033.

A7.014 When an employee is unable, due to absence, to take a previously scheduled vacation in September, October, November or December in any calendar year, he will be permitted to

[127]

take the unexpended portion of his vacation up to a maximum of two weeks in the next calendar year, subject to the following limitations:

1. The absence must be due to reasons beyond the employee's control, such as personal illness, accident or jury duty.

2. The absence must start on or after September 1 and prior to the start of the vacation.

3. As much of the unexpended vacation as possible must be rescheduled in the calendar year.

4. The unexpended vacation must be completed by April 30 of the next calendar year.

5. No payment in lieu of vacation will be made under any circumstances.

A7.02   *Vacation Assignments*

A7.021   It being a mutual objective of the Company and the Union that the method of selecting vacations result in maximum satisfaction to employees and it being necessary that the numbers of vacations granted at one time be consistent with customer service objectives and economy of operation, it is agreed that the selection of vacations will be conducted as follows:

1. The third tier supervisor or second tier supervisor(s) designated by him will consult by November 15 of each year with the

[128]

Unit President of the Union (or his designee(s)) concerning the various work groups of employees in the District to determine whether such work groups should select vacations separately or in one or more combinations of groups. In mutually discussing combinations, consideration shall be given to seniority problems, the geographical proximity of groups and the wishes of employees.

2. The final composition of work groups and the amount of vacation time available for selection each week in each group or combination of groups shall be determined by the Company.

A7.022 1. The Company, consistent with the above, will offer to all eligible employees, in order of their length of service, the choice of vacations from the vacation time available each week in their particular groups or combination of groups in the following order:

   (a) Employees who are eligible for two or more weeks' vacation in the current calendar year — two weeks.

   (b) Employees who are eligible for not more than one weeks' vacation in the current calendar year — one week.

2. The Company will then offer to all employees eligible for additional weeks of vacation, in the order of their length of

service, the choice of remaining vacation
time available each week in their particu-
lar group in the following order:

    (a) Employees who have completed seven
       years' service — one additional week.

    (b) Employees who have completed fif-
       teen years' service — one additional
       week.

    (c) Employees who have completed twen-
       ty five years' service will select an
       additional week.

A7.023  Employees who are eligible for one or more
weeks of vacation in any calendar year may
take up to four weeks of their current year's
entitlement on a day-at-a-time basis. Where
an employee takes more than two weeks on a
day-at-a-time basis, days from the remaining
eligible weeks must be taken during the
months of January, February, March, April,
May, October, November or December. The
selection of day-at-a-time vacation will be in
accordance with the provisions of Subsection
A10.03 of Section A10, Scheduling of Time
Off.

    1. Subject to the foregoing provisions in
      Subsection A7.023, employees may take a
      maximum of five (5) day-at-a-time vaca-
      tions in one-half day increments in a given
      calendar year. These half day increments
      may only be scheduled Mondays through
      Fridays. Subsequent requests for one-half

day-at-a-time vacation (subject to the 5 day maximum) and the Company's accommodation of such requests will be subject to the provisions of Section A10.03.

A7.024  Employees who are eligible for two or more weeks of vacation in any calendar year may schedule up to three weeks of their current year's entitlement during the period January 1 through April 30 of the subsequent year, provided that if one or two weeks are carried into the subsequent year an equal, or matching, number of vacation weeks taken from the employee's entitlement for the subsequent year must be scheduled and the weeks taken no later than April 30. A matching week need not be scheduled for a third vacation week carried into the subsequent year. The selection of "carry-over" and "matching" weeks shall have precedence over all other vacation selections for the period of January 1 through April 30 of the subsequent year.

A7.025  Vacation schedules will be posted by the Company after all assignments have been completed, but not later than January 1. Where eligibility to an initial or additional week of vacation occurs after the time the schedules are posted, such vacations may be scheduled to be taken upon completion of necessary service and included on the vacation schedules when posted. The Company will make every reasonable effort to adhere to

the schedule, but where the requirements of
the business make it necessary, the Company
may make changes in the assignment at any
time. If the Company decides to give vaca-
tions to more employees at a particular time,
the desires of individual employees will be
given consideration for these assignments.

A7.03 *Vacation Payments*

A7.031 The payment for each vacation week will be
the basic weekly wage rate then in effect.

A7.032 In general, employees will be paid for the
vacation period on the pay day just before the
beginning of vacation.

A7.033 Upon request of the employee, payment for
vacation time will be held until the employee
returns from vacation.

A7.034 Employees may also be paid in advance for
the week preceding the vacation. In this case,
payments for that week are based on the basic
weekly wage rate and any adjustments result-
ing from under or over-payments will be
made after the employee returns to duty.

A7.04 *Special Conditions Affecting Vacation Allow-
ances*

A7.041 Treatment for employees granted Military
Leave of Absence is covered in a separate
agreement.

A7.042 Employees absent two weeks or more imme-
diately preceding their vacation, due to sick-

ness or accident, will be given their vacation following their return to duty.

A7.043 If an employee is drawn to serve on a jury during his scheduled vacation, he will be permitted to reschedule his vacation.

A7.044 Employees who retire for any reason other than physical disability will be given the full vacation to which they are entitled by their years of service, provided there is sufficient time in the calendar year for such vacation prior to the employee's retirement date. If there is not sufficient time, employees will be given a cash allowance in lieu of unused vacation.

A7.045 Vacations will not be given to employees who are about to be discharged for proper cause.

A7.046 In cases of termination of service due to resignation or layoff, employees will be given a cash allowance in lieu of any unused vacation to which they are entitled by their years of service. In the case of interruption of service for leave of absence or resumption of service from leave of absence (other than those leaves referred to in A7.041), employees will be given unused vacation in that calendar year, to which they are entitled by their years of service, but no cash allowance in lieu of vacation will be given.

[133]

SECTION A8 — HOLIDAYS

A8.01  New Year's Day          Labor Day
       Presidents' Day         Veteran's Day
       Good Friday             Thanksgiving Day
       Memorial Day            Christmas Day
       Independence Day        Floating Holiday

A8.02  When any of the above Holidays falls on Sunday, the following Monday will be observed as the Holiday. If the Holiday falls on Saturday, the Friday immediately preceding will be observed as the Holiday.

A8.03  The posted work time schedule for the particular week will provide for a scheduled full tour on the Holiday for employees as part of their full work week. Employees will be excused on the Holiday to the extent that service requirements permit as determined by the Company.

A8.04  Excused employees will be granted a Holiday pay allowance equivalent to their basic daily wage rate. However, this Holiday pay allowance may be withheld where, in the opinion of the third-tier supervisor, the facts relating to the absence of the employee on the Holiday or the scheduled day immediately preceding or following the Holiday warrant such action.

A8.05  Employees working on a Holiday will be paid in full accordance with Section A3.04 — Holidays.

A8.06  Employees eligible for a Floating Holiday shall select this day in accordance with the procedures outlined in Subsection A10.033.

[134]

Floating Holidays, once granted, will not normally be subject to change. However, at the employees' request and subject to the requirements of the business as determined by management, employees may change a scheduled Floating Holiday.

Employees hired after September 30 in any calendar year shall not be eligible for a Floating Holiday in that calendar year.

SECTION A9 — EXCUSED WORK DAYS

A9.01 Each Regular employee who has at least six months of net credited service on January 1 of the current year shall be eligible for four (4) Excused Work Days with pay and one (1) Excused Work Day without pay during the year.

A9.02 Employees who do not work on their paid Excused Work Day shall be paid for the day as if for a normal or standard day worked, provided they are on the active payroll of the Company on that Excused Work Day.

A9.03 One paid Excused Work Day in each calendar year may be designated by the Company for employees in an administrative work group (as designated by the Company) or in any larger group, including the entire Company. Employees (except Occasional employees) in any such group for which an Excused Work Day is designated by the Company and who are not otherwise eligible for a paid Excused Work Day shall be excused and paid for such designated day as set forth in A9.02,

[135]

provided they are on the active payroll of the Company on the designated Excused Work Day.

A9.04 Employees who are on vacation or absent with pay on their paid Excused Work Day for reasons other than having observed it as an Excused Work Day shall have their paid Excused Work Day rescheduled if a vacation day would have been rescheduled under the same circumstances.

A9.05 If employees agree to work on their paid Excused Work Day and the Company determines that the day cannot be rescheduled, they shall be paid as applicable in accordance with the following subparagraphs:

(a) Employees who agree to work before the work schedule becomes fixed shall receive one day's pay as set forth in A9.02, in lieu of their Excused Work Day and shall in addition be paid in accordance with the provisions of the Collective Bargaining Agreement covering work on a scheduled day of work.

(b) Employees who agree to work after the work schedule becomes fixed shall receive one day's pay as set forth in A9.02, in lieu of their Excused Work Day and shall in addition be paid in accordance with the provisions of the Collective Bargaining Agreement covering work on a nonscheduled day.

(c) Time worked by an employee on his or her Excused Work Day shall be considered time worked on a regularly scheduled day of work for all purposes, except as is otherwise expressly provided in this Section.

[136]

SECTION A10 — SCHEDULING OF TIME OFF

A10.01 The provisions of this Section cover the procedures to be followed in scheduling of time off. These procedures relate to provisions of the following Sections of this Agreement:

> Section A7. Vacations, Subsections A7.013, A7.022, A7.023
>
> Section A8. Holidays, Subsection A8.06.
>
> Section A9. Excused Work Days

The provisions of Section A10 shall not be used to alter the above provisions of this Agreement except to the extent required by this Section.

A10.02 For the purposes of this Section A10, time off includes vacation time, Excused Work Days (paid and non-paid), floating holidays, and days in lieu of holidays which occur during a scheduled vacation week and are referred to as "HV" days.

A10.03 The selection and scheduling of time off shall be in accordance with the provisions of this Subsection A10.03.

A10.031 Employees shall select in the priority herein set forth in seniority order within the administrative work group or other appropriate groups which may be designated as set forth in Subsection A7.022. The employees' selections shall be granted, to the extent practicable, consistent with force requirements and needs of the business.

A10.032 Prior to the beginning of a calendar year, and

[137]

in accordance with the procedures stated in A7.02 — Vacation Assignments, management will make available to members of the designated groups a schedule for selection of full vacation weeks. Only full week vacations shall be selected at this time.

A10.033   Upon completion of the selections of full vacation weeks in the manner described in Subsection A10.032, the schedule will be made available for selections of other scheduled time off for which individual employees are eligible. Scheduled time off shall include the following:

1. Day-at-a-time vacation days.

2. Days in lieu of holidays occurring in vacation weeks ("HV" days).

3. Floating holidays.

4. Excused Work Days — Paid and Non-Paid.

5. Reserve-time.

Within each work group, or other vacation selection group, and in seniority order within the group, individual employees shall be given the opportunity to designate specific dates, if known, upon which they desire to observe the time off to which they are entitled.

Individuals need not designate every day to which they are entitled at this time. Subsequent requests will be considered on the basis of the earliest request to the employee's

[138]

immediate supervisor. The Company will attempt to accommodate such requests, subject to the needs of the business and force requirements of the work group.

A10.034 The selection procedure, known as the second priority selection, described in A10.033, will also include selection of "reserve-time". Reserve-time must be selected and scheduled at the time an employee is given the opportunity to designate the days upon which the employee will observe time off for which the employee is eligible. Whether or not the employee designates any or all of his or her time off under A10.033, a block of work days equal to the total amount of eligible time off under A10.033 shall be designated during the second priority selection. This block of days shall be scheduled consistent with force requirements and the needs of the business, but in any case, not later than April 30 of the succeeding calendar year.

Any time off not taken by an employee prior to the scheduled reserve-time must be taken during the scheduled reserve-time selected by that employee.

SECTION A11—TITLES OF GROUP 1 EMPLOYEES

A11.01 Following are the authorized occupational titles for employees classed as "Group 1".

Assignment Administrator
Assignment Technician

Assistant Technician
Automotive Mechanic
Building Custodian
Building Custodian Associate
Building Equipment Mechanic
Combination Technician
Communications Assistant
Customer Service Agent
Driver - Heavy Truck
Driver - Light Truck
Driver - Medium Truck
Driver - Tractor Trailer
Facilities Assigner
Field Clerk
Frame Attendant
Frame Attendant — A
General Field Clerk
Maintenance Administrator
Materials Handler
Office Clerical Assistant
Outside Plant Technician
Senior Attendant
Senior Field Clerk
Services Technician
Splicing Technician
Splicing Technician's Helper
Storekeeper
Support Systems Attendant
Switching Equipment Technician
Systems Technician
Systems Technician — Radio
Test Desk Technician
Translations Administrator

[140]

REGULAR FULL-TIME EMPLOYEES—GROUP 2

SECTION A14—DEFINITIONS

A14.01 *Full Day Tours*

    A14.011 Seven and one-half hours, starting at or after 7 A.M. but not after 9 A.M. and divided into two sessions, not necessarily of the same length, by an unpaid meal period of not more than one hour.

    A14.012 In the Financial Organization, seven and one-half hours starting at or after 6:30 A.M. but ending not later than 6 P.M. and divided into two sessions, not necessarily of the same length, by an unpaid meal period of not more than one hour.

A14.02 *Part Day Tours*

    A14.021 Either 3½ or 4 hours, starting at or after 7 A.M. but not after 9 A.M. or starting at or after 12 noon but not after 1:30 P.M.

    A14.022 In the Financial Organization, either 3½ or 4 hours, starting at or after 6:30 A.M. but not after 9 A.M.

A14.03 *Full Evening Tours*

    A14.031 Seven and one-half hours, starting at or after 1 P.M. but not after 5 P.M. and including a meal period of one-half hour, during which the Company may require employees to remain at the job location.

A14.04 *Part Evening Tours*

    A14.041 Either 3½ or 4 hours starting at or after 1 P.M. but not after 5 P.M. These tours shall apply

[141]

only to employees in the Reproduction
Bureau and to Financial Organization
employees.

A14.05  *Night Tours*

A14.051  Seven and one-half hours starting at or after
10 P.M. but not after midnight and including
a meal period of one-half hour during which
the Company may require the employee to
remain at the job location. (Part night tours
will not be scheduled.)

A14.06  *Normal Work Week*

A14.061  A normal work week consists of five full
tours which may be scheduled on any of the
six week days, except that in the case of Ser-
vice Evaluators and employees in the Finan-
cial Organization assigned to Computer Cen-
ters, which are headed by a third tier manager
whose function is to provide or support com-
puter operations, the normal work week may
be scheduled on any of the seven calendar
days of the week. Where the number of tours
worked in any week is greater than the num-
ber comprising the normal work week, the
five full tours scheduled shall comprise the
normal work week, except that in the case of
Service Evaluators and employees in the
Financial Organization assigned to Computer
Centers, which are headed by a third tier
manager whose function is to provide or sup-
port computer operations, the normal work

[142]

week will be comprised of the first five full
tours worked.

A14.07 *Group 2 Employees*

  A14.071 Employees assigned one of the occupational
titles listed in Section A24.

A14.08 *Regular Full-Time Employees*

  A14.081 Employees whose regular assignments of
work cover normal work weeks.

A14.09 *Relief Periods — Service Evaluators and Finan-
cial Organization Employees*

  A14.091 Service Evaluators will be given a relief peri-
od not in excess of fifteen minutes in any ses-
sion of two hours or more, where force and
work conditions permit. Relief periods are
paid as work time.

  A14.092 Employees in the Financial Organization
working tours starting after 6 A.M. and end-
ing prior to 6 P.M. will be given a paid relief
period of not more than fifteen minutes in
each session worked at a time designated by
the Company. In general, no other absence
from the job will be allowed.

SECTION A15—WORK TIME SCHEDULES

A15.01 The provisions of Section A2 for Group 1
employees will also apply for Group 2 employ-
ees, except that for Group 2 employees the
schedules to be posted by the Company need not
be posted in three week cycles. Any revision in
such schedules will be posted during the second

[143]

week prior to the week in which the new schedules are to be effective.

A15.02 For Service Evaluators the work week shall start on Sunday and end on Saturday. For all other Full-Time employees the work week shall start on Monday and end on Saturday.

A15.03 *Selection of Tours*

Service Evaluators in individual offices may select the method to be used in assigning tours (that is, either by rotation or on the basis of net credited service, or by date of appointment) to the extent that service requirements permit. It is recognized by both the Union and the Company that the requirements of the business make it necessary for some employees to be assigned to tours other than those they might select.

SECTION A16—BASIS OF COMPENSATION

A16.01 Employees are paid a basic weekly wage rate which is the amount paid for thirty-seven and one-half hours' work. The basic daily wage rate is the basic weekly wage rate divided by five. The basic hourly wage rate is the basic weekly wage rate divided by 37½.

A16.02 Employees working on Sunday shall be paid for such time worked in accordance with the applicable provisions of A3.03.

Employees working "non-scheduled" hours on weekdays shall be paid in accordance with the provisions of A3.02.

[144]

A16.03 Employees working on Holidays shall be paid in accordance with the provisions of A3.04.

A16.04 Employees working "non-scheduled hours" shall be paid for any part hour so worked in accordance with the provisions of A3.052.

A16.05 *Employees Called Out to Work Non-Scheduled Time*

A16.051 Employees shall be paid in accordance with the provisions of A3.07.

A16.06 *In-Charge Payment*

A16.061 Payment shall be in accordance with the provisions of A3.08

A16.07 *Evening, Night and Certain Full Day Tours*

A16.071 Differentials shall be paid in accordance with the provisions of A3.06.

A16.08 *Special City Allowance*

A16.081 Payment shall be in accordance with the provisions of A3.10.

A16.09 *Training Payment (Financial Organization Employees Only)*

The training of employees is normally a management function; however, a qualified employee in an occupation may be assigned the responsibility to train another employee in the same or higher occupation. When this occurs, the employee performing the training function will be given a special payment of $7.50 for each full session in which training functions are per-

[145]

formed. The special payment will be administered as follows:

1. Where an employee is involved in explaining and demonstrating the job, in detail, for the benefit of another employee, or explaining its relationship to associated jobs and answering job related questions, the procedure shall not be considered as job training and the training payment will not be applicable.

2. The training responsibility will include explaining the job, directing the employee in the proper procedures, observing the performance and reviewing the results of the work with the employee.

A16.10 *Differential for Use of Bi-lingual Skills*

Differential shall be paid in accordance with the provisions of A3.12.

A16.11 *Overtime Administration*

Treatment shall be in accordance with the provisions of A3.022.

SECTION A17—PAY ALLOWANCES FOR ABSENT TIME

A17.01 The provisions of Section A4 for Group 1 employees shall apply to Group 2 employees.

SECTION A18—TRAVEL TIME

A18.01 Treatment shall be in accordance with the provisions of Section A5.

[146]

SECTION A19—REIMBURSEMENT OF
INCIDENTAL EXPENSES

A19.01  Treatment shall be in accordance with the provisions of Section A6.

SECTION A20—VACATIONS

A20.01  Treatment shall be in accordance with the provisions of Section A7 except that for Group 2 employees, other than those employees in the Financial Organization, the vacation procedures in effect in each office as of January 1, 1983 will apply rather than those outlined in A7.021 and A7.022.

SECTION A21—HOLIDAYS

A21.01  Treatment shall be in accordance with the provisions of Section A8.

SECTION A22—EXCUSED WORK DAYS

A22.01  Treatment shall be in accordance with the provisions of Section A9.

SECTION A23—SCHEDULING OF TIME OFF

A23.01  Treatment shall be in accordance with the provisions of A10.

SECTION A24—TITLES OF GROUP 2 EMPLOYEES

A24.01  Following are the authorized occupational titles for employees classed as "Group 2":

[147]

Bill Production Technician
Customer Billing Analyst
Drafter
General Clerk
| Graphics Designer
Office Clerical Assistant(\*)
Materials Service Coordinator
Payroll Analyst
Senior Clerk
Service Evaluator
Staff Clerk
Stenographer — Clerk
Supplies Attendant
| Treasury Clerk

(\*) Office Clerical Assistant also authorized as "Group 1" in
A11.01.

SECTION A27—REGULAR PART-TIME EMPLOYEES
(Engaged or Re-engaged prior to January 1, 1981)

Group 1

A27.01 A Part-Time employee is one who is employed
and normally scheduled to work less hours per
average month than a comparable Full-Time
employee in the same job title, classification and
work group working the same normal daily tour.

A27.02 The classification "Part-Time" applies to those
employees in the Building Custodian Group
whose occupational titles are listed in Section
A27.05.

A27.03 Because of the nature of the work it is generally
not possible to definitely assign hours of starting

[148]

and stopping work. Therefore, work time schedules show for each day the average number of hours required per day.

A27.04 Except as covered below, the working conditions of Regular Part-Time Employees — Group 1 will be on the same basis as for Regular Full-Time Employees — Group 1.

A27.041 Employees working in excess of their scheduled hours will be paid at their basic hourly wage rate except for the time in excess of eight hours in a day or 40 hours in a week.

A27.042 The Holiday allowance to be paid Part-Time Employees will be based on one-fifth of the average hours worked per week which are not in excess of eight per day or forty hours per week during the first four of the six calendar weeks immediately preceding the Holiday week or the amount of scheduled hours worked on the Holiday, whichever is greater.

A27.043 Absent time payments will be calculated on the basis of the time assigned on the day but not in excess of eight hours, or the time assigned in the week but not in excess of forty hours.

A27.044 Vacation payments will be based on the employee's average weekly payments at basic rates for work time not in excess of forty hours per week during the first four weeks of the six weeks immediately preceding the vacation.

[149]

A27.045 Payment for Paid Excused Work Days will be as follows:

(a) For Part-Time Employees who do not work their paid Excused Work Day, payments will be based on one-fifth of the average hours worked per week which are not in excess of eight per day or forty per week during the first four of the six weeks immediately preceding the week in which the paid Excused Work Day falls, including tour differential if it would have been applicable on the Excused Work Day.

(b) If Part-Time Employees agree to work their paid Excused Work Day and the Company determines that the day cannot be rescheduled, they will be paid in accordance with paragraph (a) preceding, except that if the number of hours actually worked on the Excused Work Day is greater than the number of hours payable under paragraph (a), the greater number of hours, not in excess of a full tour, will be paid, including tour differential if it would have been applicable on the Excused Work Day. In addition, if employees are notified to work their scheduled Excused Work Day at least two full days, exclusive of Sunday, prior to their Excused Work Day, they will be paid for the time worked on the basis of a regularly scheduled day. If at least two

[150]

full days' notice, exclusive of Sunday, is not given, employees will be paid as if the hours worked were in excess of eight in a day.

A27.05 Titles of Part-Time Employees are:
Building Custodian
Building Custodian Associate

**Note:** While, in general, employees in other classifications are not engaged on a part-time basis, any of the classifications listed in Section A11 may be engaged on that basis.

A27.06 Any Regular Employee who was on the active payroll of the Company as of December 31, 1980, and who works as a Regular Part-Time Employee on or after January 1, 1981, shall thereafter continue, for the duration of that term of employment, to be entitled to working conditions and benefits on the same basis as was applicable to a Regular Part-Time Employee on December 31, 1980.

SECTION A28—PART-TIME EMPLOYEES
(Engaged or Re-engaged after January 1, 1981)

A28.01 A Part-Time employee is one who is employed and normally scheduled to work less hours per average month than a comparable Full-Time employee in the same job title, classification and work group working the same normal daily tour.

A28.02 Except for payment for overtime hours worked, all hours worked by a Part-Time employee in Phonecenter Stores, Verizon Service Centers,

[151]

Verizon Phone Booths (Kiosks), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or service centers operation, and any employee who is transferred to or employed by any new unregulated subsidiary or affiliated entity in the Verizon Services Group shall be paid at the equivalent basic hourly rate for a comparable Full-Time employee working a normal daily tour in the same job title, classification, and work group. Payment to a Part-Time employee for hours worked in excess of an equivalent normal daily tour or work week for a comparable Full-Time employee shall be at the applicable overtime rate for a comparable Full-Time employee based on such Part-Time employee's basic hourly rate. Any Regular employee who is on the active payroll of the Company as of December 31, 1980, and who works part-time on or after January 1, 1981, shall thereafter continue, during the current term of employment, to be paid on the same basis as was applicable to such a Part-Time employee on December 31, 1980.

A28.03   The classification of a Part-Time employee is based on the employee's "part-time equivalent work week" which shall be determined prospectively by dividing the employee's total normally scheduled hours per month by 4.35 and rounding the result to the next higher whole number. (Illustration: 68 hours per month divided by 4.35 equals 15.6, rounded to a "part-time equivalent work week" classification of 16)

[152]

A28.04 The "part-time equivalent work week" classifi-
cation of each Part-Time employee shall be
reviewed by the Company no less often than
every six (6) months on April 1 and October 1 of
each year and adjusted on a prospective basis, if
appropriate. In determining whether such
adjustment is appropriate, the Company
will consider the actual average number of hours
worked per month during the preceding six (6)
month period and the likelihood that such num-
ber of work hours will continue for a reasonably
foreseeable period of time except that any hours
worked which are paid at the overtime rate shall
not be counted in computing the average number
of hours worked.

A28.05 For employees who are hired on or after January
1, 1981, and who work as Regular Part-Time
employees, payments to a Regular Part-Time
employee for sickness disability, accident dis-
ability, or death benefits under the "Verizon Pen-
sion Plan" or the "Verizon Sickness and Acci-
dent Disability Benefit Plan", vacations,
holidays, anticipated disability leave, sickness
absence (not under the "Verizon Pension Plan"
or the "Verizon Sickness and Accident Disabili-
ty Benefit Plan"), or termination allowance (or
its equivalent) shall be pro-rated based on the
relationship of the individual Part-Time employ-
ee's "part-time equivalent work week" to the
normal work week of a comparable Full-Time
employee in the same job title, classification and
work group. A Part-Time employee shall not be

[153]

paid for time not worked on a holiday or for absence due to sickness (not under the "Verizon Pension Plan" or the "Verizon Sickness and Accident Disability Benefit Plan") unless such holiday or absence due to sickness occurs on a day of the week on which the employee is normally scheduled to work. Regular employees who are on the active payroll of the Company as of December 31, 1980, and who work part-time on or after January 1, 1981 shall thereafter continue, during the current term of employment, to receive payments for the benefits and other items listed above on the same basis as was applicable to a Part-Time employee on December 31, 1980.

A28.06   Employees who are hired on or after January 1, 1981, and who work as Part-Time employees shall, if otherwise eligible to participate under the terms of such plans, be eligible for coverage under the Basic Medical Expense Plan, Extraordinary Medical Expense Plan, Special Medical Expense Plan, Medical Expense Plan, Dental Expense Plan, and Vision Care Plan, as follows:

> (a) Employees whose part-time equivalent work week classification is sixteen (16) or less shall be eligible by enrollment and payment of 100% of the premiums for such coverage;

> (b) Employees whose part-time equivalent work week classification is seventeen (17) through twenty-four (24) shall be eligible by enrollment and payment of 50% of the premiums for such coverage;

[154]

    (c) Employees whose part-time equivalent work week classification is twenty-five (25) or more shall be eligible for such coverage on the same basis as a Regular Full-Time employee;

    (d) For purposes of participation hereunder, the Basic Medical Expense Plan and the Extraordinary Medical Expense Plan shall be considered together and an employee may not elect to participate in one without participating (including payment of the premium) in the other;

    (e) Regular employees who are on the active payroll of the Company as of December 31, 1980, shall continue to be eligible for such coverage on the same basis as a Regular Full-Time employee regardless of classification.

A28.07 Effective January 1, 1981, Part-Time employees, regardless of classification, shall be eligible for Excused Work Days on a prorata basis based upon the ratio of any such Part-Time employee's equivalent work week to the normal work week of a comparable Full-Time employee.

SECTION A31—REGULAR PART-TIME EMPLOYEES
(Engaged or Re-engaged prior to January 1, 1981)

Group 2

A31.01 A Part-Time employee is one who is employed and normally scheduled to work less hours per average month than a comparable Full-Time

[155]

employee in the same job title, classification and work group working the same normal daily tour.

A31.02 The occupational titles and working conditions of Regular Part-Time Employees — Group 2 will be on the same basis as for Regular Full-Time Employees — Group 2 except as follows:

A31.021 Time worked will be paid for at the employee's basic hourly wage rates, except time in excess of seven and one-half hours per day or in excess of thirty-seven and one-half hours per week, which will be paid at time and one half, except as provided in Subsection A3.021 (b). Hours in excess of seven and one-half per day shall not, however, be included in calculating hours in excess of thirty-seven and one-half per week.

A31.022 Absent time payments will be calculated on the basis of the time assigned on the day but not in excess of seven and one-half hours, or the time assigned in a week but not in excess of thirty-seven and one-half hours.

A31.023 Vacation payments will be based on the employee's average weekly payments at basic rates for work time not in excess of thirty-seven and one-half hours per week during the first four weeks of the six weeks immediately preceding the vacation.

A31.024 The Holiday allowance to be paid Part-Time Employees will be based on one-fifth of the average hours worked per week which are not in excess of seven and one-half per day or

[156]

thirty-seven and one-half per week during the first four of the six calendar weeks immediately preceding the Holiday week or the amount of scheduled hours worked on the Holiday, whichever is greater.

A31.025 Payment for paid Excused Work Days will be as follows:

(a) For Part-Time Employees who do not work their paid Excused Work Day, payments will be based on one-fifth of the average hours worked per week which are not in excess of seven and one-half per day or thirty-seven and one-half per week during the first four of the six calendar weeks immediately preceding the week in which the paid Excused Work Day falls, including tour differential if it would have been applicable on the Excused Work Day.

(b) If Part-Time Employees agree to work their paid Excused Work Day and the Company determines that the day cannot be rescheduled, they will be paid in accordance with paragraph (a) preceding, except that if the number of hours actually worked on the Excused Work Day is greater than the number of hours payable under paragraph (a), the greater number of hours, not in excess of a full tour, will be paid, including tour differential if it would have been applicable on the Excused Work Day. In addition, if

[157]

employees are notified to work their scheduled Excused Work Day at least two full days, exclusive of Sunday, prior to their Excused Work Day, they will be paid for the time worked on the basis of a regularly scheduled day. If at least two full days' notice, exclusive of Sunday, is not given, employees will be paid as if the hours worked were in excess of seven and one-half per day.

A31.03   Any Regular Employee who was on the active payroll of the Company as of December 31, 1980, and who works as a Regular Part-Time Employee on or after January 1, 1981, shall thereafter continue, for the duration of that term of employment, to be entitled to working conditions and benefits on the same basis as was applicable to a Regular Part-Time Employee on December 31, 1980.

SECTION A41—TEMPORARY EMPLOYEES

A41.01   Temporary employees are those whose term of employment is intended to last more than three weeks but not more than six (6) months.

A41.02   The provisions of Sections A1 to A24, inclusive, of Exhibit A for Regular employees will apply to Temporary Full-Time employees, except that Temporary Full-Time employees shall not be entitled to Excused Work Days other than Company designated Excused Work Days.

A41.03  The provisions of Section A28, Part-Time Employees (Engaged or Re-engaged after January 1, 1981), will apply to Temporary Part-Time Employees, except that Temporary Part-Time Employees shall not be entitled to Excused Work Days other than Company designated Excused Work Days.

A41.04  Effective January 1, 1981, working conditions for all Temporary Part-Time employees will be those contained in Section A28, and Sections A1 to A27, inclusive, will no longer apply to employees in the Temporary Part-Time classification, except that Temporary Part-Time employees shall not be entitled to Excused Work Days.

SECTION A51 — OCCASIONAL EMPLOYEES

A51.01  An Occasional employee is one who is engaged on a daily basis for a period of not more than three (3) consecutive weeks, or for a cumulative total of not more than thirty (30) days, in any calendar year, regardless of the length of the daily or weekly assignments. An Occasional employee who actually works or is engaged to work in excess of three (3) consecutive weeks or thirty (30) days in a calendar year shall be reclassified as a Regular, Term, or Temporary employee, as appropriate.

A51.02  Wage rates to be paid and any working conditions applying to the particular work for which the employee is engaged will be stated to the employee at the time of the engagement.

SECTION A61—TERM EMPLOYEES

A61.01 Term employees are those whose term of employment is intended to last longer than six (6) months but no longer than thirty-six (36) months. Term employees are engaged with the definite understanding that their employment is to terminate upon the completion of a specific project and that they will remain in the same occupational title for the duration of their term of employment.

A61.02 The provisions of Section A1 to A24, inclusive, of Exhibit A for Regular employees will apply to Term employees.

A61.03 No more than 400 employees in the combined Plant/Services and Financial Organizations may be in the Term classification.

A61.04 The Company will give notice of projects for which Term employees will be hired to the President of the Union and the Vice President of the Region where the work will be performed.

## EXHIBIT B

SECTION B1—PROCEDURE FOR ARBITRATION

B1.01 The procedure to be followed in instituting and conducting the arbitration of any matter subject to arbitration under the provisions of Article 13, shall be as follows, except that the tripartite board may be eliminated and an agency other than the American Arbitration Association may

be substituted upon mutual agreement of the parties.

B1.011 The Board of Arbitration shall consist of three members, one of whom shall be a member of the Union designated by the Union, and one individual designated by the Company, who shall be in the employ of the Company; the third shall be an impartial Chairman designated in the manner hereinafter described.

B1.02 The various steps required in connection with any such arbitration shall be taken as expeditiously as possible, but the parties agree that the following steps shall be taken within the times stated unless an extension be mutually agreed to in writing.

B1.021 Within ten days following the serving by either party upon the other of a written demand for arbitration stating precisely the question to be decided, each party shall, by a written designation given to the other, appoint the arbitrator to be appointed by it. Each such written designation shall state the full name and address of the arbitrator appointed thereby.

B1.022 Should either the Union or the Company fail within the time above stated to appoint its arbitrator, the vacancy resulting by reason of such failure shall upon the written request of either party be filled by an impartial individ-

[161]

ual appointed by the American Arbitration Association.

B1.023  Within five days following their appointment under Section B1.021 or Section B1.022 the arbitrators representing the Company and the Union shall select an impartial Chairman. If they are unable to agree, the American Arbitration Association immediately shall be requested in writing to appoint the impartial Chairman in accordance with the Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association.

B1.024  Upon the appointment of the impartial Chairman, the Board of Arbitration shall be deemed to be constituted. Within ten days following the constitution of the Board of Arbitration, hearings shall be started and carried to conclusion as expeditiously as possible. The arbitration shall be conducted under the Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association as to any procedural matter not specifically covered in this Agreement. In the absence of unanimous agreement by the other members of the Board of Arbitration with respect to the closing of the proceeding, the impartial Chairman may declare the proceeding closed. Within ten days following the closing of the proceeding, the Board of Arbitration shall render its decision in writing.

[162]

B1.025  If the members of the Board are unable to reach a unanimous decision, the decision of the impartial Chairman shall be final and binding upon the parties. The union and its members and the Company agree to abide by the decision of the Board or of the impartial Chairman, as the case may be, which shall be enforceable by appropriate action or proceeding, if necessary, in a court of law or equity or otherwise.

B1.026  Each of the parties hereto shall bear the compensation and expenses of the members appointed by it or on its behalf. The compensation and expenses of the impartial Chairman and of the American Arbitration Association, and any other expenses of the Board of Arbitration, shall be borne equally by the Union and the Company.

SECTION B2—EXPEDITED ARBITRATION

B2.01  In lieu of the procedures specified in Section B1 of this Agreement, any grievance involving the suspension of an individual employee, except those which also involve an issue of arbitrability, contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court action shall be submitted to arbitration under the expedited arbitration procedure hereinafter provided within fifteen (15) calendar days after the filing of a request for arbitration. In all other grievances involving disciplinary action which

[163]

are specifically subject to arbitration under Article 11 of this Agreement, both parties may, within fifteen (15) calendar days after the filing of the request for arbitration, elect to use the expedited arbitration procedure hereinafter provided. The election shall be in writing and, when signed by authorized representatives of the parties, shall be irrevocable. If no such election is made within the foregoing time period, the arbitration procedure in Section B1 shall be followed.

B2.02 As soon as possible after this Agreement becomes final and binding, a panel of three umpires and two alternates shall be selected by the parties. Each umpire shall serve until the termination of this Agreement unless his or her services are terminated earlier by written notice from either party to the other. The umpire shall be notified of his or her termination by a joint letter from the parties. The umpire shall conclude his or her services by settling any grievance previously heard. A successor umpire shall be selected by the parties. Umpires shall be assigned cases in rotating order designated by the parties. If an umpire is not available for a hearing within ten (10) working days after receiving an assignment, the case will be passed to the next umpire. If no one can hear the case within ten (10) working days, the case will be assigned to the umpire who can hear the case on the earliest date.

[164]

B2.03  The procedure for expedited arbitration shall be as follows:

    (a) The parties shall notify the umpire in writing on the day of agreement or date of arbitration demands in suspension cases to settle a grievance by expedited arbitration. The umpire shall notify the parties in writing of the hearing date.

    (b) The parties may submit to the umpire prior to the hearing a written stipulation of all facts not in dispute.

    (c) The hearing shall be informal without formal rules of evidence and without a transcript. However, the umpire shall be satisfied himself or herself that the evidence submitted is of a type on which he or she can rely, that the hearing is in all respects a fair one, and that all facts necessary to a fair settlement and reasonably obtainable are brought before the umpire.

    (d) Within five (5) working days after the hearing, each party may submit a brief written summary of the issues raised at the hearing and arguments supporting its position. The umpire shall give his or her settlement within five (5) working days after receiving the briefs. He or she shall provide the parties a brief written statement of the reasons supporting his or her settlement.

    (e) The umpire's settlement shall apply only to the instant grievance, which shall be settled

[165]

thereby. It shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties unless the settlement or a modification thereof is adopted by the written concurrence of the representatives of each party at the fourth step of the grievance procedure.

(f) The time limits in (a) and (d) of this Section may be extended by agreement of the parties or at the umpire's request, in either case only in emergency situations. Such extensions shall not circumvent the purpose of this procedure.

(g) In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for backpay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action. Delays requested by the Union in which the Company concurs shall not be included in such additional time.

(h) The umpire shall have no authority to add to, subtract from or modify any provisions of this Agreement.

(i) The decision of the umpire will settle the grievance, and the Company and the Union agree to abide by such decision. The compensation and expenses of the umpire and

[166]

the general expenses of the arbitration shall be borne by the Company and the Union in equal parts. Each party shall bear the expense of its representatives and witnesses.

(j) The time limit for requesting arbitration under this provision shall be the same as in existing procedures.


# EXHIBIT C
## WAGE INCREASE SCHEDULES

The rates provided for in these schedules are based on a normal workweek of 40 hours for Group 1 employees and on a normal workweek of 37½ hours for Group 2 employees.


## NOTES ON WAGE INCREASE SCHEDULE ADMINISTRATION

C1.00 *General*

C1.01 The wage increase schedules contained in C4.00 indicate the amounts to be paid to Regular, Term, and Temporary Employees. These wage rates are based on a normal full-time workweek.

C1.02 Each wage increase schedule shows the occupation(s) and the zone assignment applicable to the wage increase schedules contained therein.

C1.03 The maximum rate to be paid for the occupation and zone is indicated by the word "Maximum" opposite the applicable rate. The lowest rate for

[167]

which an interval and amount of increase appears is the minimum rate at which employees will be employed for that occupation and zone. However, in Services, special qualifications may be recognized by a higher initial rate.

C1.04 Under the caption "Next Increase" is shown the interval in months between increases and the amount of increase to be given.

C1.041 Employees will be increased in the interval shown opposite their current rate except that such increase may be deferred for a period of 6 months or the stated interval, whichever is less, in individual cases where in the reasonable judgment of the Company the employee does not merit the increase.

In the event an increase is to be deferred, the employee shall be notified in writing at least 15 days prior to the commencement of the payroll period in which the increase would normally become effective and will be advised of the reason for the deferment. If the employee is not provided with written notice as required by this subsection, the increase will not be deferred. If in the judgment of the Company the employee later merits the increase, when the period of deferment terminates, the employee's rate shall be increased by the amount of the deferred increase.

The date for the next scheduled increase shall be measured from the date the prior increase

[168]

would normally have been granted had it not been deferred.

If the employee's current rate is not shown on the Wage Increase Schedule and the difference between the rate and the maximum rate is less than the increase shown for the next lower current rate, the increase will be to the maximum rate and the interval reduced proportionately.

C1.05 If an employee's rate is to be reduced in accordance with Paragraph C2.00, the Company may, at its discretion in exceptional cases, decrease the rate by a smaller amount than the total amount specified in that paragraph.

C1.06 Nothing in this Agreement shall prevent the Company from reducing an employee to the maximum rate for occupation and zone.

C1.07 Employees may be hired into any titles at rates in excess of the minimum hiring rate at the Company's discretion. If an employee is hired into a title at a pay rate in excess of the minimum hiring rate for reasons other than job related experience and/or job related training, any employee in that title in the building into which the employee is hired who is at a lower rate of pay will be raised to the rate of the individual hired.

C1.08 *Progression Increase Deferral Upon Return From Absence*

In the event of absence for any reason continuing for more than one month (thirty days) during which the employee was scheduled to receive a

[169]

progression increase, the employee shall receive his/her progression increase effective the Sunday after he/she returns to work. In addition, the accumulated absence, if over thirty (30) days (one month), will be added to extend the time until the employee's next scheduled progression increase in intervals of thirty (30) days.

C1.09 *Cost-of-Living*

(1) Effective August 6, 2006 and August 5, 2007, adjustments will be made in basic weekly rates in each wage schedule in accordance with the following:

(a) the amount of the August 6, 2006 adjustment shall be: (i) one-half of the increase above four percent (4.0%) in the "CPI-W" (1982-84 = 100) for May 2006 over May 2004, applied to (ii) the scheduled rates in effect in each wage schedule on August 5, 2006, (iii) rounded to the nearest 50 cents.

(b) the amount of the August 5, 2007 adjustment shall be: (i) one-half of the increase above two percent (2.0%) in the "CPI-W" (1982-84 = 100) for May 2007 over May 2006, applied to (ii) the scheduled rates in effect in each wage schedule on August 4, 2007, (iii) rounded to the nearest 50 cents.

(2) In no event shall a decrease in the CPI-W result in a reduction of any basic weekly wage rate.

(3) In the event the Bureau of Labor Statistics

[170]

does not issue the appropriate Consumer Price Indexes on or before the dates referred to in Paragraph 1, the cost-of-living adjustment required by such appropriate indexes shall be effective at the beginning of the first payroll week after receipt of the indexes.

(4) No adjustment, retroactive or otherwise, shall be made as the result of any revision which may later be made in the first published figures for the CPI-W for May 2004, May 2006 and May 2007.

(5) The cost-of-living adjustment is dependent upon the availability of the CPI-W in its present form and calculated on the same basis as the CPI-W for May 2003. In the event the Bureau of Labor Statistics changes the form or the basis of calculating the CPI-W, the Companies and the Union agree to request the Bureau to make available, for the life of this agreement, a CPI-W in its present form and calculate it on the same basis as the CPI-W for May 2003, which was 179.4 (1982-84 = 100).

C2.00 *The following procedure governs the change of an employee from one occupation to another occupation having a different Wage Increase Schedule:*

C2.01 Change to an occupation with a higher maximum rate:

C2.011 Except as otherwise provided below, the wage rates of promoted employees will be changed to the rates they would be receiving

[171]

had they been hired directly into and remained in the new occupation since their net credited service date. This shall be accomplished by reconstructing the employee's wage history as though originally hired into the new occupation.

C2.012 Employees will be placed on the step of the new wage schedule to which promoted as determined by the wage reconstruction process but not to exceed the wage step from maximum rate as shown below:

| **Title Groupings** | **Step From Maximum** |
| --- | --- |
| Combination Technician | 12 months |
| Splicing Technician | |
| Systems Technician | |
| Systems Technician — Radio | |
| | |
| Automotive Mechanic | 12 months |
| Building Equipment Mechanic | |
| Customer Service Agent | |
| Facilities Assigner | |
| Switching Equipment Technician | |
| Test Desk Technician | |
| | |
| Assignment Technician | 6 months |
| Driver - Heavy Truck | |
| Driver - Tractor Trailer | |
| Material Service Coordinator | |
| Outside Plant Technician | |
| Services Technician | |
| Splicing Technician's Helper | |
| | |
| Assignment Administrator | 6 months |
| Communications Assistant | |
| Driver - Light Truck | |
| Driver - Medium Truck | |

[172]

| Title Groupings | Step From Maximum |
|---|---|
| **Frame Attendant** | 6 months |
| Frame Attendant A | |
| Maintenance Administrator | |
| Materials Handler | |
| Storekeeper | |
| Support Systems Attendant | |
| Translations Administrator | |
| Bill Production Technician | 6 months |
| Customer Billing Analyst | |
| Drafter | |
| Graphics Designer | |
| Payroll Analyst | |
| Senior Field Clerk | |
| Service Evaluator | |
| Staff Clerk | |
| Supplies Attendant | |
| Treasury Clerk | |
| General Field Clerk | 0 months |
| Senior Clerk | |
| Stenographer-Clerk | |
| Field Clerk | 0 months |
| General Clerk | |
| Assistant Technician | 0 months |
| Building Custodian | |
| Building Custodian Associate | |
| Office Clerical Assistant | |
| Senior Attendant | |

C2.013 Employees promoted from one occupation to another occupation within the same Title Groupings set forth in C2.012 will not be subject to the six and/or twelve month step from maximum rate limitation.

[173]

C2.014 Employees promoted to the occupation of Facilities Assigner or Assignment Technician and who have over four years net credited service, one year of which was spent performing plant line assigning work, will not be subject to the respective twelve or six month step from maximum rate limitation.

C2.015 If at the time of promotion the employee's current rate is higher than it would have been had the employee been hired directly into the new occupation, the rate will not be reduced.

C2.016 If at the time of promotion the employee's current rate is equal to or higher than the six month or twelve month step from maximum rate, whichever is applicable, the step from maximum rate provision will not apply. In such case, the employee's rate will be changed to the rate which would have been received had the employee been hired directly into the new occupation, unless a reduction in the rate would result, in which case C2.015 will apply.

C2.017 A promotional increase will be granted to the extent that the maximum rate for the new occupation is not exceeded.

C2.018 Employees who are subject to the six and/or twelve month step from maximum rate limitation will have the interval for the next regular increase measured from the date of this change. For all other employees, the interval for the first regular increase will be measured

[174]

from the last regular increase received prior to the change in occupation.

C2.02 *Change to an occupation with a lower maximum rate:*

    C2.021 If the change results from other than force surplus reasons, employees who are changed to an occupation with a lower maximum rate will have their rate reduced to the rate they would be receiving had they been hired into and remained in the new occupation since their net credited service date. This shall be accomplished by reconstructing the employee's wage history as though they were hired into the new occupation. If the employee's rate exceeds the maximum rate of the new occupation, the rate will be reduced to the maximum rate of the new occupation at the time of the change or, at the option of the Company, in several subsequent steps.

    C2.022 The interval for the next regular increase will be measured from the date of the last regular increase.

C2.03 *Change to an occupation with the same maximum rate, but a higher or lower minimum rate:*

    C2.031 The employee's rate will be changed either upward or downward as appropriate to the rate which would have been received had the employee been hired directly into the new occupation.

C3.00 *Change to former occupation or another occupation with a higher maximum rate after having*

[175]

*been previously changed to an occupation with a lower maximum rate.*

C3.01 *Employee at maximum rate in former occupation at the time of change to occupation with lower maximum rate:*

The employee's rate will be restored to the maximum rate of the former occupation or the new occupation, whichever is lower. Where the maximum rate of the new occupation is higher than the former occupation, treatment provided under C2.00 will apply.

C3.02 *Employee below maximum rate in former occupation at time of change to occupation with lower maximum rate:*

C3.021 If at the time of the change from the former occupation the employee's wage rate was reduced, the present wage rate will be increased an amount indicated by the reconstruction of the employee's wage rate history in the new occupation.

C3.022 The interval for the next regular increase will be measured from the date of the last regular increase prior to the change.

[176]

C4.00  WAGE INCREASE SCHEDULE
ASSIGNMENT LIST

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|
| **PHILADELPHIA AREA** | | | |
| Philadelphia | 1 | | |
| **EASTERN AREA** | | | |
| Allentown | 1 | Levittown | 1 |
| Ambler | 1 | Line Lexington | 1 |
| Ardmore | 1 | Malvern | 1 |
| Avondale | 1 | Media | 1 |
| Bala Cynwyd | 1 | Melrose | 1 |
| Bath | 1 | Mendenhall | 1 |
| Bethayres | 1 | Morrisville | 1 |
| Bethlehem | 1 | Morton | 1 |
| Bristol | 1 | Nazareth | 1 |
| Broomall | 1 | Newtown | 1 |
| Bryn Mawr | 1 | Newtown Square | 1 |
| Catasauqua | 1 | Norristown | 1 |
| Chester | 1 | Northampton | 1 |
| Chester Heights | 1 | North Wales | 1 |
| Churchville | 1 | Oxford | 1 |
| Coatesville | 1 | Paoli | 1 |
| Collegeville | 1 | Parkerford | 1 |
| Colmar | 1 | Parkesburg | 1 |
| Conshohocken | 1 | Pennsburg | 1 |
| Downington | 1 | Perkasie | 1 |
| Doylestown | 1 | Phoenixville | 1 |
| Eagle | 1 | Pineville | 1 |
| Easton | 1 | Pottstown | 1 |
| Eddington | 1 | Quakertown | 1 |
| Exton | 1 | Reading | 1 |
| Feasterville | 1 | Ridley Park | 1 |
| Fleetwood | 1 | Royersford | 1 |
| Fort Washington | 1 | Sharon Hill | 1 |
| Glenmoore | 1 | Shillington | 1 |
| Glenolden | 1 | Sinking Spring | 1 |
| Hamburg | 1 | Slatington | 1 |

[177]

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|

**EASTERN AREA**
(continued)

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|
| Harleysville | 1 | Souderton | 1 |
| Hatboro | 1 | Springfield | 1 |
| Hellertown | 1 | Trevose | 1 |
| Honeybrook | 1 | Trooper | 1 |
| Jenkintown | 1 | Upper Darby | 1 |
| Kennett Square | 1 | Warminster | 1 |
| King of Prussia | 1 | Warrington | 1 |
| Kutztown | | Wayne | |
| Langhorne | 1 | West Chester | 1 |
| Lansdale | 1 | West Grove | 1 |
| Lansdowne | 1 | Willow Grove | 1 |
| Lehighton | 1 | Yardley | 1 |

**CENTRAL AREA**

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|
| Altoona | 1 | Mechanicsburg | 1 |
| Ashland | 1 | Middleton | 1 |
| Avis | 1 | Millersville | 1 |
| Barnesboro | 1 | Millville | 1 |
| Bellefonte | 1 | Milton | 1 |
| Berwick | 1 | Minersville | 1 |
| Bloomsburg | 1 | Moosic | 1 |
| Bradford | 1 | Moscow | 1 |
| Carbondale | 1 | Mount Carmel | 1 |
| Catawissa | 1 | Mount Pocono | 1 |
| Centre Hall | 1 | Mountaintop | 1 |
| Clarion | 1 | Nanticoke | 1 |
| Clearfield | 1 | Olyphant | 1 |
| Coudersport | 1 | Orwigsburg | 1 |
| Cresco | 1 | Palmyra | 1 |
| Cresson | 1 | Patton | 1 |
| Danville | 1 | Phillipsburg | 1 |
| DuBois | 1 | Pittston | 1 |
| East Petersburg | 1 | Plymouth | 1 |
| Ebensburg | 1 | Portage | 1 |
| Eldred | 1 | Port Allegheny | 1 |
| Frackville | 1 | Pottsville | 1 |
| Freeland | 1 | Punxsutawney | 1 |
| Frenchville | 1 | Renovo | 1 |

[178]

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|

**CENTRAL AREA**
(continued)

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|
| Galeton | 1 | Reynoldsville | 1 |
| Halifax | 1 | Schuylkill Haven | 1 |
| Hamlin | 1 | Scranton | 1 |
| Harrisburg | 1 | Shamokin | 1 |
| Hawley | 1 | Shenandoah | 1 |
| Hazleton | 1 | Smethport | 1 |
| Hummelstown | 1 | Spangler | 1 |
| Hollidaysburg | 1 | State College | 1 |
| Honesdale | 1 | Steelton | 1 |
| Huntingdon | 1 | Strasburg | 1 |
| Jermyn | 1 | Stroudsburg | 1 |
| Jersey Shore | 1 | Sunbury | 1 |
| Jim Thorpe | 1 | Tamaqua | 1 |
| Kane | 1 | Tannersville | 1 |
| Kingston | 1 | Taylor | 1 |
| Lancaster | 1 | Tidioute | 1 |
| Lebanon | 1 | Tionesta | 1 |
| Lewistown | 1 | Tyrone | 1 |
| Lock Haven | 1 | Warren | 1 |
| Lords Valley | 1 | Wilkes-Barre | 1 |
| Mahoney City | 1 | Williamsport | 1 |
| Marienville | 1 | Woodland | 1 |
| Meadville | 1 | Wyoming | 1 |

**WESTERN AREA**

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|
| Aliquippa | 1 | Ligonier | 1 |
| Ambridge | 1 | Marion Center | 1 |
| Baden | 1 | Masontown | 1 |
| Beaver Falls | 1 | McDonald | 1 |
| Belle Vernon | 1 | McKeesport | 1 |
| Blairsville | 1 | McMurray | 1 |
| Boston | 1 | Mercer | 1 |
| Brownsville | 1 | Midland | 1 |
| Burgettstown | 1 | Monessen | 1 |
| Butler | 1 | Monongahela | 1 |
| California | 1 | Monroeville | 1 |
| Canonsburg | 1 | Mount Pleasant | 1 |
| Charleroi | 1 | New Castle | 1 |

[179]

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|

**WESTERN AREA**

(continued)

| Payroll Location | Zone Number | Payroll Location | Zone Number |
|---|---|---|---|
| Cheswick | 1 | New Kensington | 1 |
| Clairton | 1 | New Stanton | 1 |
| Claysville | 1 | New Salem | 1 |
| Clymer | 1 | Oakdale | 1 |
| Connellsville | 1 | Oakmont | 1 |
| Coraopolis | 1 | Penn Hills | 1 |
| Dawson | 1 | Perryopolis | 1 |
| Derry | 1 | Pittsburgh | 1 |
| Donora | 1 | Point Marion | 1 |
| Elizabeth | 1 | Robinson | 1 |
| Ellwood City | 1 | Rochester | 1 |
| Fairchance | 1 | Scottdale | 1 |
| Farmington | 1 | Sewickley | 1 |
| Finleyville | 1 | Sharon | 1 |
| Greensburg | 1 | Sharpsville | 1 |
| Greenville | 1 | Springdale | 1 |
| Grove City | 1 | Tarentum | 1 |
| Herminie | 1 | Turtle Creek | 1 |
| Homer City | 1 | Uniontown | 1 |
| Hookstown | 1 | Washington | 1 |
| Imperial | 1 | West Middlesex | 1 |
| Indiana | 1 | West Mifflin | 1 |
| Industry | 1 | West Newton | 1 |
| Irwin | 1 | Youngwood | 1 |
| Jeannette | 1 | Zelienople | 1 |
| Latrobe | 1 | | |

[180]

EFFECTIVE AUGUST 3, 2003

**WAGE TABLE: 02**
**BUILDINGS EQUIPMENT MECHANIC**
**COMBINATION TECHNICIAN**
**SPLICING TECHNICIAN**
**SWITCHING EQUIPMENT TECHNICIAN**
**SYSTEMS TECHNICIAN**
**SYSTEMS TECHNICIAN - RADIO**
**TEST DESK TECHNICIAN**

**WAGE TABLE: 01**
**CUSTOMER SERVICE AGENT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $455.00 | |
| 6 Mos. | 6 Mos. | $512.00 | $57.00 |
| 12 Mos. | 6 Mos. | $577.00 | $65.00 |
| 18 Mos. | 6 Mos. | $649.00 | $72.00 |
| 24 Mos. | 6 Mos. | $731.00 | $82.00 |
| 30 Mos. | 6 Mos. | $821.50 | $90.50 |
| 36 Mos. | 6 Mos. | $924.50 | $103.00 |
| 42 Mos. | 6 Mos. | $1,040.50 | $116.00 |
| 48 Mos. (Maximum) | | $1,171.00 | $130.50 |
| **Pension Band** | | **124** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $438.00 | |
| 6 Mos. | 6 Mos. | $491.50 | $53.50 |
| 12 Mos. | 6 Mos. | $552.00 | $60.50 |
| 18 Mos. | 6 Mos. | $619.50 | $67.50 |
| 24 Mos. | 6 Mos. | $695.00 | $75.50 |
| 30 Mos. | 6 Mos. | $780.50 | $85.50 |
| 36 Mos. | 6 Mos. | $876.00 | $95.50 |
| 42 Mos. | 6 Mos. | $983.50 | $107.50 |
| 48 Mos. (Maximum) | | $1,103.00 | $119.50 |
| **Pension Band** | | **121** | |

**WAGE TABLE: 03**
**ASSIGNMENT TECHNICIAN**
**AUTOMOTIVE MECHANIC**
**OUTSIDE PLANT TECHNICIAN**
**SERVICES TECHNICIAN**

**WAGE TABLE: 04**
**FACILITIES ASSIGNER**
**MATERIAL SERVICE COORDINATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $436.50 | |
| 6 Mos. | 6 Mos. | $489.00 | $52.50 |
| 12 Mos. | 6 Mos. | $547.00 | $58.00 |
| 18 Mos. | 6 Mos. | $613.00 | $66.00 |
| 24 Mos. | 6 Mos. | $686.50 | $73.50 |
| 30 Mos. | 6 Mos. | $769.00 | $82.50 |
| 36 Mos. | 6 Mos. | $861.00 | $92.00 |
| 42 Mos. | 6 Mos. | $965.00 | $104.00 |
| 48 Mos. (Maximum) | | $1,080.50 | $115.50 |
| **Pension Band** | | **120** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $436.00 | |
| 6 Mos. | 6 Mos. | $487.50 | $51.50 |
| 12 Mos. | 6 Mos. | $546.00 | $58.50 |
| 18 Mos. | 6 Mos. | $611.00 | $65.00 |
| 24 Mos. | 6 Mos. | $684.00 | $73.00 |
| 30 Mos. | 6 Mos. | $765.50 | $81.50 |
| 36 Mos. | 6 Mos. | $857.50 | $92.00 |
| 42 Mos. | 6 Mos. | $959.00 | $101.50 |
| 48 Mos. (Maximum) | | $1,073.50 | $114.50 |
| **Pension Band** | | **120** | |

[181]

**EFFECTIVE AUGUST 3, 2003**

**WAGE TABLE: 05**
**DRIVER - TRACTOR TRAILER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $449.00 | |
| 6 Mos. | 6 Mos. | $514.50 | $65.50 |
| 12 Mos. | 6 Mos. | $588.50 | $74.00 |
| 18 Mos. | 6 Mos. | $673.50 | $85.00 |
| 24 Mos. | 6 Mos. | $772.00 | $98.50 |
| 30 Mos. | 6 Mos. | $883.50 | $111.50 |
| 36 Mos. (Maximum) | | $1,011.50 | $128.00 |
| **Pension Band** | **117** | | |

**WAGE TABLE: 06**
**DRIVER - HEAVY TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $448.00 | |
| 6 Mos. | 6 Mos. | $510.50 | $62.50 |
| 12 Mos. | 6 Mos. | $582.00 | $71.50 |
| 18 Mos. | 6 Mos. | $664.50 | $82.50 |
| 24 Mos. | 6 Mos. | $758.00 | $93.50 |
| 30 Mos. | 6 Mos. | $865.00 | $107.00 |
| 36 Mos. (Maximum) | | $986.50 | $121.50 |
| **Pension Band** | **116** | | |

**WAGE TABLE: 07**
**STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $438.50 | |
| 6 Mos. | 6 Mos. | $496.00 | $57.50 |
| 12 Mos. | 6 Mos. | $560.50 | $64.50 |
| 18 Mos. | 6 Mos. | $633.50 | $73.00 |
| 24 Mos. | 6 Mos. | $716.50 | $83.00 |
| 30 Mos. | 6 Mos. | $810.00 | $93.50 |
| 36 Mos. (Maximum) | | $915.50 | $105.50 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 08**
**DRIVER - MEDIUM TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $438.00 | |
| 6 Mos. | 6 Mos. | $494.50 | $56.50 |
| 12 Mos. | 6 Mos. | $558.50 | $64.00 |
| 18 Mos. | 6 Mos. | $630.50 | $72.00 |
| 24 Mos. | 6 Mos. | $712.50 | $82.00 |
| 30 Mos. | 6 Mos. | $804.50 | $92.00 |
| 36 Mos. (Maximum) | | $907.50 | $103.00 |
| **Pension Band** | **113** | | |

[182]

**WAGE TABLE: 09**
**MATERIALS HANDLER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $438.00 | |
| 6 Mos. | 6 Mos. | $494.00 | $56.00 |
| 12 Mos. | 6 Mos. | $558.50 | $64.50 |
| 18 Mos. | 6 Mos. | $630.50 | $72.00 |
| 24 Mos. | 6 Mos. | $712.50 | $82.00 |
| 30 Mos. | 6 Mos. | $804.00 | $91.50 |
| 36 Mos. (Maximum) | | $907.00 | $103.00 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 10**
**FRAME ATTENDANT A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $437.50 | |
| 6 Mos. | 6 Mos. | $494.00 | $56.50 |
| 12 Mos. | 6 Mos. | $558.00 | $64.00 |
| 18 Mos. | 6 Mos. | $630.00 | $72.00 |
| 24 Mos. | 6 Mos. | $711.50 | $81.50 |
| 30 Mos. | 6 Mos. | $803.50 | $92.00 |
| 36 Mos. (Maximum) | | $907.00 | $103.50 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 11**
**COMMUNICATIONS ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $436.50 | |
| 6 Mos. | 6 Mos. | $492.00 | $55.50 |
| 12 Mos. | 6 Mos. | $555.00 | $63.00 |
| 18 Mos. | 6 Mos. | $626.50 | $71.50 |
| 24 Mos. | 6 Mos. | $706.00 | $79.50 |
| 30 Mos. | 6 Mos. | $796.50 | $90.50 |
| 36 Mos. (Maximum) | | $898.50 | $102.00 |
| **Pension Band** | **112** | | |

**WAGE TABLE: 12**
**FRAME ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $436.50 | |
| 6 Mos. | 6 Mos. | $492.00 | $55.50 |
| 12 Mos. | 6 Mos. | $554.50 | $62.50 |
| 18 Mos. | 6 Mos. | $625.50 | $71.00 |
| 24 Mos. | 6 Mos. | $705.00 | $79.50 |
| 30 Mos. | 6 Mos. | $795.00 | $90.00 |
| 36 Mos. (Maximum) | | $896.00 | $101.00 |
| **Pension Band** | **112** | | |

[183]

**EFFECTIVE AUGUST 3, 2003**

**WAGE TABLE: 13**
 **ASSIGNMENT ADMINISTRATOR**
 **DRAFTER**
 **MAINTENANCE ADMINISTRATOR**
 **TRANSLATIONS ADMINISTRATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $399.00 | |
| 6 Mos. | 6 Mos. | $456.00 | $57.00 |
| 12 Mos. | 6 Mos. | $523.00 | $67.00 |
| 18 Mos. | 6 Mos. | $598.50 | $75.50 |
| 24 Mos. | 6 Mos. | $684.50 | $86.00 |
| 30 Mos. | 6 Mos. | $783.00 | $98.50 |
| 36 Mos. (Maximum) | | $896.00 | $113.00 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 14**
 **CUSTOMER BILLING ANALYST**
 **PAYROLL ANALYST**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $399.00 | |
| 6 Mos. | 6 Mos. | $456.00 | $57.00 |
| 12 Mos. | 6 Mos. | $522.50 | $66.50 |
| 18 Mos. | 6 Mos. | $598.00 | $75.50 |
| 24 Mos. | 6 Mos. | $684.50 | $86.50 |
| 30 Mos. | 6 Mos. | $783.00 | $98.50 |
| 36 Mos. (Maximum) | | $896.00 | $113.00 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 15**
 **SPLICING TECHNICIAN'S HELPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $431.00 | |
| 6 Mos. | 6 Mos. | $482.50 | $51.50 |
| 12 Mos. | 6 Mos. | $540.00 | $57.50 |
| 18 Mos. | 6 Mos. | $605.50 | $65.50 |
| 24 Mos. | 6 Mos. | $678.00 | $72.50 |
| 30 Mos. | 6 Mos. | $759.00 | $81.00 |
| 36 Mos. (Maximum) | | $850.00 | $91.00 |
| **Pension Band** | | **111** | |

**WAGE TABLE: 16**
 **SUPPORT SYSTEMS ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $431.00 | |
| 6 Mos. | 6 Mos. | $482.50 | $51.50 |
| 12 Mos. | 6 Mos. | $539.50 | $57.00 |
| 18 Mos. | 6 Mos. | $605.00 | $65.50 |
| 24 Mos. | 6 Mos. | $677.50 | $72.50 |
| 30 Mos. | 6 Mos. | $758.00 | $80.50 |
| 36 Mos. (Maximum) | | $848.50 | $90.50 |
| **Pension Band** | | **111** | |

[184]

**EFFECTIVE AUGUST 3, 2003**

**WAGE TABLE: 17**
**TREASURY CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $425.00 | |
| 6 Mos. | 6 Mos. | $476.50 | $51.50 |
| 12 Mos. | 6 Mos. | $534.00 | $57.50 |
| 18 Mos. | 6 Mos. | $598.50 | $64.50 |
| 24 Mos. | 6 Mos. | $671.00 | $72.50 |
| 30 Mos. | 6 Mos. | $752.00 | $81.00 |
| 36 Mos. (Maximum) | | $843.00 | $91.00 |
| **Pension Band** | | **111** | |

**WAGE TABLE: 18**
**SERVICE EVALUATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $379.50 | |
| 6 Mos. | 6 Mos. | $430.50 | $51.00 |
| 12 Mos. | 6 Mos. | $487.50 | $57.00 |
| 18 Mos. | 6 Mos. | $553.00 | $65.50 |
| 24 Mos. | 6 Mos. | $627.00 | $74.00 |
| 30 Mos. | 6 Mos. | $710.50 | $83.50 |
| 36 Mos. (Maximum) | | $805.00 | $94.50 |
| **Pension Band** | | **109** | |

**WAGE TABLE: 19**
**DRIVER - LIGHT TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $403.00 | |
| 6 Mos. | 6 Mos. | $451.50 | $48.50 |
| 12 Mos. | 6 Mos. | $505.50 | $54.00 |
| 18 Mos. | 6 Mos. | $565.50 | $60.00 |
| 24 Mos. | 6 Mos. | $633.00 | $67.50 |
| 30 Mos. | 6 Mos. | $709.00 | $76.00 |
| 36 Mos. (Maximum) | | $793.50 | $84.50 |
| **Pension Band** | | **108** | |

**WAGE TABLE: 20**
**SENIOR FIELD CLERK**
**STAFF CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $375.50 | |
| 6 Mos. | 6 Mos. | $425.50 | $50.00 |
| 12 Mos. | 6 Mos. | $481.50 | $56.00 |
| 18 Mos. | 6 Mos. | $545.50 | $64.00 |
| 24 Mos. | 6 Mos. | $618.00 | $72.50 |
| 30 Mos. | 6 Mos. | $700.50 | $82.50 |
| 36 Mos. (Maximum) | | $793.00 | $92.50 |
| **Pension Band** | | **108** | |

[185]

**EFFECTIVE AUGUST 3, 2003**

### WAGE TABLE: 21
#### BILL PRODUCTION TECHNICIAN
#### SUPPLIES ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $389.50 | |
| 6 Mos. | 6 Mos. | $438.00 | $48.50 |
| 12 Mos. | 6 Mos. | $492.50 | $54.50 |
| 18 Mos. | 6 Mos. | $554.50 | $62.00 |
| 24 Mos. | 6 Mos. | $624.00 | $69.50 |
| 30 Mos. | 6 Mos. | $702.50 | $78.50 |
| 36 Mos. (Maximum) | | $790.00 | $87.50 |
| **Pension Band** | **108** | | |

### WAGE TABLE: 22
#### STENOGRAPHER CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $369.00 | |
| 6 Mos. | 6 Mos. | $418.00 | $49.00 |
| 12 Mos. | 6 Mos. | $472.50 | $54.50 |
| 18 Mos. | 6 Mos. | $534.00 | $61.50 |
| 24 Mos. | 6 Mos. | $603.00 | $69.00 |
| 30 Mos. | 6 Mos. | $682.50 | $79.50 |
| 36 Mos. (Maximum) | | $771.00 | $88.50 |
| **Pension Band** | **107** | | |

### WAGE TABLE: 23
#### GENERAL FIELD CLERK
#### SENIOR CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $364.00 | |
| 6 Mos. | 6 Mos. | $412.00 | $48.00 |
| 12 Mos. | 6 Mos. | $467.50 | $55.50 |
| 18 Mos. | 6 Mos. | $529.50 | $62.00 |
| 24 Mos. | 6 Mos. | $600.00 | $70.50 |
| 30 Mos. | 6 Mos. | $680.50 | $80.50 |
| 36 Mos. (Maximum) | | $771.00 | $90.50 |
| **Pension Band** | **107** | | |

### WAGE TABLE: 24
#### SENIOR ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $353.00 | |
| 6 Mos. | 6 Mos. | $398.50 | $45.50 |
| 12 Mos. | 6 Mos. | $450.50 | $52.00 |
| 18 Mos. | 6 Mos. | $508.50 | $58.00 |
| 24 Mos. | 6 Mos. | $575.50 | $67.00 |
| 30 Mos. | 6 Mos. | $650.50 | $75.00 |
| 36 Mos. (Maximum) | | $735.00 | $84.50 |
| **Pension Band** | **106** | | |

[186]

**EFFECTIVE AUGUST 3, 2003**

**WAGE TABLE: 25**
**FIELD CLERK**
**GENERAL CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $353.00 | |
| 6 Mos. | 6 Mos. | $398.00 | $45.00 |
| 12 Mos. | 6 Mos. | $450.50 | $52.50 |
| 18 Mos. | 6 Mos. | $508.50 | $58.00 |
| 24 Mos. | 6 Mos. | $575.00 | $66.50 |
| 30 Mos. | 6 Mos. | $649.50 | $74.50 |
| 36 Mos. (Maximum) | | $734.00 | $84.50 |
| **Pension Band** | | **106** | |

**WAGE TABLE: 26**
**BUILDING CUSTODIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $340.50 | |
| 6 Mos. | 6 Mos. | $385.50 | $45.00 |
| 12 Mos. | 6 Mos. | $436.50 | $51.00 |
| 18 Mos. | 6 Mos. | $494.00 | $57.50 |
| 24 Mos. | 6 Mos. | $559.00 | $65.00 |
| 30 Mos. | 6 Mos. | $633.00 | $74.00 |
| 36 Mos. (Maximum) | | $716.50 | $83.50 |
| **Pension Band** | | **105** | |

**WAGE TABLE: 27**
**BUILDING CUSTODIAN ASSOCIATE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $306.50 | |
| 6 Mos. | 6 Mos. | $350.00 | $43.50 |
| 12 Mos. | 6 Mos. | $399.50 | $49.50 |
| 18 Mos. | 6 Mos. | $457.50 | $58.00 |
| 24 Mos. | 6 Mos. | $522.00 | $64.50 |
| 30 Mos. | 6 Mos. | $596.50 | $74.50 |
| 36 Mos. (Maximum) | | $681.50 | $85.00 |
| **Pension Band** | | **104** | |

**WAGE TABLE: 28**
**OFFICE CLERICAL ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $332.50 | |
| 6 Mos. | 6 Mos. | $371.50 | $39.00 |
| 12 Mos. | 6 Mos. | $415.50 | $44.00 |
| 18 Mos. | 6 Mos. | $464.00 | $48.50 |
| 24 Mos. | 6 Mos. | $518.50 | $54.50 |
| 30 Mos. | 6 Mos. | $579.50 | $61.00 |
| 36 Mos. (Maximum) | | $648.00 | $68.50 |
| **Pension Band** | | **103** | |

[187]

**EFFECTIVE AUGUST 3, 2003**

**WAGE TABLE: 29**
**ASSISTANT TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $345.00 | |
| 6 Mos. | 6 Mos. | $390.00 | $45.00 |
| 12 Mos. | 6 Mos. | $439.50 | $49.50 |
| 18 Mos. | 6 Mos. | $497.00 | $57.50 |
| 24 Mos. | 6 Mos. | $562.00 | $65.00 |
| 30 Mos. (Maximum) | | $634.00 | $72.00 |
| **Pension Band** | **102** | | |

**WAGE TABLE: 30**
**GRAPHICS DESIGNER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $399.00 | |
| 6 Mos. | 6 Mos. | $456.00 | $57.00 |
| 12 Mos. | 6 Mos. | $523.00 | $67.00 |
| 18 Mos. | 6 Mos. | $598.50 | $75.50 |
| 24 Mos. | 6 Mos. | $684.50 | $86.00 |
| 30 Mos. | 6 Mos. | $783.00 | $98.50 |
| Top (Maximum) | | $896.00 | $113.00 |
| **Pension Band** | **112** | | |

[188]

**EFFECTIVE AUGUST 1, 2004**

**WAGE TABLE: 02**
**BUILDINGS EQUIPMENT MECHANIC**
**COMBINATION TECHNICIAN**
**SPLICING TECHNICIAN**
**SWITCHING EQUIPMENT TECHNICIAN**
**SYSTEMS TECHNICIAN**
**SYSTEMS TECHNICIAN - RADIO**
**TEST DESK TECHNICIAN**

**WAGE TABLE: 01**
**CUSTOMER SERVICE AGENT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $464.00 | |
| 6 Mos. | 6 Mos. | $522.00 | $58.00 |
| 12 Mos. | 6 Mos. | $588.50 | $66.50 |
| 18 Mos. | 6 Mos. | $662.00 | $73.50 |
| 24 Mos. | 6 Mos. | $745.50 | $83.50 |
| 30 Mos. | 6 Mos. | $838.00 | $92.50 |
| 36 Mos. | 6 Mos. | $943.00 | $105.00 |
| 42 Mos. | 6 Mos. | $1,061.50 | $118.50 |
| 48 Mos. (Maximum) | | $1,194.50 | $133.00 |
| **Pension Band** | | **124** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $447.00 | |
| 6 Mos. | 6 Mos. | $501.50 | $54.50 |
| 12 Mos. | 6 Mos. | $563.00 | $61.50 |
| 18 Mos. | 6 Mos. | $632.00 | $69.00 |
| 24 Mos. | 6 Mos. | $709.00 | $77.00 |
| 30 Mos. | 6 Mos. | $796.00 | $87.00 |
| 36 Mos. | 6 Mos. | $893.50 | $97.50 |
| 42 Mos. | 6 Mos. | $1,003.00 | $109.50 |
| 48 Mos. (Maximum) | | $1,125.00 | $122.00 |
| **Pension Band** | | **121** | |

**WAGE TABLE: 03**
**ASSIGNMENT TECHNICIAN**
**AUTOMOTIVE MECHANIC**
**OUTSIDE PLANT TECHNICIAN**
**SERVICES TECHNICIAN**

**WAGE TABLE: 04**
**FACILITIES ASSIGNER**
**MATERIAL SERVICE COORDINATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $445.00 | |
| 6 Mos. | 6 Mos. | $499.00 | $54.00 |
| 12 Mos. | 6 Mos. | $558.00 | $59.00 |
| 18 Mos. | 6 Mos. | $625.50 | $67.50 |
| 24 Mos. | 6 Mos. | $700.00 | $74.50 |
| 30 Mos. | 6 Mos. | $784.50 | $84.50 |
| 36 Mos. | 6 Mos. | $878.00 | $93.50 |
| 42 Mos. | 6 Mos. | $984.50 | $106.50 |
| 48 Mos. (Maximum) | | $1,102.00 | $117.50 |
| **Pension Band** | | **120** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $444.50 | |
| 6 Mos. | 6 Mos. | $497.50 | $53.00 |
| 12 Mos. | 6 Mos. | $557.00 | $59.50 |
| 18 Mos. | 6 Mos. | $623.00 | $66.00 |
| 24 Mos. | 6 Mos. | $697.50 | $74.50 |
| 30 Mos. | 6 Mos. | $781.00 | $83.50 |
| 36 Mos. | 6 Mos. | $874.50 | $93.50 |
| 42 Mos. | 6 Mos. | $978.00 | $103.50 |
| 48 Mos. (Maximum) | | $1,095.00 | $117.00 |
| **Pension Band** | | **120** | |

[189]

**EFFECTIVE AUGUST 1, 2004**

**WAGE TABLE: 05**
**DRIVER - TRACTOR TRAILER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $458.00 | |
| 6 Mos. | 6 Mos. | $525.00 | $67.00 |
| 12 Mos. | 6 Mos. | $600.50 | $75.50 |
| 18 Mos. | 6 Mos. | $687.00 | $86.50 |
| 24 Mos. | 6 Mos. | $787.50 | $100.50 |
| 30 Mos. | 6 Mos. | $901.00 | $113.50 |
| 36 Mos. (Maximum) | | $1,031.50 | $130.50 |
| **Pension Band** | | **117** | |

**WAGE TABLE: 06**
**DRIVER - HEAVY TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $457.00 | |
| 6 Mos. | 6 Mos. | $520.50 | $63.50 |
| 12 Mos. | 6 Mos. | $593.50 | $73.00 |
| 18 Mos. | 6 Mos. | $678.00 | $84.50 |
| 24 Mos. | 6 Mos. | $773.00 | $95.00 |
| 30 Mos. | 6 Mos. | $882.50 | $109.50 |
| 36 Mos. (Maximum) | | $1,006.00 | $123.50 |
| **Pension Band** | | **116** | |

**WAGE TABLE: 07**
**STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $447.50 | |
| 6 Mos. | 6 Mos. | $506.00 | $58.50 |
| 12 Mos. | 6 Mos. | $571.50 | $65.50 |
| 18 Mos. | 6 Mos. | $646.00 | $74.50 |
| 24 Mos. | 6 Mos. | $731.00 | $85.00 |
| 30 Mos. | 6 Mos. | $826.00 | $95.00 |
| 36 Mos. (Maximum) | | $934.00 | $108.00 |
| **Pension Band** | | **113** | |

**WAGE TABLE: 08**
**DRIVER - MEDIUM TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $447.00 | |
| 6 Mos. | 6 Mos. | $504.50 | $57.50 |
| 12 Mos. | 6 Mos. | $569.50 | $65.00 |
| 18 Mos. | 6 Mos. | $643.00 | $73.50 |
| 24 Mos. | 6 Mos. | $727.00 | $84.00 |
| 30 Mos. | 6 Mos. | $820.50 | $93.50 |
| 36 Mos. (Maximum) | | $925.50 | $105.00 |
| **Pension Band** | | **113** | |

[190]

**WAGE TABLE: 09**
**MATERIALS HANDLER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $447.00 | |
| 6 Mos. | 6 Mos. | $504.00 | $57.00 |
| 12 Mos. | 6 Mos. | $569.50 | $65.50 |
| 18 Mos. | 6 Mos. | $643.00 | $73.50 |
| 24 Mos. | 6 Mos. | $727.00 | $84.00 |
| 30 Mos. | 6 Mos. | $820.00 | $93.00 |
| 36 Mos. (Maximum) | | $925.00 | $105.00 |
| **Pension Band** | | **113** | |

**WAGE TABLE: 10**
**FRAME ATTENDANT A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $446.50 | |
| 6 Mos. | 6 Mos. | $504.00 | $57.50 |
| 12 Mos. | 6 Mos. | $569.00 | $65.00 |
| 18 Mos. | 6 Mos. | $642.50 | $73.50 |
| 24 Mos. | 6 Mos. | $725.50 | $83.00 |
| 30 Mos. | 6 Mos. | $819.50 | $94.00 |
| 36 Mos. (Maximum) | | $925.00 | $105.50 |
| **Pension Band** | | **113** | |

**WAGE TABLE: 11**
**COMMUNICATIONS ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $445.00 | |
| 6 Mos. | 6 Mos. | $502.00 | $57.00 |
| 12 Mos. | 6 Mos. | $566.00 | $64.00 |
| 18 Mos. | 6 Mos. | $639.00 | $73.00 |
| 24 Mos. | 6 Mos. | $720.00 | $81.00 |
| 30 Mos. | 6 Mos. | $812.50 | $92.50 |
| 36 Mos. (Maximum) | | $916.50 | $104.00 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 12**
**FRAME ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $445.00 | |
| 6 Mos. | 6 Mos. | $502.00 | $57.00 |
| 12 Mos. | 6 Mos. | $565.50 | $63.50 |
| 18 Mos. | 6 Mos. | $638.00 | $72.50 |
| 24 Mos. | 6 Mos. | $719.00 | $81.00 |
| 30 Mos. | 6 Mos. | $811.00 | $92.00 |
| 36 Mos. (Maximum) | | $914.00 | $103.00 |
| **Pension Band** | | **112** | |

[191]

**EFFECTIVE AUGUST 1, 2004**

**WAGE TABLE: 13**
**ASSIGNMENT ADMINISTRATOR**
**DRAFTER**
**MAINTENANCE ADMINISTRATOR**
**TRANSLATIONS ADMINISTRATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $407.00 | |
| 6 Mos. | 6 Mos. | $465.00 | $58.00 |
| 12 Mos. | 6 Mos. | $533.50 | $68.50 |
| 18 Mos. | 6 Mos. | $610.50 | $77.00 |
| 24 Mos. | 6 Mos. | $698.00 | $87.50 |
| 30 Mos. | 6 Mos. | $798.50 | $100.50 |
| 36 Mos. (Maximum) | | $914.00 | $115.50 |
| **Pension Band** | **112** | | |

**WAGE TABLE: 14**
**CUSTOMER BILLING ANALYST**
**PAYROLL ANALYST**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $407.00 | |
| 6 Mos. | 6 Mos. | $465.00 | $58.00 |
| 12 Mos. | 6 Mos. | $533.00 | $68.00 |
| 18 Mos. | 6 Mos. | $610.00 | $77.00 |
| 24 Mos. | 6 Mos. | $698.00 | $88.00 |
| 30 Mos. | 6 Mos. | $798.50 | $100.50 |
| 36 Mos. (Maximum) | | $914.00 | $115.50 |
| **Pension Band** | **112** | | |

**WAGE TABLE: 15**
**SPLICING TECHNICIAN'S HELPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $439.50 | |
| 6 Mos. | 6 Mos. | $492.00 | $52.50 |
| 12 Mos. | 6 Mos. | $551.00 | $59.00 |
| 18 Mos. | 6 Mos. | $617.50 | $66.50 |
| 24 Mos. | 6 Mos. | $691.50 | $74.00 |
| 30 Mos. | 6 Mos. | $774.00 | $82.50 |
| 36 Mos. (Maximum) | | $867.00 | $93.00 |
| **Pension Band** | **111** | | |

**WAGE TABLE: 16**
**SUPPORT SYSTEMS ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $439.50 | |
| 6 Mos. | 6 Mos. | $492.00 | $52.50 |
| 12 Mos. | 6 Mos. | $550.50 | $58.50 |
| 18 Mos. | 6 Mos. | $617.00 | $66.50 |
| 24 Mos. | 6 Mos. | $691.00 | $74.00 |
| 30 Mos. | 6 Mos. | $773.00 | $82.00 |
| 36 Mos. (Maximum) | | $865.50 | $92.50 |
| **Pension Band** | **111** | | |

[192]

**EFFECTIVE AUGUST 1, 2004**

**WAGE TABLE: 17**
**TREASURY CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $433.50 | |
| 6 Mos. | 6 Mos. | $486.00 | $52.50 |
| 12 Mos. | 6 Mos. | $544.50 | $58.50 |
| 18 Mos. | 6 Mos. | $610.50 | $66.00 |
| 24 Mos. | 6 Mos. | $684.50 | $74.00 |
| 30 Mos. | 6 Mos. | $767.00 | $82.50 |
| 36 Mos. (Maximum) | | $860.00 | $93.00 |
| **Pension Band** | **111** | | |

**WAGE TABLE: 18**
**SERVICE EVALUATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $387.00 | |
| 6 Mos. | 6 Mos. | $439.00 | $52.00 |
| 12 Mos. | 6 Mos. | $497.50 | $58.50 |
| 18 Mos. | 6 Mos. | $564.00 | $66.50 |
| 24 Mos. | 6 Mos. | $639.50 | $75.50 |
| 30 Mos. | 6 Mos. | $724.50 | $85.00 |
| 36 Mos. (Maximum) | | $821.00 | $96.50 |
| **Pension Band** | **109** | | |

**WAGE TABLE: 19**
**DRIVER - LIGHT TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $411.00 | |
| 6 Mos. | 6 Mos. | $460.50 | $49.50 |
| 12 Mos. | 6 Mos. | $515.50 | $55.00 |
| 18 Mos. | 6 Mos. | $577.00 | $61.50 |
| 24 Mos. | 6 Mos. | $645.50 | $68.50 |
| 30 Mos. | 6 Mos. | $723.00 | $77.50 |
| 36 Mos. (Maximum) | | $809.50 | $86.50 |
| **Pension Band** | **108** | | |

**WAGE TABLE: 20**
**SENIOR FIELD CLERK**
**STAFF CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $383.00 | |
| 6 Mos. | 6 Mos. | $434.00 | $51.00 |
| 12 Mos. | 6 Mos. | $491.00 | $57.00 |
| 18 Mos. | 6 Mos. | $556.50 | $65.50 |
| 24 Mos. | 6 Mos. | $630.50 | $74.00 |
| 30 Mos. | 6 Mos. | $714.50 | $84.00 |
| 36 Mos. (Maximum) | | $809.00 | $94.50 |
| **Pension Band** | **108** | | |

[193]

**EFFECTIVE AUGUST 1, 2004**

**WAGE TABLE: 21**
**BILL PRODUCTION TECHNICIAN**
**SUPPLIES ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $397.50 | |
| 6 Mos. | 6 Mos. | $447.00 | $49.50 |
| 12 Mos. | 6 Mos. | $502.50 | $55.50 |
| 18 Mos. | 6 Mos. | $565.50 | $63.00 |
| 24 Mos. | 6 Mos. | $636.50 | $71.00 |
| 30 Mos. | 6 Mos. | $716.50 | $80.00 |
| 36 Mos. (Maximum) | | $806.00 | $89.50 |
| **Pension Band** | **108** | | |

**WAGE TABLE: 22**
**STENOGRAPHER CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $376.50 | |
| 6 Mos. | 6 Mos. | $426.50 | $50.00 |
| 12 Mos. | 6 Mos. | $482.00 | $55.50 |
| 18 Mos. | 6 Mos. | $544.50 | $62.50 |
| 24 Mos. | 6 Mos. | $615.00 | $70.50 |
| 30 Mos. | 6 Mos. | $696.00 | $81.00 |
| 36 Mos. (Maximum) | | $786.50 | $90.50 |
| **Pension Band** | **107** | | |

**WAGE TABLE: 23**
**GENERAL FIELD CLERK**
**SENIOR CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $371.50 | |
| 6 Mos. | 6 Mos. | $420.00 | $48.50 |
| 12 Mos. | 6 Mos. | $477.00 | $57.00 |
| 18 Mos. | 6 Mos. | $540.00 | $63.00 |
| 24 Mos. | 6 Mos. | $612.00 | $72.00 |
| 30 Mos. | 6 Mos. | $694.00 | $82.00 |
| 36 Mos. (Maximum) | | $786.50 | $92.50 |
| **Pension Band** | **107** | | |

**WAGE TABLE: 24**
**SENIOR ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $360.00 | |
| 6 Mos. | 6 Mos. | $406.50 | $46.50 |
| 12 Mos. | 6 Mos. | $459.50 | $53.00 |
| 18 Mos. | 6 Mos. | $518.50 | $59.00 |
| 24 Mos. | 6 Mos. | $587.00 | $68.50 |
| 30 Mos. | 6 Mos. | $663.50 | $76.50 |
| 36 Mos. (Maximum) | | $749.50 | $86.00 |
| **Pension Band** | **106** | | |

[194]

**EFFECTIVE AUGUST 1, 2004**

**WAGE TABLE: 25**
**FIELD CLERK**
**GENERAL CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $360.00 | |
| 6 Mos. | 6 Mos. | $406.00 | $46.00 |
| 12 Mos. | 6 Mos. | $459.50 | $53.50 |
| 18 Mos. | 6 Mos. | $518.50 | $59.00 |
| 24 Mos. | 6 Mos. | $586.50 | $68.00 |
| 30 Mos. | 6 Mos. | $662.50 | $76.00 |
| 36 Mos. (Maximum) | | $748.50 | $86.00 |
| **Pension Band** | | **106** | |

**WAGE TABLE: 26**
**BUILDING CUSTODIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $347.50 | |
| 6 Mos. | 6 Mos. | $393.00 | $45.50 |
| 12 Mos. | 6 Mos. | $445.00 | $52.00 |
| 18 Mos. | 6 Mos. | $504.00 | $59.00 |
| 24 Mos. | 6 Mos. | $570.00 | $66.00 |
| 30 Mos. | 6 Mos. | $645.50 | $75.50 |
| 36 Mos. (Maximum) | | $731.00 | $85.50 |
| **Pension Band** | | **105** | |

**WAGE TABLE: 27**
**BUILDING CUSTODIAN ASSOCIATE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $312.50 | |
| 6 Mos. | 6 Mos. | $357.00 | $44.50 |
| 12 Mos. | 6 Mos. | $407.50 | $50.50 |
| 18 Mos. | 6 Mos. | $466.50 | $59.00 |
| 24 Mos. | 6 Mos. | $532.50 | $66.00 |
| 30 Mos. | 6 Mos. | $608.50 | $76.00 |
| 36 Mos. (Maximum) | | $695.00 | $86.50 |
| **Pension Band** | | **104** | |

**WAGE TABLE: 28**
**OFFICE CLERICAL ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $339.00 | |
| 6 Mos. | 6 Mos. | $379.00 | $40.00 |
| 12 Mos. | 6 Mos. | $424.00 | $45.00 |
| 18 Mos. | 6 Mos. | $473.50 | $49.50 |
| 24 Mos. | 6 Mos. | $529.00 | $55.50 |
| 30 Mos. | 6 Mos. | $591.00 | $62.00 |
| 36 Mos. (Maximum) | | $661.00 | $70.00 |
| **Pension Band** | | **103** | |

[195]

**EFFECTIVE AUGUST 1, 2004**

**WAGE TABLE: 29**
**ASSISTANT TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $352.00 | |
| 6 Mos. | 6 Mos. | $398.00 | $46.00 |
| 12 Mos. | 6 Mos. | $448.50 | $50.50 |
| 18 Mos. | 6 Mos. | $507.00 | $58.50 |
| 24 Mos. | 6 Mos. | $573.00 | $66.00 |
| 30 Mos. (Maximum) | | $646.50 | $73.50 |
| **Pension Band** | **102** | | |

**WAGE TABLE: 30**
**GRAPHICS DESIGNER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $407.00 | |
| 6 Mos. | 6 Mos. | $465.00 | $58.00 |
| 12 Mos. | 6 Mos. | $533.50 | $68.50 |
| 18 Mos. | 6 Mos. | $610.50 | $77.00 |
| 24 Mos. | 6 Mos. | $698.00 | $87.50 |
| 30 Mos. | 6 Mos. | $798.50 | $100.50 |
| Top (Maximum) | | $914.00 | $115.50 |
| **Pension Band** | **112** | | |

[196]

EFFECTIVE AUGUST 7, 2005

WAGE TABLE: 02
**BUILDINGS EQUIPMENT MECHANIC**
**COMBINATION TECHNICIAN**
**SPLICING TECHNICIAN**
**SWITCHING EQUIPMENT TECHNICIAN**
**SYSTEMS TECHNICIAN**
**SYSTEMS TECHNICIAN - RADIO**
**TEST DESK TECHNICIAN**

**WAGE TABLE: 01**
**CUSTOMER SERVICE AGENT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $473.50 | |
| 6 Mos. | 6 Mos. | $532.50 | $59.00 |
| 12 Mos. | 6 Mos. | $600.50 | $68.00 |
| 18 Mos. | 6 Mos. | $675.00 | $74.50 |
| 24 Mos. | 6 Mos. | $760.50 | $85.50 |
| 30 Mos. | 6 Mos. | $855.00 | $94.50 |
| 36 Mos. | 6 Mos. | $962.00 | $107.00 |
| 42 Mos. | 6 Mos. | $1,082.50 | $120.50 |
| 48 Mos. (Maximum) | | $1,218.50 | $136.00 |
| **Pension Band** | | **124** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $456.00 | |
| 6 Mos. | 6 Mos. | $511.50 | $55.50 |
| 12 Mos. | 6 Mos. | $574.50 | $63.00 |
| 18 Mos. | 6 Mos. | $644.50 | $70.00 |
| 24 Mos. | 6 Mos. | $723.00 | $78.50 |
| 30 Mos. | 6 Mos. | $812.00 | $89.00 |
| 36 Mos. | 6 Mos. | $911.50 | $99.50 |
| 42 Mos. | 6 Mos. | $1,023.00 | $111.50 |
| 48 Mos. (Maximum) | | $1,147.50 | $124.50 |
| **Pension Band** | | **121** | |

**WAGE TABLE: 03**
**ASSIGNMENT TECHNICIAN**
**AUTOMOTIVE MECHANIC**
**OUTSIDE PLANT TECHNICIAN**
**SERVICES TECHNICIAN**

**WAGE TABLE: 04**
**FACILITIES ASSIGNER**
**MATERIAL SERVICE COORDINATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $454.00 | |
| 6 Mos. | 6 Mos. | $509.00 | $55.00 |
| 12 Mos. | 6 Mos. | $569.00 | $60.00 |
| 18 Mos. | 6 Mos. | $638.00 | $69.00 |
| 24 Mos. | 6 Mos. | $714.00 | $76.00 |
| 30 Mos. | 6 Mos. | $800.00 | $86.00 |
| 36 Mos. | 6 Mos. | $895.50 | $95.50 |
| 42 Mos. | 6 Mos. | $1,004.00 | $108.50 |
| 48 Mos. (Maximum) | | $1,124.00 | $120.00 |
| **Pension Band** | | **120** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $453.50 | |
| 6 Mos. | 6 Mos. | $507.50 | $54.00 |
| 12 Mos. | 6 Mos. | $568.00 | $60.50 |
| 18 Mos. | 6 Mos. | $635.50 | $67.50 |
| 24 Mos. | 6 Mos. | $711.50 | $76.00 |
| 30 Mos. | 6 Mos. | $796.50 | $85.00 |
| 36 Mos. | 6 Mos. | $892.00 | $95.50 |
| 42 Mos. | 6 Mos. | $997.50 | $105.50 |
| 48 Mos. (Maximum) | | $1,117.00 | $119.50 |
| **Pension Band** | | **120** | |

[197]

**EFFECTIVE AUGUST 7, 2005**

**WAGE TABLE: 05**
**DRIVER - TRACTOR TRAILER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $467.00 | |
| 6 Mos. | 6 Mos. | $535.50 | $68.50 |
| 12 Mos. | 6 Mos. | $612.50 | $77.00 |
| 18 Mos. | 6 Mos. | $700.50 | $88.00 |
| 24 Mos. | 6 Mos. | $803.50 | $103.00 |
| 30 Mos. | 6 Mos. | $919.00 | $115.50 |
| 36 Mos. (Maximum) | | $1,052.00 | $133.00 |
| **Pension Band** | **117** | | |

**WAGE TABLE: 06**
**DRIVER - HEAVY TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $466.00 | |
| 6 Mos. | 6 Mos. | $531.00 | $65.00 |
| 12 Mos. | 6 Mos. | $605.50 | $74.50 |
| 18 Mos. | 6 Mos. | $691.50 | $86.00 |
| 24 Mos. | 6 Mos. | $788.50 | $97.00 |
| 30 Mos. | 6 Mos. | $900.00 | $111.50 |
| 36 Mos. (Maximum) | | $1,026.00 | $126.00 |
| **Pension Band** | **116** | | |

**WAGE TABLE: 07**
**STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $456.50 | |
| 6 Mos. | 6 Mos. | $516.00 | $59.50 |
| 12 Mos. | 6 Mos. | $583.00 | $67.00 |
| 18 Mos. | 6 Mos. | $659.00 | $76.00 |
| 24 Mos. | 6 Mos. | $745.50 | $86.50 |
| 30 Mos. | 6 Mos. | $842.50 | $97.00 |
| 36 Mos. (Maximum) | | $952.50 | $110.00 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 08**
**DRIVER - MEDIUM TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $456.00 | |
| 6 Mos. | 6 Mos. | $514.50 | $58.50 |
| 12 Mos. | 6 Mos. | $581.00 | $66.50 |
| 18 Mos. | 6 Mos. | $656.00 | $75.00 |
| 24 Mos. | 6 Mos. | $741.50 | $85.50 |
| 30 Mos. | 6 Mos. | $837.00 | $95.50 |
| 36 Mos. (Maximum) | | $944.00 | $107.00 |
| **Pension Band** | **113** | | |

[198]

**EFFECTIVE AUGUST 7, 2005**

**WAGE TABLE: 09**
**MATERIALS HANDLER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $456.00 | |
| 6 Mos. | 6 Mos. | $514.00 | $58.00 |
| 12 Mos. | 6 Mos. | $581.00 | $67.00 |
| 18 Mos. | 6 Mos. | $656.00 | $75.00 |
| 24 Mos. | 6 Mos. | $741.50 | $85.50 |
| 30 Mos. | 6 Mos. | $836.50 | $95.00 |
| 36 Mos. (Maximum) | | $943.50 | $107.00 |
| **Pension Band** | | **113** | |

**WAGE TABLE: 10**
**FRAME ATTENDANT A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $455.50 | |
| 6 Mos. | 6 Mos. | $514.00 | $58.50 |
| 12 Mos. | 6 Mos. | $580.50 | $66.50 |
| 18 Mos. | 6 Mos. | $655.50 | $75.00 |
| 24 Mos. | 6 Mos. | $740.00 | $84.50 |
| 30 Mos. | 6 Mos. | $836.00 | $96.00 |
| 36 Mos. (Maximum) | | $943.50 | $107.50 |
| **Pension Band** | | **113** | |

**WAGE TABLE: 11**
**COMMUNICATIONS ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $454.00 | |
| 6 Mos. | 6 Mos. | $512.00 | $58.00 |
| 12 Mos. | 6 Mos. | $577.50 | $65.50 |
| 18 Mos. | 6 Mos. | $652.00 | $74.50 |
| 24 Mos. | 6 Mos. | $734.50 | $82.50 |
| 30 Mos. | 6 Mos. | $829.00 | $94.50 |
| 36 Mos. (Maximum) | | $935.00 | $106.00 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 12**
**FRAME ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $454.00 | |
| 6 Mos. | 6 Mos. | $512.00 | $58.00 |
| 12 Mos. | 6 Mos. | $577.00 | $65.00 |
| 18 Mos. | 6 Mos. | $651.00 | $74.00 |
| 24 Mos. | 6 Mos. | $733.50 | $82.50 |
| 30 Mos. | 6 Mos. | $827.00 | $93.50 |
| 36 Mos. (Maximum) | | $932.50 | $105.50 |
| **Pension Band** | | **112** | |

[199]

**EFFECTIVE AUGUST 7, 2005**

**WAGE TABLE: 13**
ASSIGNMENT ADMINISTRATOR
DRAFTER
MAINTENANCE ADMINISTRATOR
TRANSLATIONS ADMINISTRATOR

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $415.00 | |
| 6 Mos. | 6 Mos. | $474.50 | $59.50 |
| 12 Mos. | 6 Mos. | $544.00 | $69.50 |
| 18 Mos. | 6 Mos. | $622.50 | $78.50 |
| 24 Mos. | 6 Mos. | $712.00 | $89.50 |
| 30 Mos. | 6 Mos. | $814.50 | $102.50 |
| 36 Mos. (Maximum) | | $932.50 | $118.00 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 14**
CUSTOMER BILLING ANALYST
PAYROLL ANALYST

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $415.00 | |
| 6 Mos. | 6 Mos. | $474.50 | $59.50 |
| 12 Mos. | 6 Mos. | $543.50 | $69.00 |
| 18 Mos. | 6 Mos. | $622.00 | $78.50 |
| 24 Mos. | 6 Mos. | $712.00 | $90.00 |
| 30 Mos. | 6 Mos. | $814.50 | $102.50 |
| 36 Mos. (Maximum) | | $932.50 | $118.00 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 15**
SPLICING TECHNICIAN'S HELPER

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $448.50 | |
| 6 Mos. | 6 Mos. | $502.00 | $53.50 |
| 12 Mos. | 6 Mos. | $562.00 | $60.00 |
| 18 Mos. | 6 Mos. | $630.00 | $68.00 |
| 24 Mos. | 6 Mos. | $705.50 | $75.50 |
| 30 Mos. | 6 Mos. | $789.50 | $84.00 |
| 36 Mos. (Maximum) | | $884.50 | $95.00 |
| **Pension Band** | | **111** | |

**WAGE TABLE: 16**
SUPPORT SYSTEMS ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $448.50 | |
| 6 Mos. | 6 Mos. | $502.00 | $53.50 |
| 12 Mos. | 6 Mos. | $561.50 | $59.50 |
| 18 Mos. | 6 Mos. | $629.50 | $68.00 |
| 24 Mos. | 6 Mos. | $705.00 | $75.50 |
| 30 Mos. | 6 Mos. | $788.50 | $83.50 |
| 36 Mos. (Maximum) | | $883.00 | $94.50 |
| **Pension Band** | | **111** | |

[200]

**EFFECTIVE AUGUST 7, 2005**

**WAGE TABLE: 17**
**TREASURY CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $442.00 | |
| 6 Mos. | 6 Mos. | $495.50 | $53.50 |
| 12 Mos. | 6 Mos. | $555.50 | $60.00 |
| 18 Mos. | 6 Mos. | $622.50 | $67.00 |
| 24 Mos. | 6 Mos. | $698.00 | $75.50 |
| 30 Mos. | 6 Mos. | $782.50 | $84.50 |
| 36 Mos. (Maximum) | | $877.00 | $94.50 |
| **Pension Band** | **111** | | |

**WAGE TABLE: 18**
**SERVICE EVALUATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $394.50 | |
| 6 Mos. | 6 Mos. | $448.00 | $53.50 |
| 12 Mos. | 6 Mos. | $507.50 | $59.50 |
| 18 Mos. | 6 Mos. | $575.50 | $68.00 |
| 24 Mos. | 6 Mos. | $652.50 | $77.00 |
| 30 Mos. | 6 Mos. | $739.00 | $86.50 |
| 36 Mos. (Maximum) | | $837.50 | $98.50 |
| **Pension Band** | **109** | | |

**WAGE TABLE: 19**
**DRIVER - LIGHT TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $419.00 | |
| 6 Mos. | 6 Mos. | $469.50 | $50.50 |
| 12 Mos. | 6 Mos. | $526.00 | $56.50 |
| 18 Mos. | 6 Mos. | $588.50 | $62.50 |
| 24 Mos. | 6 Mos. | $658.50 | $70.00 |
| 30 Mos. | 6 Mos. | $737.50 | $79.00 |
| 36 Mos. (Maximum) | | $825.50 | $88.00 |
| **Pension Band** | **108** | | |

**WAGE TABLE: 20**
**SENIOR FIELD CLERK**
**STAFF CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $390.50 | |
| 6 Mos. | 6 Mos. | $442.50 | $52.00 |
| 12 Mos. | 6 Mos. | $501.00 | $58.50 |
| 18 Mos. | 6 Mos. | $567.50 | $66.50 |
| 24 Mos. | 6 Mos. | $643.00 | $75.50 |
| 30 Mos. | 6 Mos. | $729.00 | $86.00 |
| 36 Mos. (Maximum) | | $825.00 | $96.00 |
| **Pension Band** | **108** | | |

[201]

**EFFECTIVE AUGUST 7, 2005**

**WAGE TABLE: 21**
**BILL PRODUCTION TECHNICIAN**
**SUPPLIES ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $405.50 | |
| 6 Mos. | 6 Mos. | $456.00 | $50.50 |
| 12 Mos. | 6 Mos. | $512.50 | $56.50 |
| 18 Mos. | 6 Mos. | $577.00 | $64.50 |
| 24 Mos. | 6 Mos. | $649.00 | $72.00 |
| 30 Mos. | 6 Mos. | $731.00 | $82.00 |
| 36 Mos. (Maximum) | | $822.00 | $91.00 |
| **Pension Band** | **108** | | |

**WAGE TABLE: 22**
**STENOGRAPHER CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $384.00 | |
| 6 Mos. | 6 Mos. | $435.00 | $51.00 |
| 12 Mos. | 6 Mos. | $491.50 | $56.50 |
| 18 Mos. | 6 Mos. | $555.50 | $64.00 |
| 24 Mos. | 6 Mos. | $627.50 | $72.00 |
| 30 Mos. | 6 Mos. | $710.00 | $82.50 |
| 36 Mos. (Maximum) | | $802.00 | $92.00 |
| **Pension Band** | **107** | | |

**WAGE TABLE: 23**
**GENERAL FIELD CLERK**
**SENIOR CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $379.00 | |
| 6 Mos. | 6 Mos. | $428.50 | $49.50 |
| 12 Mos. | 6 Mos. | $486.50 | $58.00 |
| 18 Mos. | 6 Mos. | $551.00 | $64.50 |
| 24 Mos. | 6 Mos. | $624.00 | $73.00 |
| 30 Mos. | 6 Mos. | $708.00 | $84.00 |
| 36 Mos. (Maximum) | | $802.00 | $94.00 |
| **Pension Band** | **107** | | |

**WAGE TABLE: 24**
**SENIOR ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $367.00 | |
| 6 Mos. | 6 Mos. | $414.50 | $47.50 |
| 12 Mos. | 6 Mos. | $468.50 | $54.00 |
| 18 Mos. | 6 Mos. | $529.00 | $60.50 |
| 24 Mos. | 6 Mos. | $598.50 | $69.50 |
| 30 Mos. | 6 Mos. | $677.00 | $78.50 |
| 36 Mos. (Maximum) | | $764.50 | $87.50 |
| **Pension Band** | **106** | | |

[202]

**EFFECTIVE AUGUST 7, 2005**

**WAGE TABLE: 25**
**FIELD CLERK**
**GENERAL CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $367.00 | |
| 6 Mos. | 6 Mos. | $414.00 | $47.00 |
| 12 Mos. | 6 Mos. | $468.50 | $54.50 |
| 18 Mos. | 6 Mos. | $529.00 | $60.50 |
| 24 Mos. | 6 Mos. | $598.00 | $69.00 |
| 30 Mos. | 6 Mos. | $676.00 | $78.00 |
| 36 Mos. (Maximum) | | $763.50 | $87.50 |
| **Pension Band** | **106** | | |

**WAGE TABLE: 26**
**BUILDING CUSTODIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $354.50 | |
| 6 Mos. | 6 Mos. | $401.00 | $46.50 |
| 12 Mos. | 6 Mos. | $454.00 | $53.00 |
| 18 Mos. | 6 Mos. | $514.00 | $60.00 |
| 24 Mos. | 6 Mos. | $581.50 | $67.50 |
| 30 Mos. | 6 Mos. | $658.50 | $77.00 |
| 36 Mos. (Maximum) | | $745.50 | $87.00 |
| **Pension Band** | **105** | | |

**WAGE TABLE: 27**
**BUILDING CUSTODIAN ASSOCIATE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $319.00 | |
| 6 Mos. | 6 Mos. | $364.00 | $45.00 |
| 12 Mos. | 6 Mos. | $415.50 | $51.50 |
| 18 Mos. | 6 Mos. | $476.00 | $60.50 |
| 24 Mos. | 6 Mos. | $543.00 | $67.00 |
| 30 Mos. | 6 Mos. | $620.50 | $77.50 |
| 36 Mos. (Maximum) | | $709.00 | $88.50 |
| **Pension Band** | **104** | | |

**WAGE TABLE: 28**
**OFFICE CLERICAL ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $346.00 | |
| 6 Mos. | 6 Mos. | $386.50 | $40.50 |
| 12 Mos. | 6 Mos. | $432.50 | $46.00 |
| 18 Mos. | 6 Mos. | $483.00 | $50.50 |
| 24 Mos. | 6 Mos. | $539.50 | $56.50 |
| 30 Mos. | 6 Mos. | $603.00 | $63.50 |
| 36 Mos. (Maximum) | | $674.00 | $71.00 |
| **Pension Band** | **103** | | |

[203]

**EFFECTIVE AUGUST 7, 2005**

**WAGE TABLE: 29**
**ASSISTANT TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $359.00 | |
| 6 Mos. | 6 Mos. | $406.00 | $47.00 |
| 12 Mos. | 6 Mos. | $457.50 | $51.50 |
| 18 Mos. | 6 Mos. | $517.00 | $59.50 |
| 24 Mos. | 6 Mos. | $584.50 | $67.50 |
| 30 Mos. (Maximum) | | $659.50 | $75.00 |
| **Pension Band** | | **102** | |

**WAGE TABLE: 30**
**GRAPHICS DESIGNER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $415.00 | |
| 6 Mos. | 6 Mos. | $474.50 | $59.50 |
| 12 Mos. | 6 Mos. | $544.00 | $69.50 |
| 18 Mos. | 6 Mos. | $622.50 | $78.50 |
| 24 Mos. | 6 Mos. | $712.00 | $89.50 |
| 30 Mos. | 6 Mos. | $814.50 | $102.50 |
| Top (Maximum) | | $932.50 | $118.00 |
| **Pension Band** | | **112** | |

[204]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 02**
**BUILDINGS EQUIPMENT MECHANIC**
**COMBINATION TECHNICIAN**
**SPLICING TECHNICIAN**
**SWITCHING EQUIPMENT TECHNICIAN**
**SYSTEMS TECHNICIAN**
**SYSTEMS TECHNICIAN - RADIO**
**TEST DESK TECHNICIAN**

**WAGE TABLE: 01**
**CUSTOMER SERVICE AGENT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $483.00 | |
| 6 Mos. | 6 Mos. | $543.00 | $60.00 |
| 12 Mos. | 6 Mos. | $612.50 | $69.50 |
| 18 Mos. | 6 Mos. | $688.50 | $76.00 |
| 24 Mos. | 6 Mos. | $775.50 | $87.00 |
| 30 Mos. | 6 Mos. | $872.00 | $96.50 |
| 36 Mos. | 6 Mos. | $981.00 | $109.00 |
| 42 Mos. | 6 Mos. | $1,104.00 | $123.00 |
| 48 Mos. (Maximum) | | $1,243.00 | $139.00 |
| **Pension Band** | | **124** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $465.00 | |
| 6 Mos. | 6 Mos. | $521.50 | $56.50 |
| 12 Mos. | 6 Mos. | $586.00 | $64.50 |
| 18 Mos. | 6 Mos. | $657.50 | $71.50 |
| 24 Mos. | 6 Mos. | $737.50 | $80.00 |
| 30 Mos. | 6 Mos. | $828.00 | $90.50 |
| 36 Mos. | 6 Mos. | $929.50 | $101.50 |
| 42 Mos. | 6 Mos. | $1,043.50 | $114.00 |
| 48 Mos. (Maximum) | | $1,170.50 | $127.00 |
| **Pension Band** | | **121** | |

**WAGE TABLE: 03**
**ASSIGNMENT TECHNICIAN**
**AUTOMOTIVE MECHANIC**
**OUTSIDE PLANT TECHNICIAN**
**SERVICES TECHNICIAN**

**WAGE TABLE: 04**
**FACILITIES ASSIGNER**
**MATERIAL SERVICE COORDINATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $463.00 | |
| 6 Mos. | 6 Mos. | $519.00 | $56.00 |
| 12 Mos. | 6 Mos. | $580.50 | $61.50 |
| 18 Mos. | 6 Mos. | $651.00 | $70.50 |
| 24 Mos. | 6 Mos. | $728.50 | $77.50 |
| 30 Mos. | 6 Mos. | $816.00 | $87.50 |
| 36 Mos. | 6 Mos. | $913.50 | $97.50 |
| 42 Mos. | 6 Mos. | $1,024.00 | $110.50 |
| 48 Mos. (Maximum) | | $1,146.50 | $122.50 |
| **Pension Band** | | **120** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $462.50 | |
| 6 Mos. | 6 Mos. | $517.50 | $55.00 |
| 12 Mos. | 6 Mos. | $579.50 | $62.00 |
| 18 Mos. | 6 Mos. | $648.00 | $68.50 |
| 24 Mos. | 6 Mos. | $725.50 | $77.50 |
| 30 Mos. | 6 Mos. | $812.50 | $87.00 |
| 36 Mos. | 6 Mos. | $910.00 | $97.50 |
| 42 Mos. | 6 Mos. | $1,017.50 | $107.50 |
| 48 Mos. (Maximum) | | $1,139.50 | $122.00 |
| **Pension Band** | | **120** | |

[205]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 05**
**DRIVER - TRACTOR TRAILER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $476.50 | |
| 6 Mos. | 6 Mos. | $546.00 | $69.50 |
| 12 Mos. | 6 Mos. | $625.00 | $79.00 |
| 18 Mos. | 6 Mos. | $714.50 | $89.50 |
| 24 Mos. | 6 Mos. | $819.50 | $105.00 |
| 30 Mos. | 6 Mos. | $937.50 | $118.00 |
| 36 Mos. (Maximum) | | $1,073.00 | $135.50 |
| **Pension Band** | **117** | | |

**WAGE TABLE: 06**
**DRIVER - HEAVY TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $475.50 | |
| 6 Mos. | 6 Mos. | $541.50 | $66.00 |
| 12 Mos. | 6 Mos. | $617.50 | $76.00 |
| 18 Mos. | 6 Mos. | $705.50 | $88.00 |
| 24 Mos. | 6 Mos. | $804.50 | $99.00 |
| 30 Mos. | 6 Mos. | $918.00 | $113.50 |
| 36 Mos. (Maximum) | | $1,046.50 | $128.50 |
| **Pension Band** | **116** | | |

**WAGE TABLE: 07**
**STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $465.50 | |
| 6 Mos. | 6 Mos. | $526.50 | $61.00 |
| 12 Mos. | 6 Mos. | $594.50 | $68.00 |
| 18 Mos. | 6 Mos. | $672.00 | $77.50 |
| 24 Mos. | 6 Mos. | $760.50 | $88.50 |
| 30 Mos. | 6 Mos. | $859.50 | $99.00 |
| 36 Mos. (Maximum) | | $971.50 | $112.00 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 08**
**DRIVER - MEDIUM TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $465.00 | |
| 6 Mos. | 6 Mos. | $525.00 | $60.00 |
| 12 Mos. | 6 Mos. | $592.50 | $67.50 |
| 18 Mos. | 6 Mos. | $669.00 | $76.50 |
| 24 Mos. | 6 Mos. | $756.50 | $87.50 |
| 30 Mos. | 6 Mos. | $853.50 | $97.00 |
| 36 Mos. (Maximum) | | $963.00 | $109.50 |
| **Pension Band** | **113** | | |

[206]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 09**
**MATERIALS HANDLER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $465.00 | |
| 6 Mos. | 6 Mos. | $524.50 | $59.50 |
| 12 Mos. | 6 Mos. | $592.50 | $68.00 |
| 18 Mos. | 6 Mos. | $669.00 | $76.50 |
| 24 Mos. | 6 Mos. | $756.50 | $87.50 |
| 30 Mos. | 6 Mos. | $853.00 | $96.50 |
| 36 Mos. (Maximum) | | $962.50 | $109.50 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 10**
**FRAME ATTENDANT A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $464.50 | |
| 6 Mos. | 6 Mos. | $524.50 | $60.00 |
| 12 Mos. | 6 Mos. | $592.00 | $67.50 |
| 18 Mos. | 6 Mos. | $668.50 | $76.50 |
| 24 Mos. | 6 Mos. | $755.00 | $86.50 |
| 30 Mos. | 6 Mos. | $852.50 | $97.50 |
| 36 Mos. (Maximum) | | $962.50 | $110.00 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 11**
**COMMUNICATIONS ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $463.00 | |
| 6 Mos. | 6 Mos. | $522.00 | $59.00 |
| 12 Mos. | 6 Mos. | $589.00 | $67.00 |
| 18 Mos. | 6 Mos. | $665.00 | $76.00 |
| 24 Mos. | 6 Mos. | $749.00 | $84.00 |
| 30 Mos. | 6 Mos. | $845.50 | $96.50 |
| 36 Mos. (Maximum) | | $953.50 | $108.00 |
| **Pension Band** | **112** | | |

**WAGE TABLE: 12**
**FRAME ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $463.00 | |
| 6 Mos. | 6 Mos. | $522.00 | $59.00 |
| 12 Mos. | 6 Mos. | $588.50 | $66.50 |
| 18 Mos. | 6 Mos. | $664.00 | $75.50 |
| 24 Mos. | 6 Mos. | $748.00 | $84.00 |
| 30 Mos. | 6 Mos. | $843.50 | $95.50 |
| 36 Mos. (Maximum) | | $951.00 | $107.50 |
| **Pension Band** | **112** | | |

[207]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 13**
**ASSIGNMENT ADMINISTRATOR**
**DRAFTER**
**MAINTENANCE ADMINISTRATOR**
**TRANSLATIONS ADMINISTRATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $423.50 | |
| 6 Mos. | 6 Mos. | $484.00 | $60.50 |
| 12 Mos. | 6 Mos. | $555.00 | $71.00 |
| 18 Mos. | 6 Mos. | $635.00 | $80.00 |
| 24 Mos. | 6 Mos. | $726.00 | $91.00 |
| 30 Mos. | 6 Mos. | $831.00 | $105.00 |
| 36 Mos. (Maximum) | | $951.00 | $120.00 |
| **Pension Band** | **112** | | |

**WAGE TABLE: 14**
**CUSTOMER BILLING ANALYST**
**PAYROLL ANALYST**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $423.50 | |
| 6 Mos. | 6 Mos. | $484.00 | $60.50 |
| 12 Mos. | 6 Mos. | $554.50 | $70.50 |
| 18 Mos. | 6 Mos. | $634.50 | $80.00 |
| 24 Mos. | 6 Mos. | $726.00 | $91.50 |
| 30 Mos. | 6 Mos. | $831.00 | $105.00 |
| 36 Mos. (Maximum) | | $951.00 | $120.00 |
| **Pension Band** | **112** | | |

**WAGE TABLE: 15**
**SPLICING TECHNICIAN'S HELPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $457.50 | |
| 6 Mos. | 6 Mos. | $512.00 | $54.50 |
| 12 Mos. | 6 Mos. | $573.00 | $61.00 |
| 18 Mos. | 6 Mos. | $642.50 | $69.50 |
| 24 Mos. | 6 Mos. | $719.50 | $77.00 |
| 30 Mos. | 6 Mos. | $805.50 | $86.00 |
| 36 Mos. (Maximum) | | $902.00 | $96.50 |
| **Pension Band** | **111** | | |

**WAGE TABLE: 16**
**SUPPORT SYSTEMS ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $457.50 | |
| 6 Mos. | 6 Mos. | $512.00 | $54.50 |
| 12 Mos. | 6 Mos. | $572.50 | $60.50 |
| 18 Mos. | 6 Mos. | $642.00 | $69.50 |
| 24 Mos. | 6 Mos. | $719.00 | $77.00 |
| 30 Mos. | 6 Mos. | $804.50 | $85.50 |
| 36 Mos. (Maximum) | | $900.50 | $96.00 |
| **Pension Band** | **111** | | |

[208]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 17**
**TREASURY CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $451.00 | |
| 6 Mos. | 6 Mos. | $505.50 | $54.50 |
| 12 Mos. | 6 Mos. | $566.50 | $61.00 |
| 18 Mos. | 6 Mos. | $635.00 | $68.50 |
| 24 Mos. | 6 Mos. | $712.00 | $77.00 |
| 30 Mos. | 6 Mos. | $798.00 | $86.00 |
| 36 Mos. (Maximum) | | $894.50 | $96.50 |
| **Pension Band** | **111** | | |

**WAGE TABLE: 18**
**SERVICE EVALUATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $402.50 | |
| 6 Mos. | 6 Mos. | $457.00 | $54.50 |
| 12 Mos. | 6 Mos. | $517.50 | $60.50 |
| 18 Mos. | 6 Mos. | $587.00 | $69.50 |
| 24 Mos. | 6 Mos. | $665.50 | $78.50 |
| 30 Mos. | 6 Mos. | $754.00 | $88.50 |
| 36 Mos. (Maximum) | | $854.50 | $100.50 |
| **Pension Band** | **109** | | |

**WAGE TABLE: 19**
**DRIVER - LIGHT TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $427.50 | |
| 6 Mos. | 6 Mos. | $479.00 | $51.50 |
| 12 Mos. | 6 Mos. | $536.50 | $57.50 |
| 18 Mos. | 6 Mos. | $600.50 | $64.00 |
| 24 Mos. | 6 Mos. | $671.50 | $71.00 |
| 30 Mos. | 6 Mos. | $752.50 | $81.00 |
| 36 Mos. (Maximum) | | $842.00 | $89.50 |
| **Pension Band** | **108** | | |

**WAGE TABLE: 20**
**SENIOR FIELD CLERK**
**STAFF CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $398.50 | |
| 6 Mos. | 6 Mos. | $451.50 | $53.00 |
| 12 Mos. | 6 Mos. | $511.00 | $59.50 |
| 18 Mos. | 6 Mos. | $579.00 | $68.00 |
| 24 Mos. | 6 Mos. | $656.00 | $77.00 |
| 30 Mos. | 6 Mos. | $743.50 | $87.50 |
| 36 Mos. (Maximum) | | $841.50 | $98.00 |
| **Pension Band** | **108** | | |

[209]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 21**
**BILL PRODUCTION TECHNICIAN**
**SUPPLIES ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $413.50 | |
| 6 Mos. | 6 Mos. | $465.00 | $51.50 |
| 12 Mos. | 6 Mos. | $523.00 | $58.00 |
| 18 Mos. | 6 Mos. | $588.50 | $65.50 |
| 24 Mos. | 6 Mos. | $662.00 | $73.50 |
| 30 Mos. | 6 Mos. | $745.50 | $83.50 |
| 36 Mos. (Maximum) | | $838.50 | $93.00 |
| **Pension Band** | | **108** | |

**WAGE TABLE: 22**
**STENOGRAPHER CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $391.50 | |
| 6 Mos. | 6 Mos. | $443.50 | $52.00 |
| 12 Mos. | 6 Mos. | $501.50 | $58.00 |
| 18 Mos. | 6 Mos. | $566.50 | $65.00 |
| 24 Mos. | 6 Mos. | $640.00 | $73.50 |
| 30 Mos. | 6 Mos. | $724.00 | $84.00 |
| 36 Mos. (Maximum) | | $818.00 | $94.00 |
| **Pension Band** | | **107** | |

**WAGE TABLE: 23**
**GENERAL FIELD CLERK**
**SENIOR CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $386.50 | |
| 6 Mos. | 6 Mos. | $437.00 | $50.50 |
| 12 Mos. | 6 Mos. | $496.00 | $59.00 |
| 18 Mos. | 6 Mos. | $562.00 | $66.00 |
| 24 Mos. | 6 Mos. | $636.50 | $74.50 |
| 30 Mos. | 6 Mos. | $722.00 | $85.50 |
| 36 Mos. (Maximum) | | $818.00 | $96.00 |
| **Pension Band** | | **107** | |

**WAGE TABLE: 24**
**SENIOR ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $374.50 | |
| 6 Mos. | 6 Mos. | $423.00 | $48.50 |
| 12 Mos. | 6 Mos. | $478.00 | $55.00 |
| 18 Mos. | 6 Mos. | $539.50 | $61.50 |
| 24 Mos. | 6 Mos. | $610.50 | $71.00 |
| 30 Mos. | 6 Mos. | $690.50 | $80.00 |
| 36 Mos. (Maximum) | | $780.00 | $89.50 |
| **Pension Band** | | **106** | |

[210]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 25**
**FIELD CLERK**
**GENERAL CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $374.50 | |
| 6 Mos. | 6 Mos. | $422.50 | $48.00 |
| 12 Mos. | 6 Mos. | $478.00 | $55.50 |
| 18 Mos. | 6 Mos. | $539.50 | $61.50 |
| 24 Mos. | 6 Mos. | $610.00 | $70.50 |
| 30 Mos. | 6 Mos. | $689.50 | $79.50 |
| 36 Mos. (Maximum) | | $779.00 | $89.50 |
| **Pension Band** | | **106** | |

**WAGE TABLE: 26**
**BUILDING CUSTODIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $361.50 | |
| 6 Mos. | 6 Mos. | $409.00 | $47.50 |
| 12 Mos. | 6 Mos. | $463.00 | $54.00 |
| 18 Mos. | 6 Mos. | $524.50 | $61.50 |
| 24 Mos. | 6 Mos. | $593.00 | $68.50 |
| 30 Mos. | 6 Mos. | $671.50 | $78.50 |
| 36 Mos. (Maximum) | | $760.50 | $89.00 |
| **Pension Band** | | **105** | |

**WAGE TABLE: 27**
**BUILDING CUSTODIAN ASSOCIATE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $325.50 | |
| 6 Mos. | 6 Mos. | $371.50 | $46.00 |
| 12 Mos. | 6 Mos. | $424.00 | $52.50 |
| 18 Mos. | 6 Mos. | $485.50 | $61.50 |
| 24 Mos. | 6 Mos. | $554.00 | $68.50 |
| 30 Mos. | 6 Mos. | $633.00 | $79.00 |
| 36 Mos. (Maximum) | | $723.00 | $90.00 |
| **Pension Band** | | **104** | |

**WAGE TABLE: 28**
**OFFICE CLERICAL ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $353.00 | |
| 6 Mos. | 6 Mos. | $394.00 | $41.00 |
| 12 Mos. | 6 Mos. | $441.00 | $47.00 |
| 18 Mos. | 6 Mos. | $492.50 | $51.50 |
| 24 Mos. | 6 Mos. | $550.50 | $58.00 |
| 30 Mos. | 6 Mos. | $615.00 | $64.50 |
| 36 Mos. (Maximum) | | $687.50 | $72.50 |
| **Pension Band** | | **103** | |

[211]

**EFFECTIVE AUGUST 6, 2006**

**WAGE TABLE: 29**
**ASSISTANT TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $366.00 | |
| 6 Mos. | 6 Mos. | $414.00 | $48.00 |
| 12 Mos. | 6 Mos. | $466.50 | $52.50 |
| 18 Mos. | 6 Mos. | $527.50 | $61.00 |
| 24 Mos. | 6 Mos. | $596.00 | $68.50 |
| 30 Mos. (Maximum) | | $672.50 | $76.50 |
| **Pension Band** | | **102** | |

**WAGE TABLE: 30**
**GRAPHICS DESIGNER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $423.50 | |
| 6 Mos. | 6 Mos. | $484.00 | $60.50 |
| 12 Mos. | 6 Mos. | $555.00 | $71.00 |
| 18 Mos. | 6 Mos. | $635.00 | $80.00 |
| 24 Mos. | 6 Mos. | $726.00 | $91.00 |
| 30 Mos. | 6 Mos. | $831.00 | $105.00 |
| Top (Maximum) | | $951.00 | $120.00 |
| **Pension Band** | | **112** | |

[212]

**EFFECTIVE AUGUST 5, 2007**

**WAGE TABLE: 02**
**BUILDINGS EQUIPMENT MECHANIC**
**COMBINATION TECHNICIAN**
**SPLICING TECHNICIAN**
**SWITCHING EQUIPMENT TECHNICIAN**
**SYSTEMS TECHNICIAN**
**SYSTEMS TECHNICIAN - RADIO**
**TEST DESK TECHNICIAN**

**WAGE TABLE: 01**
**CUSTOMER SERVICE AGENT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $492.50 | |
| 6 Mos. | 6 Mos. | $554.00 | $61.50 |
| 12 Mos. | 6 Mos. | $625.00 | $71.00 |
| 18 Mos. | 6 Mos. | $702.50 | $77.50 |
| 24 Mos. | 6 Mos. | $791.00 | $88.50 |
| 30 Mos. | 6 Mos. | $889.50 | $98.50 |
| 36 Mos. | 6 Mos. | $1,000.50 | $111.00 |
| 42 Mos. | 6 Mos. | $1,126.00 | $125.50 |
| 48 Mos. (Maximum) | | $1,268.00 | $142.00 |
| **Pension Band** | | **124** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $474.50 | |
| 6 Mos. | 6 Mos. | $532.00 | $57.50 |
| 12 Mos. | 6 Mos. | $597.50 | $65.50 |
| 18 Mos. | 6 Mos. | $670.50 | $73.00 |
| 24 Mos. | 6 Mos. | $752.50 | $82.00 |
| 30 Mos. | 6 Mos. | $844.50 | $92.00 |
| 36 Mos. | 6 Mos. | $948.00 | $103.50 |
| 42 Mos. | 6 Mos. | $1,064.50 | $116.50 |
| 48 Mos. (Maximum) | | $1,194.00 | $129.50 |
| **Pension Band** | | **121** | |

**WAGE TABLE: 03**
**ASSIGNMENT TECHNICIAN**
**AUTOMOTIVE MECHANIC**
**OUTSIDE PLANT TECHNICIAN**
**SERVICES TECHNICIAN**

**WAGE TABLE: 04**
**FACILITIES ASSIGNER**
**MATERIAL SERVICE COORDINATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $472.50 | |
| 6 Mos. | 6 Mos. | $529.50 | $57.00 |
| 12 Mos. | 6 Mos. | $592.00 | $62.50 |
| 18 Mos. | 6 Mos. | $664.00 | $72.00 |
| 24 Mos. | 6 Mos. | $743.00 | $79.00 |
| 30 Mos. | 6 Mos. | $832.50 | $89.50 |
| 36 Mos. | 6 Mos. | $932.00 | $99.50 |
| 42 Mos. | 6 Mos. | $1,044.50 | $112.50 |
| 48 Mos. (Maximum) | | $1,169.50 | $125.00 |
| **Pension Band** | | **120** | |

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $472.00 | |
| 6 Mos. | 6 Mos. | $528.00 | $56.00 |
| 12 Mos. | 6 Mos. | $591.00 | $63.00 |
| 18 Mos. | 6 Mos. | $661.00 | $70.00 |
| 24 Mos. | 6 Mos. | $740.00 | $79.00 |
| 30 Mos. | 6 Mos. | $829.00 | $89.00 |
| 36 Mos. | 6 Mos. | $928.00 | $99.00 |
| 42 Mos. | 6 Mos. | $1,038.00 | $110.00 |
| 48 Mos. (Maximum) | | $1,162.50 | $124.50 |
| **Pension Band** | | **120** | |

[213]

**EFFECTIVE AUGUST 5, 2007**

**WAGE TABLE: 05**
**DRIVER - TRACTOR TRAILER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $486.00 | |
| 6 Mos. | 6 Mos. | $557.00 | $71.00 |
| 12 Mos. | 6 Mos. | $637.50 | $80.50 |
| 18 Mos. | 6 Mos. | $729.00 | $91.50 |
| 24 Mos. | 6 Mos. | $836.00 | $107.00 |
| 30 Mos. | 6 Mos. | $956.50 | $120.50 |
| 36 Mos. (Maximum) | | $1,094.50 | $138.00 |
| **Pension Band** | **117** | | |

**WAGE TABLE: 06**
**DRIVER - HEAVY TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $485.00 | |
| 6 Mos. | 6 Mos. | $552.50 | $67.50 |
| 12 Mos. | 6 Mos. | $630.00 | $77.50 |
| 18 Mos. | 6 Mos. | $719.50 | $89.50 |
| 24 Mos. | 6 Mos. | $820.50 | $101.00 |
| 30 Mos. | 6 Mos. | $936.50 | $116.00 |
| 36 Mos. (Maximum) | | $1,067.50 | $131.00 |
| **Pension Band** | **116** | | |

**WAGE TABLE: 07**
**STOREKEEPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $475.00 | |
| 6 Mos. | 6 Mos. | $537.00 | $62.00 |
| 12 Mos. | 6 Mos. | $606.50 | $69.50 |
| 18 Mos. | 6 Mos. | $685.50 | $79.00 |
| 24 Mos. | 6 Mos. | $775.50 | $90.00 |
| 30 Mos. | 6 Mos. | $876.50 | $101.00 |
| 36 Mos. (Maximum) | | $991.00 | $114.50 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 08**
**DRIVER - MEDIUM TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $474.50 | |
| 6 Mos. | 6 Mos. | $535.50 | $61.00 |
| 12 Mos. | 6 Mos. | $604.50 | $69.00 |
| 18 Mos. | 6 Mos. | $682.50 | $78.00 |
| 24 Mos. | 6 Mos. | $771.50 | $89.00 |
| 30 Mos. | 6 Mos. | $870.50 | $99.00 |
| 36 Mos. (Maximum) | | $982.50 | $112.00 |
| **Pension Band** | **113** | | |

[214]

**EFFECTIVE AUGUST 5, 2007**

**WAGE TABLE: 09**
**MATERIALS HANDLER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $474.50 | |
| 6 Mos. | 6 Mos. | $535.00 | $60.50 |
| 12 Mos. | 6 Mos. | $604.50 | $69.50 |
| 18 Mos. | 6 Mos. | $682.50 | $78.00 |
| 24 Mos. | 6 Mos. | $771.50 | $89.00 |
| 30 Mos. | 6 Mos. | $870.00 | $98.50 |
| 36 Mos. (Maximum) | | $982.00 | $112.00 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 10**
**FRAME ATTENDANT A**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $474.00 | |
| 6 Mos. | 6 Mos. | $535.00 | $61.00 |
| 12 Mos. | 6 Mos. | $604.00 | $69.00 |
| 18 Mos. | 6 Mos. | $682.00 | $78.00 |
| 24 Mos. | 6 Mos. | $770.00 | $88.00 |
| 30 Mos. | 6 Mos. | $869.50 | $99.50 |
| 36 Mos. (Maximum) | | $982.00 | $112.50 |
| **Pension Band** | **113** | | |

**WAGE TABLE: 11**
**COMMUNICATIONS ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $472.50 | |
| 6 Mos. | 6 Mos. | $532.50 | $60.00 |
| 12 Mos. | 6 Mos. | $601.00 | $68.50 |
| 18 Mos. | 6 Mos. | $678.50 | $77.50 |
| 24 Mos. | 6 Mos. | $764.00 | $85.50 |
| 30 Mos. | 6 Mos. | $862.50 | $98.50 |
| 36 Mos. (Maximum) | | $972.50 | $110.00 |
| **Pension Band** | **112** | | |

**WAGE TABLE: 12**
**FRAME ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $472.50 | |
| 6 Mos. | 6 Mos. | $532.50 | $60.00 |
| 12 Mos. | 6 Mos. | $600.50 | $68.00 |
| 18 Mos. | 6 Mos. | $677.50 | $77.00 |
| 24 Mos. | 6 Mos. | $763.00 | $85.50 |
| 30 Mos. | 6 Mos. | $860.50 | $97.50 |
| 36 Mos. (Maximum) | | $970.00 | $109.50 |
| **Pension Band** | **112** | | |

[215]

**EFFECTIVE AUGUST 5, 2007**

**WAGE TABLE: 13**
**ASSIGNMENT ADMINISTRATOR**
**DRAFTER**
**MAINTENANCE ADMINISTRATOR**
**TRANSLATIONS ADMINISTRATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|-----------|------------------------|--------|-----------------|
| Start | 6 Mos. | $432.00 | |
| 6 Mos. | 6 Mos. | $493.50 | $61.50 |
| 12 Mos. | 6 Mos. | $566.00 | $72.50 |
| 18 Mos. | 6 Mos. | $647.50 | $81.50 |
| 24 Mos. | 6 Mos. | $740.50 | $93.00 |
| 30 Mos. | 6 Mos. | $847.50 | $107.00 |
| 36 Mos. (Maximum) | | $970.00 | $122.50 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 14**
**CUSTOMER BILLING ANALYST**
**PAYROLL ANALYST**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|-----------|------------------------|--------|-----------------|
| Start | 6 Mos. | $432.00 | |
| 6 Mos. | 6 Mos. | $493.50 | $61.50 |
| 12 Mos. | 6 Mos. | $565.50 | $72.00 |
| 18 Mos. | 6 Mos. | $647.00 | $81.50 |
| 24 Mos. | 6 Mos. | $740.50 | $93.50 |
| 30 Mos. | 6 Mos. | $847.50 | $107.00 |
| 36 Mos. (Maximum) | | $970.00 | $122.50 |
| **Pension Band** | | **112** | |

**WAGE TABLE: 15**
**SPLICING TECHNICIAN'S HELPER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|-----------|------------------------|--------|-----------------|
| Start | 6 Mos. | $466.50 | |
| 6 Mos. | 6 Mos. | $522.00 | $55.50 |
| 12 Mos. | 6 Mos. | $584.50 | $62.50 |
| 18 Mos. | 6 Mos. | $655.50 | $71.00 |
| 24 Mos. | 6 Mos. | $734.00 | $78.50 |
| 30 Mos. | 6 Mos. | $821.50 | $87.50 |
| 36 Mos. (Maximum) | | $920.00 | $98.50 |
| **Pension Band** | | **111** | |

**WAGE TABLE: 16**
**SUPPORT SYSTEMS ATTENDANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|-----------|------------------------|--------|-----------------|
| Start | 6 Mos. | $466.50 | |
| 6 Mos. | 6 Mos. | $522.00 | $55.50 |
| 12 Mos. | 6 Mos. | $584.00 | $62.00 |
| 18 Mos. | 6 Mos. | $655.00 | $71.00 |
| 24 Mos. | 6 Mos. | $733.50 | $78.50 |
| 30 Mos. | 6 Mos. | $820.50 | $87.00 |
| 36 Mos. (Maximum) | | $918.50 | $98.00 |
| **Pension Band** | | **111** | |

[216]

EFFECTIVE AUGUST 5, 2007

**WAGE TABLE: 17**
**TREASURY CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $460.00 | |
| 6 Mos. | 6 Mos. | $515.50 | $55.50 |
| 12 Mos. | 6 Mos. | $578.00 | $62.50 |
| 18 Mos. | 6 Mos. | $647.50 | $69.50 |
| 24 Mos. | 6 Mos. | $726.00 | $78.50 |
| 30 Mos. | 6 Mos. | $814.00 | $88.00 |
| 36 Mos. (Maximum) | | $912.50 | $98.50 |
| **Pension Band** | | **111** | |

**WAGE TABLE: 18**
**SERVICE EVALUATOR**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $410.50 | |
| 6 Mos. | 6 Mos. | $466.00 | $55.50 |
| 12 Mos. | 6 Mos. | $528.00 | $62.00 |
| 18 Mos. | 6 Mos. | $598.50 | $70.50 |
| 24 Mos. | 6 Mos. | $679.00 | $80.50 |
| 30 Mos. | 6 Mos. | $769.00 | $90.00 |
| 36 Mos. (Maximum) | | $871.50 | $102.50 |
| **Pension Band** | | **109** | |

**WAGE TABLE: 19**
**DRIVER - LIGHT TRUCK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $436.00 | |
| 6 Mos. | 6 Mos. | $488.50 | $52.50 |
| 12 Mos. | 6 Mos. | $547.00 | $58.50 |
| 18 Mos. | 6 Mos. | $612.50 | $65.50 |
| 24 Mos. | 6 Mos. | $685.00 | $72.50 |
| 30 Mos. | 6 Mos. | $767.50 | $82.50 |
| 36 Mos. (Maximum) | | $859.00 | $91.50 |
| **Pension Band** | | **108** | |

**WAGE TABLE: 20**
**SENIOR FIELD CLERK**
**STAFF CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $406.50 | |
| 6 Mos. | 6 Mos. | $460.50 | $54.00 |
| 12 Mos. | 6 Mos. | $521.00 | $60.50 |
| 18 Mos. | 6 Mos. | $590.50 | $69.50 |
| 24 Mos. | 6 Mos. | $669.00 | $78.50 |
| 30 Mos. | 6 Mos. | $758.50 | $89.50 |
| 36 Mos. (Maximum) | | $858.50 | $100.00 |
| **Pension Band** | | **108** | |

[217]

**EFFECTIVE AUGUST 5, 2007**

**WAGE TABLE: 21**
### BILL PRODUCTION TECHNICIAN
### SUPPLIES ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $422.00 | |
| 6 Mos. | 6 Mos. | $474.50 | $52.50 |
| 12 Mos. | 6 Mos. | $533.50 | $59.00 |
| 18 Mos. | 6 Mos. | $600.50 | $67.00 |
| 24 Mos. | 6 Mos. | $675.00 | $74.50 |
| 30 Mos. | 6 Mos. | $760.50 | $85.50 |
| 36 Mos. (Maximum) | | $855.50 | $95.00 |
| **Pension Band** | **108** | | |

**WAGE TABLE: 22**
### STENOGRAPHER CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $399.50 | |
| 6 Mos. | 6 Mos. | $452.50 | $53.00 |
| 12 Mos. | 6 Mos. | $511.50 | $59.00 |
| 18 Mos. | 6 Mos. | $578.00 | $66.50 |
| 24 Mos. | 6 Mos. | $653.00 | $75.00 |
| 30 Mos. | 6 Mos. | $738.50 | $85.50 |
| 36 Mos. (Maximum) | | $834.50 | $96.00 |
| **Pension Band** | **107** | | |

**WAGE TABLE: 23**
### GENERAL FIELD CLERK
### SENIOR CLERK

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $394.00 | |
| 6 Mos. | 6 Mos. | $445.50 | $51.50 |
| 12 Mos. | 6 Mos. | $506.00 | $60.50 |
| 18 Mos. | 6 Mos. | $573.00 | $67.00 |
| 24 Mos. | 6 Mos. | $649.00 | $76.00 |
| 30 Mos. | 6 Mos. | $736.50 | $87.50 |
| 36 Mos. (Maximum) | | $834.50 | $98.00 |
| **Pension Band** | **107** | | |

**WAGE TABLE: 24**
### SENIOR ATTENDANT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $382.00 | |
| 6 Mos. | 6 Mos. | $431.50 | $49.50 |
| 12 Mos. | 6 Mos. | $487.50 | $56.00 |
| 18 Mos. | 6 Mos. | $550.50 | $63.00 |
| 24 Mos. | 6 Mos. | $622.50 | $72.00 |
| 30 Mos. | 6 Mos. | $704.50 | $82.00 |
| 36 Mos. (Maximum) | | $795.50 | $91.00 |
| **Pension Band** | **106** | | |

[218]

**EFFECTIVE AUGUST 5, 2007**

**WAGE TABLE: 25**
**FIELD CLERK**
**GENERAL CLERK**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $382.00 | |
| 6 Mos. | 6 Mos. | $431.00 | $49.00 |
| 12 Mos. | 6 Mos. | $487.50 | $56.50 |
| 18 Mos. | 6 Mos. | $550.50 | $63.00 |
| 24 Mos. | 6 Mos. | $622.00 | $71.50 |
| 30 Mos. | 6 Mos. | $703.50 | $81.50 |
| 36 Mos. (Maximum) | | $794.50 | $91.00 |
| **Pension Band** | **106** | | |

**WAGE TABLE: 26**
**BUILDING CUSTODIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $368.50 | |
| 6 Mos. | 6 Mos. | $417.00 | $48.50 |
| 12 Mos. | 6 Mos. | $472.50 | $55.50 |
| 18 Mos. | 6 Mos. | $535.00 | $62.50 |
| 24 Mos. | 6 Mos. | $605.00 | $70.00 |
| 30 Mos. | 6 Mos. | $685.00 | $80.00 |
| 36 Mos. (Maximum) | | $775.50 | $90.50 |
| **Pension Band** | **105** | | |

**WAGE TABLE: 27**
**BUILDING CUSTODIAN ASSOCIATE**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $332.00 | |
| 6 Mos. | 6 Mos. | $379.00 | $47.00 |
| 12 Mos. | 6 Mos. | $432.50 | $53.50 |
| 18 Mos. | 6 Mos. | $495.00 | $62.50 |
| 24 Mos. | 6 Mos. | $565.00 | $70.00 |
| 30 Mos. | 6 Mos. | $645.50 | $80.50 |
| 36 Mos. (Maximum) | | $737.50 | $92.00 |
| **Pension Band** | **104** | | |

**WAGE TABLE: 28**
**OFFICE CLERICAL ASSISTANT**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $360.00 | |
| 6 Mos. | 6 Mos. | $402.00 | $42.00 |
| 12 Mos. | 6 Mos. | $450.00 | $48.00 |
| 18 Mos. | 6 Mos. | $502.50 | $52.50 |
| 24 Mos. | 6 Mos. | $561.50 | $59.00 |
| 30 Mos. | 6 Mos. | $627.50 | $66.00 |
| 36 Mos. (Maximum) | | $701.50 | $74.00 |
| **Pension Band** | **103** | | |

[219]

**EFFECTIVE AUGUST 5, 2007**

**WAGE TABLE: 29**
**ASSISTANT TECHNICIAN**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $373.50 | |
| 6 Mos. | 6 Mos. | $422.50 | $49.00 |
| 12 Mos. | 6 Mos. | $476.00 | $53.50 |
| 18 Mos. | 6 Mos. | $538.00 | $62.00 |
| 24 Mos. | 6 Mos. | $608.00 | $70.00 |
| 30 Mos. (Maximum) | | $686.00 | $78.00 |
| **Pension Band** | **102** | | |

**WAGE TABLE: 30**
**GRAPHICS DESIGNER**

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 1 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $432.00 | |
| 6 Mos. | 6 Mos. | $493.50 | $61.50 |
| 12 Mos. | 6 Mos. | $566.00 | $72.50 |
| 18 Mos. | 6 Mos. | $647.50 | $81.50 |
| 24 Mos. | 6 Mos. | $740.50 | $93.00 |
| 30 Mos. | 6 Mos. | $847.50 | $107.00 |
| Top (Maximum) | | $970.00 | $122.50 |
| **Pension Band** | **112** | | |

[220]

EXHIBIT D

PENSION BANDS AND BENEFITS

D1.00  Pension Bands

|  | **Wage Zone** |
|---|---|
| **Job Titles** | **1** |
| Assignment Administrator | 112 |
| Assignment Technician | 120 |
| Assistant Technician | 102 |
| Automotive Mechanic | 120 |
| Bill Production Technician | 108 |
| Building Custodian | 105 |
| Building Custodian Associate | 104 |
| Building Equipment Mechanic | 121 |
| Combination Technician | 121 |
| Communications Assistant | 112 |
| Customer Billing Analyst | 112 |
| Customer Service Agent | 124 |
| Drafter | 112 |
| Driver - Heavy Truck | 116 |
| Driver - Light Truck | 108 |
| Driver - Medium Truck | 113 |
| Driver - Tractor Trailer | 117 |
| Facilities Assigner | 120 |
| Field Clerk | 106 |
| Frame Attendant-A | 113 |
| Frame Attendant | 112 |
| General Clerk | 106 |
| General Field Clerk | 107 |
| Graphics Designer | 112 |
| Maintenance Administrator | 112 |
| Materials Handler | 113 |

[221]

| | |
|---|---|
| Materials Service Coordinator | 120 |
| Office Clerical Assistant | 103 |
| Outside Plant Technician | 120 |
| Payroll Analyst | 112 |
| Senior Attendant | 106 |
| Senior Clerk | 107 |
| Senior Field Clerk | 108 |
| Service Evaluator | 109 |
| Services Technician | 120 |
| Splicing Technician | 121 |
| Splicing Technician's Helper | 111 |
| Staff Clerk | 108 |
| Stenographer-Clerk | 107 |
| Storekeeper | 113 |
| Supplies Attendant | 108 |
| Support Systems Attendant | 111 |
| Switching Equipment Technician | 121 |
| Systems Technician | 121 |
| Systems Technician — Radio | 121 |
| Test Desk Technician | 121 |
| Translations Administrator | 112 |
| Treasury Clerk | 111 |

[222]

D2.00 *Monthly Benefit Table*

| Pension Band | Previous Effective Amounts | Temporary 4Q 2003 | Effective 1/1/2004 - 10/31/2004 | Effective 11/1/2004 | Effective 10/1/2005 | Effective 10/1/2006 | Effective 10/1/2007 |
|---|---|---|---|---|---|---|---|
| 101 | $31.36 | $32.93 | $31.36 | $31.99 | $32.95 | $33.94 | $34.96 |
| 102 | $32.66 | $34.29 | $32.66 | $33.31 | $34.31 | $35.34 | $36.40 |
| 103 | $33.98 | $35.68 | $33.98 | $34.66 | $35.70 | $36.77 | $37.87 |
| 104 | $35.31 | $37.08 | $35.31 | $36.02 | $37.10 | $38.21 | $39.36 |
| 105 | $36.63 | $38.46 | $36.63 | $37.36 | $38.48 | $39.63 | $40.82 |
| 106 | $37.97 | $39.87 | $37.97 | $38.73 | $39.89 | $41.09 | $42.32 |
| 107 | $39.28 | $41.24 | $39.28 | $40.07 | $41.27 | $42.51 | $43.79 |
| 108 | $40.59 | $42.62 | $40.59 | $41.40 | $42.64 | $43.92 | $45.24 |
| 109 | $41.96 | $44.06 | $41.96 | $42.80 | $44.08 | $45.40 | $46.76 |
| 110 | $43.25 | $45.41 | $43.25 | $44.12 | $45.44 | $46.80 | $48.20 |
| 111 | $44.58 | $46.81 | $44.58 | $45.47 | $46.83 | $48.23 | $49.68 |
| 112 | $45.88 | $48.17 | $45.88 | $46.80 | $48.20 | $49.65 | $51.14 |
| 113 | $47.22 | $49.58 | $47.22 | $48.16 | $49.60 | $51.09 | $52.62 |
| 114 | $48.55 | $50.98 | $48.55 | $49.52 | $51.01 | $52.54 | $54.12 |
| 115 | $49.85 | $52.34 | $49.85 | $50.85 | $52.38 | $53.95 | $55.57 |
| 116 | $51.19 | $53.75 | $51.19 | $52.21 | $53.78 | $55.39 | $57.05 |
| 117 | $52.48 | $55.10 | $52.48 | $53.53 | $55.14 | $56.79 | $58.49 |
| 118 | $53.84 | $56.53 | $53.84 | $54.92 | $56.57 | $58.27 | $60.02 |
| 119 | $55.17 | $57.93 | $55.17 | $56.27 | $57.96 | $59.70 | $61.49 |
| 120 | $56.47 | $59.29 | $56.47 | $57.60 | $59.33 | $61.11 | $62.94 |
| 121 | $57.78 | $60.67 | $57.78 | $58.94 | $60.71 | $62.53 | $64.41 |
| 122 | $59.13 | $62.09 | $59.13 | $60.31 | $62.12 | $63.98 | $65.90 |
| 123 | $60.44 | $63.46 | $60.44 | $61.65 | $63.50 | $65.41 | $67.37 |
| 124 | $61.76 | $64.85 | $61.76 | $63.00 | $64.89 | $66.84 | $68.85 |
| 125 | $63.08 | $66.23 | $63.08 | $64.34 | $66.27 | $68.26 | $70.31 |
| 126 | $64.40 | $67.62 | $64.40 | $65.69 | $67.66 | $69.69 | $71.78 |
| 127 | $65.74 | $69.03 | $65.74 | $67.05 | $69.06 | $71.13 | $73.26 |
| 128 | $67.03 | $70.38 | $67.03 | $68.37 | $70.42 | $72.53 | $74.71 |
| 129 | $68.38 | $71.80 | $68.38 | $69.75 | $71.84 | $74.00 | $76.22 |
| 130 | $69.67 | $73.15 | $69.67 | $71.06 | $73.19 | $75.39 | $77.65 |
| 131 | $71.03 | $74.58 | $71.03 | $72.45 | $74.62 | $76.86 | $79.17 |
| 132 | $72.36 | $75.98 | $72.36 | $73.81 | $76.02 | $78.30 | $80.65 |
| 133 | $73.66 | $77.34 | $73.66 | $75.13 | $77.38 | $79.70 | $82.09 |
| 134 | $75.00 | $78.75 | $75.00 | $76.50 | $78.80 | $81.16 | $83.59 |
| 135 | $76.28 | $80.09 | $76.28 | $77.81 | $80.14 | $82.54 | $85.02 |

[223]

LETTER AGREEMENTS

INDEX

|  |  | Page |
|---|---|---|
| Agreement Continuation (9-5-03) | . . . . . . . . . | 1 |
| Assignment of Employees to Work in Other States (8-2-00) | . . . . . . . . . . . . . . . . . . | 3 |
| BANDI (8-23-00) | . . . . . . . . . . . . . . . . . . . . . | 4 |
| * Buried Wire—Area Sub-committee (5-14-68) | . . | 5 |
| * Call-Out Administration (8-23-00) | . . . . . . . . . | 6 |
| * Communication - Division Managers and Union's BOC Vice Presidents (8-14-86) | . . . . . . . . . . . | 8 |
| Concession Telephone Service (8-27-83 and amended 1-25-96) | . . . . . . . . . . . . . . . . . . . . . | 9 |
| †‡ Contract Labor—Use of (8-9-80) | . . . . . . . . . | 11 |
| * Contract Labor—Use of (8-27-83) | . . . . . . . . . | 12 |
| * Contract Labor—Outside Plant Technicians (1-25-96) | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| * Contract Labor on MD Work (8-7-00) | . . . . . . | 15 |
| Contracting Initiatives (8-23-00) | . . . . . . . . . . . | 16 |
| Dispatching (1/25/96) | . . . . . . . . . . . . . . . . . | 17 |
| * Dispatching Services & Splicing Techs on Repair (8-23-00) | . . . . . . . . . . . . . . . . . . . . . . | 18 |
| Flextime (8-23-00) | . . . . . . . . . . . . . . . . . . . . . | 19 |
| * Flexibility for Craft Employees (8-27-89) | . . . | 20 |
| Four-Day Work Week Trial (8-23-00) | . . . . . . . | 22 |
| * Geographical Area Makeup (8-28-92) | . . . . . . . | 24 |
| Home Garaging Trial (8-23-00) | . . . . . . . . . . . | 25 |
| IME Reports (8-22-03) | . . . . . . . . . . . . . . . . . . . | 27 |
| Inter-Company Transfers (8-23-00) | . . . . . . . . . | 28 |
| Investigatory Interviews (8-11-98) | . . . . . . . . . | 29 |

\*Plant Only      †Services Only      ‡ Financial Only

\* ISP/EISP – Limitations on Contracting
   Out (8-18-00) . . . . . . . . . . . . . . . . . . . . . . . . 30

Job Title Review Committee (8-23-00) . . . . . . 31

Joint Time for Participation in Joint
   Committees (8-23-00) . . . . . . . . . . . . . . . . . . 33

Laid-Off Former Employees Applying for
   Re-Employment (8-3-03) . . . . . . . . . . . . . . . 34

Limited Extension Agreement (8-3-03) . . . . . 35

Local Agreements (8-14-86) . . . . . . . . . . . . . . 37

\* Management's Job to Manage (8-3-71) . . . . . 39

Management Returns to Bargaining
   Unit (8-27-83) . . . . . . . . . . . . . . . . . . . . . . . . 40

\* Meal Expense—Reimbursement (8-16-80) . . . 41

Mediation (1-25-96) . . . . . . . . . . . . . . . . . . . . 43

Mediation (8-23-00) . . . . . . . . . . . . . . . . . . . . 45

\* Memorandum of Understanding (8-11-74) . . . 47

\* Notification of Loan to Equivalent or
   Lower Occupation (8-11-74) . . . . . . . . . . . . . 49

On-Call Assignment (8-3-03) . . . . . . . . . . . . . 50

\* One Trip Concept (8-14-86) . . . . . . . . . . . . . . 51

\* Outside Craft Working in Unattended Central
   Offices (8-27-89) . . . . . . . . . . . . . . . . . . . . . . 52

‡ Overtime Administration - Financial (8-6-00) . . 53

\* Overtime Equalization (8-3-71) . . . . . . . . . . . 39

\* P.I.C. Agreement (8-4-60) . . . . . . . . . . . . . . . 54

Promotions Forum (8-23-00) . . . . . . . . . . . . . 55

Quarterly List—Occasional and Temporary
   Employees (6-11-71) . . . . . . . . . . . . . . . . . . . 56

Reclassification - Employee (1-25-96) . . . . . . 57

Regional Attendance Plan (8-23-00) . . . . . . . . 58

---

\*Plant Only    †Services Only    ‡ Financial Only

Safety Committee (8-16-80) . . . . . . . . . . . . . .   59
Safety Glasses (8-3-03) . . . . . . . . . . . . . . . . .   60
Safety Recognition Awards (8-23-00) . . . . . .   61
Sales Agreement (8-27-89) . . . . . . . . . . . . . .   62
Seniority (8-3-03) . . . . . . . . . . . . . . . . . . . . .   64
Service Bridging (8-22-03) . . . . . . . . . . . . . .   65
Short Notice Excused Work Days
    (SNEWDs) (8-23-00) . . . . . . . . . . . . . . . . .   66
Staffing Information . . . . . . . . . . . . . . . . . . . .   67
– Reports (8-23-00) . . . . . . . . . . . . . . . . . . . .   67
– Freezing Movement (8-11-98) . . . . . . . . . . .   67
– Internal/External Staffing (8-11-98) . . . . . . .   67
– Advertising and Classifying Job Vacancies
    (8-23-00) . . . . . . . . . . . . . . . . . . . . . . . . . . .   68
Stress Committee (8-11-98) . . . . . . . . . . . . . .   69
‡ Sunday as Part of Normal Work Week
    (8-28-92) . . . . . . . . . . . . . . . . . . . . . . . . . . .   70
Term Employees - Time in Title (1-25-96) . . .   71
Tour Schedule Selection (8-3-03) . . . . . . . . . .   72
Treatment of Grievances/Arbitration Awards
    Which Involve Backpay and/or
    Reinstatement (9-5-03) . . . . . . . . . . . . . . . .   73
Vacation Scheduling Percentages (8-11-98) . .   76
Voluntary Overtime in the Forced
    Overtime Build (7-27-00) . . . . . . . . . . . . . .   77
VRRC/VOICe Workplace Issues
    Committee (8-3-03) . . . . . . . . . . . . . . . . . . .   78
Work Jurisdiction (8-23-00) . . . . . . . . . . . . . .   79

---

\*Plant Only      †Services Only      ‡ Financial Only

**Agreement Continuation**

The following Common Issues MOU provisions with an expiration date of August 2, 2003 (unless otherwise noted) are hereby extended for the life of the new collective bargaining agreements, with no change in their terms and will be included in the applicable collective bargaining agreement(s):

- Outside Copper Cable Splicing

- Internal v. External Staffing Commitment

- IME Program

- Stress Letter of Understanding

- 1991 Memorandum of Understanding ("PA Information Age Agreement")

- BANI Customer Bid Work Letter

- Letter Agreement on Termination of Outside Contractors

- Letter Agreement on Service Quality Observing

- Letter Agreement on Service Monitoring

- FMLA – Absence for Union Business

- Provisions on Vacation Scheduling Percentage (Percentage is 18%)

- Short Notice Excused Work Days

Any Memorandum of Understanding provision that was in effect during the period of the 2000 collective bargaining agreements which has not been altered, changed, or removed, but which may have been inadvertently omitted from the above list, will speak for itself.

The status of MOU provisions with an expiration date of August 2, 2003 which have been modified by the parties during 2003 negotiations will speak for themselves.

All Local, District and International agreements that were valid and enforceable under the 2000 collective bargaining agreements, and which have not been separately renegotiated by the parties in 2003 negotiations, will continue in effect for the life of the new agreements.

The status of all Local, District and International agreements that have been renegotiated during 2003 negotiations will speak for themselves.

In the event a letter agreement has been inadvertently omitted, it will be treated in accord with the above provisions.

On the subject of oral agreements, there is no intention on the Companies' part to change the status of any oral agreement — whatever contractual status any oral

[1]

agreement had during the term of the 2000 contracts will remain unchanged unless a change is made subsequent to collective bargaining.

If there are particular oral agreements that the Union wishes to discuss or which become the subject of a dispute after the contract, the Union may bring them to the attention of Labor Relations. If we are unable to resolve the situation, the dispute can be submitted to arbitration under the usual procedures.

| For The Companies: | For The Communications Workers Of America: |
|---|---|
| By /s/   Ronald H. Williams | By: /s/     James J. Short |
| Executive Director, Labor Relations | Assistant to Vice President CWA District 13 |
| Dated:  9/5/03 | Dated:  9/5/03 |

[2]

August 2, 2000

Mr. James Short
Assistant to Vice President
District 13, CWA
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This letter is to recognize that during 2000 bargaining, the issue of assigning Pennsylvania and Delaware employees to work in other states within the Mid-Atlantic Region (DC, VA, MD, WV, NJ, DE, PA) has been discussed.

In response to concerns raised by the Union, the Company agrees that it will seek volunteers when a need arises to send Pennsylvania or Delaware employees to work in another Mid-Atlantic state. Upon request, the Union agrees to assist the Company in securing volunteers.

In the event of an emergency (such as a major service problem, severe weather, or other Act of God) in the receiving state, the Company will first seek volunteers; however, if there are not enough volunteers, the Company may assign Pennsylvania or Delaware employees to work out of state.

The Company will notify the Union when Pennsylvania or Delaware employees are asked to work out of state.

The terms of this letter will not affect the manner in which the driving titles in the Transportation Services organization have been typically deployed between Pennsylvania and Delaware.

The commitments in this letter will remain in effect for the life of the new Local 13000 and 13101 collective bargaining agreements.

Sincerely,
(s) Ron Williams
Executive Director – Labor Relations

AGREED:

(s) Jim Short
Bargaining Agent
Communications Workers of America

[3]

## LETTER OF UNDERSTANDING - "BANDI"

### 8-23-00

A condition of the Federal Communications Commission's approval of the merger between Bell Atlantic and GTE is the creation of a separate data affiliate ("SDA") to provide certain data services. The parties understand that the SDA, Bell Atlantic Network Data, Inc. ("BANDI") will need to employ employees who are currently employed by some former Bell Atlantic Network Services Companies in bargaining units represented by the CWA ("Union"). The Network Services Companies and the Union hereby agree that bargaining unit employees of the Network Services Companies may be transferred, on a voluntary basis, to employment at BANDI, which shall be treated as a transfer between employers within the same bargaining unit. Simultaneous with such transfers, BANDI will recognize the Union as the exclusive bargaining representative of the transferred employees, and the collective bargaining agreement that governed employees' terms and conditions of employment immediately prior to the change in employer will be amended to add BANDI as a party to the agreement effective as of the date of the first employee's transfer. (If BANDI's corporate name is changed, the new name will be substituted for BANDI.)

BANDI employees will continue to be covered by any promotion, lateral or downgrade plans (as well as all other rights) available to employees of the former Network Services Companies and may continue to avail themselves of the use of these plans.

The parties further understand that as a result of regulatory requirements, BANDI will not be able to provide local concession telephone service to its employees. Instead, bargaining unit employees shall receive $35 per month to be included in payroll compensation that will be effective upon the first month that a bargaining unit employee becomes employed by BANDI. BANDI employees who retire during the life of the current agreement will receive a lump sum payment of $2,600, less applicable deductions.

By: (s) Ron Williams                                     By: (s) Jim Short

Company Bargaining Chair for                            Bargaining Agent
Verizon Services Corp.,               Communications Workers of America
Verizon Delaware Inc.,
Verizon Maryland Inc.,
Verizon New Jersey Inc.,
Verizon Pennsylvania Inc,
Verizon Virginia, Inc.,
Verizon West Virginia,
Verizon Washington, D.C.


Dated: August 6, 2000


[4]

(Plant Only)

May 14, 1968

Mr. I. C. Glendenning, Executive President
Federation of Telephone Workers of Pennsylvania
121 N. Broad Street, Room 523
Philadelphia, Pa. 19107

Dear Mr. Glendenning:

It is important that reasonable steps be taken to maintain work opportunities for regular employees.

The Company and the Union both desire to give Company employees the chance to do construction work and are also concerned with the impact of new developments in buried construction on job opportunities and employment security of the employees of the Company.

In view of this, the Company is willing to establish a Buried Wire Sub-Committee with each Division of the Union which will meet on request to discuss Buried Construction and its impact on the Union and the employees under the Union's jurisdiction.

The Sub-Committees shall consist of two Representatives from the Company and two from the Union. The Sub-Committees will operate under the rules of this Buried Construction Agreement and subject to the provisions of the Plant-Services Automation Agreement as agreed upon by both parties on October 26, 1966, and a part of the Plant-Services contract effective October 27, 1966.

Very truly yours,

(s) W. W. Kinkel
Assistant Vice President

ACCEPTED:

(s) I. C. Glendenning
Executive President

[5]

August 23, 2000

(Plant Only)

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

Recognizing the importance of providing prompt service to customers, as well as minimizing administrative hassles directing call-out opportunities to employees who want such opportunities and reducing the personal inconvenience to other employees who do not, the parties agree to consider and discuss the subject of call-out administration as follows:

At the local level (District or below), both parties, upon the request of either, will engage in joint discussions about existing call-out procedures and whether there is a need to develop new mutually agreeable call-out procedures consistent with the objectives set forth above.

If agreement is not reached to continue existing procedures or on new procedures, either party may escalate the matter to the Unit President and/or Director for the district involved who will use their best efforts to resolve the matter.

If the escalation process does not satisfactorily resolve the situation, it shall then be referred to the Issues Resolution Steering Committee which will establish working committee(s) on call-out administration (several such committees may be established across the Company) whose objective will be to achieve agreement between the local parties on call-out procedures which are mutually acceptable to them.

At each level of discussion under this letter, the parties will consider the following guidelines as an approach to dealing with call-out problems:

1. A call-out availability list would be maintained utilizing volunteers. In the absence of sufficient volunteers, employees would be designated on the list. The call-out availability list could be administered by rotation, total call-out hours worked, seniority, etc.

2. The number of employees in each job title in an administrative group who would be on the call-out availability list should be at least:

   • 1 if the administrative group has 1 to 5 employees in the job title involved;

   • 2 if the administrative group has 6 to 10 employees in the job title involved, and

[6]

    • 3 if the administrative group has more than 10 employees in the job title involved.

3. Absent compelling personal circumstances, an employee on the availability list would be expected to be available to be called-out, and to respond promptly.

Nothing in this letter may be construed to affect the Company's right to require employees to work overtime.

Please sign below to signify your agreement to the provisions of this letter.

Very truly yours,

/s/ Maryanne Crompton
Director - Labor Relations
Verizon Pennsylvania Inc.

Agreed:

/s/ Jim Short
Assistant to Vice President
District 13, CWA

(Plant Only)

August 14, 1986

Mr. Martin S. Griglak
Staff Representative
District 13, CWA, AFLCIO
516 W. Crawford Ave.
Connellsville, PA 15425

Dear Mr. Griglak:

As you suggested during 1986 bargaining, it would be helpful to establish ongoing dialogue between the Company's Division Managers Network or Customer Services and the Regional BOC Vice Presidents of the Union.

One of the keys to any effective relationship is free and open communication. To that end, it is understood that the Union's Regional BOC Vice Presidents and the corresponding Company's Division Managers Network or Customer Services will meet at six month intervals for the purpose of a meaningful exchange concerning labor relations matters of mutual interest to their respective organizations.

Very truly yours,

(s) R.A. Cargo, Jr.
Division Manager - Labor Relations

AGREED:

(s) M.S. Griglak
CWA Staff Representative

[8]

August 27, 1983
(amended 1/25/96)

Mr. Vincent J. Maisano
Vice President and Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd Floor
Philadelphia, PA 19102

Dear Mr. Maisano:

This is to confirm our understanding of August 23, 1983, concerning concession telephone arrangements after the effective date of the Bell System divestiture for active and retired employees of Bell of Pennsylvania.

1. As agreed to in national bargaining, all active and retired employees of Bell of Pennsylvania will receive the terminal equipment (CPE) for which, as of July 1, 1983, they received a concession related to monthly charges. This transfer will occur on the effective date of the pending divestiture of Bell of Pennsylvania from the Bell System and will be at no cost to the employees.

2. In addition, the Union and Bell of Pennsylvania have agreed that each active employee with less than thirty (30) years of service on and after the effective date of divestiture will receive a fifty percent (50%) discount on single line local service of whatever residential class he or she elects to subscribe to at his or her residence, such discount to be applicable to all fixed monthly dial tone charges including CALC's authorized by the FCC or a State Regulatory Commission and local message unit charges.

3. Except as provided in Paragraph 6 of this letter, Bell of Pennsylvania and the Union also have agreed that each active employee with thirty (30) or more years of service and each employee who retires after the effective date of divestiture with a Bell Atlantic pension will receive a one hundred percent (100%) discount on single line local service of whatever residential class he or she elects to subscribe to at his or her residence, such discount to be applicable to all fixed monthly dial tone charges including CALC's authorized by the FCC or a State Regulatory Commission and local message unit charges. Moreover, each active and retired employee covered by this paragraph will be allowed up to twenty-five dollars ($25.00) per month in intra-LATA toll calls, said intra-LATA toll call allowance to include charges for calls within the LATA in which the active or retired employee has service and intra-LATA calls made within any other LATA served by a subsidiary of Bell Atlantic.

4. Bell of Pennsylvania will seek to adopt jointly with other Bell Atlantic Companies uniform procedures for implementation of the arrangements agreed to herein.

[9]

5. All of the arrangements agreed to herein are, of course, subject to any necessary regulatory or other governmental approval.

6. Employees who retire on or after January 1, 1996 and who reside in locations outside of Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia and West Virginia will not receive concession telephone arrangements.

Very truly yours,

(s) R.A. Cargo, Jr.
Bargaining Chairman

AGREED:

(s) Vincent J. Maisano
Vice President and Chief Negotiator

[10]

(Services/Financial Only)

August 9, 1980

Mr. W. E. Wallace
Executive Vice President
Federation of Telephone Workers of Pennsylvania
1420 Chestnut Street, 2nd Floor
Philadelphia, PA 19102

Dear Mr. Wallace:

During the recent negotiations at the National level, the concern of employees regarding the effect of the use of contract labor was discussed. The discussions resulted in a letter to Mr. John Shaughnessy, President of the Telecommunications International Union (TIU), from Mr. Rex R. Reed, Vice President—Labor Relations for the AT&T, which is reproduced below in its entirety. The Bell of Pennsylvania will continue to follow the policy stated in the letter as regards employees in the Area Headquarters Services and Financial organizations.

### AMERICAN TELEPHONE AND TELEGRAPH COMPANY

Dear Mr. Shaughnessy:

During and before recent negotiations, we had talked about contracting out work and the increasing concern of employees as to its effect on them.

In making decisions regarding contracting of work, it is management's objective to consider carefully the interests of both customer and employee along with all other considerations essential to the management of the business. For various reasons including but not limited to law, regulations, changing industry structure, economic conditions, and business considerations, it is not possible to make specific commitments on contracting out work elements of the business.

As I advised you, it continues to be the general policy of the telephone operating companies in the Bell System that traditional telephone work will not be contracted out if it will currently and directly cause layoffs or part-timing of employees.

> (s) Rex R. Reed
> Vice President
>
> Yours truly,
>
> (s) R. A. Ellison
> General Manager—Personnel
>
> (s) A. J. Maslowsky
> Assistant Comptroller

[11]

(Plant Only)

August 27, 1983

Mr. Vincent J. Maisano
Vice President and Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd Floor
Philadelphia, PA 19102

Dear Mr. Maisano:

This will confirm our agreement that on and after the date of divestiture Bell of Pennsylvania may contract to Western Electric Company, or others, types of work which the Company has contracted to Western Electric Company as an affiliated company under Section 17.03 of our Labor Agreement.

It is understood that this agreement is not intended to expand the types of work which the Company may contract under Section 17.03 but is intended to continue the Company's right to contract the types of work which Western Electric Company has normally performed as an affiliated company.

The Company further affirms that it will not layoff or part-time union-represented employees as a consequence of this letter agreement. Article 17 will be revised to reflect this commitment.

It is understood that this letter agreement applies only to Bell of Pennsylvania post divestiture when Western Electric Company will no longer be affiliated with Bell of Pennsylvania.

The sole purpose of having others perform the work described above is to remove the special relationship afforded to Western Electric under Section 17.03 in the past consistent with the divestiture of the Company from AT&T and its affiliates. This letter is not intended in any way to reduce employee protections or to change the Company's established policies as provided for in Section 17.01.

Please sign below to confirm our understanding of this matter.

(s) R. A. Cargo, Jr.
Bargaining Chairman

AGREED:

(s) Vincent J. Maisano
Vice President and Chief Negotiator

[12]

(Plant Only)

January 25, 1996

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This will replace the August 27, 1989 letter concerning use of contract labor to perform Outside Plant Technician work.

Notwithstanding the provisions of Article 17, the Company may utilize contractors to do work that is currently performed by Outside Plant Technicians (OPT) subject to the following conditions:

1. From June 1, 1996 until August 8, 1998, the Company will maintain at least 504 regular full-time Outside Plant Technicians in its workforce subject to normal temporary force fluctuations caused by promotions, transfers, retirements, etc.. In filling Outside Plant Technician vacancies which arise after the date the new collective bargaining agreement is ratified, the Company will first offer those positions, in seniority order, to applicants in the Services Technician title who were transferred from the Outside Plant Technician title to the Services Technician title between August 6, 1995 and the date of ratification.

2. The Company guarantees that for the life of the current collective bargaining agreement which is scheduled to terminate on August 8, 1998, there will be no layoffs, forced downgrades, part-timing, or forced transfers which require a home move for Outside Plant Technicians.

3. The provisions of the August 11, 1974 letter on loaning employees out of title shall not apply to OPTs. Instead, the following applies:

The Company will not loan an OPT out of title except that it may use OPTs to perform Service Technician repair work from the cable terminal to the network interface device or equivalent. The Company does not intend to contract out work for the purpose of loaning OPTs to do Service Technician work and therefore, the Company will not loan an OPT to perform work under this paragraph and then initiate use of contract labor to do that OPT's work on the day(s) while that OPT is loaned. When OPTs are loaned to perform Services Technician work, the provisions of Article 40.02, 40.03 and 40.04 will apply. The restrictions contained in this paragraph may be suspended during an emergency, as defined in Section A3.0223.

[13]

4. The Company will not use contract labor to do the Services Technician repair work described in paragraph three.

5. This Letter does not affect the rights of either party regarding work which is not governed by this letter.

Very truly yours,

(s) Dana W. Blewett
Director - Labor Relations
Bell Atlantic-Pennsylvania

AGREED:

(s) James J. Short
Assistant to Vice President

APPROVED:

(s) M. Bahr
President
Communications Workers of America

[14]

August 7, 2000

Mr. James Short
Assistant to Vice President
District 13, CWA
230 South Broad Street, 19th floor
Philadelphia, PA 19102

Dear Mr. Short:

This will confirm our agreement that effective January 1, 2001, and for the life of the current collective bargaining agreement, Verizon Pennsylvania Inc. will cease the use of contractors on multiple drop ("MD") work.

"MD" work is the replacement or transfer of service access wires in connection with replacing or relocating cable terminals or pedestals when replacing existing outside plant distribution cable. "MD" work is "M" account work assigned via work orders, and involves connecting new or existing service access wires to a new or relocated terminal or pedestal, and may involve connecting service access wires to existing or new NIDs, or existing protectors.

The parties' respective rights concerning work which has historically been classified as "C" or "R" account work is unaffected by the terms of this letter.

It is also agreed that notwithstanding any other provision of this Agreement to the contrary, Outside Plant Technicians, when performing "MD" work only, may perform all necessary work beyond the NID or protector associated with moving or replacing an existing NID or protector, or installing a new NID.

Very Truly Yours,

/s/ Ron Williams
Executive Director-Labor Relations
Verizon Services Inc.

AGREED:

/s/ Jim Short
Bargaining Agent
Communications Workers of America

[15]

August 23, 2000

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This will confirm our agreement regarding contracting initiatives.

The Company agrees, subject to certain conditions described below, that through 12-31-02, it will not contract out work of a type that it has not contracted out during the three years preceding the effective date of the agreement. This restriction shall not preclude contracting out work to deal with emergency situations including severe weather conditions.

The parties further agree to create a Contracting Initiatives Committee, which will be co-chaired by the CWA District Vice President and a company Senior Operations Manager (or their designee). The CEO of the Verizon and the President of CWA shall be ex-officio members of the Committee. Each party may appoint up to two additional members.

The purpose of this Committee is to find ways by which the levels of contracting can be reduced within the Verizon (Mid-Atlantic) Operating Companies. The objective is for company employees to do more work in a more productive and efficient manner than that performed by contractors. The Company will provide all necessary resources needed by the Committee to carry out its purpose.

In addition, the Company will notify the Union at least six months in advance of planned, new, major, contracting initiatives that are to be implemented on or after January 1, 2003, and which affect employees represented by the Union. The Contracting Initiatives Committee will then have the opportunity to discuss such new major initiatives. It is understood, however, that after the end of the six month period, the Company is free to implement planned, new, major initiatives that do not otherwise violate the collective bargaining agreement.

\s\ Ron Williams
Executive Director - Labor Relations

AGREED:

\s\ James J. Short
Bargaining Agent
Communications Workers of America

[16]

January 25, 1996

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street
Philadelphia, PA 19102

Dear Mr. Short:

This letter will confirm our discussions during 1995 collective bargaining negotiations regarding the dispatching of bargaining unit employees by other bargaining unit employees. The parties recognize that at many locations throughout the Company, bargaining unit employees such as Switching Equipment Technicians, Maintenance Administrators, Assignment Administrators, and Senior Field Clerks are assigned to dispatch other bargaining unit employees during scheduled and nonscheduled hours. However, at some locations, a question has arisen over the assignment of certain bargaining unit employees (such as Maintenance Administrators) to perform dispatching during nonscheduled hours and on weekends and Holidays.

The purpose of this letter is to clarify that the parties agree that bargaining unit employees may be assigned to dispatch other bargaining unit employees during scheduled and nonscheduled hours including weekends and Holidays. When so assigned, employees will receive general instructions or guidelines from management on how they are expected to handle dispatching. Discipline will not result due to an error in judgment in performing the dispatching duty.

This letter will not affect the Company's right to use management to dispatch employees or the Union's right to grieve dispatches it considers to be improper.

Very truly yours,

Dana W. Blewett
Director - Labor Relations
Bell Atlantic - Pennsylvania

Agreed:

James J. Short
Assistant to Vice President
District 13, CWA

[17]

August 23, 2000

Mr. James Short
Assistant to Vice President
District 13, CWA
230 South Broad Street, 19th floor
Philadelphia, PA 19102

Dear Mr. Short:

This letter confirms, for the life of the 2000 Local 13000 collective bargaining agreement, how the Company will handle the dispatching of Services Technicians and Splicing Technicians to repair "known loop or inside trouble" (that is, trouble reported by a customer to be the service access wire ("loop") or on the customer's side of the network interface device).

When dispatching Services Technicians and Splicing Technicians to perform known loop or inside trouble, the work will be assigned as follows. When the above work is done on a scheduled basis, and effective January 1, 2001, Splicing Technicians can be dispatched in circumstances where (a) the repair load on any given day for the Customer Service Center, which covers the geography in which the Splicing Technician normally works, is twenty-five percent (25%) or more above the average daily repair load for the previous calendar quarter (as determined from repair load data from the previous calendar quarter as soon as such data are available), or (b) in the case of an "emergency" as defined by Subsection A3.0223 (i.e., an event of national importance, fire, explosion, or other catastrophe, severe weather conditions, major cable and equipment failures, or an act of God). When dispatching known loop or inside trouble work to employees on an overtime basis, the Company will first offer opportunities to perform the work to available Services Technicians in the administrative group that would normally perform the work. Thereafter, the opportunities may be offered to available Splicing Technicians in the administrative group that would normally perform the work.

Where the trouble is other than known loop or inside trouble, the Company reserves the right to dispatch Splicing Technicians and if the trouble turns out to be loop or inside trouble, the Splicing Technician will repair the trouble.

Very Truly Yours,

/s/ Ron Williams
Executive Director
Labor Relations
Verizon Services Inc.

AGREED:

/s/ Jim Short
Bargaining Agent
Communications Workers of America

[18]

August 27, 1983
(Modified August 23, 2000)

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

In accordance with 2000 bargaining discussions the Company and Union agree to continue discussions for flextime trials for the duration of this contract. Where organizations express desire to conduct such flextime trials a joint committee composed of two representatives from the Company and the Union will hold discussions regarding specific locations and parameters.

Very truly yours,

/s/ Maryanne Crompton
Director - Labor Relations
Verizon Pennsylvania Inc.

Agreed:

(s) Jim Short
Assistant to Vice President
CWA, District 13

[19]

(Plant Only)

August 27, 1989

Mr. Charles H. Stackhouse
Assistant to Vice President
CWA, AFLCIO, District 13
230 South Broad Street, 15th Floor
Philadelphia, Pennsylvania 19102

Dear Mr. Stackhouse:

During 1989 bargaining, the Company presented a proposal to afford greater flexibility for the use of employees in the titles of Splicing Technician, Systems Technician, Systems Technician - Radio, and Switching Equipment Technician with respect to work on circuit packs, plug-ins, fuses, and other associated equipment. The collective bargaining forum did not permit sufficient time for proper study and reconciliation of conflicting interests to reach a solution.

Recognizing the shared technologies and interrelationship of these titles, and the need to address the competing factors of customer service, efficiency, title integrity and employment security, the Union and Company agree to the establishment of a Technology Steering Committee. The Steering Committee shall be comprised of the General Manager-Operations-Liberty Region, Vice President-Operations-Keystone Region, and the President and Vice President of the Union. The Committee will have its first meeting no later than November 1, 1989.

This Committee will have as its goal the development and implementation of at least two jointly sponsored trials, of six months or more, of work assignment flexibility programs in the areas described above. The Committee may form one or more working committees to assist in this effort. Such trials will occur only with Union agreement.

[20]

Following the completion of such trials, the Committee will develop a joint report and recommendation dealing with such items as shared duties, premium or other compensation schemes, whether an interim change in the collective bargaining agreement on this subject is appropriate, and whether future trials should be conducted. If the parties cannot agree on a joint report and recommendation, separate reports will be exchanged. Future trials or expansion of the trials will occur only with Union agreement.

Very truly yours,

(s) R.A. Cargo, Jr.
Managing Director - Labor Relations

AGREED:

(s) C.H. Stackhouse
Assistant to Vice President

APPROVED:

(s) M. Bahr
President
Communications Workers of America

[21]

**FOUR DAY WORK WEEK TRIAL**

**8-23-00**

For six (6) months following the ratification of this Agreement, Four-Day Work Week Trials will be implemented in Company jurisdictions under the following terms:

The Company and the Union mutually recognize that, in certain administrative groups, it may be beneficial to the employees and in the best interests of the business to establish four-day work week trials as a normal week. In such cases, the total number of hours presently constituting a five-day normal work week will be scheduled over four days of the calendar week. Four day work weeks will be scheduled on four consecutive days.

Individual tours scheduled during a four day normal work week may or may not be of equal length, but will not be shorter than 7.5 hours or longer than 10 hours. When a four-day schedule is in effect, the duration of tours specified in the Local Agreements will be considered to be expanded accordingly.

The Company, with the Union's input, may institute four-day trials in administrative groups. The Company or the Union may discontinue four-day trials upon fourteen (14) Days' notice to the other party.

In administering four-day trials, the Company will offer four-day work weeks to employees on a voluntary basis in seniority order. If there are insufficient volunteers, four-day work week trials will not be instituted. In BA-PA/CWA Local 13000 only, an employee who is required to work an evening, night, or weekend tour "by virtue of the operation of Section A2.02" of the local agreement may not volunteer for a four day work week. Night differential payments shall be paid pursuant to the applicable differential provision in the local collective bargaining agreements.

When a four-day schedule is in effect as a normal work week overtime payments shall apply to time worked in excess of the new normal daily tour.

Pay allowances for absent time (including sickness absence) occurring during four-day trials will be subject to the conditions specified in this Agreement. When pay treatment is calculated on a daily (as opposed to hourly or weekly) basis, a scheduled day of a four-day trial and a scheduled day of a five-day normal work week will each count as one full day, except with respect to vacations and employee designated excused work day calculations.

Vacation and employee designated excused work days will be assessed in proportion to the ratio between the hours actually scheduled on the tour in question and the hours scheduled on each tour of a five day normal work week for the employee's administrative group. For example, if a 37.5-hour employee scheduled to work three 10-hour days and one 7.5 hour day takes a vacation day on a 10 hour day, all 10 hours (or 1.33 vacation days) will be charged. If that same employee

[22]

takes a vacation day on the 7.5-hour day, 7.5 hours (or one vacation day) will be charged.

For calendar weeks containing holidays recognized under the Agreement (including floating holidays) or Company designated excused work days, the Company will revert to a five-day schedule.

Subject to the above, four-day trials will be administered in accordance with the applicable provisions of the Local Agreements. The parties may meet locally and discuss other administrative issues raised with respect to the four-day work week. These provisions will become effective upon ratification.

Unless renewed or amended by mutual agreement, these four day work week trials will terminate six (6) months following ratification of this Agreement .

[23]

(Plant Only)

August 28, 1992

Mr. Charles H. Stackhouse
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 15th Floor
Philadelphia, Pennsylvania 19102

Dear Mr. Stackhouse:

This will confirm understandings reached during the 1992 bargaining concerning Article 18, Subsection 18.033 relative to the makeup of geographical areas in Philadelphia.

There is one work location in Philadelphia which is part of a specific district level organization but which lies outside the accepted geographical area administered by that organization. The work location and the organization to which it belongs is as follows:

Eastern:

• 181 North Lane, Conshohocken—PLC 2256. Part of Customer Services Philadelphia North organization.

This location lies outside the geographical area of the district level organization to which it is assigned due to space requirements and space availability. For the purposes of Section 18.03, Article 18, Permanent Transfer of Employees, the employees at the above listed location will be considered to be within the geographical area of the district level organization to which they are assigned.

Additional cases of the type described above are not planned at this time. If, in the future, a case develops, the Company will notify the Union and will be prepared to provide the reasons for the specific case. Subject to specific agreement to the contrary between the parties, following such notification future cases will be treated as though the work location were within the geographical area of the district level organization to which is is assigned, provided no work location will be more than three miles from the boundary of such geographical area.

This letter replaces the letter agreement of August 13, 1977 covering this subject.

Very truly yours,

(s) R. J. Klauss
Local 13000 Bargaining Chairman

AGREED:

(s) C. H. Stackhouse
Assistant to Vice President

[24]

**Home Garaging Trial**

**8-23-00**

The Home Garaging Trial will be continued in administrative work units whereby employees will be assigned a motor vehicle for use in their work, for traveling between their work locations and area of residence or other designated places where the vehicle is stored. The Home Garaging Trial will be implemented only within administrative work units where some or all of the employees normally use a Company-provided motor vehicle in order to perform their work. The decision to implement a trial of this program will be within management's discretion. However, only volunteers will be utilized.

When Home Garaging is introduced within an administrative work unit, all employees within that unit who normally use a Company-provided motor vehicle in the performance of their work assignment will be eligible to participate.

Since participation is voluntary if an employee elects not to participate, management will determine where the motor vehicle assigned to that employee is to be stored and that location will become the employee's work reporting location, but not for purposes of locality wage zones, special city allowances or union local affiliation. All employees, including those who do not participate in home garaging trials in administrative work units, will report to a company designated work center (as described above) at least once a week.

Employees who participate in the program will be expected to provide normally secure and legal storage for the vehicle at their places of residence. If the vehicle cannot be properly stored at an employee's place of residence, the Company may arrange for appropriate storage at its expense.

Operating and maintenance costs will be at the Company's expense. The Company will make arrangements for maintenance of the vehicle; however, it will be the responsibility of the employee to whom the vehicle is assigned to assure that the vehicle is properly maintained.

For employees who participate in the Home Garaging Trial, a work reporting area will be established on a local basis before implementation. The work reporting area normally will be a circular geographic area. In large congested metropolitan locations or where natural barriers render a circular work reporting area impractical, other mutually suitable parameters will be established.

Each participating employee will be expected to begin and end the work tour at any assigned location within the established work reporting area.

Employees who are assigned to a job location at the beginning or end of a work tour which is outside an established work reporting area will be paid for necessary travel time to or from their homes at the beginning or end of their tours.

As specified above, at least one (1) tour per week will begin at a Company designated work center. If requested by the Local Union representative or stew-

[25]

ard, on a voluntary basis, participants will be permitted sixty (60) Company paid minutes of union meeting time each month on those days when the participant reports to work at the Company designated work center.

Unless renewed or amended by mutual agreement, this trial will be terminated six (6) months following ratification of this agreement.

August 22, 2003

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA 19103

Dear Mr. Short:

During 2003 collective bargaining, the Union presented two demands regarding Independent Medical Examination (IME) reports (VI.4 and VI.5).

This letter will confirm our agreement to meet within 90 days following contract ratification to discuss and attempt to resolve the issues involved.

Sincerely,

/s/ Ron Williams
Executive Director – Labor Relations

Agreed:

/s/ James J. Short
Bargaining Agent
Communications Workers of America/IBEW

[27]

**INTER–COMPANY TRANSFERS**

**8-23-00**

1  Commencing January 1, 2001, the Company will implement a process which will allow employees to request lateral transfers or downgrades between positions in NY/NE Companies and Mid-Atlantic Companies.

2. For the purposes of this agreement NY/NE Companies will include:

> Verizon New England Inc,
> Verizon New York Inc.
> Empire City Subway Company (Limited) Telesector Resources
>     Group, Inc.

For the purposes of this agreement Mid-Atlantic Companies will include:

> Verizon Pennsylvania Inc.
> Verizon New Jersey Inc.
> Verizon Delaware Inc.
> Verizon Maryland Inc.
> Verizon Virginia Inc.
> Verizon Washington, D.C. Inc.
> Verizon West Virginia Inc.
> Verizon Services Corp.

3. This agreement does not apply to requests for upgrades. This agreement does not apply to employee requests for lateral transfers or downgrades within these companies, among the NY/NE Companies, among the Mid-Atlantic Companies, or to any other employee movements covered by other provisions of the collective bargaining agreements, if any. This agreement will not affect existing staffing procedures in any of the NY/NE or Mid-Atlantic Companies.

[28]

August 11, 1998

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 15th Floor
Philadelphia, Pa 19102

Dear Mr. Short:

The following commitments will apply when representatives of the Company or its agents conduct an investigatory interview which may lead to discipline of the employee being questioned:

- After an employee requests Union representation at an investigatory interview, no questioning will take place until a Union representative is present at the interview.

- If the employee requests to speak privately with the Union representative upon the representative's arrival at the meeting, the employee will be permitted to do so.

- The provisions of this letter will not be used to unduly delay the investigative process.

Please sign below to confirm your agreement.

Very truly yours,

/s/ Dana W. Blewett
Director - Labor Relations
Bell Atlantic - Pennsylvania

AGREED:

/s/ James J. Short
Assistant to Vice President
CWA, District 13

[29]

August 18, 2000

Mr. James J. Short

Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This letter will confirm that for the life of the collective bargaining agreements specified below, for the employees specified below, work performed exclusively by employees in a particular job title or titles at a work location will not be contracted in the geographic area covered by that location for 6 months after any employee(s) in that job title (or titles) and work location have accepted an ISP/EISP offer. During that 6 month period, if a need arises for personnel to perform such work, the work will be performed by existing employees or an employee(s) added to the group. Thereafter, the Company's rights to contract work shall be whatever they were before the ISP/EISP offer in question was accepted.

The terms of this letter apply to the following employees:

• Local 13000 (PA): "Plant Employees" under Article 1, Section 1.01(a)

• Local 13101 (DE): "Plant Employees" under Article 1, Section 1.01(a)

• D.C, MD, VA, WV, VSC: "Category 1 Employees" under Article 40, Section 8.

Nothing in this letter is intended to enlarge the Company's rights to contract work.

Very Truly Yours,

(s) Ron Williams
Executive Director – Labor Relations

AGREED:

(s) Jim Short
Bargaining Agent
Communications Workers of America

[30]

**Job Title Review Committee**

**8-23-00**

 The parties agree that within three (3) months after ratification of this Memorandum of Understanding, a joint Union-Company Job Title Review Committee will be established. The objectives of this committee will be (1) to identify job classifications which perform substantially the same or very similar duties, but which carry different designations, and (2) to attempt to reach agreement on a single designation for each such job title to be recommended to the Company and Union bargaining committee(s) for the affected bargaining unit(s). A non-exclusive list of examples of titles which may qualify for this consideration appears on "Attachment A".

 The Committee will be composed of five (5) representatives from the Company and its affiliates and a total of five (5) from the Unions. There will be one (1) representative from each of the three affected CWA Districts; to the extent that job titles represented by a Local of the IBEW are involved, the parties agree to invite one (1) representative from each such Local to discuss the re-designation of those titles. The Committee will meet a total of at least five (5) times during the years 2000 and 2001 combined.

 Any recommendation to use a common designation will not change or otherwise affect the job content or wage rate of any of the involved titles.

| TITLE | DC | MD | VA | WV | DE | PA | NJ |
|---|---|---|---|---|---|---|---|
| Assignment Technician | | | | | | X | |
| Exchange Layout Assigner | | | | | | | X |
| | | | | | | | |
| Apprentice Technician | | | | | | | X |
| Assistant Technician | X | X | X | X | | X | |
| | | | | | | | |
| Cable Splicing Technician | X | X | X | X | | | |
| Facilities Technician | | | | | | | X |
| Splicing Technician | | | | | X | X | |
| | | | | | | | |
| Central Office Technician | X | X | X | X | | | |
| Network Technician | | | | | | | X |
| Switching Equipment Technician | | | | | X | X | |
| | | | | | | | |
| Coin Box Collector | | | | | | | X |
| Coin Telephone Collector | X | X | X | X | X | X | |
| | | | | | | | |
| Maintenance Administrator | X | X | X | X | X | X | |
| Repair Service Clerk | | | | | | | X |
| | | | | | | | |
| RCMAC Clerk | X | X | X | X | | | X |
| Translations Administrator | | | | | X | X | |
| | | | | | | | |
| Telephone Canvasser - Business | | | | | X | X | |
| Telemarketing Representative | X | X | X | X | | | X |
| | | | | | | | |
| Systems Technician - Operations | | | | | | | X |
| Systems Technician - All Others | X | X | X | X | X | X | |
| | | | | | | | |
| Communications Representative | X | X | X | X | | | |
| Customer Sales Representative | | | | | | | X |
| | | | | | | | |
| Automotive Equipment Technician | X | X | X | X | X | | |
| Automotive Mechanic | | | | | | X | |
| | | | | | | | |
| Senior Clerk | | | | | X | X | |
| General Field Clerk | | | | | X | X | |
| General Clerk | X | X | X | X | | | |
| Service Analyst | | | | | | | X |
| | | | | | | | |
| Senior Field Clerk | | | | | X | X | |
| Staff Clerk | | | | | X | X | X |
| Senior Service Analyst | | | | | | | X |
| Special Clerk | X | X | X | X | | | |

[32]

**JOINT TIME FOR PARTICIPATION IN JOINT COMMITTEES**

**8-23-00**

For the life of the new agreements, the Companies will pay for joint time spent in the following committees, all of which are also continued for the life of the agreement:

- Advisory Committee on Health Care

- Advisory Committee on Family Care

- National Health Reform Committee

- Safety Executive Council

- Training Advisory Board Executive Council

- Joint Title Review Committee (new)

- Stress Relief Committee (Commercial) (new)

- Operator Services Monitoring (new)

This list is intended to include all regional joint committees for which joint time is paid; if any were inadvertently omitted, they are eligible for the same treatment.

[33]

**Laid-Off Former Employees Applying for Re-Employment**

The Company agrees, for the life of the 2003 Agreement, to permit a laid-off former Company employee to apply, and be considered, for re-employment after ninety (90) days have elapsed from the effective date of the employee's layoff.

August 3, 2003

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA 19103

Dear Mr. Short:

RE:  <u>Limited Extension Agreement</u>

The CWA and the Company agree as follows:

**<u>Grievance and Arbitration Extension</u>**

If the parties' tentative agreements on new collective bargaining agreements are ratified by the Union's membership, the grievance and arbitration provisions of the parties' expired agreements shall be applied retroactively to the period between August 3, 2003 and the date of ratification.

**<u>Union Security Agreement</u>**

The parties' agree to extend the Union Security provisions of their respective collective bargaining agreements during the period from expiration of their 2000 agreements until the parties' reach new agreements.

The Union hereby agrees to indemnify the Company and hold it harmless from all claims, damages, costs, fees or charges of any kind which may arise out of the honoring by the Company of deduction authorizations in accordance with the provisions of this Limited Extension Agreement, the making up of sums owed the Union in cases of inadvertent failure to timely honor authorizations, and the transmitting of such deductions to the Secretary-Treasurer of the Union.

[35]

**No Strike - No Lockout**

The parties agree that until ratification of, or a vote of the Union's membership rejecting ratification of, the new collective bargaining agreements, the Union agrees on behalf of itself and the employees that it represents, that, in relation to these negotiations, there shall be no strikes, stoppages of work or other job actions of any kind by any employee or employees, or any action by the Union contrary to such obligations.  Further, until ratification of, or a vote and failure to ratify, the new collective bargaining agreements by the Union, the Companies agree that they shall not engage in a lockout, except a defensive lockout in response to a material breach of the express promises of the Union set forth herein.

Sincerely,

/s/ Ron Williams
Executive Director-Labor Relations

Agreed:

James J. Short
Bargaining Agent
Communications Workers of America

[36]

August 14, 1986

(modified August 11, 1998)

Mr. Martin S. Griglak
Staff Representative
CWA District 13, AFLCIO
516 W. Crawford Avenue
Connellsville, PA 15425

Dear Mr. Griglak:

The Company and the Union agree that in the future local management may enter into local agreements with the Union, but such agreements must be in writing and must be authorized and signed by the highest ranking Labor Relations Manager in the Region and, effective August 8, 1998, must also be authorized and signed by a Union official at the Vice President - East/West Region level or higher and by a member of the staff of CWA District 13.

It is further agreed that the President of Local 13000 and the Chairman of the Company's bargaining team will meet on or about October 22, 1986 and, at the request of either, every three months thereafter to discuss existing local agreements.

Each party shall give notice to the other at least three weeks before the meeting of the specific local agreement it seeks to modify or terminate.

The parties will discuss such local agreements and seek to reach mutual agreement on modification, termination or continuation of the agreements.

The parties shall in good faith consider the following in their efforts to mutually agree:

1. The terms of the existing Collective Bargaining Agreement, which shall be controlling, if applicable.

2. The needs of the business in the current competitive environment,

3. The Company's need for flexibility to give high quality, prompt and low cost service,

4. Fairness to the employees affected,

5. The differences, if any, in conditions giving rise to the local agreement from current conditions,

6. The reasons of the party seeking change or termination of the local agreement and of the party resisting change or termination,

7. The history and practice surrounding the local agreement,

8. The benefit to employees of continued observance of the local agreement.

[37]

The local agreements considered shall be continued, modified or terminated in accordance with the mutual agreement of the Company's Bargaining Chairman and the Union President.

If mutual agreement on a local agreement is not reached either party may proceed to arbitration pursuant to Section B1 of the parties' Collective Bargaining Agreement. The Board of Arbitration shall have authority to modify, terminate or continue the local agreement at issue, including authorization to set a termination date or termination procedure.

The Board of Arbitration shall make its decision based on the factors set forth above which were to be considered by the parties.

Neither party may present in such arbitration, nor may the Board of Arbitration consider, any proposal or position taken by either party in the meeting between the Company Bargaining Chairman and the President of the Union.

The Company agrees to withdraw its notification of termination of all local agreements, which was confirmed by letter of July 17, 1986.

Very truly yours,

(s) R. A. Cargo
Division Manager - Labor Relations

AGREED:

(s) M. S. Griglak
CWA Staff Representative

[38]

(Plant Only)

August 3, 1971

Mr. William E. Wallace
Executive Vice President & Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd floor
Philadelphia, Pa. 19102

Dear Bill:

During the final stages of bargaining in 1971, the Company submitted statements on various subjects to the Union.

The statements referred to are as follows:

1. The Company will do its best to accomplish equalization of overtime opportunities in all locations under the kinds of ground rules presently established and working in most locations. There is no intention of moving in a direction opposed to this policy as affirmed to the Union. Both the Union and the Company agree that the equalization of overtime opportunities should be over a reasonable period of time.

The Company agrees to continue to maintain overtime opportunity lists and copies of these lists will be available for the use of local Union officers and representatives. Lists will not be posted other than at those locations where overtime lists are currently posted and have been regularly posted in the past.

2. The Company affirms that management's job basically is to manage.

Please consider this as fulfillment of the Company's promise to forward the above, in letter form, to the Union.

Sincerely,

(s) T. H. Gilmore
Assistant Vice President—Labor Relations

[39]

August 27, 1983

Mr. Vincent J. Maisano
Vice President and Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd Floor
Philadelphia, PA 19102

Dear Mr. Maisano:

When a management employee with over 1 year of service in a management job is assigned to an occupation in the bargaining unit the period of service in management shall not be counted in determining the employee's service for the purpose of determining the order of layoff under Article 9 and permanent transfers under Article 18 (Plant) and Article 24 (Comptrollers) for the first year after the employee is assigned to an occupation in the bargaining unit. Management service shall be included in the computation of service credit for all other purposes immediately upon the employee's assignment to an occupation in the bargaining unit.

(s) R. A. Cargo, Jr.
Bargaining Chairman

AGREED:

(s) Vincent J. Maisano
Vice President and Chief Negotiator

[40]

August 16, 1980

Mr. William E. Wallace
Vice President & Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd Floor
Philadelphia, Pennsylvania 19102

Dear Mr. Wallace:

This is to advise you that Meal Expenses under Subsection A6.02 of Exhibit A will be administered as follows:

No meal expenses will be reimbursed on temporary assignments that have been designated as commuting by the Company.

When the Company requires an employee to remain overnight at a non-commuting location, all meal expenses will be reimbursed in accordance with Subsection A6.02.

When an employee elects to commute daily, by public transportation, on a noncommuting assignment and is given permission by the Company to do so, meal expenses will be reimbursed in accordance with the provisions of Subsection A6.02 as follows:

1. If public transportation schedules require that the employee reach the temporary location one-half hour in advance of the start of the actual work period at the temporary location (including Plant Training Center assignments), the employee will be reimbursed for breakfast. For example, breakfast would be reimbursed if the employee arrived at 7:30 a.m. for an 8:00 a.m. starting time.

2. Where the interval between the ending of the scheduled work period and the departure of public transportation is one and one-quarter hours or more, the employee will be reimbursed for the evening meal.

When an employee elects to commute on a non-commuting assignment, the noon-day meal will be reimbursed and, in addition, where the employee is required to work one and one-quarter hours or more beyond the employee's normal quitting time, the employee will be reimbursed for an evening meal in accordance with Subsection A6.02 regardless of the means of transportation used.

[41]

For weekend transportation in accordance with A6.043(a)*, breakfast on Monday morning or the evening meal on Friday is reimbursable. For weekend transportation in accordance with A5.054(**), however, breakfast on Monday morning or the evening meal on Friday is not reimbursable, unless time intervals as stated in 1 and 2 above are exceeded.

Very truly yours,

(s) R. A. Ellison
General Manager—Personnel

ACCEPTED:

(s) W. E. Wallace
Vice President and Chief Negotiator

_____

* Current reference is A6.054(a).
** Current reference in A5.055.

[42]

January 25, 1996

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 15th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This letter will confirm our agreement during 1995 contract negotiations to provide for the alternative dispute resolution of grievances through mediation, where mutually agreeable.

The use of mediation will be subject to the following conditions:

1. Grievances involving suspensions or discharges which would be subject to arbitration under the parties' Agreement are eligible for submission to mediation, except those involving an issue of arbitrability, contract interpretation, or work stoppage activity and those which are also the subject of an administrative charge or court action.

2. Mediation may be requested by either party at the time an arbitration demand is served or within 14 days thereafter. If the party receiving the request does not agree to mediation, the grievance shall be submitted to arbitration pursuant to the normal procedures.

3. If mediation is agreed upon, a mediation hearing will be expeditiously scheduled. Mediators from the Pennsylvania Department of Labor and Industry, Bureau of Mediation, will be used to conduct mediation. The mediation conference will be conducted at a mutually agreeable location.

4. Attorneys will not be used for mediation. In advance of the mediation conference, the parties will discuss the case in an effort to understand each other's position on the facts and to minimize surprise at the conference. Probable witnesses should be identified and their expected testimony summarized. Where possible, stipulations of fact should be prepared.

5. The mediation conference will be informal, with no rules of evidence. Either party may elect to make an opening and/or closing statement. Witnesses will testify in person. No stenographic or other recording of the conference shall be made, except that the parties and mediators may take notes during the conference.

6. The mediator may meet with each party privately at any time to propose a resolution of the matter. An agreed resolution shall be without prejudice or precedent to either party's position and will not be referred to in the future except in proceedings involving discipline of the same grievant.

[43]

7. If the matter is not resolved by the parties, the mediator will render a final and binding decision on the matter before concluding the conference unless the mediator requests, and the parties agree to, up to 5 days to issue a decision. In making his or her decision, the scope of the mediator's authority shall be governed by Section 13.02 of the parties' Agreement. The decision of the mediator will be without prejudice or precedent to either party's position and will not be referred to in the future except in proceedings involving discipline of the same grievant.

8. Each party will bear its own costs. The cost of the mediator, if any, will be shared equally by the parties.

Unless renewed or modified, this letter agreement terminates when the current collective bargaining agreement terminates in August 1998.

Very truly yours,

Dana W. Blewett
Director - Labor Relations
Bell Atlantic - Pennsylvania

Agreed:

James J. Short
Assistant to Vice President, CWA

[44]

# MEDIATION

**8-23-00**

The provisions on "Mediation Cases" in the 1998 MOU will be continued for the life of the 2000 collective bargaining agreements:

**MEDIATION CASES:** The Companies will amend their current mediation provisions so that the following types of cases may be submitted to mediation by mutual agreement:

- arbitrable discharge cases;

- disputes where employees allege that they were improperly denied an opportunity to work overtime;

- disputes where it is alleged that management is doing "bargaining unit" work.

Where there is mutual agreement to mediate one or more cases, the parties will reserve two days per month per CWA District for mediation cases. In addition, in jurisdictions with a backlog of mediation cases, the parties will reserve up two additional days per month for the next 6 months in order to address the backlog. However, either party may move a case which is subject to mediation to mediation without agreement of the other party, subject to the following:

- the mediator will serve as a mediator only and will not render a decision if there is no agreed settlement;

- if there is no settlement in mediation, the case may be moved to arbitration through the normal arbitration procedures;

- if there is an arbitration in such case, the person who was the mediator cannot serve as the arbitrator and a party cannot introduce any statements (or documents) made (or produced) by the other party, its witnesses or advocates in the mediation, as evidence in the arbitration.

In addition, suspensions of five days or less may be moved to mediation without agreement, under the normal mediation rules (where the mediator can become an arbitrator if no settlement is reached).

In addition, the following mediation trial will be conducted under each of the local collective bargaining agreements, as follows:

- The trial will last from January 1, 2001 to December 31, 2001.

- The following matters will be subject to mediation without mutual agreement under the normal mediation rules (where the mediator can become an arbitrator if no settlement is reached):

  - Suspensions of up to 10 days

  - Claims of management performing bargaining unit work

[45]

- Claims of an improper "bypass" under a lateral transfer plan ( solely for purposes of this trial, whether or not these claims are subject to arbitration under applicable contract provisions)

At the close of the trial, the Company and Union will meet to discuss the trial and to decide whether to continue the trial, by mutual agreement, for a period not exceeding the remaining life of the applicable collective bargaining agreements.

[46]

(Plant Only)

## MEMORANDUM OF UNDERSTANDING

It is mutually recognized that harmonious labor-management relations are in the best interests of the public, the employees, the Union and the Company.

Within the last several years, where there have been differences between the Company and the Union, the Union has, on occasion, resorted to publicity and legislative activities to obtain support for their objectives from the public, the Company's customers and from various legislative bodies and government officials.

The Union and the Company agree that a preferable and viable alternative is to seriously discuss and find solutions to problems internally.

It is, therefore, mutually agreed that the Union and the Company, during the life of the basic agreement between the parties, will make an honest effort to settle internally any problems which may arise.

The Company and the Union agree that they should encourage improved relationships between their respective representatives at all levels.

The officials respectively representing the Company and Union will, from time to time during the life of this Memorandum of Understanding at the request of either and the mutual convenience of both, meet to appraise their administration of this Memorandum of Understanding and to analyze influences which may be impairing the attainment of these joint goals. Such meetings will be at the Area or (at the request of either party) Company-wide level and shall take place no less than once a year.

The Union and the Company recognize that services of the Federal Mediation and Conciliation Service and similar agencies are available and may be helpful in depolarizing labor relations situations which may be dealt with under this Memorandum of Understanding. Where appropriate, and the parties mutually agree, the FMCS or similar agency will be called upon to aid in achieving harmonious labor-management relations under this Memorandum of Understanding.

August 11, 1974

| FEDERATION OF TELEPHONE WORKERS OF PENNSYLVANIA | THE BELL TELEPHONE COMPANY OF PENNSYLVANIA |
|---|---|
| By (s) I. C. Glendenning<br>Executive President | By (s) R. E. Young<br>Assistant Vice President<br>—Labor Relations |
| By (s) W. E. Wallace<br>Vice President & Chief<br>Negotiator | By (s) J. R. Hoy<br>General Personnel<br>Supervisor - Philadelphia |
| By (s) E. J. Maher<br>Division President—Phila. | |
| By (s) W. B. Christy<br>Division President—Eastern | By (s) R. E. DeFord<br>Personnel Supervisor—<br>Eastern |
| By (s) G. E. Mercer<br>Division President—Central | By (s) C. S. Fries<br>General Personnel<br>Supervisor—Central |
| By (s) F. S. Wentzel<br>Division President—Pittsburgh | By (s) R. A. Cargo, Jr.<br>General Personnel<br>Supervisor—Western |
| By (s) M. S. Griglak<br>Division President—Western | |

[48]

(Plant Only)

August 11, 1974

Mr. William E. Wallace
Vice President and Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd floor
Philadelphia, Pennsylvania 19102

Dear Mr. Wallace:

When loaning employees for a full tour or more to do work which is usually performed by an equivalent or lower classification within the bargaining unit, the Company will notify the Union of such loan in advance where practicable. It is not the practice of the Company to loan employees out of their job classification capriciously or in the absence of real need. The Company will advise the Union of the reasons for such loan and will discuss with the Union any questions relative to the loan. The Union reserves the right to grieve the loan.

This letter agreement is without prejudice to the position of the parties concerning the arbitrability of/or the Company's right to make out-of-title loans or work assignments and temporary transfers or temporary promotions or the claim of the Union that such loans when made unilaterally are contract violations.

Very truly yours,

(s) R. E. Young
Assistant Vice President—Labor Relations

AGREED:

(s) W. E. Wallace
Vice President and Chief Negotiator

[49]

August 3, 2003

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA 19103

Dear Mr. Short:

This will confirm our agreement during 2003 contract negotiations to establish a joint Union-Management Committee to explore ways in which the parties can address On Call Assignments.

The committee shall consist of no more than 3 members for the Union and 3 members for the Company and will meet within 3 months of the ratification of the 2003 Agreement.

The committee will engage in joint discussions regarding the possible implementation of trial on-call procedures. It is the objective of the committee to explore options and develop recommendations that can be presented to the duly authorized representatives of the parties.

Unless renewed or amended by mutual agreement, the provisions of this letter will terminate on August 2, 2008.

Sincerely,

/s/ Ron Williams
Executive Director – Labor Relations

AGREED:

/s/ James Short
Assistant to Vice President
District 13, CWA

[50]

(Plant Only)

August 14, 1986

Mr. Martin S. Griglak
Staff Representative
CWA District 13, AFLCIO
516 Crawford Avenue
Connellsville, PA 15425

Dear Mr. Griglak:

This letter agreement amends the letter agreement dated August 16, 1980, regarding work on subscriber loops, protectors and connecting blocks to read as follows:

It is agreed that Outside Plant Technicians may work up to and on protectors, or connecting blocks to which loops are connected, whether they are within or outside buildings, including mounting, dismounting and replacing protectors and connecting blocks, but will not work beyond the protector or connecting block.

It is agreed that Splicing Technicians and Services Technicians may repair trouble on subscriber loops, protectors, connecting blocks and inside wire and inside wiring cable up to and including the connecting block to which equipment is attached.

Very truly yours,

(s) R. A. Cargo, Jr.
Division Manager - Labor Relations

AGREED:

(s) M. S. Griglak
CWA Staff Representative

[51]

(Plant Only)

August 27, 1989

Mr. Charles H. Stackhouse
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 15th Floor
Philadelphia, PA 19102

Dear Mr. Stackhouse:

This letter will confirm our agreement during 1989 collective bargaining that the Company may assign outside craft employees (except Outside Plant Technicians) to work on 2 pairs in central offices when no inside craft employee is present in the central office.

The parties agree that this letter agreement voids the decisions in AAA Case No. 14 30 0044-82 and AAA Case No. 14 300 0696-87, and agree to delete the letter agreement dated August 14, 1986 on assigning outside craft employees to work in unattended central offices after normally scheduled hours.

The Company further agrees to pay the lump sum of $50,000 to be distributed among employees designated by the Union in full settlement of the remedy in AAA Case No. 14 300 0696-87, which payment shall also settle all arbitration cases and grievances held pending the outcome of AAA Case No. 14 300 0696-87 and any other arbitration case or grievance in the process as of this date which involves in whole or in part a claim that the Company's use of outside craft employees in a central office violates the parties' Agreement.

Very truly yours,

(s) R.A. Cargo, Jr.
Managing Director - Labor Relations

AGREED:

(s) C.H. Stackhouse
Assistant to Vice President

APPROVED:

(s) M. Bahr
President
Communications Workers of America

[52]

August 6, 2000

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This letter addresses overtime administration in the Financial organization in connection with the elimination of the separate letter on overtime administration for Financial during 2000 collective bargaining negotiations.

The Union reaffirms its commitment to assist the Company in seeking volunteers to work overtime. If the Company has a need to assign employees to work overtime beyond the limits set forth in Subsection A3.021, and the situation is not covered by Subsections A3.0222 or A3.0223, the involved third tier supervisor and the Union's Regional Vice President will meet to discuss the situation and consider any special circumstances associated with the operations of the Financial organization.

Very truly yours,

(s) Ron Williams
Executive Director - Labor Relations

Agreed:

(s) James J. Short
Bargaining Agent
Communications Workers of America

[53]

(Plant Only)

August 4, 1960

Mr. I. C. Glendenning
Vice President and Chief Negotiator
Federation of Telephone Workers of Pennsylvania
121 North Broad Street, Room 612
Philadelphia, Pennsylvania

Dear Mr. Glendenning:

In accordance with our discussion, it is agreed that:

1. New construction work on polyethylene cable and ready-access terminals—such work will be performed to a large extent by splicers but may be assigned to linemen or equivalent or higher titles whenever the Company determines that efficiency of operations, including reasonably effective utilization of forces, makes such assignment desirable.

2. Subsequent changes, additions, or rearrangements may be assigned to installers or equivalent or higher titles.

3. This understanding will remain in effect until termination of the General Agreement between the parties covering wages and working conditions executed on the date of this letter.

If the above is in accordance with your understanding, will you please sign one copy of this letter and return it to us for our files.

Very truly yours,

(s) W. M. Cooper
General Plant Manager

ACCEPTED:

(s) I. C. Glendenning
Chief Negotiator

[54]

August 23, 2000

Mr. James Short
Assistant to Vice President
District 13, CWA
230 South Broad Street, 19th floor
Philadelphia, PA 19102

Dear Mr. Short:

During 2000 bargaining, the Union proposed an alternative method for selecting employees for promotion in which specified factors, including seniority, would be given equal weight, and seniority would prevail where these qualifications were deemed equal. While the Company remains committed to the promotional system it utilizes, the Company recognizes there is value in better understanding the Union's proposal and how it would affect the selection of employees for promotion.

Given the parties continuing efforts at resolving areas of dispute in an interest-based problem-solving way, the Company and Union have agreed to form a Promotions Forum, in which up to three representatives of each party will discuss and consider the other party's interests and concerns about promotions using the Issues Resolution Process. This Joint Committee, which may also include up to three representatives from CWA Local 13500, will meet at least three (3) times in 2001 and three (3) times in 2002. The Company's attendees will include a representative from Human Resources and Labor Relations. The Union's attendees will include two representatives who have had in-depth involvement in grievances over "promotion bypasses."

Unless extended by mutual agreement, the provisions of this letter agreement will terminate when the parties' August 2000 Agreement terminates.

Please sign below to signify your agreement to the provisions of this letter.

Very truly yours,

/s/ Maryanne Crompton
Director - Labor Relations

Agreed:

/s/ Jim Short
Assistant to Vice President

[55]

June 11, 1971

Mr. W. E. Wallace
Vice President & Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd floor
Philadelphia, Penna. 19102

Dear Mr. Wallace:

In accordance with our discussions during the present negotiations the Company agrees to provide to the Federation of Telephone Workers of Pennsylvania, on a quarterly basis, a list of Occasional and Temporary Full-Time and Part-Time employees in the Plant and Services organizations who are on the payroll at the end of each quarter. These lists will show the name, job classification and payroll location for each listed employee and, in addition, the number of days worked in the quarter.

It is understood that, with the implementation of this quarterly list, any local lists presently furnished to representatives of the Union will be discontinued.

If you are in agreement with this letter please sign both copies, retaining one copy for your files, and return the other for our files.

Very truly yours,

(s) T. H. Gilmore
Assistant Vice President—Labor Relations

(s) E.R. Weaver
Assistant Comptroller
Corporate Accounting and Personnel

ACCEPTED:

(s) W. E. Wallace
Vice President and Chief Negotiator

[56]

January 25, 1996

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 15th Floor
Philadelphia, PA 19102

Dear Mr. Short:

Effective March 1, 1996, the Company guarantees that during a calendar year, no more than twenty-five percent (25%) of all openings for Regular Full-Time employees in the job titles in the Plant/Services and Financial Organizations will be filled by reclassifying an employee from Part-Time to Full-Time, or from Temporary or Term to Regular.

This guarantee will terminate when the August 1995 collective bargaining agreement terminates.

Very truly yours,

Dana W. Blewett
Director - Labor Relations
Bell Atlantic - Pennsylvania

Agreed:

James J. Short
Assistant to Vice President, CWA
District 13, CWA

[57]

August 23, 2000

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

During 2000 collective bargaining, the Union expressed interest in discussing how the Company's Regional Attendance Plan (RAP) is administered.

In recognition of the importance of promoting both good health and good attendance among employees, the Company proposes that there be a post-bargaining meeting held during the fourth quarter of 2000 or no later than the first quarter of 2001 to discuss any concerns the Union has about how the RAP is administered in certain cases. At least one month before that meeting, the Union would provide the Company with a written summary of its concerns and proposed improvements to RAP administration, which the parties would discuss in detail at the meeting. The Company will provide the Union with a written response to its concerns within one month after the meeting. The Company will give serious consideration to exploring solutions proposed by the Union. The Union recognizes and agrees that any changes adopted by the Company as a result of this RAP meeting would be adopted by the Company on a trial basis and that the Company would remain free to rescind or amend those changes without the Union's agreement.

The one day meeting would be attended by three Company representatives and three Union representatives, who would be paid for time actually spent in the meeting (unless on full-time Union leave of absence). Additional RAP meetings may be held up to two times per calendar year thereafter if mutually agreeable to the parties. A subsequent meeting shall be treated in accord with the provisions of this letter governing the initial RAP meeting.

Your signature on the line below will indicate the Union's agreement to the provisions of this letter.

Very truly yours,

/s/ Maryanne Crompton
Director – Labor Relations

Agreed:

(s) Jim Short
Assistant to Vice President
CWA, District 13

[58]

August 16, 1980

Mr. William E. Wallace
Vice President and Chief Negotiator
Federation of Telephone Workers of Pennsylvania
1410 Chestnut Street, 2nd Floor
Philadelphia, Pennsylvania 19102

Dear Mr. Wallace:

Safety is a concern to the Company and the Union. The Company and the Union mutually recognize the need for a work environment in which safe operations can be achieved in accomplishing all phases of work, and the need to promote better understanding and acceptance of the principles of safety on the part of all employees to provide for their own safety and that of their fellow employees, customers and the general public.

To achieve the above principles, the Company and the Unions representing employees in the Bell of Pennsylvania agree to establish for the duration of the Collective Bargaining Agreements with the Unions an advisory committee on safety principles at the headquarters level of the Bell of Pennsylvania. The Committee shall consist of not more than three (3) representatives from the Company and not more than one (1) representative from each Union representing Bell of Pennsylvania employees. This committee shall meet from time to time as required but at least three (3) times per year.

In connection with any safety activities, the Company agrees to reimburse only for the time spent by active employees for attendance at such committee meetings during the employee's scheduled tour at the employee's regular straight time rate of pay.

Very truly yours,

(s) R. A. Ellison
General Manager—Personnel

AGREED:

FEDERATION OF TELEPHONE WORKERS
OF PENNSYLVANIA
By (s) W. E. Wallace
Vice President and Chief Negotiator

[59]

August 3, 2003

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA 19103

Dear Mr. Short:

This will confirm our agreement during 2003 contract negotiations to meet and discuss providing safety glasses, including prescription safety glasses, to employees, at the Company's expense.

The parties shall meet within 3 months of the ratification of the 2003 Agreement.

Unless renewed or amended by mutual agreement, the provisions of this letter will terminate on December 31, 2006.

Sincerely,

/s/ Ron Williams
Executive Director – Labor Relations

AGREED:

/s/ James Short
Assistant to Vice President
District 13, CWA

[60]

August 23, 2000

Mr. James Short
Assistant to Vice President
District 13, CWA
230 South Broad Street, 19th floor
Philadelphia, PA 19102

Dear Mr. Short:

In accordance with 2000 bargaining discussions, it is agreed that when the Safety Committee meets, the subject of Safety Recognition Awards will be discussed.

Very truly yours,

/s/ Maryanne Crompton
Director – Labor Relations

Agreed:

/s/ Jim Short
Assistant to Vice President

[61]

August 27, 1989

Mr. Charles H. Stackhouse
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 15th Floor
Philadelphia, PA 19102

Dear Mr. Stackhouse:

This letter confirms our understanding regarding sales and referral incentive programs reached in 1989 bargaining and supersedes the parties' Plant Sales Agreement (as restated in a letter dated December 26, 1979) and voids the associated arbitration case, AAA Case No. 14300097587.

The Company may develop and implement on and off the job sales and referral incentive programs which will provide participating employees, which may include management and other non-bargaining unit personnel, the opportunity to earn merchandise, cash, meals, recognition, and other awards of value based on individual and/or collective performance in achieving standards developed and administered solely by the Company. Except for attending informational meetings, participation in sales and referral incentive programs by employees shall be wholly voluntary and shall not be used for evaluation and/or discipline purposes unless there is dishonesty. However, employees may be required to present brochures, literature, etc. as requested by the Company.

The Company agrees to notify the Union of corporate-wide sales incentive programs prior to implementation by the Company. The development, design, size, and frequency, and/or administration of sales and referral incentive programs, including the amount of merchandise, cash or other awards earned by participating employees, are wholly within the discretion of the Company and are not subject to the grievance and arbitration provisions of the Collective Bargaining Agreement. However, a claim by the Union that an individual employee's participation in a sales or referral incentive program was not wholly voluntary, or a claim that an individual employee's participation or nonparticipation was used for evaluative or disciplinary purposes in violation of this letter, is subject to the grievance and arbitration provisions of the Collective Bargaining Agreement.

[62]

Very truly yours,

(s) R.A. Cargo, Jr.
Managing Director - Labor Relations

AGREED:

(s) C.H. Stackhouse
Assistant to Vice President

APPROVED:

(s) M. Bahr
President
Communications Workers of America

[63]

August 3, 2003

Mr. James Short
Assistant to Vice President CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA 19103

Dear Mr. Short:

This will confirm our agreement during 2003 contract negotiations that in any situation governed by Net Credited Service ("NCS") date, where employees have the same NCS date, the following process will apply as a "tiebreaker":

- Employees with the same NCS date will be ranked by the last four digits of their social security number – the lower that number, the higher the NCS date is for purposes of this process.

- In the event the last four digits in two or more employees' social security numbers are identical, employees will be ranked by their birth month – the earlier the month, the higher the NCS date is for the purposes of this process.

- In the event the birth month is the same, employees will be ranked by the date in the month on which the employee was born – the earlier the date, the higher the NCS date is for the purposes of this process.

Sincerely,

/s/ Ron Williams
Executive Director – Labor Relations

AGREED:

/s/ James Short
Assistant to Vice President
District 13, CWA

[64]

August 22, 2003

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA   19103

Dear Mr. Short:

During 2003 collective bargaining, the Union presented a demand proposing immediate service bridging for movement between companies in which Verizon has a majority ownership interest.

This letter will confirm our agreement to meet after bargaining to discuss service bridging issues, including reduction of the 5-year bridging rule to one year.  Your signature below also affirms that you are and will continue to be the authorized agent to bargain on behalf of and bind Locals 827 and 1944, International Brotherhood of Electrical Workers, on the issues we discuss post-bargaining concerning service bridging.

> Sincerely,
>
> /s/ Ron Williams
> Executive Director  –  Labor Relations

Agreed:

/s/ James J. Short
Bargaining Agent
Communications Workers of America/IBEW

[65]

## SHORT NOTICE EXCUSED WORK DAYS (SNEWDs)

### 8-23-00

Effective, January 1, 2001, and continuing for the calendar years 2002 and 2003, notwithstanding the applicable Excused Work Day provisions in the local collective bargaining agreements, requests to supervision for up to three (3) paid Excused Work Days and one (1) unpaid Excused Work Day will be granted on short notice to employees eligible for paid and unpaid Excused Work Days under the following conditions:

1. The employee must request time off on short notice prior to the start of a scheduled tour or half-tour, but no more than twenty four (24) hours prior to the start of the scheduled tour or half-tour.

2. The Company will grant all Excused Work Days on the basis of the earliest request(s) to supervision provided that the Company may deny any and all requests in work groups of five (5) or more which would result in less than eighty percent (80%) of the scheduled force being available for duty. In a work group of four (4), the Company may deny any and all requests which would result in only one or two scheduled employees being available for duty. In a work group of 3, the Company may deny any and all requests which would result in only one employee being available for duty. This paragraph does not apply to a work group of one or two employees.

3. The work group shall be the same as the group designated for purposes of vacation selection.

4. Short Notice Excused Work Days may be taken in one-half (1/2) day increments; however, no more than one full day may be requested at any one time.

5. In each work group, the Company may designate up to four (4) work days in any month as unavailable for Short Notice Excused Work Days. Such designations will be made in accord with work schedule posting requirements.

6. The Company will have the right to deny any and all requests during any severe service disruption that may be caused, for example, by a natural disaster or other calamity (e.g., fires, explosions, civil disturbances, wars, acts of terrorism, major utility and transportation disruptions). Disputes regarding the application of the terms and conditions of Short Notice Excused Work Days may be submitted to the grievance procedure; however, neither these provisions nor their interpretation and application shall be subject to arbitration.

[66]

**ENHANCED STAFFING INFORMATION**

**8-23-00**

Over the life of the 2000 collective bargaining agreement, the Company will continue to provide on a monthly basis, separate associate staffing reports which reflect the number of new hires, promotions and laterals by state, city, work location and job title.

Over the life of the 2000 collective bargaining agreement, the Company will continue to provide on a quarterly basis, job forecasts by job title, city, major work location (i.e., work locations with 25 or more associates) and state.

These reports will be provided to each major work location (25 or more associates) and to the appropriate Local union offices; electronic or other automated means may be used instead of paper distribution where mutually agreed. A report that includes the names and Net Credited Service Dates (or dates of hire in the case of new hires) for employees promoted, laterally transferred or hired will be provided to the appropriate local Union offices.

**"FREEZING" PROMOTIONS AND LATERAL TRANSFERS**

**8-11-98**

On "the Effective Date of this Memorandum", the Companies will discontinue its practice in PA, DE and NJ of restricting promotions out of a particular organization or work group (sometimes referred to as imposing a "freeze" on promotions). This practice does not exist in DC, MD, VA, and WV. Effective 10/1/98, with regard to lateral transfers out of a director's work group, during any nine month period, there will be at least three months when lateral transfers may not be frozen and in no case would they be frozen for more than two consecutive months, subject to local lateral transfer plans and applicable contract provisions.

**INTERNAL/EXTERNAL DESIGNATIONS ON JVR
AND STAFFING CRITERIA**

**8-11-98**

Within thirty days following "the Effective Date of this Memorandum" the Companies will remove the "internal" and "external" designations from the Job Vacancy Request form. In addition, the Companies reaffirm that the best qualified candidate, whether internal or external, will be selected to fill a job vacancy. With regard to internal candidates, seniority will continue to be considered in accordance with existing contractual provisions.

[67]

### INTERNAL vs. EXTERNAL STAFFING COMMITMENT

#### 8-11-98

Except for entry level positions (see Attachment B), the Companies will fill at least 50% of their regular full-time requisitions with qualified internal candidates (promotions or transfers) commencing 1/1/99 and terminating 8/5/00. Failure to meet this requirement will be excused when caused by major changes in business circumstances (e.g., business/work volumes significantly higher or lower than projected for sustained periods of time, extraordinary and severe service disruptions, natural disasters, other calamities). This commitment is also contingent on there being qualified internal candidates. Furthermore, the Companies' compliance with this commitment will be measured on a full calendar year basis aggregating all requisitions within each particular bargaining unit, except in DC, MD, VA and WV the aggregation of requisitions will be by state. Status reports will be provided to the Union at the end of each calendar quarter.

### ADVERTISING AND CLASSIFYING JOB VACANCIES

#### 8-23-00

The Company agrees that effective January 1, 2001, all regular full-time, regular part-time, and temporary Associate Vacancy Requests (AVRs) submitted to the Associate Staffing Center will be advertised for ten (10) business days via STAR (or any future system which replaces or complements STAR). This replaces the 8/11/98 job advertising commitment in New Jersey.

The Company also reaffirms that the designations "internal" and "external" will not be placed on Associate Vacancy Requests (AVR). In addition, the Company reaffirms that the best-qualified candidate, whether internal or external, will be selected to fill a job vacancy. With regard to internal candidates, seniority will continue to be considered in accordance with existing contractual provisions.

[68]

## STRESS LETTER OF UNDERSTANDING

During 1998 bargaining negotiations, the Union raised concerns regarding employee stress levels. Recognizing the desirability of reducing workplace stress levels to the extent possible, the Company and the Union emphasize their mutual belief that it would be beneficial to all employees, the Company and the Union for the parties to engage in ongoing dialogue designed to explore ways to reduce the level of stress in the workplace, and to assist employees to manage stress in their daily lives. Accordingly, this letter will confirm our agreement during 1998 bargaining to establish joint Union-Management Committees for the life of the contract to explore ways in which the parties can work together to reduce employee stress levels. Upon written request by the authorized representative of the Union, a committee will be established in a line of business/business unit with bargaining unit employees.

Where such joint committees are established, they shall have one meeting in October, November and December of 1998 and shall meet quarterly thereafter or more frequently by mutual agreement as required. Up to six representatives from the Company and up to six representatives from the Union shall ordinarily attend the meetings; however, upon advance mutual agreement, additional representatives of either party may attend designated meetings to discuss specific subject(s). The Company representatives at each meeting shall include the involved line of business field Director and the Director of Labor Relations.

The objectives of the Joint Committees shall include:

1. Identifying current practices that contribute to a feeling of stress in the workplace.

2. Identifying those factors outside the workplace that contribute to a sense of stress on the job.

3. Reviewing and analyzing possible alternatives to current practices that are determined to be sources of significant stress.

4. Recommending strategies and initiatives designed to reduce employee stress levels and to assist employees to manage stress more successfully.

This letter of Understanding shall expire at 11:59 PM on August 5, 2000.

[69]

August 11, 1998

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFL-CIO
230 Broad Street, 19th Floor
Philadelphia, Pennsylvania  19102

Dear Mr. Short:

Section A14.061 covers certain computer centers and provides that "in computer centers headed by a third tier supervisor whose function is to provide or support computer operations" Sunday is a part of the normal work week.

In order to reflect recent changes and identify those operations and centers covered by Section A14.061, they are listed below.

| *Operation* | *Location* |
|---|---|
| Terminal Room | 1717 Arch Street, Philadelphia |
| Computer Room — including Bill Print, Bill Mailing & Reports Distribution | 1500 Tech Center Drive, Monroeville |

As new computer locations are established, the Company reserves the right to apply Section A14.061 to those locations.

This letter replaces the letter agreement of August 28, 1992 covering this subject.

Very truly yours,

Dana W. Blewett
Director-Labor Relations

AGREED:
(s) James J. Short
Assistant to Vice President

[70]

January 25, 1996

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 15th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This letter will confirm the Company's commitment made during 1995 collective bargaining that for the life of the current collective bargaining agreement, any time spent by an employee in a job title while that employee is in the Term classification will not count towards the time in current title requirements of the Regional Associate Mobility Plan ("RAMP").

Nothing in this letter should be read to suggest that the Company and Union have negotiated any provision of RAMP or that the Union accepts RAMP, either in whole or in part. This letter is simply a commitment by the Company regarding how it will administer a single RAMP requirement for the life of the August 1995 collective bargaining agreement.

Very truly yours,

Dana W. Blewett
Director - Labor Relations
Bell Atlantic - Pennsylvania

Agreed:

James J. Short
Assistant to Vice President
District 13, CWA

[71]

August 3, 2003

Mr. James Short
Assistant to Vice President
District 13, CWA
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This letter confirms our agreement in 2003 negotiations on an alternate procedure to using the provisions of Section A2.02 for the scheduling of tours.

Beginning in the fall of 2003, when vacation assignment discussions are held prior to November 15 of each year under Section A7.021, the appropriate Union Representative will inform the Company of the tour scheduling method to be used during the following calendar year in the administrative group(s) that Representative is responsible for. The Representative may designate one of the two tour selection methods described in the next paragraph.

The two alternate tour scheduling methods are (1) scheduling tours using the provisions of Section A2.02, or (2) scheduling based on employees, on a semi-annual basis (normally in December and June), selecting their tours on the basis of their net credited service to the extent that service requirements permit. It is recognized by both the Union and the Company that the requirements of the business make it necessary for certain employees to be assigned to tours other than those they might select.

This agreement will remain in effect for the life of the 2003 Agreement.

Sincerely,

/s/ Ron Williams
Executive Director – Labor Relations

AGREED:

/s/ James Short
Assistant to Vice President
CWA, District 13

[72]

**Treatment of Grievances Settled by the Parties or Arbitration Awards**
**Which Involve Backpay and/or Reinstatement**

**9-5-03**

If, as a result of the settlement of a grievance by the parties or an arbitration award, the grievant is to receive back pay and/or reinstatement following a discharge, layoff, demotion, or suspension, unless and to the extent the settlement or arbitration award specifies otherwise, the employee will be entitled to the following compensation and benefits, and no other compensation (other than any back pay awarded or agreed upon) or benefits:

1. In the case of a discharged employee reinstated to employment with full back pay, or regardless of the amount of back pay if the settlement or award specifies that the employee is to be "made whole" for the entire period off the payroll, the employee shall receive, less any applicable deductions: (a) full service credit under the pension plan for the period off the payroll, (b) reimbursement for the COBRA premiums the employee paid for medical, dental and/or vision coverage if the employee continued those coverage(s) under COBRA, or if the employee did not continue those coverage(s) under COBRA, reimbursement for premiums paid by the employee for medical, dental and/or vision coverage not to exceed the amount the employee would have paid as premiums for such coverage(s) had the employee elected COBRA coverage and reimbursement for out-of-pocket medical, vision and dental expenses if, under the provisions of the applicable plans, the employee would not have incurred these expenses if they had remained on the payroll. The appropriate Plan Administrator would determine which expenses would be reimbursable. Copies of bills and receipts for services provided must be submitted in order for the employee to be eligible for a reimbursement. (c) any Corporate Profit Sharing Award(s) the employee would have received but for the termination, (d) any Ratification Bonus the employee would have received but for the termination, (e) reimbursement for telephone-related services that would have been covered by Concession Telephone Service had the employee remained on the payroll, (f) recognition of the time off the payroll as "hours worked" for purposes of FMLA eligibility, and (g) if a reinstated employee was a participant in the Verizon Savings and Security Plan for Mid-Atlantic Associates, the Companies will deduct from any backpay awarded or agreed upon, the contributions the employee would have made based on the last election on file as of the date of the employee's termination, and the employee will receive the Companies match in his or her Savings and Security Plan account to which the employee would have been entitled proportionate to the employee's contribution.

2. A laid off employee who is reinstated as a result of a grievance settlement or arbitration award shall receive the compensation and benefits set forth in paragraph 1 irrespective of the amount of back pay the employee is to receive.

[73]

3. In the case of a discharged employee reinstated to employment with no back pay or partial back pay, pursuant to a settlement or award which does not specify that the employee is to be "made whole" for the entire period off the payroll, the employee shall receive, less any applicable deductions, the following, each of which will be prorated as specified: (a) prorated service credit under the pension plan for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, with immediate bridging of service, and (b) reimbursement for the COBRA premiums the employee paid for medical, dental and/or vision coverage if the employee continued those coverage(s) under COBRA, or if the employee did not continue those coverage(s) under COBRA, reimbursement for premiums paid by the employee for medical, dental and/or vision coverage not to exceed the amount the employee would have paid as premiums for such coverage(s) had the employee elected COBRA coverage and reimbursement for out-of-pocket medical, vision and dental expenses if, under the provisions of the applicable plans, the employee would not have incurred these expenses if they had remained on the payroll, based upon the employee's coverage at the time of the discharge, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed (The appropriate Plan Administrator will determine which expenses will be reimbursable. Copies of bills and receipts for services provided must be submitted in order for the employee to be eligible for a reimbursement), (c) any Corporate Profit Sharing Award(s) the employee would have received but for the termination, prorated according to Section 3 of the Corporate Profit Sharing Plan, so that the employee receives one-twelfth of the applicable Corporate Profit Sharing Award(s) for each full month's worth of backpay awarded, (d) any Ratification Bonus the employee would have received but for the termination, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, (e) reimbursement for telephone-related services that would have been covered by Concession Telephone Service had the employee remained on the payroll, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, (f) recognition of the time off the payroll as "hours worked" for purposes of FMLA eligibility, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, and (g) if a reinstated employee was a participant in the Verizon Savings and Security Plan for Mid-Atlantic Associates, the Companies will deduct from any backpay awarded or agreed upon, the contributions the employee would have made based on the last election on file as of the date of the employee's

[74]

termination prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, and the employee will receive the Company match in his or her Savings and Security Plan account to which the employee would have been entitled proportionate to the employee's contribution.

4. Any backpay awarded or agreed upon will be reduced by the amount of money the employee received under any governmental unemployment compensation program, and the amount of money the employee received from other employment, during the period the employee was discharged or suspended.

**VACATION SCHEDULING PERCENTAGES**

*PROCEDURE FOR THE SELECTION OF VACATIONS IN 1999:*

During 1999, at least 17% of the employees in each vacation administrative work group shall be permitted to schedule off in a given week.

*PROCEDURE FOR THE SELECTION OF VACATIONS IN 2000:*

During 2000, at least 18% of the employees in each vacation administrative work group shall be permitted to schedule off in a given week.

Where the application of the percentage figures specified above results in other than a whole number, the number yielded will be rounded up to the next whole number.

Regarding vacation availability during traditional fall hunting season and the December holiday season, management will make a reasonable effort to consider the need for higher vacation availability.

Those work groups whose vacation availability is currently greater than the percentages specified above, will not be required to reduce their vacation scheduling availability in 1999 and 2000.

[76]

July 27, 2000

Mr. Jim Short
Assistant to the Vice President
CWA District 13
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

**Voluntary Overtime in the Forced Overtime Build Agreement**

Dear Jim,

Where overtime limitations (caps) exist in the Mid-Atlantic States' jurisdictions, the Companies agree for the purposes of determining whether an employee has worked the specified overtime cap, voluntary overtime will count toward any such forced overtime cap. Upon request, the Union will assist in securing volunteers to work overtime. As a result of this commitment, the Union agrees to move any other existing overtime related issues and matters to the Common Issues table.

(s)Ron Williams

Executive Director
Labor Relations

Agreed:

(s) Jim Short
Bargaining Agent
Communications Workers of America

[77]

August 3, 2003

Mr. James Short
Assistant to Vice President
CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA 19103

Dear Mr. Short:

This will confirm our agreement during 2003 contract negotiations to establish a committee to discuss workplace issues in the Verizon Repair Resolution Center (VRRC) and Verizon Order Inquiry Center (VOICe) groups in Pennsylvania.

The VRRC/VOICe Workplace Issues Committee will be made up of no more than six representatives of the Company and six representatives of the Union. The Committee will include the Directors of the VRRC, the VOICe, and Labor Relations, or their designated representatives, and the Regional Vice Presidents of Local 13000.

The first meeting will occur within 90 days after the ratification of the 2003 contract, and shall meet quarterly thereafter. Any additional meetings will be arranged by mutual agreement. Meetings will be held at mutually agreed times and locations.

The Committee will discuss average handling time, adherence time, monitoring, scheduling, rotation of off-line positions, "wrap time", notification of forced overtime and review of Supervisory observations with employees, as well as any other subjects affecting the VRRC or VOICe the Committee may choose to discuss.

The Committee will be empowered to address workplace issues by joint agreement, including the initiation of trials in either or both work groups.

Trials or other initiatives implemented by the Committee will be undertaken without prejudice to either party's position on the underlying issues and will not set any precedent. Unless the Committee agrees otherwise, either party may terminate a trial after 30 days' notice to the other party.

This agreement will expire on the expiration date of the 2003 labor contract between Verizon Pennsylvania and CWA District 13, Local 13000.

Sincerely,

/s/ Ron Williams
Executive Director-Labor Relations

AGREED:

/s/ James Short
Assistant to Vice President
CWA, District 13

[78]

August 23, 2000

Mr. James J. Short
Assistant to Vice President
CWA, District 13, AFLCIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Short:

This will confirm our agreement in 2000 bargaining to establish a mechanism for discussing situations where the Union believes significantly new job duties will be, or have been, added to a job title, and the Union has a position over which title or titles should be assigned the work.

In these situations, either of the Union's Regional Vice Presidents may request a meeting with Labor Relations to discuss their concerns or viewpoints on the matter.

The process described in this letter will not affect the provisions of Article 31, "New Job Titles and Job Classifications".

Very truly yours,

/s/ Maryanne Crompton
Director – Labor Relations
Verizon Pennsylvania Inc.

Agreed:

(s) Jim Short
Assistant to Vice President


APPROVED:

(s)  Morty Bahr
President
Communications Workers of America

[79]

GENERAL INDEX

|  | Group 1 | Group 2 |
|---|---|---|
| Absence—Pay Treatment | | |
| Accident on Duty | 100 | 146 |
| Death in Family | 102 | 146 |
| Election Activity (Clerk, Inspector | | |
| or Judge) | 105 | 146 |
| Excused Work Days | 135 | 147 |
| Fatigue Time—excused | 94 | 94 |
| Holiday in Period of Absence | 98 | 146 |
| Illness | 99 | 146 |
| Jury Duty | 102 | 146 |
| Modified Duty | 100 | 146 |
| Pre-Admission Medical Tests | 106 | 146 |
| Quality of Work Life—Joint Meetings | 106 | 146 |
| Quarantine | 102 | 146 |
| Reasons Not Specified in Agreement. | 101 | 146 |
| Union Activity— | | |
| Excused Time | 11 | 11 |
| Joint Conference | 104 | 146 |
| Leave of Absence | 11 | 11 |
| Union Orientation Meeting | 106 | 146 |
| Visit to Medical Department or Local | | |
| Consultant | 102 | 146 |
| Voting Time | 104 | 146 |
| Witness—Court or Grand Jury | 102 | 146 |
| Administrative Groups | 71 | 71 |
| Agency Shop | 45 | 45 |
| Agreement Continuation (Letter - #1) | | |
| Amendments to Agreement | 33 | 33 |
| Arbitration | 33 | 33 |
| Arbitration Procedures | 160 | 160 |
| Arbitration, Expedited | 163 | 163 |
| Assignment of Employees | 73 | 73 |
| Working in Other States (Letter - #2) | | |
| BANDI (Letter–#3) | | |
| Basic Daily Wage Rate (Definition) | — | 144 |
| Basic Hourly Wage Rate (Definition) | 7,84 | 7,144 |
| Basic Weekly Wage Rate (Definition) | 6,84 | 6,144 |
| Benefits | 34 | 34 |

[I]

GENERAL INDEX

|  | Group 1 | Group 2 |
|---|---|---|
| Bi-Lingual Differential | 97 | 146 |
| Build-up of work week | 85 | 142 |
| Bulletin Boards | 15 | 15 |
| Call Out— |  |  |
|   Work time | 92 | 145 |
|   Travel Time | 110 | 145 |
|   Transportation Expense | 109,114 | 145 |
| Change of Tour (notice of) | 84 | 144 |
| Classification of Employees (Group) | 78 | 143 |
| Clerk of Election | 105 | 146 |
| Company Supervisor (Definition) | 7 | 7 |
| Compensation for Work time— |  |  |
|   Call-out | 92 | 145 |
|   Change of tours or hours (insufficient notice) | 82,83 | 142 |
|   Evening and Night Tour Differential. | 90 | 145 |
|   Excused Work Days | 135 | 147 |
|   Holidays | 88 | 147 |
|   Hours—excessive within 24 hour period (Fatigue Time) | 94 | 94 |
|   Hours in excess of 49 in a week | 86 | 144 |
|   In-Charge payment | 92 | 145 |
|   Part hours | 89 | — |
|   Non-scheduled time (week days) | 85 | 145 |
|   Normal | 84 | 144 |
|   Overtime | 86 | 144 |
|   Relief Periods | — | 143 |
|   Saturday Differential | 90 | 145 |
|   Scheduled time (week days) | 85 | 143 |
|   Special City Allowance | 95 | 145 |
|   Sunday hours | 88 | 144 |
|   Tour Change (insufficient notice) | 84 | 144 |
|   Training | 97 | 145 |
|   Work week build-up | 85 | 144 |
| Confidential Employees | — | 8 |
| Contract Labor | 35 |  |
|   (See Letter Agreements) |  |  |
| Contracting Initiatives (Letter - #12) |  |  |
| Court Witness | 102 | 146 |

[II]

# GENERAL INDEX

| | Group 1 | Group 2 |
|---|---|---|
| Death in Family | 102 | 146 |
| Deferral of wage increase | 168,169 | 168,169 |
| Definitions— | | |
|   Basic Daily Wage Rate | — | 144 |
|   Basic Hourly Wage Rate | 7,84 | 7,144 |
|   Basic Weekly Wage Rate | 6,84 | 6,144 |
|   Employee | 5 | 5 |
|   Employee Classification (Group) | 78 | 143 |
|   Full Day Tour | 77 | 141 |
|   Full Evening Tour | 77 | 141 |
|   Full-Time Employee | 79 | 143 |
|   Generic Terms | 8 | 8 |
|   Holiday Tours | 88 | 145 |
|   Part Day Tour | 77 | 141 |
|   Part Evening Tour | 78 | 141 |
|   Night Tour | 78 | 142 |
|   Normal Work Week | 78 | 142 |
|   Occasional Employees | 159 | 159 |
|   Payroll Location | 7 | 7 |
|   Regular Full-Time Employee | 79 | 143 |
|   Regular Part-Time Employee | 148 | 155 |
|   Sunday Tour | 88 | 143 |
|   Temporary Employees | 158 | 158 |
|   Term Employees | 160 | 160 |
|   Time Required for Notice (Written) | 7 | 7 |
|   Titles of Company Supervisors. | 7 | 7 |
|   Union Representative. | 7 | 7 |
|   Work Week Build-Up | 85 | 144 |
| Demotions for Misconduct, Discharges & Suspensions | 31 | 31 |
| Differential | | |
|   -Evening and Night Tours. | 90 | 145 |
|   -Saturday Tours | 90 | 145 |
|   -Bi-Lingual | 97 | 146 |
| Discharges | 32 | 32 |
| Discrimination — for Union Activity | 32 | 32 |
| Dispatching by Barg. Unit Employees (Letter– #13) | | |
| Dispatching Serv. & Splicing Techs. on Repair (Letter - #14) | | |
| Dues deduction (or payments in lieu) | 9 | 9 |

[III]

GENERAL INDEX

|  | Group 1 | Group 2 |
|---|---|---|
| Duration of Agreement | 74 | 74 |
| Employment Security Training | 61 | 61 |
| Enhanced Income Security Plan | 48 | 48 |
| Establishment of New Job Titles and Job Classifications | 54 | 54 |
| Establishment of new location | 16 | 16 |
| Evening Tour—Definition | 77 | 141 |
| Evening and Night Tour Differential | 90 | 145 |
| Excused Time—Union Business | 11 | 11 |
| Excused Work Days | 135 | 147 |
| Short Notice (Letter - #52) | | |
| Expedited Arbitration | 163 | 163 |
| Expense Reimbursement— | | |
| Temporary Transfer | 115 | 147 |
| Permanent Transfer | 118 | 147 |
| Fatigue Time | 94 | 94 |
| Federal or State Laws (effect on Agreement) | 33 | 33 |
| Flextime (Letter - #15) | | |
| Four Day Work Week (Letter - #17) | | |
| Generic Terms (Use of male/female pronoun) | 8 | 8 |
| Grievances (Procedure) | 25 | 25 |
| Group 1 Employees (Definition) | 78 | — |
| Group 2 Employees (Definition) | — | 143 |
| Hiring Above Start Rate | 169 | 169 |
| Holidays— | | |
| List of | 134 | 134 |
| Definition of Holiday time | 88 | 147 |
| During period of absence | 98 | 147 |
| Floating holiday—selection | 134 | 147 |
| Floating holiday—change of selection | 134 | 147 |
| Holiday in Vacation | 127 | 147 |
| Worktime compensation | 88 | 147 |
| Home Garaging (Letter - #19) | | |
| Illness Absence | 99 | 146 |
| IME  Reports (Letter – #20) | | |

[IV]

## GENERAL INDEX

|  | Group 1 | Group 2 |
|---|---|---|
| In-Charge Payment | 92 | 145 |
| Income Security Plan | 48 | 48 |
| Inclement Weather | 46 | 46 |
| Inspector of Election | 105 | 146 |
| Inter-Company Transfers (Letter– #21) | | |
| Investigatory Interviews (Letter– #22) | | |
| Issues Resolution (Letters – #6, #41) | | |
| Job Stewards (Status of) | 43 | 43 |
| Joint Conference Time | 104 | 146 |
| Judge of Election | 105 | 146 |
| Jury Duty | 102 | 146 |
| Laundry Expense | 116 | 146 |
| Layoffs—Part Timing (Procedures) | 16 | 16 |
| Leave of Absence—Union Business | 11 | 11 |
| Limitations on Contracting Out (Letters – #5, #6, #7, #8, #9, #10, #11, #12) | | |
| Limited Extension Agreement (Letter – #27) | | |
| Loans to Another Company (Letter - #35) | | |
| Loans to Equivalent or Lower Occupation (Letter– #35) | | |
| Location (establishment of new) (Art. 7) | 15 | 15 |
| Lodging Expenses (Temporary Transfer) | 115 | 147 |
| Meal Expenses (Temporary Transfer) | 115 | 147 |
| Mediation (Letters - #32, #33) | | |
| MD Work–Use of Contract Labor (Letters - #8, #9) | | |
| Modified Duty | 100 | 146 |
| Motor Vehicle Usage Program | 68 | 68 |
| Moving Expense (Permanent Transfer) | 118 | 147 |
| New Job Title/Classification | 54 | 54 |
| Night Tour (Definition) | 78 | 142 |
| Night and Evening Tour Differential | 90 | 145 |
| Non-Discrimination | 45 | 45 |
| Notice of Change of Tours or Hours | 83 | 143 |
| Occasional Employees | 159 | 159 |
| On-Call Assignment (Letter - #36) | | |

GENERAL INDEX

| | Group 1 | Group 2 |
|---|---|---|
| One Trip Concept (Letter– #37) | | |
| Organizational or Operating Units (Establishment of) | 7 | 7 |
| Outside Craft Working in Unattended C.O. (Letter– #38) | | |
| Overtime Administration | 86 | 146 |
| – Financial (Letter–#39) | | |
| – Voluntary OT in Forced OT Build (Letter– #64) | | |
| Overtime (See Compensation) | 84 | 144 |
| Part Hours Worked | 89 | 145 |
| Part-Time Employees | | |
| Definition | 148 | 155 |
| Part-Time Employees (Engaged After 1-1-81) | 151 | 159 |
| Regular Part-Time Employees (Engaged Prior to 1-1-81) | 148 | 155 |
| Temporary Part-Time | 158 | 158 |
| Part-Timing—Lay-Offs—Procedures | 16 | 16 |
| Payroll Location (Definition) | 7 | 7 |
| Per Diem | 115 | 147 |
| Pension Bands and Monthly Benefits | 221 | 221 |
| Pensions & Benefits | 34 | 34 |
| Permanent Transfer | 36 | 36 |
| Personal Automobile—Use of | 121 | 147 |
| Personnel Record (discipline related items) | 47 | 47 |
| Posting—Worktime Schedules | 79 | 143 |
| Pre-Admission Medical Tests | 106 | 146 |
| Progression Increases Deferred | 168,169 | 168,169 |
| Promotions | 44 | 44 |
| Promotions, Temporary | 52 | 52 |
| Quality of Work Life—Joint Meetings | 104 | 146 |
| Quarantine—Authorized | 102 | 146 |
| Reassignment Pay Protection Plan. | 56 | 56 |
| Recognition—Bargaining Agent | 8 | 8 |
| Regular Full-Time Employee (Definition) | 79 | 143 |

[VI]

GENERAL INDEX

|  | Group 1 | Group 2 |
|---|---|---|
| Reimbursement—Incidental Expense (See Expense Reimbursement) | 115 | 147 |
| Relief Periods | — | 143 |
| Retroactivity of Awards | 42 | 42 |
| Safety | 40 | 40 |
| Safety Glasses (Letter - #47) | | |
| Saturday Differential | 90 | 145 |
| Schedules—work time—posting | 80 | 143 |
| Scheduling of Time Off | 137 | 147 |
| Seniority (Letter - #50) | | |
| Service Bridging (Letter – #51) | | |
| Service Quality and Supervisory Observing | 67 | 67 |
| Short Notice EW Days (Letter - #52) | | |
| Special City Allowance | 95 | 145 |
| Staffing Information (Letter– #53) | | |
| – Advertising & Classifying Job Vacancies | | |
| – Internal vs. External Candidates | | |
| – Freezing Lateral Movement | | |
| – Reports | | |
| Stress Committee (Letter - #58) | | |
| Sunday Hours (Definition) | 88 | 144 |
| Suspensions | 31 | 31 |
| Technological Displacement | 60 | 60 |
| Technology Change Committee | 58 | 58 |
| Temporary Employee (Definition) | 158 | 158 |
| Temporary PartTime Employee | 159 | 159 |
| Temporary Promotions | 52 | 52 |
| Term of Agreement | 74 | 74 |
| Term Employees | 160 | 160 |
| Titles—Occupational | 139 | 147 |
| Time Off, Scheduling & Selection | 137 | 148 |
| Tours | | |
|    Changes | 84 | 144 |
|    Definition | 77 | 141 |

GENERAL INDEX

|  | Group 1 | Group 2 |
|---|---|---|
| Schedule Selection (Letter - #61) | | |
|    Selection | 80 | 144 |
| Training Payment | 97 | 145 |
| Training, Employment Security | 61 | 61 |
| Transfers Due to Job Related | | |
|    Disability | 53 | 53 |
| Transfer—Permanent | 36 | 36 |
| Transfer—Temporary | 115 | 147 |
| Transfer and Promotion—Union Representative | 14 | 14 |
| Transportation Expense | 116 | 147 |
| Travel Expense (Meals, Lodging—Noncommuting) | 115 | 147 |
| Travel Time—General | 107 | 147 |
|    Call-Out. | 92 | 147 |
|    Temporary Assignment, commuting. | 111 | 147 |
|    Temporary Assignment, noncommuting | 113 | 147 |
|    Vacation during noncommuting assignment | 113 | 147 |
|    Permanent Transfer | 115 | 147 |
| Union Business—Excused Time | 11 | 11 |
| Union Business—Leave of Absence | 11 | 11 |
| Union Bulletin Board | 15 | 15 |
| Union Dues Deduction (or payment in lieu of). | 9 | 9 |
| Union Orientation | 106 | 146 |
| Union Recognition | 8 | 8 |
| Union Representative (Definition) | 7 | 7 |
| Union Representation (Disciplinary interviews) | 47 | 47 |
| Union Representative—Promotion and Transfer. | 14 | 14 |
| Union Security—Agency Shop | 45 | 45 |
| Vacation— | | |
|    Amount in accordance with service | 126 | 147 |
|    Carry-over (and Matching) | 131 | 147 |
|    Cash allowance in lieu of vacation | 133 | 147 |
|    Day-at-a-Time (Reserve Week) | 130 | 147 |
|    Discharge | 133 | 147 |
|    Half Days. | 130 | 147 |
|    Holiday. | 127 | 147 |
|    Jury duty during vacation | 133 | 147 |
|    Lay-off | 16,133 | 16,147 |

[VIII]

GENERAL INDEX

|  | Group 1 | Group 2 |
|---|---|---|
| Leave of Absence—Military .................. | 132 | 147 |
| Leave of Absence—Other. .................... | 133 | 147 |
| Non-commuting assignment.................. | 113 | 147 |
| Pay rate applicable to vacation ................. | 125,132 | 147 |
| Posting vacation assignments .................. | 131 | 147 |
| Reschedule (due to absence) ................. | 127,132 | 147 |
| Resignation ............................... | 133 | 147 |
| Retirement. ............................... | 133 | 147 |
| Scheduling ................................ | 137 | 147 |
| Selection of (Seniority) ..................... | 129 | 147 |
| Scheduling Percentages (Letter– #63) |  |  |
| Union/Management consultation prior to selection .. | 128 | 147 |
| Voting Time ................................. | 104 | 146 |
| Wages ...................................... | 15,167 | 15,167 |
| Hiring Above Start Rate ...................... | 169 | 169 |
| Defer Progression Increases ................... | 168,169 | 168,169 |
| Wage Increase Schedule Administration ........... | 167 | 167 |
| Wage Zones ................................. | 177 | 177 |
| Weather—Inclement ......................... | 46 | 46 |
| Witness—Court or Grand Jury. ................. | 102 | 146 |
| Work Week (Definition of) .................... | 78 | 142 |
| Working Conditions— |  |  |
| Occasional Employees ....................... | 159 | 159 |
| Part-Time Employees ........................ | 148 | 155 |
| Temporary Employees ....................... | 158 | 158 |
| Worktime Schedules— |  |  |
| Change after posting ........................ | 82 | 143 |
| Notice of Change. ........................... | 82 | 143 |
| Posting ................................... | 79 | 143 |
| Selection—Seniority ........................ | 80 | 143 |
| Workweek Buildup .......................... | 85 | 144 |
| Zones (Wage) ............................... | 177 | 177 |

TITLE CHANGES EFFECTIVE 8-10-80

| Old | New |
| --- | --- |
| Attendant | Building Custodian |
| Communications Installation/ Repair Technician | Services Technician |
| Data Technician | Systems Technician—Data |
| General Utility Worker | Materials Service Attendant Associate |
| House Service Attendant | Building Custodian Associate |
| Mechanic | Automotive Mechanic |
| PBX Installation Technician | Systems Technician |
| PBX Repair Technician | Systems Technician |
| Radio Technician | Systems Technician—Radio |
| Senior Utility Worker | Materials Service Attendant |
| Senior Utility Worker—A | Driver—Heavy Equipment |
| Supply Service Attendant | Materials Service Coordinator |
| Utility Maintenance Mechanic | Building Equipment Mechanic |
| | Maintenance Administrator (effective 1-1-81) |
| | Storekeeper |
| | Support Systems Attendant (effective 9-2-79) |

[X]

## TITLE CHANGES EFFECTIVE 8-10-80

| **Old** | **New** |
| --- | --- |
| Central Office Repairman | Radio Technician |
| Clerk | General Clerk |
| Combination Man | Combination Technician |
| Communications Serviceman | Communications Installation/Repair Tech. |
| Deskman | Test Desk Technician |
| Frameman | Frame Attendant |
| Frameman-A. | Frame Attendant-A |
| General Utility Man. | General Utility Worker |
| Lineman | Outside Plant Technician |
| Mail Carrier. | Office Clerical Assistant |
| PBX Installer. | PBX Installation Technician |
| PBX Repairman | PBX Repair Technician |
| PBX Repairman (Metro). | Data Technician |
| Senior Utility Man | Senior Utility Worker |
| Senior Utility Man-A | Senior Utility Worker-A |
| Splicer | Splicing Technician |
| Splicer's Helper. | Splicing Technician's Helper |
| Supplies Service Man | Supply Service Attendant |
| Switchman. | Switching Equipment Technician |
| Utility Maintenance Man | Utility Maintenance Mechanic |

[XI]

NOTES

[XII]

This amended Agreement contains the provisions of the following Agreements:

**Date Effective**

| Date of Execution | Other | Wages | Date of Termination |
|---|---|---|---|
| 5/19/43 | 5/17/43 | 9/ 5/43 | 5/16/44 |
| 9/ 5/45 | 9/ 5/45 | 10/21/45 | 9/ 4/46 |
| 10/29/45 | 10/29/45 | 11/18/45 | 10/28/46 |
| 2/ 8/46 | 2/17/46 | 2/17/46 | 2/ 7/47 |
| 3/28/46 | 4/ 7/46 | 4/ 7/46 | 4/ 7/47 |
| 5/ 1/47 | 5/18/47 | 5/18/47 | 4/ 7/48 |
| 6/ 8/48 | 7/ 4/48 | 7/ 4/48 | 7/ 1/50 |
| 10/ 8/48 | 10/17/48 | 10/17/48 | 7/ 1/50 |
| 7/ 1/50 | 7/16/50 | 7/16/50 | 6/29/51 |
| 10/11/50 | 10/22/50 | 10/22/50 | 4/25/52 |
| 12/ 8/51 | 12/ 9/51 | 12/ 9/51 | 10/28/52 |
| 10/30/52 | 10/26/52 | 12/21/52 | 10/30/53 |
| 10/31/53 | 11/22/53 | 11/22/53 | 10/28/54 |
| 11/ 5/54 | 11/14/54 | 11/14/54 | 11/ 2/55 |
| 11/ 2/55 | 11/13/55 | 11/13/55 | 2/ 6/57 |
| 2/ 6/57 | 2/10/57 | 2/10/57 | 4/30/58 |
| 5/ 2/58 | 5/18/58 | 5/18/58 | 4/29/59 |
| 4/30/59 | 5/ 3/59 | 5/ 3/59 | 7/27/60 |
| 8/ 4/60 | 8/ 4/60 | 7/31/60 | 8/ 2/61(*) |
| 8/10/61 | 8/ 9/61 | 8/13/61 | 8/ 9/62(*) |
| 8/14/62 | 8/14/62 | 8/12/62 | 8/14/63 |
| 8/15/63 | 8/15/63 | 8/18/63 | 10/14/64(*) |
| 10/22/64 | 10/20/64 | 10/25/64 | 10/20/65(*) |
| 11/23/65 | 11/23/65 | 11/21/65 | 10/26/66 |
| L10/26/66 | 10/23/66 | 10/23/66 | 4/24/68(*) |
| + 5/14/68 | 5/14/68 | 5/12/68 | 5/11/69 |
|  |  | 5/10/70 | 5/12/71 |

*) Wage Reopener

(L) 3 year agreement, terminating 10/22/69.

(+) Full agreement negotiated in lieu of 4/24/68 wage reopener

# EXHIBIT B

**OPINION AND AWARD**

In the Matter of the Arbitration

between

**VERIZON PENNSYLVANIA, INC.**

and

**COMMUNICATIONS WORKERS OF AMERICA**

CWA Arbitration No. 13-2008-058V
Verizon Case No. 0052-08

BEFORE a tri-partite Board of Arbitration:

Barbara Zausner, Impartial Arbitrator
Paul LoConte, Verizon Arbitrator
Michael P. Davis, CWA Arbitrator

AWARD DATED: July 7, 2016

APPEARANCES

Jones Day
Attorneys for the Company
By, E. Michael Rossman, Esq.

Willig, Williams & Davidson
Attorneys for the Union
By, Nancy B. G. Lassen, Esq.
     Danielle K. Newsome, Esq.

## ISSUE

Did the Company violate Articles 2,7,8,17 or 41 of the collective

bargaining agreement by setting up and implementing a process to deliver set

top boxes to existing customers by common carrier for customer self-

installation? And if so, what shall be the remedy?

1

## PROCEDURAL BACKGROUND

On February 25, 2008, the Union filed a grievance at the Executive Board level that alleges: "The Company is offering customers a self-installation process for video set top boxes. These set top boxes are owned, operated, and maintained by Verizon. Therefore, all work associated with the set top box must be performed by CWA members." When the grievance was moved to arbitration, Articles 2, 7, 8, 17, and 41 were specified. The parties agreed that I should frame the issue.

The above named arbitration board held a hearing on December 10, 2015. Both parties filed briefs. We held an executive session on June 29, 2016, at which time we closed the record.

## DISCUSSION AND OPINION

Article 17, "Contract Labor," Section 17.01 provides:

> The Company will maintain its established policies as to the assignment of work in connection with the installation and maintenance of communications facilities owned, maintained and operated by the Company.

At issue in this grievance, as articulated by the Union, is "that Verizon began to offer customers a process whereby they would receive and self-install ... set top boxes. These are existing customers who [already] have a FiOS service...." According to the Union, Verizon "completely chang[ed] the way that

2

the work was done in terms of delivering and installing set top boxes to existing FiOS customers." (Tr., pp. 7-9).

*Summary of testimony*

Jeff Reamer has been Executive Vice President of Local 13000 since 2008. He was employed by Verizon in 1988. From 1991 to 2000 he worked as a Service Technician. He then assumed a System Technician position. He was the Unit 25 president from 2005 to 2008. That Unit "encompasses most of Eastern Pennsylvania and Bucks County," including Doylestown. (Tr., p. 22). The FiOS product was deployed in mid-2004 in the Doylestown area.

Mr. Reamer described FiOS as "a fiberoptic network that … provides services that the … ordinary copper network … could not provide," including high speed data, voice and video." (Tr., p. 23). The network (and initial set top box) was installed and is serviced and maintained by members of Local 13000. In Mr. Reamer's view, the set top box "is owned, operated and maintained by Verizon." It is "a communications device that interfaces directly with the customer's television. It's the very end of the Verizon network." (Tr., p. 24). Customers rent the boxes, for which they pay a monthly fee.

After the initial install of a set top box, "service technicians provided every bit of the service to the customers by delivering … installing … and replacing the set top box." (Tr., p. 26). In the 2004, 2005 period, "service technicians would take out a new box or … diagnose that the box was defective and [would] replace it with [a] box they had on their truck."  (Tr., p. 26).

3

The order for a new box was stocked by a storekeeper and loaded on a truck. The truck driver would transport the boxes to various locations. A "service technician would get an order for a set top box and get it from the storekeeper." (Tr., p. 32). At about the end of 2007, the Company began direct shipping the set top boxes to Verizon customers using various vendors and shipping by common carrier. Customers can install the boxes themselves if they so choose or use a service technician for a fee.

According to Mr. Reamer, "the Union [is not] challenging the delivery portion of the process for customers who actually pick up their own box. The Union's issue with the arrangement is that, "From the inception of FiOS in 2004, our bargaining unit members performed every facet of the installation of [all] of these set top boxes, including going out to the customer with the set top box, installing it, swapping it, upgrading it." Verizon "changed that established policy or practice and began using someone other than a Local 13000 bargaining unit member to begin delivering the set top boxes" and allowing customers to install the boxes. (Tr., p. 35). There was no notice to the bargaining unit initially. The first notice the Union received from the Company about the "customer self-installation option" was in November 2007. (U-5, email from Ms. Crompton). The self-install option was available "to existing FiOS customers for adds, upgrades, downgrades or swaps." (Tr., p. 37).

Mr. Reamer testified that a set top box is required equipment for FiOS TV. "Everything the customer does through a set top box is a signal that is

4

transmitted back … through the Verizon FiOS network. Your set top box is the very end of the FiOS network." (Tr., p. 55). Customers get access to features of their telephone service through the set top box. These features include caller ID, voice mail, billing, etc. The system is not functional for video unless the set top box is installed in the FiOS network. Both the service technician and storekeeper jobs are plant job titles.

Asked on cross examination where the demark[1] is in the FiOS network, Mr. Reamer said it is the optical network terminal "where the fiberoptic line terminates at the customer's house." He said the ONT is not necessarily "where Verizon's FiOS network ends … and the customer's equipment begins." In the Union's view, "in the case of a video, where there is a set top box at the end of that segment when the customer has video … the set top box all the way back through to Verizon's Central Offices is the fiberoptic network." He agreed that wiring is customer owned equipment as is the television set, and the router, etc. (Tr., p. 63). Technicians do not repair defective set top boxes.

On cross examination, Mr. Reamer agreed the Union is not challenging the pick up or return of set top boxes by customers. Asked if the Union is challenging the customer's actual installation or setting up the box in their home, he replied, "We are challenging the delivery, circumventing the bargaining unit and not having a Local 13000 technician go out, deliver, and install and/or swap out the box." (Tr., p. 59). There is no objection to

---

[1] Short for demarcation, demark is alternately spelled demarc by the parties.

customers picking up the boxes and taking them home. When customers set up the box, the Union "believe[s] that is bargaining unit work." The Union objects to the use of "an outside vendor ... sending [the box] through common carrier to [a] customer [because that] is bargaining unit work." (Tr., p. 60).

Barry Davis began working in staff support for technicians who install and maintain DSL in 2004. He is no longer part of regional staff but still has responsibilities for DSL support in the Pennsylvania-Delaware area. DSL has been offered in Pennsylvania since 1998. The DSL signal "originates in the Central Office. It travels toward the customer on copper cable facilities." The cable "terminates in a network interface" (NID) that "acts as a demark between the customer's facilities and Verizon's facilities." According to Mr. Davis, the NID is the demark and "is where Verizon's network ends and the customer's equipment begins." (Tr., pp. 74-75).

Mr. Davis testified, in 1998 or 1999 when the Company first started offering DSL in Pennsylvania, the sales department would "initiate the shipment of a self-install kit to the customer." (Tr., p. 76). It was sent by "a carrier such as UPS." The kit contained filters, the router, the router's power supply, a phone cable and an ethernet cable. The Company still offers DSL in Pennsylvania and still offers the self-install option." (Tr., 78).

Mr. Davis testified about the Guardian Plan, an insurance plan for the customer's inside wire and jacks as well as single line phone sets. If repairs are needed on the inside wire, and the customer has the Guardian Plan, a Verizon

6

technician completes the repairs at no cost. If the customer had a defective telephone, the Company offered to ship a loaner phone set that the customer installed. The customer can return the set to Verizon by common carrier.

On cross examination, Mr. Davis agreed that the materials shipped in the Guardian self-install kit are devices owned by the customer. There is no monthly fee for use of the equipment. The loaner phone is not owned by Verizon. An outside vendor supplies that and the customer can buy it if they so choose.

Sherry Hessenthaler has worked for Verizon for more than thirty years. From 2007 until January 2009, she had responsibilities supporting the FTTP, Fiber To The Prem, program. The Company "built out a brand new network ... from our Central Office to a customer's premise, with the intent to provide them service over that fiber network versus our traditional copper network. The services were primarily data and video." (Tr., p. 86).

FiOS TV was first offered in Pennsylvania in about the fourth quarter of 2006. There were a "couple hundred" households with FiOS service in 2007; there are about 2.9 million households at present. Asked what's involved in getting a TV signal to the customer, Ms. Hessenthaler said they "basically bring the content signals into the video hub office" and then through a network to a video servicing office. The VSO is where they put the optical network terminals. Cable runs from the wire centers to fiber distribution hubs that service various residences. The Company provides "a FiOS service drop

7

from that terminal to the customer's prem." (Tr., p. 90-91). The set top box, which is on the customer side of the ONT, is customer premise equipment like the inside wiring, the routers, etc. The customer selects the content at the set top box.

Ms. Hessenthaler testified that repairs to the set top box are done by the manufacturer that provided them. Self-install of different types of boxes was made available early in 2007. The Company "did not offer video service in Pennsylvania until the fourth quarter of 2006." She agreed that "a customer would have to have a set top box to get video service." (Tr., p. 101). To obtain another type of set top box, a customer would deal with a Verizon sales center. The customer could be shipped a box, or could pick it up from Verizon and have a technician install the box for a fee.

If the set top box is mailed, Verizon incurs the cost. Common carriers handle and deliver the boxes. Verizon transmits the order to CTDI, one of its vendors. The vendor ships the set top box out based on information provided by Verizon. Asked if the set top boxes are "proprietary devices that are owned by Verizon," Ms. Hessenthaler said they are owned by Verizon Online, a wholly owned subsidiary of Verizon. (Tr., p. 116). The set top box is "owned by Verizon" but the other supplies provided to the customer along with the self-install kit are given to the customer; there is no charge for them. (Tr., p. 118).

Drop shipping of the set top boxes began during the fourth quarter of 2007. Prior to that time, if "a customer upgraded, swapped, exchanged or had

a repair on a set top box, then a service technician and a truck would take that box to the customer's house...." The customer could also pick up the box at a local Presence Center. "There was no mail delivery option during that period of time." (Tr., p. 119). Verizon has a "contractual arrangement with CTDI whereby CTDI is compensated for shipping the kits ... to Verizon customers." (Tr., pp. 120-121). Verizon transmits a video signal and the set top box receives those signals. The box transmits a signal back when, for example, a customer orders a pay-per-view program. The set top box is a "Verizon asset and it's utilizing made-for-Verizon services." (Tr., p. 124).

Michael Freeston, a Services Technician, testified on rebuttal. He started in that job in November 2006. He testified the services technicians did not know about direct shipping of set top boxes until early in 2008. Before boxes were shipped, technicians carried "a stockpile on the truck...." They had "extra boxes" to replace defective ones, upgrades, or swaps. Those were being delivered and installed by him in the field in 2006 and 2007.

Mr. Freeston said the set top boxes have programmed content that is maintained by Verizon. They are "loaded" "through the Verizon network" depending on what the customer orders. Upgrades, updates and additional program content that is transmitted to the set top boxes in customers' residences comes from the video service office through the ONT, "through the internal, and goes to the box but its driven from our video service office...." (Tr., p. 129). Technicians go to customer locations where there is an issue with

9

firmware not downloading or not loading properly. They may "reload the entire firmware application or replace the box." He still carries set top boxes on his truck that he gets from the Company storeroom keeper. (Tr., p. 129-130).

***Positions of the Parties***

<u>Union</u>

The Union points to the analysis in the Garrett Award interpreting Article 17.01: "Wherever the evidence shows an established policy [that] contemplates the performance of a given type of installation or maintenance work by bargaining unit personnel, that policy must be maintained in force for the term of the parties' Agreement." The meaning of "phrases such as 'established policies,' and 'communications facilities'" is to be "ascertained … on the basis of the parties' own conduct in applying Section 17.01…." (Garrett, 1430 0422 72, 1973, p. 32).

The Aiges Award discusses the three elements that must be shown on the record. There must be "an established policy as to the assignment of work," "the work must be in connection with the installation and maintenance of communications facilities," and "the communications facility must be owned, maintained and operated by the Company. (Aiges, 1988, p. 11).

According to the Union, it has "established" the three elements "required by Article 17.01." "Local 13000 bargaining unit members were assigned to deliver the set top boxes to already existing customers who wanted to replace,

upgrade or add boxes to the FiOS TV service." That was the *status quo* when the Company "began directing a contractor to drop deliver the set top boxes, thereby cutting out the bargaining unit's delivery work." There was no "significant change to conditions … that completely eliminate[d] the need to have the functions performed." The work "continues but "it is now assigned to UPS and other common carrier employees" instead of Local 13000 bargaining unit members.

The Union contends Verizon controls the vendor of the set top box who receives customer information from Verizon and is directed by Verizon to ship the set top box to the customer. The customer pays rent to Verizon for the box. The "basic [delivery] work" is performed by the contractor; it continues to be done. The Union cites the Christenson Decision regarding another matter, that "delivery, inventorying and related duties have not been eliminated although changed in nature." (Christenson, 1430 0626 83, 1984, p. 18). "[The] need to perform the work has not been eliminated;" it still exists and is performed by UPS or another common carrier.

The Union distinguishes the delivery of Guardian phone sets and DSL self-installation kits by common carrier because "neither the Guardian Plan loaner phones nor DSL routers are owned by the Company." (Brief, p. 12). The fact that customers pay rental fees for set top boxes shows that the boxes are "owned, operated, and maintained by Verizon." (Brief, p. 12).

The Union also contends the "set top boxes are indisputably a

communications facility: they are a proprietary component of the FiOS TV network, without which a subscriber cannot transmit communications or receive communications via signals from Verizon." "FiOS is the 'gatekeeper' for customer access to products and services." (Brief, p. 13).

In the Union's view, and in this context, the set top box is "analogous to company-owned telephone sets: the end point of transmission which makes communication possible." (Brief, p. 13). Set top boxes are "essential or 'absolutely required in order that' communication can occur." (Quoting from Garrett, p. 4). Other arbitrators have "repeatedly found that telephone sets owned by the Company were a communications device, the delivery of which falls under the coverage of Article 17.01. (Brief, p. 15, citing Gill (1430 0842 74, 1977); Galfand (1430 2121 80, 1982), and Dunsford. (Gr. No. 13-85-65A, 1986). The delivery of a "Company-owned communications facility ... is the elementary first step to installation and maintenance and falls squarely within the scope of Article 17.01." (Brief, p. 15).

The Union points to the prior awards, which "stand for the proposition that delivery is a specific job function protected by 17.01, such that the Company cannot use outside contractors to perform the work." (Brief, p. 16, citing Stone, (1430 0897 75, 1982, re delivery of air tanks to pole locations) and Gill, (re paying an apartment maintenance man to retrieve and return telephones for a fee).

The Union also cites Handsaker (14300 1762 84, 1985) who followed

12

Christensen and Galfand in finding violations of 17.01 when material is transported to the job site by common carriers. The Union concludes on this point, "the delivery of set top boxes is work in connection with the installation and maintenance of communications facilities within the ambit of Article 17.01. Verizon has an obligation … to use Local 13000 bargaining unit personnel to deliver the set top boxes, or obtain Local 13000's agreement to a different arrangement." (Brief, p. 17).

Finally, the Union reiterates, the "set top boxes are owned, operated and maintained by the Company." "They are proprietary units" leased to customers and from which "Verizon derives revenue." (Brief, p. 18). The customer orders the service from Verizon. The box is drop-shipped in accordance with Verizon's direction to CTDI and is "branded with Verizon's logo" among other indicia noted above." In the Dunsford case, the arbitrator rejected Verizon's denial of ownership where "the customer … ordered the equipment from the Company, the Company directed and paid for shipment, and therefore, the Company owned the equipment until it was installed." (Brief, p. 19). In this case, the Company controls the repair and "engages in direct maintenance of set top boxes through regular updates and programming."

As remedy, the Union seeks an order to the Company immediately to "cease and desist from delivery of set top boxes by anyone other than Local 13000 bargaining unit members, except pursuant to agreement with Local 13000" and "compensation for all affected bargaining unit members at

13

overtime rates, retroactive to the date that the Company first improperly implemented delivery for customer self-installation ... in November 2007...."  It cites the Rubin, (1430 0839 74), McDermott (1430 1030 73) and Garrett Awards. (Brief, p. 21).

Company

The Company maintains "since the inception of FiOS TV service in Pennsylvania, the Company has given customers ... the option of self-installing set top boxes in certain circumstances." (Brief, p. 1). Customers want and expect this option. The installation is simple. The Union is mistaken that Article 17 prohibits this. The Company cites prior cases that "make clear that Article 17 does not regulate what customers do in their own homes." "A customer is not a contractor." "The 'established policy' that the Company is to maintain under the parties' Contract Labor provision ... allows for self-installation of set top boxes if that is something that the customer wants." (Brief, pp. 2-3).

The Company claims its established practice has been to permit self-installs of FiOS set top boxes and "DSL routers and filters, traditional telephones, and all sorts of equipment." The bargaining unit technicians "are not delivery people. They are skilled craftspeople who may carry equipment incidentally to their own work, but they do not deliver equipment for others." (Brief, p. 4). "Article 17 does not reach customers [and] does not reach self-installs." (Tr., p. 70)

14

The Company emphasizes the "highly competitive environment" in which it operates. It must also maintain "a level of service and convenience that exceeds that of its competitors." (Brief, p. 6).

In the Company's view, the network "ends at the customers' Optical Network Terminals." The set top boxes are "inside the customer's home and squarely on the customer's side of the demarc." (Brief, pp. 6-7). Other such equipment includes, "The customer's inside wiring, wall jack, set top box, television, computer, router, gaming system, audio system, and the cabling connecting these items." (Brief, p. 7, fn 1). "Particularly when replacing or upgrading a set top box – customers prefer to perform the [installation] process by themselves" because it is "more convenient than scheduling, waiting for, and paying for an in-home service appointment." "From day one, a customer needing to replace a defective set top box or wanting an upgraded box could pick one up at a Company Local Presence Center and install the box himself or herself." The Company began shipping set top boxes for self-installation at the end of 2007. (Brief, p. 8).

The Company points to other items that customers have the option of self-installing. When DSL was made available in 1998, self-installation of filters and routers was permitted. In 1985, when the Guardian Plan was introduced for customer inside wire, wall jacks and telephone sets, the Company began shipping loaner replacement phones to customers. They could purchase the phones after the loaner period or ship them back to the

15

Company.

The Company argues the Union has not met its burden of proving a violation of Section 17.01. It points to the language on its duty to "maintain its established policies as to the assignment of work in connection with the installation and maintenance of communications facilities owned, maintained and operated by the Company." The term "'established policies' was not meant to be interpreted [in a] fixed and immutable manner but rather so as to accord the Company freedom to modify its policies in light of significant changed conditions, including changes in business conditions, technology, personnel, collective bargaining attitudes, and other factors which might contribute to change or evolution of established policies." (Quoting from the Gorman Decision, AAA 14 300 00577, p. 3).

The Company asserts, "When it comes to customer self-installation of set top boxes in their own homes, the Union cannot establish any of [the Article 17] elements." The Company cites the Strongin Award (AAA 14 30 1878, p. 4), "allowing self-installation of telephone cords mailed via common carrier," and the Seitz Award (1430 1013 76, pp. 19-22) "finding 'no merit' to the similar contention where customers installed and activated their telephone." (Brief, p. 12). Seitz held that a customer "carrying home and plugging in a phone was not doing 'work' for Article 17 purposes." (Brief, p. 12). Strongin found that "customer self-installation is not an 'assignment of work' by the Company." (Decision, p. 4). Self-installation of set top boxes falls into the same category.

The Company further argues "self-installation has been the 'established policy' since the inception of FiOS TV service in Pennsylvania." Moreover, "bargaining-unit technicians have never exclusively installed set top boxes" as Arbitrator Gorman found when he rejected the claim that "assignment 'was very much mixed'...." (Decision, p. 20).

A set top box is not a "communications facility" in the Company's view. That is "because equipment residing on the customer's side of the demarc is customer premise equipment, not communications facilities." It points to the Aiges Decision (AAA 14 300 0295, p. 22, denying "Article 17 applies to 'every inch of cable ... on the [customer's side of the demarc point]."  It also cites the Gorman Decision (p. 13), holding that Article 17 does not apply to "wire ... being installed *on the customer's side* of the demarc point. (Emphasis in the Brief). "In the FiOS network, the demarc is the ... ONT." "The set top box ... is customer premise equipment, not a communications facility in the Company's network" and is therefore, "not covered by Article 17." The Company points to the Aiges Decision, specifically that "the Company was '*obliged* to establish a ... network point of demarcation – the 'demarc point' – at each customer's premises'." (Brief, p. 15).

In the Company view, "a set top box is not 'maintained' or 'operated' by the Company." It cites the Gorman Decision on customer's inside wiring's "interconnection" "with the Company's network so that sound and data may be transmitted [to the customer]." That interconnection "cannot ... bring that wire

17

within the coverage of Article 17...."

As to the alleged violation that occurs when Verizon mails a set top box to customers for self-installation, the Company relies on a number of factors. First, "the delivery of equipment by mail for customer self-installation purposes is a long established practice at Verizon Pennsylvania." It has been a practice for FiOS since 2007. Further "the use of mails in connection with customer self-installations was well established decades prior to that." (Brief, p. 17). It notes DSL kits sent out in 1998 and loaner phones under the Guardian Plan in the 1980s.

As to the practice, the Company concludes, the "short window between the time [it] introduced FiOS TV service in Pennsylvania ... and" 2007 when it began to "use the mails to deliver set top boxes and other equipment to customers for self-installation purposes" proves that mailing is an established practice.

The Company distinguishes the Galfand Decision "protecting technicians' delivery of telephones" as contrary to holdings by other arbitrators, including Strongin. In any event, "it is undisputed that Verizon Pennsylvania has been mailing customers telephones under the Guardian Plan since 1985 (three years after Arbitrator Galfand's decision)."

The Company reiterates that "a set top box is not a facility for purposes of Article 17." "Equipment can be a facility only if it's part of the Company's network ... on the Company's side of the demark." Customers operate the set

top box. If maintenance is required on a set top box, it's sent out to a vendor." The Company does not maintain the set top boxes.

*Opinion of the Impartial Arbitrator*

There are several questions before the Board, all of which have been discussed over the years by various arbitrators when considering Article 17. In this case, the equipment is a FiOS set top box that is both initially installed and maintained on an ongoing basis by bargaining unit employees. The question is whether there was an established policy in effect at the time of the change as to assignment of the installation or maintenance work and the delivery of the equipment. Further, the work to be done must be on or associated with a communications facility.

The record evidence confirms the Union's claim that bargaining unit members were assigned to deliver the set top boxes that they installed beginning when the service (FiOS) was implemented. Service technicians have also swapped out set top boxes and maintained them as described in the testimony. In both cases, when installing or swapping out set top boxes, technicians carried the equipment they needed with them, including a variety of set top boxes.

The Union filed this grievance shortly after confirming that the Company was drop shipping the set top boxes to customers. Therefore, there was an

established practice that technicians who were installing new service carried set top boxes with them and those who were exchanging, upgrading or swapping out existing set top boxes brought them along to the premises. While the Union views any work, even that done by a customer, on a set top box as bargaining unit work, the issue before us is whether contracting out the delivery of set top boxes to common carriers violates Section 17.01.

As to what customers may do and with regard to what equipment, it is clear to a majority of the Board that customers have options as to both delivery and installation. Some equipment can be picked up from the Company and customers can install various equipment themselves or have a Company technician do it for a fee.

Is the set top box a communications facility? A majority believes it is. Nothing in the record proves that set top boxes are not communications facilities or that its location with respect to the NID is dispositive (of who owns it or who may perform work on it). The set top box is, as the testimony confirms, an integral part of the FiOS network, which cannot function fully without the set top box. Work performed installing a set top box is doing work in connection with that communications facility.

Although the Company claims it does not own the set top boxes, the evidence is to the contrary. There are several bases for finding that the Company is the owner. The boxes, with a Company logo on them, are sent out to customers at the Company's direction. The customer, who pays rent to the

20

Company for the use of the box, does not own the set top box. Neither does the vendor, who is compensated by the Company for the cost of mailing the boxes.

The Company's focus on customer self-installation of set-top boxes is misplaced. The Union's focus is on the delivery of set top boxes to existing customers by common carrier. When Mr. Reamer was asked if the Union is "challenging the customer's actual installation or setting up the box in their home," he said, "**What we are challenging is** the fact that the Company is **utilizing an outside vendor ... and sending it through common carrier** to [the customer who installs it]. [That is] bargaining unit work." (Tr., p. 60). Prior awards have confirmed that self-installation by a customer does not amount to contracting out bargaining unit work.

A majority of the Board concludes that the set top box is a communications facility that is owned, operated and maintained by the Company. The question of customer self-installation of certain equipment, including modular telephones, etc. has long been settled. Delivery is another matter. Perhaps the most germane of the awards cited by the parties is the Galfand Award, which the Company asserts was wrong when it was issued and which, it observes, contradicts the Strongin Award.

Case No. 14300 1878 79, (Strongin, 1980) cited by the Company, deals with "having customers, rather than Company employees, install, attach, 'hook up' various items of equipment, and by mailing, rather than having Company employees deliver, telephone cords to customers. (Emphasis added, Opinion,

21

p. 1). The Strongin Board decided Section 17.01 "does not apply to the installation by a private customer of equipment [that] he has purchased from the Company." Further, "with respect to the alleged 'contracting out' to the postal service, the majority of the Board is of the view that the delivery of cords was merely incidental to the installation, and as the Company is no longer routinely engaged in installing these cords, it is under no obligation to use bargaining unit personnel to deliver them." (Id., p. 4). The latter point does not apply here because Company technicians continue to install some of the set top boxes rented out to customers. The Company is still having technicians install set top boxes. When that occurs, delivery of a box is not incidental.

The Galfand Board in 1430 2121 80 took issue with Strongin's decision, in part, because the last sentence quoted above is "the only reference … concerning [Strongin's] reasons for upholding the propriety of the Company's use of the mail to deliver cords for modular telephones." (Id., p. 5). He also observed, "Strongin distinguish[ed] the Gill case only [as to] customer installation." He did not comment on the "mailing of cords to customers.…" (Award, p. 7). Galfand declined to rely on the Strongin conclusion as to delivery.

Galfand gives considerable attention to delivery. "Although both Seitz and Bloch speak in terms of the 'ancillary' or 'incidental' aspects of delivery to installation by trained employees … they were deciding only whether customers could be substituted for employee delivery and not whether an

22

outside contractor or its employees may be so substituted." There was no argument before Galfand "that delivery as such is not 'work in connection with the installation and maintenance of communications facilities owned, maintained and operated by the company'." (Id., p. 11).

Galfand also discussed the Stone Award (1430 0897 75), which deals with "the subject of 'delivery' as a job function, in and of itself...." (p. 11). Stone "rejected the Company's argument that the delivery involved none of the craft skills [that] were an integral reason for the relatively high rate of pay they enjoyed." Galfand expressed the opinion that "delivery itself, as a component of the bargaining unit's work, is subject to the protection of Section 17.01 against contracting out to others." The function of delivery is part of the job. (Id., p. 12). He did not intend to disrupt or dilute the Seitz or Bloch awards that held, "transportation from and to a Phone Store by a customer" does not violate the Contract. "Such an activity by a Company-paid outside contractor, which UPS clearly is and which the US Postal Service clearly is, does violate Section 17.01." (P, 18).

When the Company began shipping boxes in 2007, the existing practice was that technicians delivered the set top boxes. Technicians continue to carry set top boxes for delivery when there is a new install or when a customer opts to have a technician swap out and reinstall a set top box. A technician may also diagnose a malfunction and install a new box for a customer. They work on downloading and other aspects of solving set top box problems. We

23

conclude that mailing set top boxes is different from the customer picking up the set top box from a Company location because the customer is not a contractor. But employees of other employers who do the delivery work as part of their jobs, are getting the advantage of work that is protected by Section 17.01. Therefore, the Company must cease and desist from mailing the product to customers when the Company is to provide the installation or maintenance on a set top box.

The remaining question is what should be the monetary remedy for the breach. There is no record evidence by which to assess how often the Company sent out set top boxes to existing customers who wanted a different box that they did not want to install themselves. In the opinion of the impartial member of the Board, this should be the subject of further discussion among the Board before the final award issues.

A majority of the Board concludes the remedy issue should be referred back to the parties for resolution. The Board will retain jurisdiction in the event the parties cannot agree on what the monetary remedy shall be.

## AWARD

The grievance is granted. The bargaining unit employees who have been denied the opportunity to perform the delivery work in question are entitled to compensation. The Company is directed immediately to cease and desist from delivery of set top boxes by anyone other than Local 13000 bargaining unit members, except pursuant to agreement with Local 13000. The Board of Arbitration named above shall retain jurisdiction in the event that the parties are unable to agree on the monetary remedy.

By:

Barbara Zausner, Impartial Arbitrator

July 7, 2016

Michael P. Davis, CWA Arbitrator

July 11, 2016

✓Concur                Dissent

Paul LoConte, Verizon Arbitrator

Concur          ✓Dissent

\* See Attached  Dissenting Opinion.

25

IN THE MATTER OF ARBITRATION
BETWEEN

VERIZON PENNSYLVANIA INC.

- and -

COMMUNICATION WORKERS OF AMERICA

Verizon Case No. 0052-08

CWA Case No. 13-2008-058V

### Dissenting Opinion of Verizon Arbitrator Paul A. LoConte to the July 7, 2016

### Opinion and Award

Verizon Pennsylvania, Inc. agrees with the panel majority's conclusion (Maj. Op. at 21) that "[p]rior awards have confirmed that self-installation by a customer does not amount to contracting out bargaining unit work." That, unfortunately, is the limit to what the majority correctly decided in this case. For multiple reasons, the Company respectfully dissents.

First, the majority framed the issue actually before the panel too narrowly and, most disturbingly, decided issues that were never placed before it.

On the one hand, the majority erred with its suggestion that this case had nothing to do with "customer self-installation of set top boxes." (Maj. Op. at 21 asserting that the Company's "focus on customer self-installation of set-top boxes" during the proceedings was "misplaced," and asserting that the Union's challenge was limited to "the delivery of set top boxes to existing customers by common carrier").) That is simply incorrect. The act of customer self-installation was something that the Union always challenged, from the very inception of this case. In its initial grievance, for example, the Union complained that the Company was "offering customers a self-installation process." (Jt. Ex. 2 (claiming that "all work associated with the set top box must be performed by CWA members").) In demanding arbitration, the Union styled the case as involving the "Contracting [of] Set [T]op Video Box to Customer." (Jt. Ex. 3.) Likewise, Union witness Jeff Reamer repeatedly confirmed that customer (as opposed to technician) installation of set top boxes was a main component of the Union's case:

> We are challenging the delivery, circumventing the bargaining unit, and not having a Local 13000 technician go out, deliver, and install and/or swap out that box.

(Tr. 59:15-18 (Reamer) (emphasis added); *id.* at 60:1-11 (testifying, in response to question about whether customers are permitted to set up boxes in their own homes, that "We believe that that facet of it is bargaining unit work.").) Moreover, as noted above, the majority reaffirmed that customer self-installations do not violate Article 17. (Maj. Op. at 21.) For the majority to nevertheless suggest that self-installations were not at issue is belied by the record.

Not at issue, however, was "mailing the product to customers when the Company is to provide the installation or maintenance on a set top box." (Maj. Op. at 24.) To the contrary – and as framed by the Union's grievance, the Union's statement of the issue, and the parties' entire course of conduct in the matter – processes associated with technician installations had absolutely nothing to do with this case. Nevertheless, the majority wonders (*id.*) why "[t]here is no record evidence by which to assess how often the Company sent out set top boxes to existing customers who wanted a different box that they did not want to install themselves." The answer is that the case had nothing to do with that, and the majority's decision to address an issue not put before it was plain error.

Second, the majority errs with its conclusion (Maj. Op. at 23) that "[w]hen the Company began shipping boxes in 2007, the existing practice was that technicians delivered the set top boxes." To begin with, the majority once again asks the wrong question. That is, the majority asked whether technicians had ever delivered set top boxes in any circumstances (including, most obviously, in situations in which they were to perform installation work). But the question that the majority should have considered is whether there was an established and exclusive practice of technicians delivering boxes for customer self-installation. Pointedly, no such practice has ever existed. The Union presented no evidence that any of its members have ever delivered FiOS equipment to customers for purposes of self-installation. In fact, technicians do not act and never have acted as delivery drivers for customers who wish to perform self-installation of FiOS equipment (or DSL equipment, for that matter).

Moreover, contrary to the majority's suggestion, the Company did not have any established practices with respect to FiOS TV service or set top boxes in 2007. This is because, as the undisputed evidence demonstrates, those practices were still in development in 2007. FiOS TV service then was brand new. The Company did not begin offering FiOS TV service or employing set top boxes in Pennsylvania until late 2006.[1] As of 2007 there were only a couple hundred FiOS TV customers in the Commonwealth. In short, the technology was still in its infancy at the time the Company began mailing set top boxes to customers for self-installation, and the practices associated with set top box installation had not been settled.

Third, the majority's conclusion (Maj. Op. at 20) that a set top box is a communications facility because it is "an integral part of the FiOS network" is wholly unsupported. It is undisputed that FiOS network ends at the NID/ONT (a/k/a demark), and it is equally undisputed that set top boxes reside on a customer's side of the NID/ONT. The majority's remark (*id.*) that FiOS cannot "function fully without the set top box" does not change any of this. To illustrate: a customer cannot receive FiOS TV service without a television, but this does not convert the television into a component of the Company's network or give the Union some sort of claim that its members should now be delivering TV sets to customers.

Fourth, the majority's conclusion (Maj. Op. at 21) that set top boxes are "maintained by the Company" is misplaced. The majority apparently believes that the Company's uploading of software to set top boxes constitutes maintenance for Article 17 purposes. The record does not support that conclusion – at most it establishes that the Company uploads software to set top boxes on an automated basis – but ultimately it is beside the point. Article

---

[1] On cross, Jeff Reamer recanted his contrary testimony that delivery of set top boxes began 2004 or 2005, which would have been impossible since there was no FiOS TV service in Pennsylvania at that time.

17 is in play only if a communication facility is <u>exclusively</u> owned, operated <u>and</u> maintained by the Company. Here, however, the undisputed evidence is that set top boxes are sent to contractors for repair when there are issues with them, and thus it is undisputed that maintenance of set top boxes is not exclusive bargaining unit work. (Tr. 66:7-8 (Reamer); *see also* Tr. 93 ("The actual repair to the set top box itself, if it's deemed to be repaired, repairable, it would be repaired by the manufacturer who provided them or manufacturer agent.").) Thus, even if a set top box were a communications facility for Article 17 purposes (which it is not), and even if the Company did have established practices with respect to set top box installation as of 2007 (which it did not), the Union's claim under Article 17 would still fail at the threshold.

In sum, the majority's opinion is unsupported by the record in this case, and it reflects a manifest disregard of the parties' collective bargaining agreement. For this reason, the Company respectfully dissents.

Dated: July 21, 2016

_____
Paul A. LoConte
Verizon Arbitrator

# EXHIBIT C

**SUPPLEMENTAL AWARD on the REMEDY**

In the Matter of the Arbitration

between

**VERIZON PENNSYLVANIA, INC.**

and

**COMMUNICATIONS WORKERS OF AMERICA
DISTRICT 2-13**

CWA Arbitration No. 13-2008-058V
Verizon Case No. 0052-08
Supplemental award on remedy

BEFORE a tri-partite Panel:

Barbara Zausner, Impartial Arbitrator
Craig W. Brewster replaced Paul LoConte as Verizon Arbitrator
Michael P. Davis, CWA Arbitrator

SUPPLEMENTAL AWARD DATED: January 22, 2018

APPEARANCES

Jones Day
Attorneys for the Company
By, E. Michael Rossman, Esq.

Willig, Williams & Davidson
Attorneys for the Union
By, Nancy B. G. Lassen, Esq.
    Danielle K. Newsome, Esq.

1

**ISSUE**

What shall be the remedy for the Company's breach of Article 14.01?

On July 7, 2016, the Board of Arbitration issued an opinion in this matter in which we reserved jurisdiction over the remedy. The terms of the Award are as follows:

> The grievance is granted. The bargaining unit employees who have been denied the opportunity to perform the delivery work in question are entitled to compensation. The Company is directed immediately to cease and desist from delivery of set top boxes by anyone other than Local 13000 bargaining unit members, except pursuant to agreement with Local 13000. The Board of Arbitration named above shall retain jurisdiction in the event that the parties are unable to agree on the monetary remedy.

The parties were unable to agree on a remedy and returned the question to the above-named Arbitrators. We held hearings on August 9 and September 12, 2017. We closed the record on receipt of the parties' post-hearing briefs.

**DISCUSSION AND OPINION**

*Positions of the Parties*
*Union*

According to the Union, after the issuance of the initial Award in this matter, Verizon refused to return the disputed work to the bargaining unit and initially declined to discuss the remedy issue. After the Company's appeal to the US District Court for the Eastern District of Pennsylvania was dismissed,

2

the parties held a discussion over remedy that "was fruitless."[1] Thereafter, the remedy issue was returned to the Panel for a decision. On January 5, 2017, the Company raised the defense of laches for the first time.

The Union cites the award on the merits arguing, it is "amply clear that both the 'assignment of the installation or maintenance work and the delivery of the equipment' were at issue." The majority found that an established policy for the assignment of the work was in effect. Under the practice, "Services Technicians who were installing new service carried set top boxes with them and those who were exchanging, upgrading or swapping out existing set top boxes brought them along to the premises." (Quoting from the award).

The exception for instances where customers pick up equipment from Presence Centers and bring it home is noted. Therefore, the Union claims, if the box did not arrive at the premises of the customer, "then delivery and necessarily the work associated therewith is bargaining unit work." "The Union's emphasis has been on delivery because delivery is the 'gatekeeper' act from which one can determine whether a customer can install or maintain (including swap or upgrade) the set top box."

The Union "believes that the Award's cease and desist order is clearly meant to preclude the Company from delivering set top boxes to customers for any reason, and thereby defines the scope of the bargaining unit's protected work jurisdiction: given the work assignment protected by Article 17.01, the

---

[1] Quotes in the "Positions" section are from the parties' Remedy Briefs.

only 'option' for customers to install, swap, upgrade and otherwise maintain set top boxes is the one that existed when the grievance was filed; i.e., when customers pick up the box themselves from a Company location and deliver it to the premises."

The Union argues the "supplemental award must restore the delivery, installation and maintenance of set top boxes to services technicians" because the Company violated Article 17.01, "an extremely strong and unambiguous work preservation clause," which reserves the work at issue. Under the established policy, that "Services Technicians delivered set top boxes to customer premises" ... and then "perform[ed the] installation and maintenance work," the assignment must be restored to the Services Technicians.

Verizon has, since April 2017, "hired persons into an empty ... job title, Assistant Technician, solely to deliver set top boxes for customer self-installation." The Union notes the Assistant title never performed the "protected" work. Assistant Technicians cannot perform the full range of duties. Specifically, this Panel should direct the Company that, "unless the customer obtains the box from the Company and brings it to the premises, the Company's delivery of set top boxes, and the installation or maintenance (including swaps and upgrades) of those boxes must be performed by Services Technicians, absent further agreement with the Union."

The Union further argues, "the supplemental award should direct a monetary remedy that accounts for the bargaining unit's missed work

opportunities." A monetary remedy generally is imposed by arbitrators where the issue is the improper assignment of bargaining unit work. "In this case, only a monetary remedy suffices to make the Union's bargaining unit whole ...." "When, as here, the exact amount of monetary damages is difficult to discern, the arbitrator should make a reasonable approximation based on the available facts and circumstances."

The Union cites record testimony about "the specific tasks involved in the work and the amount of time necessary to complete each step;" that is, approximately two hours per job. The Company agreed it "takes approximately 1.8 hours per job when a Services Technician is sent to complete a job after a customer decides not to continue with a self-installation." (Tr 9/12/17, 115, C-13). That estimate "would not include the time a technician spends at the garage work center" before and after the shift.

The Union also quotes testimony of Gregory Bream, a Company witness, that "FiOS Services Technicians are only able to complete between two and three jobs during each full work shift." The Union concludes "it takes approximately one and a half hours after arriving on site until the average residential set top box service is completed in working order." On this point, the Union concludes, "the two hour per job estimate is ... an underestimate...."

As to the rate to be employed, the Union contends the "remedy should be calculated at overtime rates." It points to contract language that "guarantees full time work to all Services Technicians." Those employees have

had full time work throughout the period of the grievance. Citing arbitral precedent, the Union asserts an award calculated at overtime rates is "the standard measure of damages." Arbitrators Rubin and McDermott, in cases between these parties, both imposed remedies at overtime rates. Had Services Technicians, who were all fully employed at the time they performed the work at issue, they would have done so on overtime.

In the Union's view, "the Company's argument for "a lesser remedy" misconstrues the Award, which, the Union claims, "encompasses only the discreet act of taking set top boxes to customer premises, and even then that a monetary remedy is owed only when the customer requested a 'truck roll' after receiving the shipment." The Arbitration Panel credited the Union's testimony on what established policies were in place when the grievance was filed. The Board "directed the Company to return the protected work assignment to the affected bargaining unit members (Services Technicians), by ordering the Company to stop drop-shipping set top boxes to customers in Local 13000's jurisdiction."

As Union Exhibits 20 and 21 show, Verizon "made over a million shipments to customers in Pennsylvania containing nearly one and a half million set top boxes."

The specific elements of relief the Union seeks are as follows:

1) The Company should be directed to return to Services Technicians in the Local 13000 bargaining unit the work that the Panel has found to

6

be protected by Article 17.01 of the Agreement as follows: except where a customer has retrieved and delivered the set top box(es) to the premises from a Company location, the delivery, installation and maintenance (including swaps and upgrades) of set top boxes within the territorial limits of the Commonwealth of Pennsylvania.

2) In light of the Company's conduct subsequent to the issuance of the Panel's Award (i.e., refusing to restore the protected work jurisdiction and assigning Assistant Technicians) the cease and desist order should be revised, and restated as follows:

Except where a customer has retrieved and delivered the set top box(es) to the premises from a Company location, the Company is ordered to cease and desist from assigning the delivery, installation and maintenance (including swaps and upgrades) of set top boxes within the territorial limits of the Commonwealth of Pennsylvania by any persons or through any means other than Services Technicians in the CWA Local 13000 bargaining unit (or such other bargaining unit classifications as may be agreed to by the Union).

3) A monetary remedy in this matter should be directed, to compensate these employees, and to deter future violations of Article 17.01. The remedy requested consists of: the number of set top box shipments and deliveries to Pennsylvania customers (other than by customers themselves, and including deliveries made by Assistant Technicians), from the date of the grievance until the Company returns the disputed work to the bargaining unit Services Technicians, multiplied by two overtime hours per delivery at the applicable top step wage rate. This sum must be equitably distributed by the Company to Services Technicians employed in Pennsylvania since the filing of the grievance within ninety (90) days after the date of the Supplemental Award. Within thirty (30) days after the issuance of the Supplemental Award, the Company shall submit its calculations of the back pay amount and distribution list to the Union for review and approval. (FN) [2]

Finally, but not least, the Panel should retain jurisdiction over implementation of the remedy.

*Company*

---

[2] FN in the Union's Remedy Brief: "The Company is in possession of all data to calculate the exact back pay amount. At this time, based on data sources supplied by the Company to date (Attachment 1 (U-21, U-21a), AT LEAST 1,069,964 SET TOP BOX SHIPMENTS, CONTAINING 1,373,486 or more set top boxes, were improperly shipped by Verizon to Pennsylvania customers from 2008 – 2017."

In the Company's view, and because "the Company has complied fully with the Panel majority's injunction..., Verizon has ceased all common-carrier set top box deliveries in Pennsylvania – and so the question now before the Panel and the parties is what additional monetary remedy (if any) the Panel should award. Under the Company's interpretation of the Majority's opinion, central holdings are that customer self installation is not subcontracting and that the Company was directed to "cease and desist from delivery of set top boxes by anyone other than Local 13000 bargaining unit members." Verizon has "complied fully" with that injunction. It also reads the award to limit "potential monetary damages" to "the amount of lost time (if any) that a Services Technician incurred when installing a replacement or upgraded set top box at an existing customer's request" after the box had been delivered by common carrier.

Verizon takes issue with various other aspects of the Majority's opinion. Because these matters were disposed of the initial decision, we have not reconsidered them here.

The Company reviews a number of arbitration decisions that discuss what remedies appropriately may be imposed. None of the cited awards relies on the same contract language at issue here, nor does any involve these parties. Another limiting factor, the Company asserts, is that there is "no evidence that any identifiable bargaining unit member was terminated, laid off, demoted, transferred, or otherwise subjected to adverse consequences ...." It

reiterates, "the Union's extreme delay in prosecuting this matter [constitutes] a textbook case for the application of laches."

Arguing that the Panel "should maintain its stated framework for damages," the Company claims "little to no monetary relief should be awarded." The Company observes, only "in a limited number of cases – roughly 7.8% of self-installation orders – [did] a customer who initially requested self-installation later request a technician to complete the installation." The Company also contends it did not return delivery to Services Technicians "because they never had it." Delivery is not the sort of skilled work that classification performs.

The Company's laches defense is based upon the fact that after April 7, 2008, when the "Union issued a timely arbitration demand" "the grievance sat for years." The Union controls which cases are scheduled for arbitration. Hearings on the merits of this case began on December 10, 2015, more than seven years after the demand was filed.

After the issuance of the initial award in this case, the Company decided to use Assistant Technicians, a bargaining unit position, to replace shipping by common carrier. "The Company concluded that it made absolutely no business sense to use Services Technicians to perform routine deliveries of set top boxes to self-installation customers ...."

The Company asserts "the Union bears the burden with respect to damages." In its view, "monetary damages are warranted only where the Union

proves that particular employees suffered a 'monetary loss sustained as a result of the breach'," (Quoting from Harbison Walker, a published award). "The amount of time that Services Technicians lost in instances in which they installed set top boxes for existing customers who had previously had boxes shipped to them is *de minimis.*"

### Opinion of the Majority

Article 17, "Contract Labor," Section 17.01 provides:

> The Company will maintain its established policies as to the assignment of work in connection with the installation and maintenance of communications facilities owned, maintained and operated by the Company.

In our initial decision on the merits of the dispute, a majority of the arbitration board concluded "there was an established policy in effect at the time of the change as to the assignment of the installation or maintenance work and the delivery of the equipment." The work was performed by Services Technicians. We also found that the work at issue was associated with a communications facility owned, maintained and operated by the Company. Those facts are the underpinning of the decision. Services Technicians delivered the boxes they were to install, as well as those needed for replacements or swaps, when FiOS initially was implemented. Services Technicians also carried (i.e., delivered) the equipment they needed when installing or swapping out boxes, including set top boxes and ancillary

equipment. Therefore, we found that the Company violated Article 17 and the Union is entitled to a remedy. We asked the parties to attempt to agree on the remedy and it was understood that if they failed to do so, the Panel would determine what it should be.

The work at issue -- that is, the bargaining unit work that Services Technicians were deprived of when Verizon shipped set top boxes to customers -- includes delivery of the boxes (unless the customer has obtained one from a Company facility) and installation of set top boxes to be installed or swapped out.

The Company premise, that it has "complied fully with the Panel's major injunction," misstates the terms of the award. Given that specific employees, Services Technicians, lost work to which they were entitled under the Contract when the Company began drop shipping set top boxes, the Company's use of Assistant Technicians instead of outside carriers does not resolve the issue. The work belonged to Services Technicians.

We agree with the Company that there is no firm basis for awarding pay at overtime rates. The grievants (Services Technicians) did not lose income as they were fully employed at the time. The record does not support a finding that the remedy should be at overtime rates but it should be calculated at the top straight time rate.

We dismiss the Company's laches defense for two reasons. First, the filing of the grievance put the Company on notice that the Union viewed the

11

Company's shipping set top boxes as a violation of Article 17. The Company was free to ignore the notice but the Union's failure to bring the case more quickly to arbitration did not prejudice the Company. The Union has the right to determine the order of cases that go to arbitration, a fact of which the Company was aware throughout the grievance processing. So far as this record reveals, the Company made no effort to speed up processing of this case.

The record supports imposition of the following portions of the Union's proposed remedy and we so award.

## AWARD

The Company is directed to return to Services Technicians in the Local 13000 bargaining unit the work that the Panel has found to be protected by Article 17.01 of the Agreement as follows: except where a customer has retrieved and delivered the set top box(es) to the premises from a Company location, the delivery, installation and maintenance (including swaps and upgrades) of set top boxes within the territorial limits of the Commonwealth of Pennsylvania.

Except where a customer has retrieved and delivered the set top box(es) to the premises from a Company location, the Company is ordered to cease and desist from assigning the delivery, installation and maintenance (including swaps and upgrades) of set top boxes within the territorial limits of the Commonwealth of Pennsylvania by any persons or through any means other than Services Technicians in the CWA Local 13000 bargaining unit (or such other bargaining unit classifications as may be agreed to by the Union).

A monetary remedy in this matter is directed to compensate these employees and to deter future violations of Article 17.01. The remedy requested consists of: the number of set top box shipments and deliveries to Pennsylvania customers (other than by customers themselves, and including deliveries made by Assistant Technicians), from the date of the grievance

12

until the Company returns the disputed work to the bargaining unit Services Technicians, at the straight time rate of two hours per delivery at the top step wage rate. This sum must be equitably distributed by the Company to Services Technicians employed in Pennsylvania since the filing of the grievance within ninety (90) days after the date of the Supplemental Award. Within thirty (30) days after the issuance of the Supplemental Award, the Company shall submit its calculations of the back pay amount and distribution list to the Union for review and approval.

The Company is in possession of all data to calculate the exact back pay amount. At this time, based on data sources supplied by the Company to date (Attachment 1 (U-21, U-21a), at least 1,069,964 set top box shipments, containing 1,373,486 or more set top boxes, were improperly shipped by Verizon to Pennsylvania customers from 2008 – 2017.

By:

Barbara Zausner, Impartial Arbitrator

January 10, 2018

Michael P. Davis, CWA Arbitrator

Concur        Dissent

Craig W. Brewster, Verizon Arbitrator

Concur        Dissent